**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| _____ x | | |
| OKLAHOMA FIREFIGHTERS PENSION | : | Case No. |
| AND RETIREMENT SYSTEM, Individually | : | |
| and on Behalf of All Others Similarly Situated, | : | <u>CLASS ACTION</u> |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | COMPLAINT FOR VIOLATIONS OF |
| v. | : | THE FEDERAL SECURITIES LAWS |
| | : | |
| PEABODY ENERGY CORPORATION, | : | |
| GLENN L. KELLOW, and AMY B. | : | |
| SCHWETZ, | : | <u>DEMAND FOR JURY TRIAL</u> |
| | : | |
| Defendants. | : | |
| _____ x | | |

## INTRODUCTION

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Peabody Energy Corporation ("Peabody" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## OVERVIEW OF THE ACTION

1.     This is a securities class action brought on behalf of all persons or entities who purchased or otherwise acquired Peabody common stock from April 3, 2017 through October 28, 2019, inclusive (the "Class Period").  The action is brought against Peabody and certain of its officers and/or directors (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.     Peabody is currently the largest coal mining company in the world, with 23 coal mines throughout the United States and Australia.  One of its mines in Australia is the North Goonyella mine, which was acquired by Peabody in 2004 and through which the Company ships coal to customers in India, China and South Korea.  As of the start of the Class Period, the North Goonyella mine was considered Peabody's most profitable single operation.

3.     On April 3, 2017, the start of the Class Period, Peabody emerged from bankruptcy protection and reported record production output, while simultaneously touting the

Company's "record safety" achievements and its "ongoing commitment to ensuring safe, productive operations."

4.      Unknown to the market at this time, however, was that Defendants failed to disclose, and would continue to omit, the following adverse facts pertaining to the safety practices at the Company's North Goonyella mine, which were privately known to or recklessly disregarded by Defendants:

(a)      The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)      The Company failed to follow its own safety procedures; and

(c)      As a result, the North Goonyella mine was at a heightened risk of shutdown.

5.      The truth about Peabody's inadequate safety practices was revealed when, on September 28, 2018, a fire erupted at the mine, forcing Peabody to suspend operations indefinitely.  On this news, Peabody shares fell $5.54 per share, or 13.4 percent.

6.      Following the fire, Defendants assured the market that the Company had a feasible plan to remediate and reopen the North Goonyella mine, and that it would be able to extract significant coal at the mine in the near-term.  Unknown to the market at this time, however, was that Defendants failed to disclose, and would continue to omit, the following adverse facts pertaining to the feasibility of Peabody's plan to restart the North Goonyella mine:

(a)      The Company's low-cost plan to restart operations at the mine posed unreasonable safety and environmental risks;

(b)     The Australian body responsible for ensuring acceptable health and safety standards, the Queensland Mines Inspectorate ("QMI"), would likely mandate a safer, cost-prohibitive approach; and

(c)     As a result, there would be major delays in reopening the North Goonyella mine and restarting coal production.

7.      The truth about the feasibility of Peabody's plan to restart operations at North Goonyella was revealed through a series of disclosures.  First, on February 6, 2019, Peabody revealed that contrary to previous statements, production at the North Goonyella mine would not resume in 2019, but was instead now targeted to begin to ramp in the early months of 2020.  On this news, Peabody shares fell by $3.80 per share, or 10.6%.

8.      Second, on May 1, 2019, Peabody reported that it had received a directive from QMI which could lead to further delays and necessitate a re-evaluation of the Company's re-entry plan.  On this news, Peabody shares fell $1.61 per share, or 5.6%.

9.      Third, on July 31, 2019, Peabody reported additional delays to the reentry of North Goonyella, explaining that QMI's requirements had resulted in a slower rate of progress than Peabody's initial plan had contemplated.  As a result, Peabody suspended its 2020 production guidance at the mine and informed investors that it was reevaluating its entire reentry plan.  On this news, Peabody shares fell by $1.06 per share, or 4.8%.

10.     Fourth, on August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that Peabody had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation.  On this news, Peabody's stock fell $0.37 per share, or 2 percent.

11.     Finally, on October 29, 2019, Peabody disclosed that QMI was placing strict restrictions on restarting operations at the North Goonyella mine and that as a result Peabody was forced to drastically adjust the reentry plan, ultimately announcing a ***three year or more delay*** before any meaningful coal could be produced.  On this news, Peabody shares declined $3.56 per share, or 22 percent.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Peabody common stock trades on the New York Stock Exchange ("NYSE") located within this Judicial District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Peabody common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

16.     Defendant Peabody is a Delaware corporation headquartered in St. Louis, Missouri.  The Company's stock is listed on the NYSE under the ticker symbol "BTU."

17.     Defendant Glenn L. Kellow ("Kellow") was, at all relevant times, Peabody's President and Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors.

18.     Defendant Amy B. Schwetz ("Schwetz") was, at all relevant times, Peabody's Executive Vice President and Chief Financial Officer ("CFO").

19.     Defendants Kellow and Schwetz are sometimes collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Peabody's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

20.     Peabody and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Founded in 1883 and headquartered in St. Louis, Missouri, Peabody is currently the largest coal mining company in the world, with operations throughout the United States and Australia.  In total, Peabody owns and operates 23 coal mines.

22.     The Company's coal mines are organized into six business segments, the largest of which is the Australian Metallurgical Mining segment, within which Peabody owns and operates seven Australian mines.  Prior to the start of the Class Period, in 2016, the Australian Metallurgical Mining segment alone accounted for 23.1% of the Company's revenues.

23.     One such mine within the Australian Metallurgical Mining segment is the North Goonyella mine, which was acquired by Peabody in 2004.  The North Goonyella mine is an underground coal mine located in Queensland, Australia.  Coal from this mine is transported to ships at Australian ports for export to customers in India, China, and South Korea.

24.     According to *The Australian Financial Review*, the North Goonyella mine is Peabody's "most profitable single operation," [1] and in 2017 it generated approximately $100 million out of Peabody's total operating profit of $498 million, equaling approximately 20%.[2] In May 2017, Defendant Kellow conceded the importance of the mine, describing North Goonyella as a "high margin mine" that is the "core of [Peabody's] met coal platform."

25.     In excavating coal from the North Goonyella mine, Peabody uses a method called longwall mining.  This method utilizes heavy machines underground to cut large panels of coal, frequently up to 1,500 feet wide and two miles long.  Longwall mining often causes methane and other dangerous, flammable gases to linger underground, high concentrations of which often occur when production rates are high and longwall mining equipment is repositioned within the mine. This leaves the mine prone to spontaneous combustion events when the high concentrations of flammable gases come into contact with a heat source. As a

---

[1] Matthew Stevens, *Peabody rewrites the rulebook after wildfire at North Goonyella,* THE AUSTRALIAN FINANCIAL REVIEW (Mar. 28, 2019), https://www.afr.com/companies/mining/peabody-rewrites-the-rulebook-after-wildfire-at-north-goonyella-20190327-p51853.

[2] Matthew Stevens, *Peabody pondering life after its North Goonyella mine*, THE AUSTRALIAN FINANCIAL REVIEW (Oct. 16, 2018), https://www.afr.com/companies/peabody-pondering-life-after-its-north-goonyella-mine-20181016-h16pr8.

result, it is imperative that mines utilizing the longwall mining method implement adequate safety measures to protect against these risks, including, among others, ventilation systems, methane drainage methods, gas monitoring controls, and airtight seals.

26.     For this reason, Peabody's Board of Directors (the "Board") has a "Health, Safety, Security, and Environmental Committee" (the "Safety Committee") that is responsible for reviewing significant mine safety risks, policies, and performance with Peabody management.  In 2017, 2018, and 2019, the Safety Committee held 8, 9, and 6 meetings, respectively.

27.     On April 13, 2016, after a multi-year decline in coal prices that strained Peabody's ability to service its $8.8 billion debt load, the Company filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and Peabody's stock was delisted from the NYSE.  A year later, on April 3, 2017, Peabody announced that it had emerged from bankruptcy and that its stock would begin trading again on the NYSE.

28.     Following its emergence from bankruptcy, Peabody was faced with a fragile economic situation including a high debt load, and thus was motivated to produce high amounts of coal while cutting safety costs in order to boost the Company's profit.

**Materially False and Misleading Statements**

29.     At the beginning of the Class Period, the North Goonyella mine reported record production output.  While Defendants touted these results, they misled investors about the sustainability of North Goonyella's coal production by failing to disclose that Peabody's inadequate safety measures had put the mine at a heightened risk of complete shutdown.

30.     The Class Period begins on April 3, 2017.  On that date, Peabody announced that it had emerged from bankruptcy protection and that its stock would begin trading again on the

NYSE under the ticker symbol "BTU."  In conjunction with that announcement, Peabody further declared that: "In the past year, Peabody has reduced debt by more than $5 billion from pre-filing levels at March 2016.  In addition, ***Peabody achieved record safety this past year***; protected jobs; served global customers; reduced costs and built cash and liquidity; strengthened the Australia platform; accelerated coal mine restoration; provided third-party bonding assurances; and was recognized globally for sustainability."

31.     On May 4, 2017, Peabody reported positive financial results for its first quarter 2017.  Peabody reported that its revenue had increased 29 percent to $1.33 billion over the first quarter 2016, and that its net income increased $287.2 million to $122.1 million, the highest net income in nearly five years.  The Company also reported that its adjusted EBITDAR increased $304.9 million to $390.0 million.

32.     Defendant Kellow was quoted in the first quarter 2017 earnings release stating that following the Company's emergence from bankruptcy, "The emerged Peabody is proceeding with a new balance sheet, improved industry fundamentals and a sharp focus on creating value. . . .  This focus begins with ***an emphasis on safe and productive operations*** that are constantly working to move down the cost curve; carries forward with intense management of both the asset and liability side of our balance sheet; and extends to our financial strategies that are aimed at prioritizing higher returns for shareholders."

33.     On the same date, Peabody hosted a conference call with analysts and investors to discuss the Company's results.  At the conclusion of that call, Defendant Kellow reiterated the Company's continued focus on safety at its mines, stating: "I would in closing like to extend my appreciation to our employees around the world for their ***ongoing commitment to ensuring safe, productive operations and continued delivery of value***."

34.    At the same time, in response to an analyst's question, Defendant Kellow reiterated the importance of the North Goonyella mine to Peabody's overall financial well-being, noting that "I think the high return is probably the key there.  And I've said we'd regard the coal or the met coal platform as being those high-margin mines in Coppabella on PCI and North Goonyella on hard coking coal.  So, I think the capital allocations and capital priorities and the ability to expand, I think our focus would first and foremost be around those mines with respect to capital."  He later repeated that those two mines are "what we believe two high quality, high margin mines in North Goonyella and Coppabella."

35.    On July 10, 2017, Peabody filed its 2016 Form 10-K/A with the SEC.  The 2016 10-K/A contained a section entitled "Risk Factors."  Among those provided, the Company included the following potential risk warning:  "Risks inherent to mining could increase the cost of operating our business."  Under the heading, the Company elaborated: "Our mining operations are subject to conditions that can impact the safety of our workforce, or delay coal deliveries or increase the cost of mining at particular mines for varying lengths of time.  These conditions include . . . *fires and explosions from methane gas* or goal dust."  The Company went on, "Despite our efforts, such conditions could occur and have a substantial impact on our results of operations, financial condition or cash flows."  This purported disclosure regarding the risk of fire and explosion from methane gas, was repeated in the 1Q 2017 10-Q, 2Q 2017 10-Q, 3Q 2017 10-Q, 1Q 2018 10-Q, 2Q 2018 10-Q and the 2017 10-K.

36.    On August 1, 2017, Peabody reported positive financial results for the second quarter 2017.  Peabody reported that its revenues had increased 21 percent to $1.26 billion from $1.04 billion and that its adjusted EBITDA increased $245.2 million from the same period in

the prior year to $317.9 million, led by the Australian platform, which outpaced U.S.

contributions and contributed an additional $181.6 million over the prior year.

37.     On the same date, Peabody hosted a conference call with analysts and investors

to discuss the Company's results, where Defendant Kellow acknowledged that "[o]perationally,

the second quarter marked the best six months of production over the past five years at the

North Goonyella mine."  Then, at the conclusion of that call, Defendant Kellow once again

reiterated the Company's continued focus on safety at its mines, stating that he "would like to

extend my appreciation to all our employees both at the mines and in offices for their ***continued***

***commitment to ensuring safe and productive environments***."

38.     On October 25, 2017, Peabody once again reported positive financial results for

the third quarter 2017.  Peabody reported that its revenues had increased 22 percent to $1.48

billion and that its adjusted EBITDA increased $281.1 million from the prior year to $411.3

million.  The press release quoted Defendant Schwetz as stating that "Peabody continues to take

aggressive actions to reduce debt and advance the shareholder return initiatives we outlined in

August."

39.     On the same date, Peabody hosted a conference call with analysts and investors

to discuss the Company's results, where Defendant Kellow claimed that: "Through all of our

actions, ***Peabody maintains constant vigilance toward safety***."

40.     On February 7, 2018, Peabody reported positive financial results for the fourth

quarter and full year 2017.  Peabody reported that revenues for the fourth quarter increased 5

percent over the prior year to $1.52 billion and full year 2017 revenues increased 18 percent

over the prior year to $5.58 billion, driven by, among other things, higher Australian

metallurgical and thermal coal pricing.  Peabody further reported that fourth quarter adjusted EBITDA increased $122.2 million over the prior year to $416.2 million.

41.     On the same date, Peabody hosted a conference call with analysts and investors to discuss the Company's results, where Defendant Kellow once again stated that: "At the operational level, ***our global safety performance continues to surpass industry averages***. While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  ***As always, we are ever vigilant on our journey of continuous improvement in safety***."  He later reiterated this point: "***As always, we begin with a focus on safe productive operations*** and return maximization."

42.     On February 22, 2018, during Peabody's Analyst and Investor Day, Defendants represented in an investor presentation that at the North Goonyella coal mine, "***Record safety results reflect 80% improvement since 2013***."

43.     On April 25, 2018, Peabody again reported positive financial results for the first quarter 2018.  Peabody reported that revenues for the first quarter rose 10 percent over the prior year to $1.46 billion and that adjusted EBITDA increased 7 percent over the prior year to $363.0 million.

44.     On the same date, Peabody hosted a conference call with analysts and investors to discuss the Company's results, where Defendant Kellow emphasized the Company and its employees' "***ongoing focus on safe productive work places***."

45.     In or around May 2018, Peabody published its 2017 Corporate and Social Responsibility Report, in which it stated that Peabody "***commit[s] to safety and health as a way of life***" and that "***Safety is Peabody's first value, integrated into all areas of our business***." The report went on to state that: "***A focus on improving culture and doing business better***

*lifted the North Goonyella Underground Mine to new records for performance in safety*, production and development in 2017."  The report further discussed a Peabody initiative called "Project Excellence," which "is Peabody Australia's cost and productivity improvement plan that *has driven initiatives critical to the platform's sustainability without compromising safety*, achieving 2017 savings of about $130 million.  The platform boasted *its best-ever safety performance* and reclaimed more than 1,200 acres of land."

46.     Similarly, the report included a letter from Defendant Kellow in which he stated, "*Peabody's global safety performance continues to surpass industry averages.  The Australian platform achieved a record safety year in 2017, and we remain ever vigilant on our journey of continuous improvement in safety*."

47.     On July 24, 2018, Peabody reported positive financial results for the second quarter 2018.  Peabody reported that revenues for the second quarter increased 4 percent over the prior year to $1.31 billion, and that adjusted EBITDA increased $51.8 million over the prior year to $369.6 million.

48.     On the same date, Peabody hosted a conference call with analysts and investors to discuss the Company's results, where Defendant Kellow once again emphasized the Company and its employees' "*continued focus on safe and productive workplaces*."

49.     In August 2018, in an Investor Presentation, Defendants stated that Peabody's "*[s]afety performance continues to outperform industry averages*," and that Peabody paid "*[s]trong attention to operational excellence by committing to safe workplaces*, maximizing resource recovery, improving environmental performance and restoring mined lands."

50.     On September 18, 2018, after Peabody had continuously touted its safety record at North Goonyella for over a year, *The Australian Financial Review* reported that work had

been suspended at the mine due to elevated methane and carbon monoxide levels.  According to

the report, "multiple sources have indicated that the coal is generating excessive levels of heat,

that this is the source of the gas accumulation and that management is uncertain why or where

this unanticipated burst of heat is coming from."  The report further explained that "[t]hose

same sources estimate that mine management has no more than two weeks to solve both issues

because a half-moved longwall 'cannot just sit down there for too long without moving.'"

51.     Peabody downplayed these concerns, with the report quoting the Company as

responding: "About 2 ½ weeks ago, an area of the North Goonyella mine began registering

higher gas levels, suggesting *modest* elevated temperatures and low-level oxidation of some

coal." However, the Company also stated that "[m]ine management quickly assessed the facts

[and] took appropriate steps," and further reassured investors that 2018 coal production volumes

would not be impacted by these operational issues, noting that "the company had been trending

to the upper end of its 2018 metallurgical coal sales volume targets, ***and those targets have not

been revised*.**"

52.     The next day, on September 19, 2018, Peabody issued Form 8-K noting that "the

[C]ompany is working toward resuming operations," and further repeating its statements to *The

Australian Financial Review*, above.

53.     Several days later, on September 25, 2018, Peabody issued another Form 8-K,

once again downplaying the significance of the issues at the North Goonyella mine and the

imminent risk of spontaneous combustion at the mine, stating that "***gas levels at its North

Goonyella Mine have been variable*** and remain elevated.  The company is working with the

Queensland Mines Inspectorate ("QMI") and third-party experts as we continue a progressive

plan aimed at reducing gas levels and accommodating a safe return to mining operations."

54.    The statements referenced in ¶¶ 30-53 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella mine, which were privately known to or recklessly disregarded by Defendants:

(a)    The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)    The Company failed to follow its own safety procedures; and

(c)    As a result, the North Goonyella mine was at a heightened risk of shutdown.

55.    Despite these attempts to downplay the operational issues at the North Goonyella mine, on September 28, 2018, Peabody issued a press release reporting that a fire was occurring within the mine and that as a result, the Company did "not expect any production from North Goonyella in the fourth quarter of 2018."  On this news, ***Peabody's stock fell $5.54, or 13.5 percent***, closing at $35.64 on September 28, 2018, down from the previous day's close of $41.18.

56.    In the immediate aftermath of the fire, an article by *The Daily Mercury* published on September 28, 2018 quoted a long-time underground operator at the North Goonyella mine as stating that employees had been told not to talk about the incident: "We're told 'don't talk to the media, don't talk to the media' but I think people have a right to know."

57.    Then, in an investor update on October 2, 2018, Peabody stated that the fire was mostly contained and that the Company would initiate a formal review of the fire with the involvement of independent third parties.  On October 11, 2018, Peabody further disclosed that

the QMI would commence a safety investigation into Peabody related to the events leading up to the North Goonyella fire.

58.     However, even after the fire and the announcement of both an internal and a governmental investigation, Defendants continued to mislead investors about the Company's plan to restart operations at North Goonyella, falsely assuring investors that the Company would be able to mine significant coal at the North Goonyella mine in the near-term, while continuing to conceal major issues that would impede any progress at the mine and which would ultimately cause QMI to reject its plans.  Specifically, Defendants' statements conditioned investors to believe that its low-cost plan to restart operations at North Goonyella was reasonable and had a high likelihood of regulatory approval, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks such that QMI would likely mandate a safer, more cost-prohibitive approach that would cause major delays in restarting the mine.

59.     On October 30, 2018, Peabody hosted a conference call with analysts and investors to discuss the Company's third quarter 2018 financial results, where Defendant Kellow convinced investors that Peabody would in fact be able to restart operations at North Goonyella.  He stated, "based on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella.  While we very much understand the concern, *based on what we know today, that conclusion is at best premature and at worst unwarranted*."  Defendant Kellow also informed investors that production in North Goonyella may restart in the second half of 2019.  Defendant Schwetz reiterated this point, noting, "*The company will take all steps to work safely, progress the plan and look to mitigate costs, while pursuing options for a resumption of activities at the appropriate time*."  On this news, Peabody's stock price increased by 3.4 percent.

60.     Analysts equated Defendants' reassurances regarding North Goonyella to the rising stock value, with J.P. Morgan reporting on October 30, 2018 that "[t]he market has warmed to Peabody's recovery plan for North Goonyella with the stock rising 4.7% compared with the S&P's +0.85 so far today.  As CEO Kellow suggested some investors seem to believe the mine was lost to a fire, and Peabody's plan shows that closure is neither the company's #1 or #2 scenario."  MKM Partners echoed this sentiment, stating that the "[u]pdate on North Goonyella [was] encouraging," as "[t]he base case goal it appears is to resume longwall mining in 2H19, which we view as positive news as the shares appeared to reflect a total loss assumption."

61.     However, just months later, on February 6, 2019, Peabody reported disappointing earnings for the fourth quarter 2018, weak Q4 2018 coal production, and a soft 2019 outlook due to remediation costs and lack of production at the North Goonyella mine.  At the same time, Defendant Kellow revealed that production at the North Goonyella mine would not resume in 2019, but was instead now targeted to "begin to ramp up in the early months of 2020." On this news, ***Peabody's stock fell $3.80, or 10.6 percent***, closing at $32.05 on February 6, 2019, down from the previous day's close of $35.85.

62.     However, Defendant Kellow continued to mislead the market regarding the likelihood that production at the mine would restart in the near-term, stating that: "While there is so much work ahead of us, ***our base case contemplates approximately 2 million tons of sales from North Goonyella in 2020***."

63.     Analysts bought this story, with Clarksons Platou Securities Inc. noting that even though higher-than-expected projected capital expenses and the anticipated costs of reopening North Goonyella weighed on Peabody's shares, "with that said, we view 2019 as a bit of a

transition year, given the headwinds at North Goonyella should subside by 2020." Credit Suisse further noted on March 20, 2019 that "Seaborne met volumes are suppressed in the near term, but recover in 2020," as "the return of North Goonyella . . . position[s] Peabody well to generate above mid-cycle EBITDA as the base business continues to perform well and volumes normalize in 2020."  It further reported that "we believe management has developed a solid plan of action going forward that has been well received by the market [and b]ased on our conversations with management, we are confident in Peabody's ability to execute on their plan going forward."

64.    On March 27, 2019, the Company issued a press release entitled "Peabody Releases Initial Learnings From North Goonyella Incident."  In that press release, Peabody concluded that the fire resulted from a planned longwall move and further admitted that its safety precautions were insufficient, stating that, as a result of the fire, Peabody was "making changes in systems, processes and training, where warranted, to put into place the improvements needed to successfully move forward from this incident."  These changes included improvements to ventilation controls, gas level monitoring, longwall relocation processes, and underground sealing methods.

65.    On May 1, 2019, Peabody issued a Form 8-K reporting positive first quarter 2019 earnings that met analysts' estimates.  At the same time, however, Peabody reported that it was "currently complying with a directive concerning documentation from the Queensland Mines Inspectorate, following a thorough review, which has resulted in a multi-week delay to the initial project plan."  The Company went on that "[i]f further delays occur, the company will re-evaluate its reventilation and re-entry plans, including longwall production targets, quarterly

project costs and capital expenditures." On this news, ***Peabody's stock fell $1.61, or 5.6 percent***, closing at $27.16 on May 1, 2019, down from the previous day's close of $28.77.

66.   Yet Defendants continued to mislead the market regarding the possibility of regulatory approval from QMI and the timeline for restarting the North Goonyella mine. In connection with the release of its first quarter 2019 financial results, Peabody hosted a conference call with analysts and investors, where Defendant Kellow stated: "Our focus at this point is working through that process, responding to their requests for information and then being able to – as I said, ***everything's ready to flick the switch and to be out to re-ventilate and that will enable this thing to monitor and then re-enter the mine and have a better assessment***." He further stated, "At that point we look to re-examine the overall timing and sequencing on the project plan, but just to reiterate, we're ready to go, so we're just working through that, what is a final part of the process . . . ***It's dotting the I's and crossing the T's around supporting documentation with respect to chisel-out procedures and protocols that are on the wrong side***." Defendant Schwetz reiterated this point, noting: "Related to North Goonyella, in the first quarter, ***we completed segmenting of the mine into multiple zones to facilitate a phased reventilation and reentry. In addition, all physical activities in advance of reventilating the first segment of the mine have been completed.***"

67.   Once again, analysts believed Defendants' statements. On May 1, 2020, J.P. Morgan reported that: "The company also reported that it is ready to re-enter the first portion of the North Goonyella mine but has been delayed as the Queensland Mine regulator reviews documents." Deutsche Bank reported on the same date that "North Goonyella undergoing multi-week delay due to Queensland Mines Inspectorate review, but guide of 2m st of production of 2020 remains unchanged."

68.     On July 31, 2019, Peabody issued a Form 8-K again reporting positive earnings for the second quarter 2019.  However, the Company reported additional delays to the reentry into North Goonyella due to QMI, stating: "Advancement during the recovery phase has been subject to the discretion of the regulatory authority, special protocols and substantial related administrative requirements, which has resulted in a far slower rate of progress than originally contemplated." As a result, Peabody suspended its 2020 production guidance at the mine and informed investors that it was reevaluating its entire reentry plan.  Defendant Kellow also announced that Peabody had hired an outside firm to evaluate its organizational structure.  On this news, ***Peabody's stock fell $1.06, or 4.8 percent***, closing at $21.06 on July 31, 2019, down from the previous day's close of $22.12.

69.     Analysts connected this stock drop to the news about North Goonyella, with J.P. Morgan reporting on July 31, 2019 that "we expect the North Goonyella news will dominate and depress the market's reaction to [other positive Company news]," and, later that day confirming, "[t]he market did not react well to Peabody's announcement of delays at North Goonyella."

70.     On the same date, however, Peabody hosted a conference call with investors and analysts to discuss its second quarter 2019 financial results, where Defendant Kellow once again touted the Company's progress in reentering the mine, stating: "Turning to North Goonyella, ***major progress has been made to-date including reventilation and re-entry of the mine***.  We've also learned a substantial amount since we commenced activities underground earlier this month."

19

71.     Analysts accepted this story, with Deutsche Bank noting on August 4, 2019 that "Key catalysts for the stock include . . . progress at North Goonyella where we expect the market has now rebased down, so any announcements could be positive."

72.     On August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that Peabody had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation. Specifically, QMI noted that all Peabody employees chose not to be interviewed by the agency. Among other things, the following observations were included in the report:

(a)     Review of the mine's records suggests that gas trends were not given sufficient consideration, which may have impacted the way in which [trigger action response plans[3]] were applied and actioned;

(b)     Some key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls do not appear to have been reviewed or countersigned by key personnel, as required under the mine's safety and health management system;

(c)     There is evidence that some boreholes located deep within the 9N goaf region were insufficiently sealed, allowing an ingress of oxygen into active goaves, with the potential to escalate conditions for spontaneous combustion; and

(d)     There is evidence to suggest the mine did not follow its own procedures relating to major ventilation changes.

73.     On this news, ***Peabody's stock fell $0.37, or 2 percent***, closing at $18.13 on August 9, 2019, down from the previous day's close of $18.50.

---

[3] A Trigger Action Response Plan ("TARP") is a list of documented and known mining hazards and set of actions that managers and supervisors must follow when these hazards materialize based on certain triggering events.

## THE TRUTH IS FULLY REVEALED

74.     On October 29, 2019, Peabody issued a Form 8-K reporting a third quarter 2019 loss of $0.88 per share, as compared with positive third quarter 2018 earnings of $0.63 per share, missing analysts' consensus expectations by more than 50 percent.  At the same time, Peabody disclosed for the first time that QMI's strict restrictions on restarting operations at the North Goonyella mine would result in a ***three or more year delay*** before any meaningful coal could be produced.

75.     During the subsequent earnings call, Defendant Kellow elaborated on this revelation, stating that: "Overall, we believe the highly restrictive approach from QMI has required a greatly disciplined approach from Peabody.  As such, we have identified a preferred path, which . . . represent[s] significant lower risk, the best path to return the regular way mining and maximizes the value of a mine with a potential life of several decades."  Defendant Kellow went on to explain that even the beginning steps of that new plan were still "contingent on obtaining pre-approval from QMI."

76.      On this news, ***Peabody's stock fell $3.56, or 22 percent***¸ closing at $12.48 on October 29, 2019, down from the previous day's close of $16.04.

77.     Analysts were taken by surprise, with Deutsche Bank reporting on October 29, 2019 that "[a]t North Goonyella, the company will now change its focus to the southern panels and ***does not expect material production for 3+ years now (vs an original plan of 2020)***."  It also stated that "[t]he next few quarters will likely be a further transition period for the company, with the additional work at North Goonyella."

## UNDISCLOSED ADVERSE FACTS

78.     The market for Peabody stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or

21

failures to disclose, Peabody common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Peabody shares relying upon the integrity of the market price of the Company's common stock and market information relating to Peabody, and have been damaged thereby.

79.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Peabody common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Peabody's business, operations, and prospects as alleged herein.

80.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made a series of materially false and/or misleading statements about Peabody's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

81.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

82.     The Individual Defendants permitted Peabody to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

83.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Peabody, their control over, receipt, and/or modification of Peabody's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Peabody, participated in the fraudulent scheme alleged herein.

84.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Peabody stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Peabody's business, operations, and management and the intrinsic value of Peabody stock and caused Plaintiff and members of the Class to purchase Peabody shares at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

85.     During the Class Period, as detailed herein, Peabody and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Peabody stock, and operated as a fraud or deceit on Class Period purchasers of Peabody shares by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Peabody stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Peabody stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

86.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Peabody stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

87.     At all relevant times, the market for Peabody stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Peabody filed periodic public reports with the SEC;

(b)     Peabody regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Peabody was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Peabody common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "BTU."

88.     As a result of the foregoing, the market for Peabody securities promptly digested current information regarding Peabody from all publicly available sources and reflected such information in Peabody's stock price.  Under these circumstances, all purchasers of Peabody common stock during the Class Period suffered similar injury through their purchase of Peabody common stock at artificially inflated prices and the presumption of reliance applies.

89.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

90.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Peabody who knew that the statement was false or misleading when made.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all person or entities who or which purchased or otherwise acquired Peabody common stock during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class are: Defendants (as defined herein); any officers or directors of Defendants during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity

in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

92.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Peabody stock was artificially inflated; and

(f)     The extent of the damage sustained by Class members and the appropriate measure of damages.

93.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

94.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

96.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Peabody common stock during the Class Period.

99.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Peabody shares.  Plaintiff and the Class would not have purchased Peabody stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

100.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Peabody stock during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

101.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of Peabody within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Peabody, the Individual Defendants had the power and ability to control the actions of Peabody and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 28, 2020                    Respectfully submitted,

                                              **LABATON SUCHAROW LLP**

                                              */s/ Francis P. McConville*
                                              Christopher J. Keller
                                              Eric J. Belfi
                                              Francis P. McConville
                                              140 Broadway
                                              New York, New York 10005
                                              Telephone: (212) 907-0700
                                              Facsimile: (212) 818-0477
                                              ckeller@labaton.com
                                              ebelfi@labaton.com
                                              fmcconville@labaton.com

                                              *Attorneys for Plaintiff*

## <u>CERTIFICATION</u>

I, Chase Rankin, as Executive Director of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Oklahoma Fire.  I have reviewed a complaint filed against Peabody Energy Corporation ("Peabody") alleging violations of the federal securities laws;

2.      Oklahoma Fire did not purchase Peabody Energy common stock at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Oklahoma Fire is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Oklahoma Fire's transactions in Peabody common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Oklahoma Fire sought to serve or currently serves as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

*Weiner v. Tivity Health, Inc.*, No. 3:17-cv-01469 (M.D. Tenn.)
*Giugno v. Bristol-Myers Squibb Co.*, No. 3:18-cv-00878 (N.D. Cal.)
*In re Campbell Soup Co. Sec. Litig.*, No. 1:18-cv-14385 (D.N.J.)
*Mulquin v. Nektar Therapeutics*, No. 4:18-cv-06607 (N.D. Cal.)
*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 1:19-cv-01323 (N.D. Ill.)
*Potts v. Weight Watchers International, Inc.*, No. 1:19-cv-02005 (S.D.N.Y.)
*Employees' Ret. Sys. of the Puerto Rico Electric Power Authority v. Conduent Inc.*, No. 2:19-cv-08237 (D.N.J.)
*Logan v. ProPetro Holding Corp.*, No. 7:19-cv-00217 (W.D. Tex.)
*In re Farfetch Ltd. Sec. Litig.*, No. 1:19-cv-08657 (S.D.N.Y.)
*In re Resideo Technologies, Inc. Sec. Litig*, No, 0:19-cv-02863 (D. Minn.)
*Hayden v. Portola Pharmaceuticals Inc.*, No. 3:20-cv-00367 (N.D. Cal.)
*In re Six Flags Entertainment Corp. Sec. Litig.*, No. 4:20-cv-00201 (N.D. Tex.)

6.      Oklahoma Fire sought to serve as a representative party, but not as a lead plaintiff, in the following class action under the federal securities laws filed during the last three years:

*Oklahoma Firefighters Pension & Retirement System v. United States Steel Corp.*,
No. 2:19-cv-00470 (W.D. Pa.)

7.      Beyond its pro rata share of any recovery, Oklahoma Fire will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 25th day of September, 2020.

Chase Rankin
*Executive Director*
*Oklahoma Firefighters Pension and Retirement System*

2

**EXHIBIT A**

**TRANSACTIONS IN PEABODY ENERGY CORPORATION**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 07/26/18 | 3,320 | $44.08 | ($146,355.56) |
| Purchase | 07/31/18 | 564 | $42.41 | ($23,921.83) |
| Purchase | 08/01/18 | 881 | $42.56 | ($37,497.03) |
| Purchase | 08/02/18 | 1,845 | $42.74 | ($78,857.15) |
| Purchase | 03/08/19 | 1,859 | $30.93 | ($57,507.05) |