**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PEABODY ENERGY CORP. SECURITIES LITIGATION | Civil Action No. 1:20-cv-08024-PKC<br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ........................................................................ 1

II.    JURISDICTION AND VENUE ............................................................... 18

III.   PARTIES ................................................................................................. 19

IV.   SUBSTANTIVE ALLEGATIONS ......................................................... 22

     A.     Company Background ................................................................... 22

         1.     North Goonyella Mine – Peabody's Most Profitable Mine ..................... 23

         2.     Longwall Coal Mining ............................................. 25

         3.     Peabody's Health, Safety, Security, and Environmental Committee ........................................................... 29

     B.     Background on Mine Safety Regulation by QMI ................................. 31

     C.     Peabody Emerges From Bankruptcy in April 2017 Still Straddled With Debt, Just Less of It .......................................... 32

     D.     Confidential Witnesses ................................................................. 33

     E.     Fire at North Goonyella Mine .................................................... 35

         1.     Peabody Acquires North Goonyella Mine With Full Awareness of Its Volatile Nature ............................................... 35

         2.     The Lack of Adequate Safety Procedures and Other Problems at the North Goonyella Mine Before the September 2018 Fire .............................................. 37

         3.     Peabody Pushed North Goonyella Mine Management to Extract Coal Without Sufficient Attention to Risk Management and Safety ........................................... 38

         4.     Peabody Failed to Properly Staff North Goonyella and Properly Train Its Mine Personnel ........................................ 39

         5.     Elevated Levels of Methane Reported at North Goonyella Throughout 2017 and 2018 ........................................ 42

         6.     Elevated Methane and Ethylene Levels Detected at North Goonyella in Late August 2018 Leads to Mine Evacuation ................... 45

7. Containment Efforts at North Goonyella ................................................... 48

8. Peabody Mishandles "Heating Event" at North Goonyella Mine Which Threatens the Operation of the Whole Mine ...................... 51

9. MREs Prepared by the QMI Following the North Goonyella Mine Evacuation Corroborate the Accounts of the CWs ........................................................................................................... 58

10. Fire at the Mine is Identified No Later Than September 22, 2018 ...................................................................................................................... 64

11. Daily Meetings and Reports About North Goonyella Shared With Peabody Senior Management and North Goonyella Task Force in the U.S. .............................................................. 67

12. Peabody Publicly Addresses Situation at North Goonyella Mine ............................................................................................................... 69

F. Top North Goonyella Union Official Warns Mining Union in September 2018 That Only a "Miraculous Change in Circumstance" Would Prevent Long-Term Interruption to Coal Production at North Goonyella Mine ................................................... 70

G. Media Outlets Report on North Goonyella Situation ........................... 73

H. Projections for Resumption of Coal Production at North Goonyella Lack Reasonable Basis Given Rapidly Changing Conditions ............................ 74

I. Defendants Misrepresent Peabody's Ability to Reopen the North Goonyella Mine and Resume Coal Production .................................... 78

J. The Process for Reopening the Mine ................................................... 80

K. Peabody Releases the Initial Findings of its Internal Investigation of the North Goonyella Fire ................................................................... 84

L. Initial Findings from QMI Investigation .............................................. 88

M. The Truth is Finally Disclosed Concerning the Inability to Open North Goonyella for Coal Production for At Least Three Years .......................... 90

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ......................... 90

A. Overview of Defendants' Fraudulent Conduct .................................... 90

B. Defendants' Materially False and Misleading Statements and Omissions ........................................................................................... 91

1.    April 3, 2017 – Peabody Emerges from Bankruptcy ................................ 91

2.    May 4, 2017 - 1Q17 Financial Results ...................................... 93

3.    August 1, 2017 - 2Q17 Financial Results .................................. 95

4.    October 25, 2017 - 3Q17 Financial Results.............................. 96

5.    February 7, 2018 - 4Q17/FY 2017 Financial Results ............................ 98

6.    February 22, 2018 - Peabody's Analyst and Investor Day ...................... 98

7.    February 26, 2018 – 2017 Financial Results ........................... 99

8.    April 25, 2018 - 1Q18 Financial Results ................................... 99

9.    May 2018 - Corporate and Social Responsibility Report ...................... 100

10.   July 24, 2018 - 2Q18 Financial Results ................................. 101

11.   August 2018 and September 2018 - Investor Presentations .................. 101

12.   September 2018 – Reports of Fire at North Goonyella Mine
      Start to Emerge, Yet Defendants Continue to Downplay
      Risk ............................................................. 102

13.   The Truth Begins to Emerge, But Defendants Continue to
      Mislead the Market ............................................... 108

      (a)    September 28, 2018 – Company Press Release
             About North Goonyella Fire (First Partial
             Revelation of the Truth).............................. 108

      (b)    September 30, 2018 – October 11, 2018: Peabody
             Releases Updates On Goonyella Fire ......................... 113

      (c)    October 30, 2018 - 3Q18 Financial Results.............................. 115

      (d)    February 6, 2019 - 4Q18/ FY 2018 Financial
             Results (Second Partial Revelation of the Truth) ...................... 124

      (e)    May 1, 2019 - 1Q19 Financial Results (Third Partial
             Revelation of the Truth).............................. 130

      (f)    May 24, 2019 – Press Release Announcing
             Company Proceeding With Re-ventilation of First
             Segment of North Goonyella Mine ............................ 134

(g)     July 3, 2019 – Press Release Announcing Company
         Proceeding With Re-Entry Of Zone One of North
         Goonyella Mine ................................................................. 134

(h)     July 31, 2019 - 2Q19 Financial Results ............................ 135

VI.    THE FULL TRUTH IS REVEALED .............................................. 139

VII.   POST-CLASS PERIOD EVENTS ................................................. 144

VIII.  ADDITIONAL EVIDENCE OF SCIENTER ............................... 145

       A.    Defendants Were on Heightened Awareness As To The Safety
             Risks Posed by the North Goonyella Mine .......................... 147

       B.    The North Goonyella Mine Was Peabody's Most Profitable
             Operation Generating Approximately 20% of the Company's
             Operating Profit ................................................................ 148

       C.    Statements By Former Employees, Contractors, and Inspectors
             Provide Factual Support For a Strong Inference of Scienter
             Throughout the Class Period .............................................. 149

IX.    CONTROL PERSON ALLEGATIONS ........................................ 153

X.     LOSS CAUSATION/ECONOMIC LOSS ................................... 156

       A.    September 28, 2018 – First Partial Revelation of the Truth ............... 157

       B.    February 6, 2019 – Second Partial Revelation of the Truth ............... 157

       C.    May 1, 2019 – Third Partial Revelation of the Truth ......................... 158

       D.    October 29, 2019 – Final Revelation of the Truth ............................. 158

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED
       UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS ...................... 159

XII.   NO SAFE HARBOR ................................................................. 161

XIII.  CLASS ACTION ALLEGATIONS .............................................. 162

XIV.   COUNTS ................................................................................. 164

XV.    PRAYER FOR RELIEF .............................................................. 167

XVI.   JURY TRIAL DEMANDED ....................................................... 167

**GLOSSARY OF TERMS AND ABBREVIATIONS**
**USED IN AMENDED COMPLAINT**

| Term | Definition |
|------|------------|
| AMSJ | Australian Mine Safety Journal |
| CHPP | Coal Handling and Preparation Plant |
| HPI | "High Potential Incident" as defined in the Coal Mining Safety and Health Act |
| MG | Maingate |
| MREs | Mine Record Entry reports |
| PHMP | Principal Hazard Management Plan |
| QMI | Queensland Mine Inspectorate (now known as Department of Natural Resources Mines and Energy) – Mining Regulatory Body in charge of worker safety in Queensland which includes the North Goonyella Mine |
| SIMT | Site Incident Management Team |
| SIMTARS | Safety In Mines Testing & Research Station "The Queensland Government's own mine fire service provider that provided advice and gas monitoring services to Peabody throughout the fire event. The Queensland Government charged fee-for-service rates to Peabody for this service. |
| spon com | A "spontaneous combustion" event, which is when coal self-heats |
| SSE | Senior Site Executive (senior level position at a mine).  At North Goonyella, Mike Carter was the SSE starting before the Class Period through April 2018 when John Anger became the SSE and Carter moved to a different position at Peabody. |
| TARPs | Trigger Actions Response Plans |
| TG | Tailgate |

Lead Plaintiff Oregon Public Employees Retirement Fund, individually and on behalf of all others similarly situated, by their undersigned counsel, hereby brings this Consolidated Amended Class Action Complaint (the "Complaint") against Peabody Energy Corporation ("Peabody" or the "Company"), its President and CEO, Glenn L. Kellow ("Kellow") and its former CFO, Amy B. Schwetz ("Schwetz" collectively, "Defendants").[1]  The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Peabody; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former employees of Peabody and others with knowledge of the matters alleged herein; and consultation with an expert in longwall coal mining with more than 20 years of experience and experts in the areas of loss causation and damages.[2]  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

I.      **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons and entities who or which purchased or otherwise acquired Peabody common stock during the period from April 3,

---

[1] Kellow and Schwetz are collectively referred to as the "Individual Defendants."

[2] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2). All CWs will be described in the masculine to protect their identities.

2017 through October 28, 2019, inclusive (the "Class Period"), and were damaged thereby. The action is brought against Peabody and certain of its current and former officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Defendant Peabody is the largest coal mining company in the world with operations throughout the United States and Australia. During the Class Period, Peabody owned and operated 23 coal mining operations. The Company's coal mines are organized into six business segments, the largest of which is the Australian Metallurgical Mining segment in which Peabody owns and operates seven (7) Australian mines.[3] During the Class Period, Peabody was Australia's fifth largest coal mining company. The Australian Metallurgical Mining segment accounted for approximately 23.1% of the Company's revenues.

3.      One mine within the Australian Metallurgical Mining segment is the North Goonyella mine, which was acquired by Peabody in 2004. The North Goonyella mine is an underground coal mine located in Queensland, Australia, 160 kilometers west of Mackay. According to *The Australian Financial Review,* the North Goonyella mine is Peabody's "most profitable single operation," and in 2017 it generated approximately $100 million, or approximately 20%, of Peabody's total operating profit of $498 million.[4]

4.      In excavating coal from the North Goonyella mine, Peabody uses a method called "longwall mining." This method utilizes heavy machines underground to cut large panels of coal typically 2 to 2.5 miles long and 850 to 1500 feet wide.  A longwall mining system consists of many components including approximately 200 hydraulic Roof Supports, an armored face

---

[3] Metallurgical ("met") coal (or "coking coal") is mined to produce the carbon used in steelmaking while thermal coal is used to make steam that generates electricity.

[4] Unless otherwise noted, all amounts are denominated in U.S. dollars.

conveyor (complete with head and tail drives), a shearer machine to cut the coal, a stageloader, crusher, mobile belt tailpiece, electrical supply components and transformers.

5.      Longwall mining requires the longwall equipment system to be moved to different sections (or panels) once the available coal from a panel has been mined, which is an expensive and time-consuming process.  In September 2018, prior to the fire at North Goonyella described herein, Peabody was in the middle of a two-month longwall move at the North Goonyella mine, from its 9 North (or "9N") panel (already mined) to its 10 North (or "10N") panel (the next mine face to be mined).

6.      Longwall mining often causes methane and other dangerous, flammable gases to be released underground, elevated concentrations of which often occur when production rates are high. When longwall mining equipment is repositioned within the mine, ventilation controls are changed which can create additional issues relating to gas levels. Finally, during the beginning and ending of the mining of longwall panels, conditions within the mine can leave the mine more prone to spontaneous combustion events if flammable gases come into contact with a heat source. As a result, it is imperative that mines utilizing the longwall mining method implement adequate safety measures to protect against these risks, including, among others, ventilation systems, methane drainage methods, gas monitoring controls, and airtight seals.

7.      On April 3, 2017, the start of the Class Period, Peabody emerged from bankruptcy protection trading at a price of $31.50 per share.  From April 3, 2017 through the beginning of September 2018, the Defendants repeatedly boasted of Peabody's record coal production while simultaneously touting the Company's "***record safety***" and its "***ongoing commitment to ensuring safe, productive operations,***" including at the North Goonyella mine.  For example, during this time, Defendants represented:

(a)     "The emerged Peabody is proceeding with . . . *an emphasis on safe and productive operations* that are constantly working to move down the cost curve" (5/4/17);

(b)     "*Through all of our actions, Peabody maintains constant vigilance toward safety*." (10/25/17);

(c)     "*At the operational level, our global safety performance continues to surpass industry averages. . . . As always, we are ever vigilant on our journey of continuous improvement in safety*."  (2/7/18);

(d)     "*As always, we begin with a focus on safe productive operations and return maximization*." (2/7/18);

(e)     At the North Goonyella coal mine, "*Record safety results reflect 80% improvement since 2013*." (2/22/18);

(f)     Defendant Kellow emphasized the Company and its employees' *"ongoing focus on safe productive work places."* (4/25/18; similar statement on (7/24/18);

(g)     Peabody *"commit[s] to safety and health as a way of life"* (2017 Corporate and Social Responsibility Report, published in May 2018);

(h)     "*Safety is Peabody's first value, integrated into all areas of our business*."  (2017 Corporate and Social Responsibility Report, published in May 2018);

(i)     "*A focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety*," (2017 Corporate and Social Responsibility Report, published in May 2018); and

(j)     *"[s]afety performance continues to outperform industry averages*," and "[*s]trong attention to operational excellence by committing to safe workplaces*," (August 2018).

8.      Defendants' statements about North Goonyella and the Company's overall commitment to safety (from the start of the Class Period through September 2018)—which artificially increased the Company's stock price from approximately $31.50 per share to a high of more than $47 per share—were materially false and misleading when made in that Defendants failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella mine, which were known or recklessly disregarded by Defendants:

(a)      The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)      The Company had failed to properly ventilate the North Goonyella mine resulting in the build-up of methane gas and carbon monoxide;

(c)      The Company's systems at North Goonyella had failed to monitor and analyze mine gases were insufficient;

(d)      North Goonyella faced serious staffing issues and a lack of sufficient experienced personnel as a result of layoffs at the mine before the Class Period;

(e)      Training of mine employees at North Goonyella to recognize potential ventilation and combustibility issues was insufficient;

(f)      The Company failed to follow its own safety procedures, including its Sealing Management Plan;

(g)      The Company lacked emergency sealing procedures at North Goonyella;

(h)      The Company breached its safety obligations under the Mining Safety & Health Act and Peabody's environmental license;

(i)      In the days leading up to and following the September 1, 2018 evacuation at North Goonyella, the problems at the mine went far deeper than just elevated methane gas.

Indeed, mine management did not know why or where the unanticipated bursts of heat were coming from or how to address the heating events; and

> (j)     As a result, the North Goonyella mine was at a heightened risk of experiencing spontaneous combustion which could adversely affect its ongoing longwall move and the resumption of its record levels of coal production.

9.     The truth about Peabody's inadequate safety practices at North Goonyella was partially revealed when, on September 28, 2018, the Company disclosed, for the first time, that a fire had erupted at the mine earlier in September forcing Peabody to indefinitely withdraw all of its workers from the mine and suspend all operations at the mine. The Company also announced it did "***not expect any [coal] production from North Goonyella in the fourth quarter of 2018***" (i.e., October to December 2018)." On this news, Peabody shares fell $5.54 per share, or 13.4 percent, from a close on September 27, 2018 of $41.18 per share to a close on September 28, 2018 of $35.64 per share.

10.     Statements by former Peabody employees, former contractors working on site at the mine, former mining inspectors responsible for the North Goonyella mine, and regulatory reports prepared by the Queensland Mine Inspectorate (now known as Department of Natural Resources, Mines, and Energy, but referred to herein at the "QMI"): (i) confirm that throughout the Class Period, Peabody failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event, and (ii) provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions both before and after the fire.  Indeed, these witnesses and documents confirm that:

> • Peabody management in the U.S. dictated what happened at the North Goonyella mine site in Australia and applied significant

pressure on mine management, always "pushing for more." An overly aggressive coal production schedule and aggressive forecasts from Peabody U.S. led mine management at North Goonyella to prioritize coal production over mine safety throughout the Class Period. ¶¶ 81-86.

• Indeed, mine personnel at North Goonyella often cut corners and failed to adhere to the requirements set out by official procedures and regulations for the sake of speed. ¶ 86.

• Staffing cuts at the North Goonyella mine in 2015 left the mine starved of leadership in important mine management positions, including in the Health and Safety group, which remained understaffed as the workload at the mine increased significantly starting in 2017. ¶¶ 87-89.

• Training of mine personnel in issues related to health and safety was insufficient in the time leading up to the mine fire in September 2018. ¶¶ 87-91.  The Company's initial findings of its investigation, released in March 2019, confirm insufficient ventilation and combustibility training for North Goonyella mine personnel. ¶¶ 216-217.

• Throughout 2017 and the first half of 2018, Peabody consistently measured levels of methane gas in the North Goonyella mine that exceeded 2.5%.  Although the mining safety regulations mandated withdrawal (or evacuation) of mine workers when methane levels exceeded 2.5%, mine management often failed to withdraw its team and instead worked through elevated gas levels risking mine worker safety. ¶¶ 93-94.

• The constant pressure to get things done quickly, including the longwall move, and a lack of coordination among leadership contributed to the incorrect and dangerous sequence of events leading to the mine fire. ¶ 98.

• Following the evacuation of the North Goonyella mine on September 1, 2018, senior Peabody executives in the United States including Defendant Kellow were in daily contact with North Goonyella mine management regarding the condition of and actions being taken at the mine. ¶¶ 162-172.

• In September 2018, Peabody corporate set up a war room at its headquarters in St. Louis, Missouri ("HQ") and created a North Goonyella Task Force which held regular meetings to: (i) discuss what was happening at the mine, (ii) receive information from Australia, and (iii) make decisions. The members of the North

Goonyella Task Force included: (i) Defendant Kellow; (ii) Defendant Schwetz; (iii) Charles Meintjes (EVP of Corporate Services and CCO); (iv) Kemal Williamson (President of U.S. Operations and Group Executive Operations, Australia before that); (v) Charles Lilly (technical services group) who traveled to North Goonyella from the US and acted as an onsite technical expert for the War Room Team; (vi) Mike Breneman (Safety Director, Americas/U.S. Operations February 2015 – June 2020) and (vii) George Schuller (President – Australia). ¶¶ 162-172.

• Immediately after evacuation, the North Goonyella Task Force met via videoconference multiple times per day, seven days per week. Over time, the frequency of the Task Force meetings lessened. ¶¶ 162-172.

• Peabody U.S. had access to significant information on the North Goonyella mine and the fire. Members of the North Goonyella Task Force should have received every piece of paper generated by the QMI concerning the mine conditions. ¶¶ 162-172.

• Defendant Kellow was very involved with the post fire recovery and remediation efforts at North Goonyella and often would demand 2:00 AM CT meetings with Peabody's C-Suite executives when there was any news about the North Goonyella mine. ¶¶ 162-172.

• Defendant Schwetz also was "very involved" with Peabody's operations and likely attended nearly all of the North Goonyella Task Force meetings. ¶¶ 162-172. Defendant Schwetz also had oversight on forecasting for coal production, and periodically attended weekly sales and trade meetings. ¶¶ 162-172.

• During the time between the mine evacuation on September 1, 2018 and when the Company reported the existence of the fire on September 28, 2018, countless errors were made in trying to locate the fire source and address the elevated gas levels and associated risk. These errors included, but were not limited to: (i) utilizing the incorrect Trigger Action Response Plans ("TARPs");[5] (ii) drilling boreholes for gas insertion and release in the wrong areas of the

---

[5] Trigger Action Response Plans (TARPs) are derived from a mine's Major Hazard Management Plan and consist of a set of documented and known workplace hazards that need to be continuously checked for. Once a risk is identified, a remedial process is triggered. The responsible person carrying out the inspection has to perform according to the plan. TARPs may be developed for any of the major hazard areas within a mine. Failure to adhere to TARPs can lead to escalation of the level of risk without adequate controls being implemented.

mine and/or failing to drill the boreholes deep enough; (iii) failing to collect gas samples from the tube bundle for an entire week; (iv) pumping nitrogen into the wrong sections of the mine in an attempt to control the fire; and (v) remediation efforts which caused carbon monoxide levels to skyrocket from approximately 600 ppm to 1500 ppm and then to 28,000 ppm and hydrogen levels to jump from approximately 1600 ppm to highs over 36,000 ppm. ¶¶ 143-150.

• As of late September 2018, the mine was "not in a good way" and it looked like Peabody might have to seal a 3rd longwall in the mine unless there was a "***miraculous change in circumstance in the coming days***." ¶ 179. If Peabody had to seal the 3rd longwall block, "then the future of North Goonyella [was] up in the air." The alternative, according to a mine union representative, was to seal up the whole mine, a disaster for Peabody. ¶ 179.

• After the North Goonyella evacuation on September 1, 2018, Defendant Kellow said things in quarterly Peabody conference calls that did not match reality. ¶ 171. Moreover, Peabody downplayed the severity of what happened at the mine in its calls with investors and sugarcoated the seriousness of the fire. ¶ 171.

• The ever-changing conditions of the mine after the fire broke out, made it extremely difficult to make predictions about North Goonyella. ¶ 130.

• Peabody's initial projections for North Goonyella's re-opening after the fire were very ambitious. As time went on, the reliability of the North Goonyella forecasting decreased and the risk for inaccuracy increased. ¶¶ 188-192.

• Peabody's headquarters in the U.S. was very involved with and interested in forecasts for the resumption of coal production at North Goonyella. ¶¶ 183-196.

• By no later than October 2018, Peabody management knew it would take at least 18 months for the mine to be operational again. ¶ 186.  Nonetheless, Defendants represented to the market in October 2018, that if the 10 North panel could be accessed, coal production would resume in the second half of 2019 (which was between 4 and 9 months shorter than internal Company estimates showed). ¶¶ 295-296.

• The North Goonyella Task Force, which included Defendants Kellow and Schwetz, knew or were reckless in not knowing that it

would take significantly longer to reopen the North Goonyella mine than the Company represented to the market. ¶¶ 162-175.

• At the time when Peabody was stating that they hoped to re-open the mine within a year, they learned through remote cameras and drones sent into the mine that the fire had melted the longwall conveyor belt and caused damage to the longwall. Indeed, the fire had "consumed" the mine and there was significant damage to the overall infrastructure of the mine. ¶ 187.

• Members of Peabody's Technical Services Team viewed Peabody's mine re-opening timeline as "unrealistic" given what they observed on the remote cameras and drones and based on mining rules in Australia. From the drone/camera images, they "saw enough" to understand the damage in the mine was extensive and that it would take significantly longer to reopen the mine. ¶195.

• In mid 2019, former mine workers from the North Goonyella mine stated that the probability of full re-entry at the mine, as Peabody had described to the market, was a "management pipe dream" given the impending uncertainties associated with how the coal reserve would respond when re-ventilated and the uncertainties of equipment and mine damage. ¶ 211.

• By July or August 2019, the projected timetable to return to mining at North Goonyella was sometime between 2022 and 2025. The models forecasting this potential reopening were scrutinized by: (i) Andrew Muir (former Director Financial Projects): (ii) Peter Baker (former Senior Vice President, Queensland Operations); (iii) George Schuller (former President – Australia) and (iv) "all the financial people in the U.S." There was "no shortage of people looking at the models." ¶¶ 173, 193.

• Thus, Defendants lacked a sufficient basis for Peabody's projections, starting in September 2018, regarding the timing and amount of coal production from North Goonyella.

11.     Indeed, preliminary investigations by the Company and by the QMI, the mining regulatory body in charge of worker safety at the North Goonyella Mine, both revealed severe deficiencies in the Company's safety practices. For example:

(a)     On March 27, 2019, Peabody released its initial findings from its investigation of the North Goonyella mine fire. Peabody concluded that the fire resulted during a

planned longwall move from the 9 North panel ("9N") to the 10 North panel ("10N") and admitted that: (i) there was a lack of proper ventilation controls during the longwall take-off process which allowed too much air to enter the mined-out area in the 9 North panel resulting in oxidation; (ii) the system used to monitor and analyze gas in the mine was insufficient; (iii) sealing of 9N and removal of the longwall took too long after evacuation and the idle status of the mine for some period of time during the longwall move contributed to too much air getting into the mined-out area of 9N ("the longwall goaf")[6] and caused oxidation; (iv) training of mine employees to recognize potential ventilation and combustibility issues was insufficient; (v) certain of the Company's plans and protocols at North Goonyella were not followed; and (vi) the difficulties sealing the affected area of the mine were significantly exacerbated once mine personnel were above ground and exclusion zones were established.  Peabody concluded that as a result of the fire, it was "making changes in systems, processes and training, where warranted, to put into place the improvements needed to successfully move forward from this incident." These changes included improvements to ventilation controls, gas level monitoring, longwall relocation processes, and underground sealing methods.

(b)     On August 9, 2019, the QMI released its preliminary investigative findings confirming that Peabody had deficient safety systems at North Goonyella and that the Company and its employees were not cooperating with its investigation. Among other things, the QMI initial findings noted: (i) the Company did not follow its own procedures relating to major ventilation changes; (ii) the Company did not give sufficient consideration to gas trends which impacted the way in which certain trigger action plans were applied; (iii) key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls were not reviewed

---

[6] The "goaf" is the mined-out area of the mine.

by key mine personnel, as required under the mine's safety and health management system; and (iv) boreholes leading to the mined out region of 9N were insufficiently sealed, allowing oxygen to get into the active mined out areas escalating conditions for spontaneous combustion.

12.     After the disclosure of the fire at North Goonyella, Defendants mislead investors about the Company's plan to restart operations at the mine, falsely assuring investors that the Company would be able to mine significant coal at the mine in the near-term, while continuing to conceal major issues that would impede, or at least significantly delay, any progress towards re-opening the mine.  Further, Defendants falsely blamed all reopening delays on the QMI (worker safety regulators), claiming the QMI took longer than Peabody expected to approve the Company's reopening plans.  However, as set forth herein, the QMI only issued recommendations to Peabody regarding its safety protocols, it did not impede the Company's re-opening plans. All reopening delays at North Goonyella were the result of the Company's inadequate safety measures which first contributed to and then exacerbated the seriousness of the September 2018 fire.

13.     Defendants' statements (from September 28, 2018 through the end of the Class Period), artificially inflated and/or artificially maintained Peabody's stock price, and conditioned investors to believe that the Company's plan to restart operations at North Goonyella was reasonable and had a high likelihood of success, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks and, that Peabody faced major delays in restarting the mine. For example, Defendants falsely stated:

(a)     "***If the next panel (10 North, which is already developed) is accessible, production would be targeted for the second half of 2019, whereas southern panels (GM***

- 12 -

*South) access would likely extend to 2020 given that development was in early stage*s."
(10/30/18)

      (b)     "[B]ased on the market reaction, it would seem that the market
contemplates an entire loss of North Goonyella. While we very much understand the concern,
***based on what we know today, that conclusion is at best premature and at worst unwarranted***."
(10/30/18, Defendant Kellow)

      (c)     "*[L]ongwall production in the 10 North panel [will] begin to ramp up in
the early months of 2020*." (2/6/19, Defendant Kellow).

      (d)     *"[B]ase case contemplates approximately 2 million tons of sales from
North Goonyella in 2020*." (2/6/19, Defendant Kellow)

      (e)     **"[E]everything is ready to flick the switch and to be able to reventilate. . .
. just to reiterate, we're ready to go. So we're just working through that, what is the final part
of the process**." (5/1/19, Defendant Kellow).

      (f)     "***It's dotting the I's and crossing the T's around supporting
documentation with respect to a lot of procedures and protocols that are on site***." (5/1/19,
Defendant Kellow).

      (g)     "Turning to North Goonyella, ***major progress has been made to-date
including reventilation and re-entry of the mine***. We've also learned a substantial amount since
we commenced activities underground earlier this month." (7/31/19, Defendant Kellow).

    14.    However, unknown to the market at the time was that Defendants failed to
disclose the following material known adverse facts pertaining to the feasibility of Peabody's
plan to restart operations at the North Goonyella mine in the near term:

(a)     Once the mine was evacuated and "strict exclusion zones" were set up above ground, Peabody could only gain access to control the fire and seal the fire areas (9N) through boreholes on the surface which, according to Mine Record Entry reports prepared by the QMI ("MREs"), the Company was still drilling until at least November 2018. Moreover, even surface areas of the mine were severely "limited" in access.  Further, Peabody did not know the source of the fire or how to control it and remedial actions they took made the fire, and its resulting damage, worse. Thus, it was highly likely that Peabody would not be able to get miners back underground at North Goonyella before the end of 2018 and that coal production on the longwall at 10N, or anywhere in the mine, would not resume for at least 12 months after underground access was permitted.

(b)     The longwall remaining in "idle" status without being sealed further threatened conditions underground. According to a longwall mining expert, if a longwall move is stopped mid-move, speed in recovery (resuming operations) is critical, as mine conditions deteriorate over time – especially roof conditions.  This not only makes the recovery operations more dangerous, it increases the amount of work required during recovery. When there are delays in a longwall move and water builds up on the mine floor (which is exactly what happened here), mine roadways deteriorate very quickly and there is a serious risk of significant roof damage (which is exactly what happened here) – which would make access to those mine faces much more difficult and recovery more time-consuming.  Moreover, if a longwall is not operating for a long period of time, it significantly changes the production levels and profit structure of the mine.

(c)     A significant portion of the longwall system at North Goonyella had been "sealed" underground and was likely damaged. According to a longwall mining expert, longwall

- 14 -

panels are typically 2 to 2.5 miles long and 850 to 1350 feet wide, so it would have been nearly

impossible, if not completely impossible given the state of the North Goonyella mine with the

fire still not under control and gas levels fluctuating widely, even to attempt to: (i) gain re-entry

to the mine; (ii) assess the condition of the longwall panel stuck deep underground in 9N through

boreholes in the surface; and  (iii) move the damaged equipment from 9N to 10N before

confirming the fire was completely extinguished in 9N and before rehabilitating damaged

segments of the mine.

        (d)     If the longwall equipment was unrecoverable or lost to the fire, it likely

would take at least 12-15 months to locate, acquire, and customize a substitute longwall panel for

reentry and coal production at 10N.[7]  Indeed, the majority of the Roof Supports (the part of the

longwall system used to hold the mine roof up during a longwall move and during coal

production), each which weigh approximately 32 tons a piece, were stuck underground and also

likely heavily damaged.[8] According to MREs prepared by the QMI in September 2018, certain of

the Roof Supports in 9N were "leaking off" and losing contact with the roof after evacuation and

at least ten Roof Supports required re-pressurizing. Indeed, five months after mine evacuation,

the Company disclosed: (i) several roof falls (meaning the Roof Supports sealed in 9N were

certainly damaged); and (ii) damaged conveyor belts on the longwall panel sealed in 9N.

        (e)     Given that Peabody made an insurance claim soon after the announcement

of the fire for equipment sealed in the mine, coal production on the 10N longwall panel could not

---

[7] Before the fire, in March 2018, Peabody ordered a new longwall mining system for North
Goonyella.  The system included Roof Supports, a face conveyor for a 300-meter face, shearer
and beam stage loader and featured advanced longwall automation technology. The new system
was purportedly more technologically advanced than Peabody's existing leased longwall system.
Delivery of the new system was planned for the second quarter of 2019 and required an outside
service provider to install and commission the longwall and provide operational support.

[8] A picture of a longwall system Roof Support can be found at ¶ 45.

begin until the Company had received and installed a new longwall mining system including new Roof Supports. If Peabody was able to permanently seal the 9N face and mine the 10N panel, they would have had to replace the 78 Roof Supports stuck within the mine (and referenced in the insurance claim) with those scheduled for delivery at North Goonyella in mid to late 2019. According to a longwall mining expert, assuming the new system was delivered on time, it still would require weeks to transport it to the 10N longwall face, install the system, and complete the commissioning to make the system operational, assuming the affected areas of the mine had been rehabilitated by that time. Thus, resuming coal production in early 2020 would have been the earliest possible start date for Peabody if mine re-entry was permitted soon thereafter and 10N was accessible to the Company.

(f)     According to a longwall mining expert, if the 10N panel was not accessible due to the ongoing fire, heat or gas conditions in 9N (which a miner had to pass by to get to the 10N panel of the mine), and Peabody had to access the mine through the undeveloped southern panels (such as 6 South), both access and resumption of coal production in 2020 was highly unlikely given that it would have taken at least an additional 18-24 months to develop and prepare the southern panels for longwall coal production, including: (i) construction work to establish ventilation, belt conveyor, and roadways; (ii) development mining to develop the 6S panel itself; (iii) rehabilitation work to maintain the tailgate entry for the 6 South longwall; and (iv) transporting the new longwall system to the 6 South area and commissioning it.[9]  Peabody's back-up plan to move to the 6 South panel also required Peabody to obtain re-entry access to the

---

[9] This timeline is supported by admissions made by Defendant Kellow on October 29, 2019 ("A panel of this length should require about 18 to 24 months to develop based on typical development rates, and then we would have been in a position to begin longwall production.") (¶ 345).

mine in order to seal off the fire at 9N and be able to pull back to the 6 South panel and resume operations.

(g)     If Peabody had to move to the 6 South panel to resume coal production, annual mine profitability would be materially reduced (from the mine's 2 to 3 million annual tons) as the length of the panels in the southern part of the mine were shorter and required more frequent longwall moves. During longwall moves, coal production is on pause for approximately two to three months and thus annual coal production is much lower in years with a longwall move.[10]

(h)     Further delays in restarting mine operations at North Goonyella would mean mine personnel would have to be let go (to contain costs at the mine) and later recalled back if, and when, longwall operations resumed; and

(i)     As a result, there would be further delays in reopening the North Goonyella mine and restarting coal production.

15.     The truth about the feasibility of Peabody's plan to restart operations at North Goonyella was revealed through a series of disclosures following the disclosure of the fire on September 28, 2018. For example, on February 6, 2019, Defendant Kellow revealed that contrary to Peabody's prior statements, coal production at the North Goonyella mine would not resume in 2019, but would ramp up in the "early months of 2020." On this news, Peabody's stock fell $3.80 per share, *or 10.6 percent*, closing at $32.05 per share on February 6, 2019, down from the previous day's close of $35.85 per share.

---

[10] As set forth herein, longwall moves in the northern section of the mine (9N, 10N) typically occurred every 15 months.

16.     Then, on May 1, 2019, Peabody announced an additional "multi-week delay" to its plans to ramp up longwall production in the 10N panel in early 2020. However, the Company reiterated that it still "expect[ed] to produce approximately 2 million tons from North Goonyella in 2020." On this news, Peabody's stock fell $1.61 per share, *or 5.6 percent*, closing at $27.16 per share on May 1, 2019, down from the previous day's close of $28.77 per share.

17.     Finally, on October 29, 2019, Peabody reported a loss of ($0.77) per share as compared with third quarter 2018 earnings of $0.63 per share, missing analysts' consensus expectations by more than 50 percent. Peabody also disclosed for the first time that, after a detailed review and assessment of North Goonyella, it had determined that it would no longer pursue access to the 10N panel and would try to mine North Goonyella's undeveloped southern panels, beginning with the 6 South panel. ***Based on the new approach, the Company expected no meaningful coal volumes at North Goonyella for three or more years.*** On this shocking news, Peabody's shares fell $3.56 per share, or 22 percent¸ closing at $12.48 per share on October 29, 2019, down from the previous day's close of $16.04 per share.

18.     Peabody's stock never recovered. On March 15, 2021, the Company's stock closed at approximately $4.00 per share, down from Class Period highs of more than $47 per share.

19.     As a result of Defendants' false and misleading statements and omissions, the precipitous decline in the price of the Company's common stock and Plaintiffs' and other Class members' significant losses were foreseeable to Defendants.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Peabody common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.   PARTIES

23.     Court-appointed Lead Plaintiff Oregon Public Employees Retirement Fund, established in 1946, is the retirement and disability fund for public employees in Oregon. It is a sophisticated institutional investor that had approximately $75,600,000,000 in total pension assets under management as of March 2021. As set forth in the Certification previously submitted to the Court (ECF No. 12-1), Lead Plaintiff purchased or otherwise acquired Peabody common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

24.     Defendant Peabody is a Delaware corporation headquartered in St. Louis, Missouri. The Company's stock is listed on the NYSE under the ticker symbol "BTU."

25.     Defendant Glenn L. Kellow ("Kellow") was, at all relevant times, Peabody's President and Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors. Peabody announced on March 18, 2018, that Kellow would be leaving the Company in August 2021.  Kellow signed Peabody's annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Peabody's

- 19 -

internal controls over financial reporting. Throughout the Class Period, Kellow also participated in each of the Company's quarterly earnings conference calls described herein. Kellow was a direct and substantial participant in the fraud.  Kellow's total estimated compensation during the Class Period was as follows:

(a)     $20.6 million for fiscal 2017 (including: (a) $1,018,809 in base salary; (b) $15 million in Stock Award Value; and (c) $4.6 million in Other Compensation including Non-Equity Incentive Plan Compensation);[11]

(b)     $7.3 million for fiscal 2018 (including: (a) $1,080,647 in base salary; (b) $5.2 million in Stock Award Value; and (c) $1 million in Other Compensation including a bonus of $884,783; and

(c)     $7.6 million for fiscal 2019 (including: (a) $1.1 million in base salary; (b) $5.22 million in Stock Award Value; and (c) $1.3 million in Other Compensation including Non-Equity Incentive Plan Compensation).

26.     Defendant Amy B. Schwetz ("Schwetz") was, at all relevant times, Peabody's Executive Vice President and Chief Financial Officer ("CFO"). Schwetz signed Peabody's annual reports and certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Peabody's internal controls over financial reporting. Throughout the Class Period, Schwetz also participated in each of the Company's quarterly earnings conference calls described herein.

---

[11] Under Peabody's 2017 Incentive Plan, the Company granted Emergence RSU Awards to all active employees, including Kellow and Schwetz. These Emergence RSU Awards vested ratably on each of the first three anniversaries of the grant date, subject to continued employment. The ultimate value of the Emergence RSU Awards depended on the sustainability of Peabody's financial results in the years following grant in 2017. Kellow was granted 680,890 RSUs with a "Target Value" of $15 million. Schwetz was granted 236,042 RSUs with a "Target Value" of $5.2 million.

Schwetz was a direct and substantial participant in the fraud. Schwetz resigned from Peabody in January 2020, soon after the end of the Class Period.[12] Schwetz's total estimated compensation during the Class Period was as follows:

(a)     $7.69 million for fiscal 2017 (including: (a) $556,250 in base salary; (b) $5.2 million in Stock Award Value; and (c) $1.9 million in Other Compensation including Non-Equity Incentive Plan Compensation);

(b)     $2.8 million for fiscal 2018 (including: (a) $593,750 in base salary; (b) $1.38 million in Stock Award Value; and (c) $841,681 in Other Compensation including Non-Equity Incentive Plan Compensation); and

(c)     $2.3 million for fiscal 2019 (including: (a) $624,500 in base salary; (b) $1.6 million in Stock Award Value; and (c) $77,785 in Other Compensation).[13]

27.     The Individual Defendants were compensated, in part, pursuant to Peabody Short-Term Incentive Plan ("STIP"), which is structured with performance metrics that emphasize profitability and safety. In 2018, adjustments were made to: (i) reduce the weight of the safety metrics from 25% to 20%; and (ii) replace Individual Performance metrics with Free Cash Flow Per Share.

28.     The Individual Defendants made, or caused to be made, false statements that artificially inflated the price of Peabody common stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Peabody's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The

---

[12] Schwetz left Peabody during the first quarter 2020.
[13] Schwetz received no Non-Equity Incentive Plan Compensation for 2019 due to her resignation.

Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to—and were being concealed from—the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

29.     Founded in 1883 and headquartered in St. Louis, Missouri, Peabody is currently the largest coal mining company in the world, with operations throughout the United States and Australia. During the Class Period, Peabody owned and operated 23 coal mining operations. Peabody is considered the leading pure-play coal miner with large scale operations in the U.S. and Australia and exposure to thermal and metallurgical coal. Although U.S. thermal coal demand is stabilizing, Peabody is a big player in the metallurgical coal market.

30.     The Company's coal mines are organized into six business segments, the largest of which is the Australian Metallurgical Mining segment, in which Peabody owns and operates seven (7) Australian mines. Prior to the start of the Class Period, in 2016, the Australian Metallurgical Mining segment accounted for 23.1% of the Company's revenues.

31.     One mine within the Australian Metallurgical Mining segment is Peabody's flagship North Goonyella mine which was acquired by the Company in 2004.

### 1.   North Goonyella Mine – Peabody's Most Profitable Mine

32.     The North Goonyella mine is an underground coal mine located in the Bowen Basin in Central Queensland, Australia – approximately 65 kilometers north of Moranbah and 160 kilometers west of Mackay.

33.     The North Goonyella coal seam is considered one of the three (3) premier metallurgical (also referred to as "met") quality coal mines in the world and it met coal commands compelling margins for Peabody during times of strong industry conditions.[14]

34.     In recent years, the strong cyclical recovery in steel has created extended strength in met coal prices. North Goonyella ships a high-quality hard coking coal that typically realizes at or near the benchmark for premium or high-quality hard coking coal.[15]

35.     According to media reports, the mine has coal reserves amounting to 175 million tons of coking coal -- one of the largest coal reserves in the world. The mine's costs have typically averaged at or above the high end of Peabody's met coal cost per ton, with a target range of $85 to $95 per short ton.[16]

36.     According to *The Australian Financial Review*, the North Goonyella mine is Peabody's "most profitable single operation,"[17] and in 2017, it generated approximately $100

---

[14] Coked coal is a fuel with a high carbon content and few impurities, made by heating coal in the absence of air. It is an important industrial product, used mainly in iron ore smelting, but also as a fuel in stoves. Coking coal, also known as metallurgical or "met" coal, is used to create coke, one of the key irreplaceable inputs for the production of steel.

[15] Hard coking coal is an input into the production of steel, rather than being used only as a fuel. In this way, the demand for coking coal is tied to the demand for steel.

[16] A short ton is a mass measurement unit equal to 2,000 pounds-mass and is commonly referred to in the United States simply as a ton.

[17] Matthew Stevens, *Peabody rewrites the rulebook after wildfire at North Goonyella*, THE AUSTRALIAN FINANCIAL REVIEW (Mar. 28, 2019), https://www.afr.com/companies/mining/peabody-rewrites-the- rulebook-after-wildfire-at-north-goonyella-20190327-p51853.

million, or approximately 20%, of Peabody's total operating profit of $498 million.[18]  Indeed, on August 1, 2017, Defendant Kellow represented that North Goonyella was "running at its best performance in 5 years." And, on October 25, 2017, Defendant Schwetz and Kellow both boasted of "record production and strong sales volumes the from North Goonyella Mine."

37.    In May 2017, Defendant Kellow acknowledged the importance of the mine, describing North Goonyella as a "high margin mine" that is the "core of [Peabody's] met coal platform." Because the North Goonyella mine was the Company's "most profitable single operation" and core to its "met coal platform," the mine's success was essential to driving the Company's overall success as it emerged from bankruptcy at the start of the Class Period.

38.    Total annual coal production from North Goonyella varies significantly based on whether or not there is a longwall move during the year. A longwall move at North Goonyella typically takes 2-3 months, and during that time as equipment is moved, coal production is reduced or "offline." The mine had been averaging approximately one move each 15 months in the northern section of the mine. Thus, in 2016, a year with a longwall move, the North Goonyella mine shipped 1.6 million tons of coal, but in 2017, a year with no longwall move, the mine shipped a record 2.9 million tons of coal.

39.    In July 2018, Peabody announced that it had committed to a mine life extension at North Goonyella, with the introduction of a new mining area, North Goonyella South, which would see longwall mining continue at North Goonyella until 2026 and would secure the jobs of the more than 230 workers employed by the mine.

---

[18] Matthew Stevens, *Peabody pondering life after its North Goonyella mine*, THE AUSTRALIAN FINANCIAL REVIEW (Oct. 16, 2018), https://www.afr.com/companies/peabody-pondering-life-after-its- north-goonyella-mine-20181016-h16pr8.

40.     Coal from North Goonyella is transported to ships at Australian ports for export to customers in India, China, and South Korea.  Peabody has longstanding relationships with Indian steelmakers whose demand for metallurgical coal has substantially increased in recent years.

41.     For example, in its February 6, 2019 press release announcing the Company's fourth quarter 2018 and full year 2018 results, Peabody highlighted the ongoing importance of the Asia/Pacific region in 2018.  Peabody stated:

> Seaborne metallurgical coal supply/demand balance remains favorable.  India continues to demand metallurgical coal to meet its steel making needs, with metallurgical coal imports rising 5 percent in 2018 over the prior year. . .  Increased steel production from ASEAN nations also continues to support seaborne metallurgical coal demand.

### 2.     Longwall Coal Mining

42.     In excavating coal from the North Goonyella mine, Peabody uses a method called longwall mining. This method utilizes heavy machines underground to cut large panels of coal, typically 2 to 2.5 miles long and 850 to 1500 feet wide.

43.     A longwall mining system consists of many components – approximately 200 hydraulic Roof Supports, an armored face conveyor (complete with head and tail drives), a shearer machine to cut the coal, a stageloader, crusher, mobile belt tailpiece, electrical supply and transformers. Below is an example of a CAT longwall system.



44.     According to a longwall mining expert, there is a significant amount of
engineering and design work to make all of the components of a longwall system compatible.
The Roof Supports are electro-hydraulic and have highly sophisticated electronic programming
to automate them.  Even the belt conveyor drive system is specifically designed for the longwall.

45.     Longwall mining requires the longwall to be moved to different sections (or
panels) once the available coal has been mined which is an expensive and time-consuming
process. One of the methods that companies use to minimize the downtime for a longwall move
is to have a second set of equipment already set up in the next area to be mined, with the only
components that are required to be moved being the Roof Supports – simply due to their
significant weight and cost.  Especially with very long panels, the company will remove the
equipment from the finished panel and have it rebuilt while they mine the next panel. With the
exception of the Roof Supports (which a company usually only has one full set of), longwall
equipment will typically only be used on every other panel or mine face. An example of a single
Roof Support for a longwall mining system is pictured below:



46.     In short, the goal in longwall mining is to remove essentially all of the coal from a broad coal "face" and allow the roof and overlying rock to collapse into the void behind, while maintaining a safe working space along the face for the miners.

47.     Before longwall mining begins, gate roads are driven to the back of each panel. The gate road along one side of the block is called the "Maingate" or MG and the road on the other side of the longwall panel is called the "Tailgate" or "TG." The Maingate side of the panel is where auxiliary equipment is located, including the belt conveyor, electrics, and stageloader.

48.     Longwall mining often causes methane and other dangerous, flammable gases to be released underground, elevated concentrations of which often occur when production rates are high. When longwall mining equipment is repositioned within the mine, ventilation controls are changed which can create additional issues relating to gas levels. Finally, during the beginning and ending of the mining of longwall panels, conditions within the mine can leave the mine more prone to spontaneous combustion events if flammable gases come into contact with a heat

source. As a result, it is imperative that mines utilizing the longwall mining method implement

adequate safety measures to protect against these risks, including, among others, ventilation

systems, methane drainage methods, gas monitoring controls, and airtight seals.

49.     Prior to the September 2018 fire at North Goonyella, Peabody had announced that

it was in the middle of a two-month longwall move from the 9N panel to 10N panel.  Upon

disclosing the fire on September 28, 2018, Peabody announced that activities at North Goonyella

"ha[d] been delayed for about two and a half weeks thus far and the company is working toward

resuming operations. Peabody is well over halfway through the two-month longwall move at this

point.  The longwall move, which was expected to be completed in September [2018], is now

targeted for completion in the early part of the fourth quarter," (or, sometime in October 2018).

50.     According to a longwall mining expert, due to geologic conditions of the mine,

the panels in the northern portion of the North Goonyella mine are considerably longer than the

panels in the Southern part of the mine. (see sketch of mine panels at North Goonyella below).

Because of this difference in length, more frequent longwall moves are required when mining the

southern panels of the mine. More frequent longwall moves occasioned by the shorter panels in

the southern half of the mine significantly affect the average annual volume of coal production at

North Goonyella as coal production is reduced or "offline" every time a longwall move occurs.

Between the winding down of production as the Company finishes mining a panel, the move

time, and then the ramping up for a new panel, there is typically about one quarter of time

(approximately 2 to 3 months) of lost production time (approximately a 25%-30% annual

reduction in coal production) in years with a longwall move.  In fact, the Company has

represented that the average annual production at North Goonyella in a year without a longwall

move in the northern panels is approximately 3 million tons and 1.5 to 2 million tons in a year with a longwall move in the northern panels.



### 3.   Peabody's Health, Safety, Security, and Environmental Committee

51.    Peabody's Board of Directors (the "Board") has a "Health, Safety, Security, and Environmental Committee" (the "Safety Committee") that is responsible for reviewing significant mine safety risks, policies, and performance with Peabody management. In 2017, 2018, and 2019, the Safety Committee held 8, 9, and 6 meetings, respectively.

52.    The Safety Committee Charter lays out the Safety Committee's numerous oversight responsibilities, including:

(a)    "review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including such liabilities

reported in the Company's public reports and financial statements, and steps taken by management to address such risks, including contingency planning and emergency response activities."

(b)    "review at least annually the Company's health, safety, security and environmental objectives, policies and programs (including processes to ensure compliance with applicable laws and regulations), assessments of the effectiveness of such policies and programs (including periodic performance metrics and audits) and performance."

(c)    "review methods to communicate the Company's health, safety, security and environmental values and performance to Company employees and the public."

(d)    "review and discuss with management any material noncompliance with health, safety, security and environmental laws, including any pending or threatened administrative, regulatory or judicial proceedings related to such noncompliance, and management's response to such noncompliance."

(e)    "review and recommend approval of the environmental and mine safety disclosures required to be included in the Company's periodic reports on Forms 10-K and 10-Q."

(f)    "consider and advise the Board of Directors on health, safety, security and environmental matters and sustainable development and on the health, safety, security or environmental risks or exposures associated with projects for which management is seeking Board approval."

(g)    "consider and advise the Compensation Committee on the Company's performance with respect to incentive compensation metrics relating to health, safety, security or environmental matters."

(h)     "review and discuss with management significant legislative, regulatory, political and social issues and trends that may affect the health, safety, security and environmental management process and system in place at the Company or the Company's business operations, financial performance or public image, and management's response to such matters."

### B.     Background on Mine Safety Regulation by QMI

53.     QMI is the independent statutory body responsible for administering safety and health legislation in the Queensland mining, petroleum and gas, explosives and fireworks industries.  QMI's role is to ensure that acceptable safety and health standards are established and practiced within the mining and quarrying industries. QMI also establishes safety and health legislation and standards, undertakes audits and inspections, and promotes and participates in safety and health education programs.[19]

54.     The primary goal of the QMI at North Goonyella was to ensure no mine worker was put at risk. QMI inspectors can only issue recommendations to Peabody, they cannot tell mine management what to do. Only if a QMI inspector observes behavior that involves "unacceptable levels of risk," do they have the power to issue directives which must be followed. QMI Inspectors also are provided with company plans but are not responsible for giving direct approval to such plans. QMI Inspectors only provide acknowledgment that the company plans follow acceptable procedures.

---

[19] https://www.business.qld.gov.au/industries/mining-energy-water/resources/safety-health/mining/legislation-standards/inspectorate#:~:text=The%20Mines%20Inspectorate%20is%20part,gas%2C%20explosives%20and%20fireworks%20industries

C.    **Peabody Emerges From Bankruptcy in April 2017 Still Straddled With Debt, Just Less of It**

55.    On April 13, 2016, after a multi-year decline in coal prices that strained Peabody's ability to service its $10.1 billion debt load, the Company filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and Peabody's stock was delisted from the NYSE.[20] In bankruptcy, Peabody was able to wipe out approximately $5 million in debt.

56.    On April 3, 2017, approximately one year after filing for bankruptcy, Peabody announced that it had emerged from bankruptcy and that its stock would begin trading again on the NYSE at an opening price of $31.50 per share. Early market trading on April 3, 2017 put Peabody's market capitalization at around $4 billion.

57.    Following its emergence from bankruptcy, Peabody was faced with a fragile economic situation including a still high debt load. Thus, Peabody was motivated to massively ramp up coal production at its most profitable mines while cutting safety costs in order to boost the Company's bottom line.

58.    However, the Company was believed to be "well-positioned" to counter demand declines in the U.S. with its ability to serve growing Asian markets with premium met coal from its Australian operations, specifically high margin coal from North Goonyella.[21]

---

[20] The Company's Australian operations were excluded from bankruptcy.

[21] https://www.stltoday.com/business/local/one-year-after-bankruptcy-peabody-expresses-optimism-though-challenges-remain-for-coal-industry/article_77416645-110d-5ad8-8572-1f2c39d0b75c.html

### D.      Confidential Witnesses

59.     Former Peabody employees, former contractors working on site at the mine, and former mining inspectors responsible for the North Goonyella mine confirm that Peabody failed to implement adequate safety controls at the mine; faced serious staffing issues and a lack of experienced personnel as a result of layoffs preceding the Class Period; insufficiently trained North Goonyella mine employees to recognize potential ventilation and combustibility issues; and failed to follow Company safety procedures, giving rise to an increased risk for a spontaneous combustion event. These witnesses also provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions before both and after the September 2018 fire.

60.     CW-1 was employed as a Manager - Financial Modeling - at Peabody's Australian headquarters in Brisbane from November 2018 to December 2019. Prior to that, CW-1 was the Commercial Superintendent North Goonyella Coal from June 2012 to November 2018. During his time as Commercial Superintendent, CW-1 spent approximately two (2) months (from September and October 2018) at the camp site at North Goonyella, approximately 15 km from the mine, working as a part of the team tasked with determining the costs associated with re-opening the mine and preparing the financial projections for progress thereafter. In this role, CW-1 reported to Nick Oakley (Commercial Manager).

61.     CW-2 was employed as a Process Engineer for Peabody from February 2014 to July 2018 and rotated between the Moorvale, North Goonyella, and Wilpinjong mines. CW-2 worked at the preparation plant or the CHPP (coal handling and preparation plant) where he monitored the incoming and outgoing coal for quality. CW-2 reported to Paul McKenzie (former CHPP Maintenance Superintendent) who in turn reported to John Anger (then Director Safety Health Environment at North Goonyella).

62.     CW-3 was employed by Peabody as Manager of the Accounting team throughout the Class Period. In his role as a Manager of Accounting, CW-3 managed the accounting for the "coal trade" and worked closely with the Peabody trade desk.

63.     CW-4 was employed with Peabody throughout the Class Period and served as a Business Director during the Class Period at Peabody's St. Louis, Missouri headquarters. CW-4 worked alongside experts on blasting and geo-technical practices to identify, develop, record, and share best practice steps that could be used in all Peabody mines to make mining more efficient.

64.     CW-5 was employed at Peabody from before the Class Period through early summer 2018.  CW-5 served as a Project Manager and Engineer with a focus on Longwall Move Optimization, including at North Goonyella.  CW-5 frequently traveled to North Goonyella as part of his responsibilities at Peabody and reviewed longwall plans as part of his expertise.

65.     CW-6 was an employee of Peabody from before the Class Period until August 2019, most recently as the Health Safety Training Manager.[22] Prior to that, CW-6 worked as an underground operator in a contracted position at the North Goonyella mine for several years. Following the North Goonyella "spontaneous combustion" (referred to herein as "spon com"), CW-6 was assigned to the Incident Management Team ("IMT") at North Goonyella and served as the scribe for that team.

66.     CW-7 was employed as a Superintendent by Peabody at the North Goonyella mine from March 2018 to October 2018. During this time, CW-7 had responsibility for the

---

[22] Plaintiff believes that the details of the responsibilities of all of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA. However, Plaintiffs can provide additional specificity, including exact titles for CW-5, CW-7 and CW-8, to the Court through an *in camera* submission.

nitrogen pumps that were tasked with reducing oxygen levels in the mine. Prior to his time with

Peabody, CW-7 worked as a consultant for other major coal companies in Australia.

67.     CW-8 was an Engineer for Peabody from May 2018 to January 2021. CW-8

began his tenure with Peabody working with the engineering team at North Goonyella Mine

before transitioning to the Incident Management Team ("IMT") where he took the role of

Planning Coordinator for approximately 7-10 months beginning in September 2018. CW-8

explained that following his time with the IMT, he rejoined North Goonyella's engineering team

of approximately 20 people until he left the mine in January 2020 to go work at another Peabody

mine until January 2021.

68.     CW-9 was a Regional Inspector of Mines at the Department of Natural Resources,

Mines and Energy (f/k/a the QMI) in Central Queensland from March 2017 to March 2019. CW-

9 has approximately 44 years of underground coal mining experience including in Queensland,

Australia. CW-9's specialty was ventilation and gas, which made him well-suited to address the

issues at North Goonyella.

    **E.      Fire at North Goonyella Mine**

        **1.      Peabody Acquires North Goonyella Mine With Full Awareness of Its
                  Volatile Nature**

69.     Peabody acquired the North Goonyella mine in April 2004.[23]  It was well-known

throughout Peabody that the North Goonyella mine was historically a safety risk. Because the

North Goonyella mine was "gassy" and at risk for a spontaneous combustion event, constant

monitoring of mine gases was required.

---

[23] https://miningdataonline.com/property/530/North-Goonyella-Mine.aspx

70.     Even prior to Peabody's acquisition of the North Goonyella mine in April 2004, reports identified the mine as having "outburst potential."[24]  Indeed, both methane and carbon dioxide outbursts occurred in the 1980s and 1990s to the north and south of the North Goonyella mine.  The mine itself experienced spontaneous combustion events in 1997, 1998, and 1999.  A report from June 2000, identified a fire at the mine, which because of "intense heat," caused "deformation of the [Bootend] housing."  The report further noted that the "incident highlights the need for eternal vigilance during inspections."

71.     After the acquisition of North Goonyella by Peabody, the mine continued to experience spontaneous combustion and heating events, and frequent instances of elevated methane levels.  For example, in August 2004, the mine was evacuated due to a spontaneous combustion event and elevated gas levels.

72.     In January 2014, elevated methane levels and the presence of ethylene (dangerous even in minute levels) were detected at the mine. As a result, an emergency seal was constructed in Longwall Tailgate 7 at North Goonyella.

73.     One month later, in February 2014, mine workers were evacuated from the mine due to the activation of a Level 4 TARP in Longwall 7 North, which required an emergency sealing. Re-entry was initially not permitted because Peabody could "not demonstrate that adequate controls ha[d] been implemented" so that the level of risk would be acceptable to re-enter the mine.

---

[24] https://ro.uow.edu.au/cgi/viewcontent.cgi?article=1199&context=coal

### 2. The Lack of Adequate Safety Procedures and Other Problems at the North Goonyella Mine Before the September 2018 Fire

74. During the Class Period, in stark contrast to Defendants' public statements, the North Goonyella mine lacked: (i) sufficient safety measures and (ii) compliance with and adherence to internal Company safety protocols and Australian mining regulations.

75. Because of the natural geologic conditions at North Goonyella, constant gas monitoring and proper ventilation was incredibly important.

76. CW-5 advised that the underground in Queensland, Australia (where the North Goonyella mine is located) is "notoriously gassy" and that there is the opportunity for a dangerous situation due to the inherent risk level of the mine conditions. CW-5 explained that the ventilation engineer at North Goonyella needs to be "on top of his game" as the coal has a propensity to combust and is arguably the most dangerous in the world.

77. CW-7 also confirmed that North Goonyella was more susceptible to this type of event than other mines and that moving a longwall panel from one face to another often causes increased gas levels on the return side because actual mining processes have temporarily ceased.

78. CW-7 explained that Peabody monitored gas levels at North Goonyella in a number of ways. According to CW-7, one form of monitoring within the mine included twice daily MOP (Mine Operational Plan) meetings between all staff at the superintendent level and higher. According to CW-7, the MOP meetings took place twice daily: (i) in the morning where they reviewed the previous 24 hours; and (ii) in the afternoon (prior to the beginning of the night shift) to discuss the next 24 hours. CW-7 explained that in the MOP meetings, the group discussed what was meant to happen during those timeframes and then what did happen, including any specific events. CW-7 confirmed that during his tenure in 2018, John Anger

(Director Safety Health Environment) and Marek Romanski (then Underground Mine Manager), or a representative on Romanski's behalf, would attend the MOP meetings.

79.     CW-7 confirmed that every event that occurs in the mine is recorded by the Mines Department.

80.     According to CW-7, there is a separate, automated system in the mine called CITEC that also records gas levels, among other things. According to CW-7, the CITEC system is monitored 24 hours a day and seven days a week by a control room operator. CW-7 advised that in addition to the control room operator, there were also screens throughout the mine that displayed the CITEC readings, which could be observed by the entire workforce.

### 3.     Peabody Pushed North Goonyella Mine Management to Extract Coal Without Sufficient Attention to Risk Management and Safety

81.     In 2017, Peabody achieved record levels of coal production at North Goonyella – almost 3 million tons in a year without a longwall move. Forecasts for coal production at North Goonyella in 2018 were aggressive, especially when considering that there was a planned longwall move at the mine in 2018 which would mean at least two to three months of restricted or no coal production.

82.     As set forth herein, Peabody corporate's extremely aggressive coal production schedule and aggressive forecasts caused mine management at North Goonyella to prioritize coal production over mine safety throughout the Class Period.

83.     According to CW-5, the Peabody culture was to "push the boundaries of what was safe." CW-5 explained that the mine staff was always being "beaten down by Mother Nature and Peabody Management." CW-5 advised that Peabody's management was always thinking "money, money, money." CW-5 noted that he did not agree with the way the Company operated and he doubted Peabody management could even "run a small business in the outside world."

84.     CW-5 explained that Peabody management dictated what happened on the mine site and applied pressure on mine management, despite being nowhere near the realities of the mine. CW-5 recalled Peabody management always "pushing for more." CW-5 gave the example that if mine staff were to say the mine could produce 2 million tons of coal annually, Peabody would tell the shareholders it could produce 3 million tons annually. CW-5 explained that these unrealistic expectations put tremendous pressure on mine staff and led to bad decision making.

85.     CW-5 explained that Peabody "continuous[ly] misses on the small things" and "following the plan in place wasn't their strong suit" in regard to the staff at North Goonyella. CW-5 recalled witnessing North Goonyella staff missing small things on numerous occasions.

86.     CW-2 also witnessed mine personnel "cutting corners" and being "loose with the rules." CW-2 observed issues in adherence to the requirements set out by official procedures. For example, CW-2 explained instances at North Goonyella where steps were skipped or glossed over for the sake of speed and that mine management would either "turn a blind eye" or workers were praised for the speed in which a task had been completed. According to CW-2, he observed a number of times where issues occurred and official reporting would have been required, but instead the decision of whether or not to report was determined after the fact and many such times resulted in no reporting at all. CW-2 noted that he did not observe this type of behavior in the Moorvale or Wilpinjong mines that he rotated through.

### 4.     Peabody Failed to Properly Staff North Goonyella and Properly Train Its Mine Personnel

87.     According to CW-6, the issues at North Goonyella mine extended much further back than the 2018 spon com (spontaneous combustion) event. According to CW-6, layoffs at North Goonyella in 2015 cut "most of the meat" leaving North Goonyella starved of leadership. CW-6 stated that in the wake of the cuts in 2015, which included many management positions at

the mine, the number of contractors went "way up" and the workload tripled. According to CW-6, key mine positions remained vacant long after the workload ramped up. CW-6 noted that the Health and Safety group consisted of 12 people when he first started, but had been whittled down to only three people. CW-6 recalled it being very difficult to keep up with training during this time period.

88.     CW-6 brought up the staffing issues during the Safety and Way of Life ("SAWL") audits in 2016 and 2017. CW-6 specifically recalled showing Ian Humphris (former VP Health Safety and Environment) a list of issues and Humphris agreed about the need for additional managerial support at North Goonyella. CW-6 explained that due to the shortness of staff, employees in management positions were regularly working 14 plus hour days, which broke fatigue rules. CW-6 recalled Marek Romanski (then Underground Mine Manager at North Goonyella) clocking out of his shift and then going back to work in order to circumvent the fatigue rules. CW-6 advised that this continued for years with upper management saying that the North Goonyella staff was working too much, but failing to provide additional support.

89.     Further exacerbating personnel issues at the mine was the fact that remaining staff were long tenured and high paid, thus replacement personnel were typically hired on the cheap – and were mostly younger and inexperienced mine workers:

        (a)     CW-2 described issues with the culture at the North Goonyella mine and explained that North Goonyella was different than other mines he rotated through. According to CW-2, North Goonyella was an approximately 25 year-old mine and that the strength of the mine union made employee turnover and change slow going. CW-2 advised that much of the North Goonyella mine staff had been there for a very long time, even since the mine first opened, and that they were very set in their ways.  CW-2 advised that his interactions with mine management

at the North Goonyella site was difficult as the site level staff remained largely the same over the years. According to CW-2, the culture was ingrained in the staff from many years of the same employees working at the mine.

(b)     CW-7 confirmed that North Goonyella had a considerably older and longer-tenured staff than the other mines he worked at and he suggested that this may have contributed to the systems and processes which CW-7 described as "not the most up to date or efficient."

(c)     CW-2 advised that North Goonyella did not always staff positions appropriately. CW-2 advised that while the North Goonyella staff was older than at most other mines it meant that they tried to staff remaining open positions with recent graduates as a cost saving measure.   CW-2 explained that recent graduates were often placed in "big" roles with a lot of responsibility that did not afford them the necessary room to make mistakes and learn.

(d)     CW-2 stated that the staff at North Goonyella did not feel like their grievances were heard and they "felt like nothing would change."  According to CW-2, these grievances included safety issues.  CW-2 estimated that between October 2017 and July 2018, five young team members who could have excelled in leadership roles left Peabody because of their negative experiences at North Goonyella. According to CW-2, one employee whose background was as a gas drainage engineer and a geologist was forced to serve as a ventilation engineer to fill a role in which Peabody had not hired a proper specialist.

(e)     CW-5 recalled that Peabody had parted ways with an expert ventilation engineer with 15-20 years of experience while CW-5 was an employee. CW-5 advised that Peabody had shifted towards hiring naive and inexperienced employees who did not know the mine well and were not aware of the constant level of danger. CW-5 noted that Peabody

management had a propensity to hire inexperienced employees that they could "push around" and "yes men" that would not question the practices at the mine like older and more experienced employees might.

90.     CW-2 added that there is a lot of training that goes into to ensuring things run appropriately, but that this was not his experience at North Goonyella.

91.     CW-2 explained that Peabody took an "ad hoc" approach that would include himself and members of the engineering team who lacked underground experience and were then responsible for these tasks and the risk of something going wrong was "very, very high." CW-2 added that a colleague who at the time was in charge of a lot of administrative training expressed that while he did not wish anything bad upon the plant, he did hope for a "big near miss" to "get people to wake up."

92.     CW-6 explained that another key decision that was detrimental to the operations at North Goonyella was replacing Site Senior Executive ("SSE") Michael Carter with John Anger in April 2018. CW-6 advised that Carter was retained at North Goonyella, but Anger was appointed as the most senior member of the mine. CW-6 explained that Anger lacked the technical background of Carter and that CW-6 was "concerned" about Anger's lack of experience in underground mines. CW-6 added that ultimately it was Anger's job to ensure the health and safety of the mine as the most senior mine official.

### 5.     Elevated Levels of Methane Reported at North Goonyella Throughout 2017 and 2018

93.     Throughout 2017 and the first half of 2018, elevated levels of methane gas ($CH_4$) were recorded in the 9 North longwall face and/or tailgate roadway. For example:

(a)     According to a High Potential Incidents ("HPI") report, on January 31, 2017, elevated methane gas was reported in the 9 North tailgate roadway at North Goonyella,

which caused coal production to be stopped and longwall operators to withdraw from the 9N

longwall face.

       (b)     According to a MRE report, the next day, on February 1, 2017, the mine

reported three exceedances of 2.5% methane in the longwall tailgate which requires the

withdrawal of mine personnel.  The MRE also highlighted that the longwall was experiencing its

first full caving and floor fracture in the mined-out area (goaf). The QMI Inspectors

recommended that Peabody management look more critically at its reports to ensure that all

safety related items, specifically those listed in Schedule 5 (and referred to in Section

309(3)(b)(i) Coal Mine Safety & Health Regulations 2001), were included in Peabody's statutory

reports.  As the longwall removes the coal and the entire set of Roof Supports move forward, it

opens up large areas behind the longwall face.  This is especially true when a panel first begins,

and as a result, you may have a significant distance before the first full caving happens.  When

the first roof fall occurs, it pushes a tremendous amount of air across the face, and so the

ventilation in the mine is changed, which can result in high methane levels in the working areas.

       (c)     A risk assessment conducted by the QMI on February 9, 2017 detailed a

concerning lack of adequate hazard identification at the mine. Because Peabody was not

demonstrating effective consistent management of these matters at all levels, the QMI verbally

provided the North Goonyella site supervisor with certain directives including to: (a) review the

Principal Hazard Management Plan for Gas Management including the risk assessments and

TARPs, and to implement effective adequate controls for the management of flammable gases;

and (b) review the application of adequate controls to ensure that triggering levels of flammable

gas were not detected.  Both directives were due by March 16, 2017.

(d)     There were numerous occasions in early 2017 where the methane levels in North Goonyella's tailgate general body exceeded 2.5%.  The reports also indicate a concerning and repeated failure by Peabody to withdraw or evacuate its mine personnel to a place of safety in the face of the elevated gas levels. Instead, it appears Peabody frequently continued on with coal production operations while methane levels were in excess of 2.5%. This is a clear breach of Coal Mining Safety and Health Act Section 273 which requires evacuation (or withdrawal) of mine personnel when methane levels exceed 2.5%.

(e)     In April 2017, managing high methane levels in the Tailgate continued to be a problem at the mine, despite coal production being idle for more than 20 hours before the elevated levels were recorded.[25] The report specified that each exceedance of trigger levels needed to be further investigated by Peabody to identify all contributing factors so the Company could ascertain what was causing the elevated gas readings.

(f)     In July 2017, methane levels in the 9 North Tailgate roadway remained elevated over 2.5% for several hours, peaking at between 3% and 3.9%%.[26]

(g)     In September 2017 and November 2017, methane levels in the 9 North Tailgate roadway remained elevated over 2.5% for several hours, peaking at 2.65% and 2.95%, respectively.[27]

(h)     According to a November 20, 2017 MRE report, the QMI convened a Level 4 meeting with North Goonyella coal mine management concerning the elevated methane gas levels at the mines in January 2017, which was attended by: (i) Peter Baker (Peabody Vice President), (ii) Mike Carter (Site Senior Executive), and (iii) Marek Romanski (then

---

[25] *See* April 27, 2017 MRE.
[26] *See* July 11, 2017 and July 12, 2017 HPI reports.
[27] *See* September 3, 2017 and November 5, 2017 HPI reports.

Underground Mine Manager). The QMI recommended that senior mine managers at North

Goonyella attend a Level 4 compliance meeting with the chief inspector at QMI due to their

repeated failure to follow safety protocols.

(i)     In May 2018, methane levels over 2.5% were recorded in a "development

area" of the mine.[28]

(j)     On several days throughout June 2018, and again in July 2018, methane

levels over 2.5% were detected and access to both two mine faces was restricted.[29]

### 6.     Elevated Methane and Ethylene Levels Detected at North Goonyella in Late August 2018 Leads to Mine Evacuation

94.     According to CW-9, prior to the September 2018 fire at North Goonyella, he had

been to North Goonyella on many prior occasions including for "high potential incidents"

("HPI"), workforce withdrawals, and serious accidents. CW-9 explained that, in the past, he had

received notices of HPIs at North Goonyella concerning methane levels that exceeded 2.5% and

had conducted inspections in connection with those reports.[30]

95.     CW-9 was involved with the longwall move at North Goonyella prior to the

evacuation and fire. CW-9 explained that his primary goal at North Goonyella was to ensure no

worker was put at risk. CW-9 emphasized that the QMI inspectors could not tell mine

management what to do but could only issue recommendations to the Company. According to

CW-9, if an inspector witnessed behavior that involved "unacceptable levels of risk," QMI had

the power to issue directives, which had to be followed. CW-9 also stated that QMI inspectors

---

[28] *See* May 30, 2018 MRE.

[29] *See* June and July 2018 HPIs.

[30] Under the Coal Mining Safety and Health Act, HPI reports must be completed if methane levels underground exceed 2.5%.

could not "be a part of the solution" or part of the risk management Incident Team, but as a QMI

Inspector, he did receive daily updates from the Company.

96.     CW-9 explained that he had been provided the North Goonyella Sealing

Management Plan weeks before the planned longwall move. CW-9 advised that he reviewed the

plan, but that QMI inspectors are not responsible for giving direct approval to such plans.  CW-9

added that the QMI Inspector "gives acknowledgment" that the plan follows acceptable procedures

and noted that this plan was similar to the previous longwall move that had occurred at North

Goonyella.

97.     CW-6 explained that between August 21, 2018 and August 28, 2018, the staff at

Peabody failed to appropriately follow the Sealing Management Plan, a plan that CW-6 advised

they had executed multiple times. CW-6 recalled that the most recent longwall move, when

Michael Carter was still the SSE, had been the "most successful longwall move in North

Goonyella history" and the August 2018 move was operating under the same plan, but with

minor modifications.

98.     However, according to CW-6, the plan was not followed and there were specific

shortcomings in the preparation phase during when gas levels are taken and the seals are

prepared, responsibilities that belonged to Dennis Black (North Goonyella's Ventilation Officer).

CW-6 advised that the first seal had not even been prepared when the longwall had already been

moved halfway. CW-6 explained that the first seal occurs in the tailgate, which is the gassiest

portion of the mine and labor should have been allocated to this task. CW-6 explained that

"longwall makes the money" and the desire to get the move done quickly and a lack of

coordination and leadership contributed to the incorrect and dangerous sequence of events.

99.     CW-5 recalled that following the combustion event at North Goonyella he called

several of his former colleagues who were working at the mine at the time and he was told that

they didn't follow the longwall plan. According to CW-5, a Peabody employee informed him that Peabody "[expletive] up some of the ventilation" and this caused a heating that Peabody then "did not handle as well as they could have."

100.    CW-5 advised in cases where the longwall was moved too soon, there would likely be incident reports.

101.    CW-6 advised that he heard others at the mine had evidence of "spon com" occurring prior to the August 28, 2018 readings. According to CW-6, there are two different devices that read gas levels in the mine, one is a real-time reader, which only picks up four different gases and the other, the "tube bundle," completes readings for a wider array of gases over an approximately 20-minute cycle.

102.    CW-6 explained that in August 2018, there had been readings of ethylene, which at minute levels serves as a warning as it is not common in mines. According to CW-6, he heard that in August 2018, there was an Ethylene reading of 1 ppm (an Ethylene reading of 5 ppm triggers an immediate mine evacuation). CW-6 added that the danger with Ethylene is that it is not easy to ascertain how much time from its emergence there is before an event occurs.

103.    CW-5 confirmed that if there was a reading of Ethylene in North Goonyella, this was a "red flag" because Ethylene is "a fair way down the combustion curve." CW-5 explained that the presence of Ethylene should warrant an investigation immediately as it may be the leading indicator that there is a fire.

104.    According to CW-6, he was aware that on August 28, 2018, the mine reached a Level 3 trigger due to heightened gas readings and that workers wanted to evacuate the mine at that point instead of waiting for the gas readings to reach a Level 4.

105.    CW-9 corroborated that on August 28, 2018, the mine reported the initial withdrawal (i.e., evacuation) of all workers due to high methane levels, which triggered the filing of a HPI. CW-9 explained that the men eventually returned to the mine that day, following a decreased reading of methane levels.

106.    On August 30, 2018, miners were withdrawn again from the mine due to elevated gas levels in the 9 North Tailgate area. CW-9 corroborated that on August 30, 2018 another withdrawal occurred due to high methane levels.

107.    On August 31, 2018, miners returned underground only to be evacuated/ withdrawn that afternoon. The miners on the nightshift returned underground.

### 7.    Containment Efforts at North Goonyella

108.    On September 1, 2018, high methane levels caused the immediate evacuation of all underground mine personnel at North Goonyella.  In the hours that followed, the mine's spontaneous combustion triggers were reached, escalating the level of risk.

109.    According to CW-9, on September 1, 2018, carbon monoxide (CO) levels reached approximately 700 ppm.

110.    With the limited exceptions listed herein, miners were not allowed back underground at North Goonyella until July 2019.  However, between September 1, 2018 and September 14, 2018 while underground access was prohibited, the following individuals entered the mine:  (i) One crew went underground to install an auxiliary fan and tubing on the takeoff face; (ii) deputies conducted inspections underground for a short period of time following withdrawal; (iii) members of the workforce returned underground on a voluntary basis to deal with the water that was created due to power being off underground for six (6) days and to move machinery blocking ventilation paths; (iv) electricians and fitters returned underground for critical work in their respective fields; and (v) mine officials returned underground to inspect

- 48 -

certain affected areas. During this time (September 2018), re-entry plans contemplated only volunteer personnel as Peabody could not force mine employees to enter the mine given the emergency state of the mine.[31]

111.    CW-9 recalled receiving a call on September 2, 2018 from Marek Romanski (Underground Mine Manager at the time) and being updated on the situation. CW-9 recalled thinking that "something else was going on" once he heard about the high levels of carbon monoxide. CW-9 arrived at the mine in the afternoon on September 2, 2018.

112.    CW-6 advised that neither he, John Anger (SSE) nor Steven Stook (Tech Services Manager) were onsite from August 31 - September 2, 2018, and that he did not receive a prompt to check the automated messages from the mine that would have informed him of that the Level 4 trigger had been reached (indicating high carbon monoxide levels and oxidation) on September 3, 2018.

113.    CW-7 recalled that at the beginning of September 2018, when he returned to the mine from Brisbane, contractors had withdrawn from the mine and had adopted a "wait and see approach" about going back in.

114.    CW-6 recalled that on September 3rd when he returned to the mine, SSE John Anger distributed duty cards which defined employees' new roles as part of the Incident Management Team ("IMT"). CW-7 corroborated that after the evacuation, everyone received "duty cards" that described their new roles under these unique circumstances.

115.    CW-6 recalled that from September 3rd to September 28th, he and his colleagues were working 20-hour days for months on the "front lines."

---

[31] *See* 9/8/18 MRE.

116.    CW-7 also discussed the formation of the IMT which included approximately ten individuals from various functions (mining, engineering, external parties, etc.) and explained that the IMT team meetings replaced the MOP meetings. IMT would meet twice a day and a team headed by the Health Safety Training Manager was responsible for recording the IMT discussions.

117.    CW-7 recalled the introduction of morning briefings with the entire mine staff to discuss the North Goonyella situation.

118.    CW-9 advised that MREs prepared by the QMI in September 2018 reflect the discussions of the daily morning meetings at North Goonyella, where he received gas figures, discussed the prior day, plans for the current day, and offered his recommendations. CW-9 recalled that the participants in these daily meetings included: (i) Peter Baker (former Senior Vice President – North Queensland Operations); (ii) John Anger (Senior Site Executive), (iii) Marek Romanski (thenUnderground Mine Manager), (iii) Martin Watkinson (technical expert from SIMTARS), and (iv) Darren Brady from Serinus Health and Safety Environment. CW-9 dealt with Peter Baker and recalled that Charles Lilly (Senior Director – Engineering) was brought in from Peabody U.S. to assist. CW-9 explained that as SSE, John Anger primarily was responsible for the business functions of the mine and that Marek Romanski, as UMM, was the primary decision maker regarding underground operations until Mike Carter was brought in as a consultant during the spontaneous combustion event in order to provide Romanski with opportunities to take breaks from the mine due to the expectation that the impending schedule would be very demanding. CW-9 explained that over time, Carter eventually assumed the responsibilities of the UMM, in terms of power, but not in title.

119.    CW-7 confirmed that his superiors referred to the event as a "heating" and that mine employees pushed back on that notion as they were concerned about the situation being more serious than simply a "heating."

### 8.    Peabody Mishandles "Heating Event" at North Goonyella Mine Which Threatens the Operation of the Whole Mine

120.    CW-6 worked ten consecutive days from September 3rd to September 13th, once it was determined by SSE Anger that 24-hour coverage of the mine was necessary. According to CW-6, during this time, he worked with: (i) Charles Lilly (Senior Director – Engineering) who was sent from Peabody HQ in Saint Louis, (ii) Robin Hall, (Senior Manager Program and Systems Training) and (iii) Lee Earnshaw (Development Coordinator).

121.    CW-6 recalled a desire to get back into the mine and that he had to "physically stop" Mike Carter from planning work. CW-6 advised that he stopped the mine from planning and conducting any work until it was known exactly what the ramifications of the event were. CW-6 referred to himself as the "driver" of the stoppage, citing the concern that the fire may have been an "environmental disaster" with serious risks if work resumed too early. CW-6 recalled a lot of tension around the toxicology and environmental issues surrounding the fire.

122.    CW-9 recalled that in the early days of September 2018, Peabody mine management was eager to get people underground and on approximately September 7, 2018, CW-9 instructed Peabody to produce a Risk Assessment plan. CW-9 explained that TARPs were designed for either: (i) an active longwall move; or a (ii) sealed longwall, and at the time neither was occurring, so he instructed Peabody to select a more appropriate TARP given the circumstances. CW-9 explained to Peabody that if they did not produce the appropriate risk assessment that he would not sign off on re-entry. CW-9 recalled the selection of the TARP associated with a sealed goaf and he instructed Peabody mine management that this is not the

TARP that he would have used. CW-9 explained that the TARP they had chosen identifies 450 ppm CO as a "code red" and that this was the "line in the sand." CW-9 advised that when levels hit this point, it is an indication to exit the mine and this level was achieved on approximately September 12, 2018 which forced personnel had to "come out and stay out." CW-9 explained that the TARP selected did give permission to send individuals underground to attempt to rectify the situation if CO reached 450 ppm, however, because the TARP was not specifically suited for the events occurring in the mine it did not possess any references to methane gas levels. CW-9 explained that 450 ppm carbon monoxide is much more dangerous when methane is not taken into account and as a result, he would not allow anyone to enter the mine.

123.    CW-9 suggested that Peabody construct a custom TARP that addressed both carbon monoxide and methane for this very reason. CW-9 explained that the existing TARPs were not constructed for this type of event and Peabody needed one that addressed multiple factors, especially at this time when they were aware that the goaf was full of methane and that the Graham's Ratio pointed towards a heating event occurring. CW-9 advised that Peabody had the necessary knowledge to create a new TARP at their disposal through the experts they had brought in, however, they elected to bypass that option. CW-9 noted that the reason behind this was possibly due to Peabody's reluctance to commit to the time required to develop a new TARP.

124.    CW-6 explained that in early September 2018, when he returned to the mine, Peabody was using the Transition TARP, which did not make sense because the mine was not prepared for this action and not a single seal was complete.

125.    CW-6 spoke with Lee Earnshaw (Development Coordinator) about Peabody's use of the Transition TARP which he felt was the incorrect choice. CW-6 also explained that for a

longwall there are two TARPs: (i) one for when the mine is producing which focuses on the gases emitted; and (ii) one for when it is not producing, which focuses on the safety of the workers. There also is a Transition TARP, which is only instituted when all five seals are built and the doors to the mine are about to be closed and the Seal Up TARP which is followed once mine gases normalize.

126.    CW-6 advised that he and Earnshaw approached Control Room Operator Jimmy Green about this issue, and Green showed them an e-mail from August 21, 2018 from Marek Romanski to the control room stating, "time to crossover to the transition TARP."

127.    CW-6 stated that Explosion Risk Zone ("ERZ") Officers, who are responsible for taking gas samples, had allegedly failed to collect samples from the tube bundle for an entire week, which CW-6 believes could have been due to the confusion surrounding their responsibilities during the TARP change and may have been why these individuals were hesitant to speak with investigators in fear of admitting responsibility. CW-6 explained that ERZ Officer is a statutory position with a legal obligation to inspect where the miners are working.

128.    Beginning in September 2018, CW-8 (who served as Planning Coordinator at North Goonyella for approximately 7-10 months starting in September 2018), collected data from the various shifts at North Goonyella and compiled the data into reports in an effort to determine the best course of action. According to CW-8, this included gas data and pressure readings. CW-8 provided the reports to senior level mine staff, including: (i) John Anger (SSE), (ii) Marek Romanski (then Underground Mine Manager) and (iii) Mike Carter (Vice President – Operational Support). CW-8 confirmed that his reports also were shared with Peabody Australia Headquarters in Brisbane, who were "closely associated" with the efforts in the mine.

129.     CW-8 also was responsible for recording the Mine Record Entry (MRE) meetings with the QMI and other government representatives and private third parties. CW-8 explained that when he returned to the engineering team, that team was tasked with re-entry plans for the mine. CW-8 recalled being responsible for the conveyor belts in the mine and was tasked with ensuring that materials were on time, adequate for Australian codes and regulations, and that the contractors were organized.

130.     CW-8 recalled the "Startup Tour" meetings that occurred prior to each shift change where the IMT, including John Anger, Marek Romanski and Mike Carter, provided updates to the incoming shift. CW-8 explained that there were short and long-term plans for re-entering the mine, but senior mine staff was hesitant to provide specific dates. According to CW-8, there were "ever-changing issues" and a regular flow of new information that altered timelines. According to CW-8, these variables made it "extremely difficult to make predictions." According to CW-8, specific dates would typically only be provided in response to a question from the workforce and these would come with the caveat of being reliant on things continuing on the current trajectory without any issues arising.

131.     CW-7 explained that gas levels in the mine fluctuated based on the time of the day. For example, around 4:00 PM local time, gas levels typically would go up as the barometer went down, but that would reverse in the morning. CW-7 recalled that about 10 days into the period of elevated gas levels, CITEC still detected the ethylene, which was uncommon in mines. CW-7 explained that this gas was more common at plants where timber was burning and signified to miners that there is trouble and certainly an "event" is occurring. According to CW-7, the presence of ethylene was brought up by employees at the morning briefings and discussed at meetings of the critical incident team.

132.    CW-7 recalled, in response to this concern, Romanski took a group of three or four people into the mine to adjust the position of the monitors. CW-7 explained that Romanski thought the readings were inaccurate and a result of incorrect positioning of the equipment. According to CW-7, one of the men that entered the mine was an electrician, who upon exiting told CW-7, "I am not [expletive] going back in there" and made it clear to CW-7 that he would refuse to re-enter the mine if asked. CW-7 described the electrician as looking "quite disturbed" and pointed out that this was very uncommon for people accustomed to being in mines. CW-7 advised that every member of the party carried handheld monitors and that afterwards that same electrician informed CW-7 that the environment in the mine was conducive to an explosion. CW-7 recalled that after the adjustment to the monitoring equipment, the ethylene was still recorded as present.

133.    According to CW-9, around September 9 or 10, 2018, Peabody received a 1.47 Graham's Ratio reading, which considers calculations of oxygen and nitrogen in order to assess the temperature of the coal. CW-9 explained that this is a "key ratio" and serves as a predictor for a potential spontaneous combustion ("spon com") event and that a reading of 1.47 is a concerning figure. CW-9 explained that the 1.47 Graham's Ratio was a concerning figure because of where it was occurring in the mine. CW-9 recalled that it initially levelled out around 1.00, which allowed him to send people back into the mine, however, this led to another increase and was a sign that "what they were doing wasn't helping." CW-9 explained that at the time, the Company was injecting nitrogen as well as methane into boreholes in the mine. CW-9 recalled questioning Romanski's decision to inject methane into the mine and that Romanski explained to him that it was an inert gas. CW-9 pointed out to Romanski that methane is not an inert gas and utilizing it would only be done in hopes of displacing the oxygen to "starve" the spon com. CW-9 advised

that the problem was that ventilation was still on and the mine was pushing the gas in the wrong direction regardless of the approach taken.

134.    CW-9 added that when examining the temperature of the coal, it is important to look at the trend, and in this case the temperature was trending upwards given that it was getting "hotter and hotter."  CW-9 reiterated that it is necessary to look at how the temperature is trending upwards, the rate at which this was occurring and at this point it was, "definitely trending upwards" and "everything was going the wrong way." According to CW-9, at that time, carbon monoxide levels were around 140 to 150 litres per minute and increasing, explaining that this CO figure will increase as the fire grows while the Graham's Ratio is indicative of the temperature of the fire.

135.    CW-9 explained that the continued ventilation would not have been an issue had Peabody drilled the injection (or bore) holes in the correct locations. CW-9 recalled himself and other industry experts lobbying Company personnel to alter the drilling locations of the boreholes.

136.    CW-9 explained that Peabody had been injecting gas into the mine for days or weeks before the event and he began noticing issues regarding the location of the gas injections between September 7 and September 12, 2018. CW-9 advised that these issues were rectified, but following the final withdrawal of personnel from the mine, Peabody had to begin drilling from the surface without the benefit of being able to see what was occurring in the mine and that is when, in his estimation, miscalculations began to occur.  CW-9 added that at this point the situation was "getting worse."

137.    CW-9 also advised that it is important to ensure the drilling goes deep enough and is placed in the correct area. According to CW-9, Peabody failed to drill deep enough (per QMI

recommendations) and also drilled boreholes on the incorrect side of the mine, failing to take into account the vents. CW-9 recalled instructing Peabody to drill on the intake side, but they elected to drill on the tailgate side. CW-9 explained that he thought this was crazy and that it was "very frustrating."

138.    CW-9 noted that the problem is that nitrogen is the same weight as air, and that Peabody could have used carbon dioxide, which is heavier than air, instead because this gas can "get as low as you want" and when you pump it into the mine "it settles down and ends up at the floor of the seam." CW-9 explained that instead Peabody used nitrogen, which has a much smaller margin for error and requires precise placement. CW-9 recalled the frustration related to the drilling locations and explained that he and experts continued to suggest that Peabody drill on the other side of the mine, but it took Peabody drilling on the incorrect side for approximately a week before they took their advice and changed course.

139.    CW-9 added that he would send a daily update, essentially his notes from the morning meeting that very closely resembled the MRE reports, to the Chief Inspector of Coal Mines, who in turn would pass these along to the Minister of Resources of Safety and Health.

140.    CW-9 advised that due to a prior engagement, he was not at the mine for approximately two weeks in the middle of September 2018, but that he received daily updates from another QMI inspector onsite and that after approximately one week he received word that Peabody had sealed the 9N tailgate chute. According to CW-9, shortly thereafter, he was informed that Peabody had planned to shut off the fan at the back of the longwall and upon hearing this, CW-9 instructed his fellow QMI inspector not to allow Peabody to do that.

141.    CW-9 recalled his fellow QMI inspector informing him that it was "too late" and that Peabody had already shut the fan off. CW-9 explained that the "golden rule" was that you do

not mess with the ventilation in an event like this, the danger is that the methane will go over the heated area and cause a combustion, which is what happened. Soon black smoke began exiting the mine. CW-9 explained that you do not alter the ventilation in these situations because "you can never be sure what it's going to do." According to CW-9, the fan in question was an exhausting fan, which was sucking the air from underground and by shutting it off, Peabody was sucking the air back into the mine and reversing the pressure underground that in turn pulled the gases towards the goaf. CW-9 explained that this was pulling the methane over the spon com.

142.    CW-9 explained that by the time he returned to the mine by October 5, 2018, "the shit had hit the fan" and the event was all over the news and neighboring open cut mines were being affected and registering increased gas levels. CW-9 recalled that the Queensland Mine Rescue Services were already on the scene before he returned and had set up the inertisation or "GAG" unit.  According to CW-9, black smoke had escaped the mine and the mine had been sealed off by the time of his return and that neighboring mines were experiencing high CO levels depending on the wind direction.

### 9.    MREs Prepared by the QMI Following the North Goonyella Mine Evacuation Corroborate the Accounts of the CWs

143.    According to MREs prepared daily by the QMI from September 3, 2018 to September 28, 2018, Peabody had Safety and Health Experts from its U.S. Headquarters, industry experts from the U.S. and Australia, and mining inspectors from the QMI on site daily at North Goonyella to: (i) monitor the evolving conditions at the mine, (ii) take and review the fluctuating gas readings and (iii) attempt to treat the oxidation from the mine surface.[32]  The

---

[32] The Queensland Government's Safety In Mines Testing & Research Station (Simtars) provided advice and gas monitoring services to Peabody throughout the fire event. Hundreds of pages of information and reports were provided to Peabody by the Queensland Government's own mine fire service provider – Simtars.  The Queensland Government charged fee-for-service rates to

strategy involved, among other things, the introduction of seven pumping units that were injecting nitrogen into the coal mine in an attempt to force gas from the mine and rob it of the oxygen that might promote a fire.[33]

144.   On September 3, 2018, a QMI inspector convened a meeting at the North Goonyella mine with mine management including Marek Romanski and others to discuss the status of the high carbon monoxide levels in the 9N Tailgate. Romanski explained that Peabody had started putting methane into the mined-out region (known as the "goaf"), which had resulted in skyrocketing methane levels of *10.52%* (at which point underground power had been shut off). The QMI inspector recommended a comprehensive plan for ventilation, monitoring points, inertisation points, and points where methane was being injected into the goaf, as well as a detailed timeline of events.[34]

145.   On September 4, 2018, the QMI inspector convened another meeting at the North Goonyella mine, this time with: (i) Marek Romanski, (ii) John Anger (the SSE), and (iii) others to discuss the status of the high carbon monoxide levels in the 9N Tailgate. By that point, methane levels in the mine had risen from *12.6%* to *14.02%*. Romanski claimed that in the past 24 hours, they "started to develop a re-entry plan," but according to the QMI Inspector, the "actions to date were managing the Oxygen but not addressing the heating." Romanski further stated, and Anger agreed, that the mine was "intending to proceed until they were certain the risk

---

Peabody which purportedly amounted to hundreds of thousands of dollars.
https://www.amsj.com.au/government-report-into-north-goonyella-mine-fire-missing-in-action/
[33] https://www.afr.com/companies/peabody-admits-smoke-really-did-mean-fire-20181001-h163ha and MRE reports.
[34] *See* 9/3/18 MRE.

was acceptable," and that the re-entry plan "needs to address the critical work required to be completed to manage the situation in 9 North and to ensure the safety of the mine."[35]

146.    By September 5, 2018, methane levels had risen to **17.6%** and another meeting with the QMI representatives, senior mine management, and Charles Lilly from Peabody U.S. was held.[36]

147.    On September 6, 2018, representatives from the QMI and Stephen Woods from ISHR (Industry Health & Safety Representative of the Construction, Forestry, Maritime, Mining and Energy Union)[37] met at the mine and discussed that the mine was, in effect, in an "emergency situation" and all access to the mine should be strictly controlled.

148.    One problem in the days after the evacuation was that the Company still was using the incorrect TARP. In short, the Company had a TARP for when it was still active in the longwall and another TARP for when the longwall was sealed, but they were neither still in the longwall (underground) nor had they yet sealed the longwall.  Peabody lacked an adequate TARP for this particular circumstance.

(a)    A September 7, 2018 MRE reported that the TARPs the Company was using during this critical time were "not completely relevant due to the current situation."[38]  The "Active Goaf TARP" was "not totally relevant as the longwall is no longer active." Also, the Sealed Goaf TARP the Company was using also was "not relevant as the Longwall is not sealed."  According to the MRE:

---

[35] *See* 9/4/18 MRE.

[36] *See* 9/5/18 MRE.

[37] In the mining industry, the ISHR, also referred to as the "checkie," is considered one of the most important people within the industry. ISHRs are empowered to make companies to comply with legislation and make working conditions as safe as possible. https://www.cfmeuqld.asn.au/wp/latest/cfmeu-mining-and-energy-union-qld-district-officals/

[38] *See also* https://www.amsj.com.au/inspectors-oversee-north-goonyella-mine-fire/

> The inspectors made it clear that the Mine needs to establish trigger points to ensure there are no false alarms" and equally as important, trigger points that identify when the situation changes so that investigation into the change can commence before it reaches a critical evacuation trigger.  At the moment, the Mine is using the Sealed Goaf TARP as it more closely matches the situation but they agreed to review this. [39]

(b)     As a result, the QMI Inspector recommended the Company submit a change to its Sealing Plan as the original sealing method had changed, something the Company had not done as of September 13, 2018.

(c)     On September 13, 2018, the QMI Inspector again reiterated that the Company should consider whether the current TARPs are still relevant "given the events of the past few weeks."

(d)     On September 21, 2018, a QMI again raised the issue of the applicability of the Company's TARPs being applied for proposed re-entry.

149.     Daily meetings with the QMI and senior mine personnel including Marek Romanski (UMM), Mike Carter, John Anger (SSE), and Charles Lilly (Director of Engineering) continued, during which the status of the high carbon monoxide levels in the 9N Tailgate were discussed.

(a)     For example, in a September 9, 2018 MRE, one of the QMI inspectors referred to the "Spon Com" event on the site of the North Goonyella mine, stating that he attended a meeting at North Goonyella Mine to discuss the status of the 9 North goaf which is being monitored for accelerated oxidization resulting in a Spon Com event.  A September 22, 2018 MRE also referred to the existence of a spontaneous combustion event having already

---

[39] Further discussion about the Company utilizing the incorrect Sealed Goaf TARP also appears in the MRE dated September 8, 2018.

transpired.  Specifically, the MRE for this date notes that additional QMI inspectors were on site to "continue monitoring the mine's progress in managing a spontaneous combustion event occurring at Longwall 9 North recovery faceline."

(b)     On September 10, 2018, the QMI inspector attended a meeting to discuss the rising carbon monoxide levels and its potential cause(s).[40]

(c)     On September 11, 2018, it was discovered that the Floxal Unit was injecting gas into the wrong area of the mine.[41]

(d)     On September 12, 2018, gas results confirmed carbon monoxide on the Maingate ("MG") side of the Tailgate Chute Road. The QMI Inspectors again advised Peabody senior mine personnel to review the North Goonyella Sealing Management Plan as the longwall had not yet been permanently sealed.[42]

(e)     On September 13, 2018, the QMI again advised that Peabody must revise its Sealing Management Plan and reconsider whether the current TARPs the Company was using were still relevant.[43]

150.     Mine and QMI records demonstrate serious problems and "significant errors" by Peabody in managing the spon com event in the weeks following the evacuation.  For example:

(a)     On September 14, 2018, Peabody told the QMI it had drilled a borehole in the wrong section of the mine in "error" and needed to re-drill in the correct location. The QMI requested Permit to Drill documentation.[44]

---

[40] *See* 9/10/18 MRE.

[41] *See* 9/11/18 MRE.

[42] *See* 9/12/18 MRE.

[43] *See* 9/13/18 MRE.

[44] *See* 9/14/18 MRE.

(b)      On September 14, 2018, Peabody was reprimanded by QMI for failing to take measurements of the Floxal gas being injected into the Maingate Seals of the Mine. In addition, the QMI indicated that "there were errors in the Ventilation Model being used" which had to be "rectified in order to ensure the model was validated before the work was undertaken."[45]

(c)      On September 15, 2018, the QMI Inspector noted: (i) that there was a "significant error in the ventilation quantity being used…" which needed to be investigated; and (ii) "obvious errors" in the ventilation model (and the assumed air quantities) for what the Mine was calling "Option B."[46]

(d)      On September 17, 2018, the QMI Inspector: (i) noted a "significant error" in the ventilation quantity being used at Tailgate Chute Road; (ii) reiterated that the Mine needed to "take additional time when drilling new holes to ensure that the holes get closer to the coal seam….there is a possibility that a lot of the insert gas being injected into the new goaf holes is filling cracks and joints" (which was not desirable); and (iii) stressed that Peabody had to assess the impact to ventilation and gas monitoring of its new plans or the change could cause "explosibility and the risk to people on the surface conducting operations around boreholes and at portals."[47]

(e)      On September 19, 2018, the QMI pointed out "unknown explosibility environments" and the need to review and submit a new sealing TARP which reviewed triggers

---

[45] *See* 9/14/18 MRE.

[46] *See* 9/15/18 MRE.

[47] *See* 9/70/18 MRE.

and actions including explosibility.  The QMI Inspector further advised the development of a TARP process for managing risk to surface workers in case of an explosion underground. [48]

(f)      By September 21, 2018, Peabody had still not analyzed the impact on the whole mine of sealing the 9N Tailgate Chute. [49]

(g)      According to a QMI Inspector, the long idle status of the mine (post evacuation) led to structural issues with the mine roof and further contributed to delays in recovery. [50]

(h)      An MRE from September 22, 2018 noted that barometric pressure remained abnormally high, the injection of certain nitrogen gases (N2) was having no effect, gas composition had not changed since turning off the Bleeder Fan, and the Company had moved to what it termed Plan B, as Plan A was no longer being seriously considered. [51]

### 10.      Fire at the Mine is Identified No Later Than September 22, 2018

151.    Actions taken by Peabody in September 2018 to control the oxidation of the coal and reduce elevated gas levels ultimately were unsuccessful.[52]

152.    By September 22, 2018, Peabody observed haze coming out of the main fan shaft. An MRE from September 23, 2018 discussed the "acceleration of the spontaneous combustion event…"[53] In fact, CW-7 referred to photos on his cellphone and confirmed that he had taken a picture of the first day that black smoke billowed out of the mine on September 22, 2018.

---

[48] *See* 9/19/18 MRE.

[49] *See* 9/21/18 MRE.

[50] *See* 9/03/18 MRE.

[51] *See* 9/22/18 MRE.

[52] https://www.qt.com.au/news/north-goonyella-an-explosion-waiting-to-happen-fir/3536670/

[53] *See* 9/23/18 MRE.

153.     On the morning of September 23, 2018, carbon monoxide levels increased from approximately 600 ppm to 1500 ppm and hydrogen levels increased to 1600 ppm, both significant increases.

154.     On September 24, 2018, things got dramatically worse with carbon monoxide levels skyrocketing to up to 28,000 ppm and hydrogen fluctuating widely from highs over 36,000 ppm to lows of approximately 2000 ppm over the next 24 hours.[54]

155.     At around the same time, the tube that Peabody was recording its gas readings with either melted due to the heat or was destroyed by a roof fall. In addition, the main sample point in the tailgate chute road was lost on September 23rd when the roadway was temporarily sealed. Thus, as of approximately September 24, 2018, Peabody could not measure underground gas levels. Notwithstanding, the Company was pumping nitrogen down the mine and a Liquid Nitrogen unit was continuously pumping Liquid Nitrogen down the mine. Peabody also plugged off the tailgate chute road with rocsil (a resin product sometimes used as a mine seal) to try to direct gases in the goaf down to the maingate chute road and out of the takeoff face area.

156.     At this point, the Company moved its control room away from the site, moved the IMT to the CHPP and moved the majority of its workforce to the North Goonyella camp, 15 kilometers away.  Remaining workers drilled boreholes from the surface into each main airway leading into the longwall to attempt to reestablish a way to monitor gas levels underground and prepare for the sealing of the longwall block. Conditions at the mine at this point were in serious flux - changing by the hour and day.

157.     According to Luke Ludlow, a North Goonyella mine union representative, as of late September 2018, the mine was "not in a good way" and the reality was that it looked like

---

[54] *See* ¶ 179.

Peabody might have to seal a 3rd longwall in the mine (with half a longwall still inside) unless there was a "miraculous change in circumstance in the coming days." ¶ 179. If Peabody did have to seal the 3rd longwall block, "then the future of North Goonyella is up in the air." The alternative, according to Ludlow was having to seal up the whole mine, a disaster for Peabody.[55]

158.    At around 6 pm on September 27, 2018, thick black smoke emanated from the main fan shaft and the next morning inspectors noted volumes of black smoke coming from the belt drift, the main fan. Finally, on September 27, 2018, the QMI inspector gave a Directive under Section 125 of the Coal Mining Safety & Health Act to suspend operations and withdraw from an exclusion zone until an acceptable level of risk was achieved.[56]

159.    CW-7 recalled that while pumping nitrogen into the mine, workers noticed a "gray plume," that became visible as it passed by the sun, while escaping a vent fan. CW-7 explained that anytime a miner pointed something out that that meant it was unusual, so he took this information to Romanski who dismissed it as "methane being pushed out of the mine." CW-7 noted that he was doubtful this information influenced any decisions going forward.

160.    The next day, on September 28, 2018, the QMI issued a directive to not enter past the locked gate of the mine.

161.    CW-1 confirmed that following the fire at the mine, an "exclusion zone" was established and only select personnel were allowed near it or able to enter the mine.  CW-1 added that during the initial period in which the exclusion zone was established no one was allowed to enter the mine and then as time went on select individuals were permitted entry.

---

[55] *See* ¶ 179.
[56] https://www.amsj.com.au/inspectors-oversee-north-goonyella-mine-fire/

**11.    Daily Meetings and Reports About North Goonyella Shared With Peabody Senior Management and North Goonyella Task Force in the U.S.**

162.    According to CW-4, Peabody Australia was in daily contact with senior Peabody executives in the United States, including Defendants Kellow and Schwetz.  CW-4 reported that in response to the fire at North Goonyella in September 2018, Peabody corporate set up a war room at headquarters in St. Louis ("HQ") and created a North Goonyella Task Force, which held regular meetings to: (i) discuss what was happening at the mine, (ii) receive information from Australia, and (iii) make decisions.

163.    According to CW-4, the following individuals were members of (or linked to) the North Goonyella Task Force: (i) Defendant Kellow; (ii) Defendant Schwetz; (iii) Charles Meintjes (EVP of Corporate Services and CCO); (iv) Kemal Williamson (President of U.S. Operations and Group Executive Operations, Australia before that position); (v) Charles Lilly (technical services group);  (vi) Mike Breneman (Safety Director, Americans/U.S. Operations February 2015 – June 2020) and (vii) George Schuller (President – Australia). CW-4 advised that Mike Breneman was "tapped" to coordinate the North Goonyella Task Force Meetings. CW-4 stated that Kellow viewed Breneman favorably, but that Breneman was frustrated with how things were managed with respect to the North Goonyella mine.

164.    CW-4 added that Defendant Schwetz was "very involved" with Peabody's operations and likely attended nearly all of the Task Force meetings.

165.    According to CW-4, at first, the Task Force met multiple times a day, seven days per week, including a 5:00 or 6:00 AM CT call with Australia. CW-4 confirmed that over time, the frequency of the task force meetings lessened.

166.    CW-4 recalled that things were hectic at HQ immediately post-fire and that there was a sense of urgency among North Goonyella Task Force members. CW-4 heard that

Defendant Kellow would demand 2:00 AM CT meetings with Peabody's C-Suite executives when there was news about the North Goonyella mine.

167.    According to CW-4, Peabody U.S. had access to a lot of information on the North Goonyella mine including photos of "great big plumes of black smoke" which would normally be attributed to a fire rather than smoldering from small smokers on the surface of a mine where coal is stacked (also known as a "heating event").

168.    CW-4 confirmed that members of the NG Task Force should have received every piece of paper generated by the QMI in Australia.

169.    CW-4 reported that Charles Lilly, an expert who also worked in Peabody's technical services group, also was heavily involved with evaluating what was going on at the North Goonyella mine and planning next steps. According to CW-4, Lilly evaluated and corresponded as an onsite technical expert for the War Room Team. CW-4 recalled that Lilly would travel to Australia at least four times a year both before and after the fire at the North Goonyella mine.

170.    CW-4 recalled that Defendant Kellow and Charles Meintjes would come down to technical services multiple times per week to consult with Lilly. CW-4 stated that Peabody also engaged third party experts and that the Company had a lot of information on the fire and where it was located.

171.    CW-4 recalled there was a lot of hallway conversation at HQ regarding the North Goonyella mine and that it was surprising to him that during investor calls and quarterly meetings, executives called the incident at North Goonyella a "heating event" and not a "fire." In CW-4's opinion, this downplayed the severity of what happened at the mine. It was CW-4's

opinion that the Company was sugarcoating the seriousness of the fire. CW-4 advised that, in his opinion, what Defendant Kellow said in quarterly conference calls often did not match reality.

172.    In CW-4's opinion, the North Goonyella Task Force knew that it would take longer to reopen the North Goonyella mine than the Company had represented to the market.

173.    CW-1 explained that Peabody was "doing everything in their power" to get North Goonyella "up and running."  CW-1 recalled the models he prepared being scrutinized by Andrew Muir, Peter Baker, "all the financial people in the U.S.," as well as former President – Australia George Schuller. CW-1 added that there was "no shortage of people looking at the models."

174.    CW-1 heard from other mine employees that Peabody's initial response to the fire was wrong because the Company had incorrectly identified which part of the mine the fire was occurring in.

175.    CW-1 also heard from other mine employees that the ventilation fans tasked with removing oxygen from the mines were turned in the wrong direction and were sending additional gas into the mines, worsening the fire.

### 12.    Peabody Publicly Addresses Situation at North Goonyella Mine

176.    On September 19, 2018, Peabody issued a Form 8-K confirming that the longwall move at its North Goonyella Mine had been "interrupted by ***temporarily elevated gas levels***," but that "[s]ervices such as power, ventilation and normal water management activities in the mine continue, and the mine is shipping from inventories."  The Company also reported that ***"Longwall move activities have been delayed for about two and a half weeks thus far and the company is working toward resuming operations***," but that the Company's 2018 metallurgical coal sales volume targets had not been revised.

177.    On September 25, 2018, Peabody issued another Form 8-K, once again downplaying the significance of the issues at the North Goonyella mine and the imminent risk of spontaneous combustion at the mine, stating, in part, that:

> **Peabody noted today that gas levels at its North Goonyella Mine have been variable and remain elevated**. The company is working with the Queensland Mines Inspectorate and third-party experts as **we continue a progressive plan aimed at reducing gas levels and accommodating a safe return to mining operations**. Determination of the timing of completion of the longwall move and expected financial effects will be made when gas levels subside and personnel can safely resume longwall move activities.

178.    On September 28, 2018, days after photographs of smoke billowing from North Goonyella began circulating, Defendants finally confirmed that Peabody's most profitable mine was on fire, that the fire was "ongoing," that its impacts were still uncertain, and that the Company did not expect any coal production from North Goonyella in the fourth quarter of 2018 (October 1, 2018 – December 31, 2018).

### F.    Top North Goonyella Union Official Warns Mining Union in September 2018 That Only a "Miraculous Change in Circumstance" Would Prevent Long-Term Interruption to Coal Production at North Goonyella Mine

179.    On September 26, 2018, more than two days before Peabody finally confirmed the existence of a fire at North Goonyella, Luke Ludlow, then North Goonyella's Union Lodge President[57] sent an email to the leadership of the Queensland branch of Construction, Forestry, Mining and Energy Union (CFMEU): (i) informing his union peers of massive spikes in the levels of dangerous and volatile gases in the mine, (ii) confirming fears of a potential explosion inside the mine, and (iii) warning that only a "***miraculous change in circumstance***" in the days

---

[57] The North Goonyella Union Lodge disbanded in November 2019, after 26 years, following Peabody's October 2019 announcement that the Goonyella mine would not reopen for several years.

ahead would prevent critical mining equipment being sealed in the mine and long-term

interruption to coal production. Ludlow's email stated, in part:

> Dear All,
>
> I would like to provide everybody with an update on the situation at North Goonyella at present. . . . On the Thursday night of the 30th of August, our workforce was withdrawn from the pit due to high/low gas and oxygen readings in our tailgate area under directions of a TARP. Our workforce returned underground the following day only to be removed that afternoon before our nightshift was able to return underground. From Saturday afternoon of the 1st of September, our workforce was withdrawn and subsequently aside from a few instances that I will detail below, has not been able to go back underground due to the elevated/decreased gas and oxygen readings.
>
>         \*    \*    \*
>
> **This event has seen high readings of gas that we don't want, low gas readings of gases we do want and more oxygen than we want in our goaf. We have had a raft of experts join us on site and work with our IMT to try and figure out what is occurring underground with many different opinions however this event continues to escalate. The readings we have been receiving have been fluctuating with the barometer but unfortunately steadily increasing before sitting stagnant for the best part of 2 weeks up until Sunday just gone**.
>
>         \*    \*    \*
>
> <u>Where we are now (Since Sunday Morning):</u>
>
> To date, our workforce has been withdrawn from the mine completely since the 1st of September with the only access to the mine workings done so as previously mentioned however we have had a complete withdrawal of everyone continuously since approximately the 14th of September.
>
>         \*    \*    \*
>
> I have mentioned in this section "since sunday morning" because things have changed significantly from that point. For the approximately 10 days before Sunday, we had seen readings of around 600ppm CO, 12% Oxygen, stable amounts of both ethane and ethylene as well as other gases, all fluctuating with the barometer as it rose and fell. **On Sunday morning we seen the**

**likes of CO increase to 1500 ppm and hydrogen increase to 1600 ppm of which were both significant increases to these gases, with other gases doing similar things. On Monday it only got worse with readings recorded of up to 28,000 ppm of CO and 36,000 ppm of hydrogen before coming back to about 2000ppm and then going back up to just higher than those peaks again on Tuesday. Since that time we have lost the tube that we were recording those readings to either malfunction, melting or being destroyed by a roof fall as the popular theories. We had previously also lost the main sample point in the tailgate chute road on the Sunday night due  to this roadway being sealed. This meaning that along with losing another of our sample points on the Tuesday night, we effectively don't know what readings we are getting down there at present**.

\* \* \*

**Our mine site has been abandoned in the sense that in case of an explosion underground, we need to have exclusion zones**. We have moved our control room away from site, our IMT is based out of our CHPP now and our workforce is out in the paddock manning the flauxal units to ensure they operate continuously. Anybody else who is not required is being told to stay at the camp on standby so that we don't have unnecessary personnel on site.

\* \* \*

**To summarize, our mine is not in a good way and the reality of sealing a 3rd longwall in our mine is right in front of us unless we have some miraculous change in circumstance in the coming days**. Whilst it would be negative to seal this longwall block with half a longwall inside, it would be somewhat positive in the fact that we are not having to seal the whole mine. **None the less, if we do have to seal this block then the future of North Goonyella is up in the air and we won't know what that looks like until discussions would take place around that…**

180.    Ludlow's internal email which warned that only a "miraculous change in circumstance" in the days ahead would prevent critical mining equipment from being sealed in the North Goonyella mine stands in stark contrast to Defendants' statements to the market, only two days later, which utterly failed to mention this bleak scenario that ultimately came to pass.

Instead, Defendants seriously downplayed the situation at the mine and just noted that coal production at North Goonyella would be on hold for three months.

### G.   Media Outlets Report on North Goonyella Situation

181.   On September 20, 2018, *The Australian Financial Review*, reported on Peabody mine workers who had spoken on the condition of anonymity and detailed that the problems at the mine "stretch[ed] beyond" just elevated gas readings and that mine management was uncertain why or where the unanticipated burst of heat was coming from. Those same sources estimated that mine management had no more than two weeks to solve both issues because a half-moved longwall "cannot just sit down there for too long without moving."

182.   On October 2, 2018, *The Australian Financial Review* issued an article on Peabody entitled "Peabody admits smoke really did mean fire."[58]   The article noted:

> On Tuesday September 18, The Australian Financial Review contacted Peabody seeking confirmation that mining at North Goonyella had been suspended because of high methane and carbon monoxide levels. We also sought comment on claims that miners had experienced problems with excessive heat as they worked to reposition their long wall mining equipment **and that management had been slow and indecisive in its response to the problems.**
>
> We were told there had been issues but it was nothing like as serious as proposed and that a very active and capable management team was well into the process of successful mitigation of the heating and gas problems.
>
> The strategy, signed off by the Mines Inspectorate, involved, among other things, the introduction of seven pumping units that were injecting nitrogen into the coal mine in an attempt to force gas from the mine and rob it of the oxygen that might promote a fire.

---

[58] https://www.afr.com/companies/peabody-admits-smoke-really-did-mean-fire-20181001-h163ha

Peabody's immediate response was to wonder about the motivation of the people that had delivered their concerns to the [Australian Financial Review].

We then informed Peabody that our information had come from working miners concerned about their immediate safety and their future jobs. We noted that in our long experience, the people that stride along the coal face rarely mislead or overstate issues of safety particularly.

**Again, we were assured that matters were in hand, that the necessary internal and external expertise had been introduced to deal with issues that were nothing like as severe as our sources had indicated**.

Over the two weeks since pretty much everything we had been warned would happen has happened. **The nitrogen didn't work because no one knew where to put it with the accuracy that would have made it effective, the mine is on fire, the leased long wall equipment is likely lost, the mine remains a dangerous place to be even though it is now inside an exclusion zone whose 3 kilometre extension has enveloped production infrastructure like the wash plant**.

As a result Peabody and the regulator have been forced to agree on a new "multi-tiered plan" that includes the introduction of a "mobile GAG unit". It is effectively a jet engine whose exhaust fumes are pumped down into the mine with the ambition of extinguishing the fire. The GAG injects inert gases at a rate 10 times greater than the nitrogen units.

\* \* \*

In the weeks between first contact over North Goonyella's gas and heating issues, we have heard criticism of Peabody's operational management . . .

### H.    Projections for Resumption of Coal Production at North Goonyella Lack Reasonable Basis Given Rapidly Changing Conditions

183.    CW-1 spent approximately 2 months (September to October 2018) at the camp site at North Goonyella, approximately 15 kilometers from the mine, working as a part of the team with Nick Oakley (Commercial Manager) tasked with determining the costs associated with re-opening the mine and the financial projections for progress thereafter.

184.     According to CW-1, Peabody deployed two "task teams," one stationed in Brisbane, Australia and another at the camp site near North Goonyella, who were in charge of operations, recovery, legal, media, and social responsibilities. CW-1 recalled both teams being in place during the two months he was at the North Goonyella camp and continuing after he departed the camp site in late October 2018.

185.     According to CW-1, he and Nick Oakley were in charge of the financial projections with operational input from John Deakins (Development Manager). CW-1 explained that in his role, he was reliant on the figures and information provided by the operational employees in terms of how much it would cost to get the mine functional again. According to CW-1, John Anger and Michael Carter were responsible for the mine forecasts. CW-1 recalled that Andrew Muir (Director Financial Projects) was tasked with scrutinizing the forecasts and determining the budget and timing for the recovery efforts.  CW-1 confirmed that Muir was doing a lot of work to help with "the estimation of the recovery in dollars."

186.     CW-1 advised that the North Goonyella forecasts garnered a lot of interest from Peabody's headquarters in the U.S. and were heavily scrutinized by the U.S. team. CW-1 confirmed that the original estimate was that it would take 12-15 months for the mine to be operational again, an estimate that was later revised to 18 months before he left North Goonyella for a different position in Brisbane in late October 2018.  CW-1 explained that discussions on when the mine would re-open occurred at a high level, but "no one knew at the time exactly when the mine was going to re-open."

187.     CW-1 explained that the estimate to re-open the mine "just went up as they went along" as Peabody discovered that things had melted or that equipment had become buried underground.  CW-1 advised that, in his estimation, the most important thing that Peabody could not figure out was where the fire was exactly and what had caused it.  CW-1 explained that

as time went on and Peabody attempted to determine this information, the dollar figure [to re-open the mine] "just went north."

188.     CW-3 stated that Peabody's initial projections for North Goonyella re-opening after the fire were very ambitious. CW-3 advised that at first, the Peabody forecasting team was using a mathematical approach to calculate which portions of the North Goonyella mine were "not good" but, as time went on, forecasting's reliability decreased and their risk for inaccuracy increased.

189.     CW-3 added that there was an internal model at Peabody that was used to make predictions, but eventually, they had to scrap the predictions because when North Goonyella was included and they kept missing the mark, in essence, it was more of "a burden than a benefit to include the predictions on North Goonyella." CW-3 recalled that predictions were still being included during the summer of 2019.

190.     CW-3 worked on the coal trade team, which contributed trade numbers and forecasts to hedge the trading side of the business.  According to CW-3, Justin Burk (Peabody Sales & Trading) and Bryan Galli (Chief Marketing Officer) were the heads of the trade team and primary users of forecasted material. Galli reported either to COO Charles Meintjes or directly to CEO Kellow.

191.     CW-3 recalled that CFO Schwetz had oversight on forecasting for production, but not sales. According to CW-3, everything with trade went through Bryan Galli, and that at that time, Galli and Kellow would have both been on Peabody's Board and should have been very informed as to what was occurring. CW-3 advised that there were sales and trade meetings on a weekly basis that Schwetz periodically attended.

192.    CW-3 said that there was a team that managed forecasts and that St. Louis was the main hub to which various mine sites in Australia sent their sales number and other information. CW-3 recalled that there was a lot of internal discontent over how the numbers came together and that there were inaccuracies in the numbers. CW-3 added that there was an effort during his tenure to address the problems related to forecasting specifically.

193.    CW-1 explained that following his re-location to Brisbane, John Anger, Mike Carter, and Andrew Muir continued to lead the North Goonyella recovery efforts. According to CW-1, while working at Peabody's Australian Headquarters in Brisbane he worked on the "life of mines" modeling and long-term forecasting for Peabody's Australian mines. CW-1 recalled conducting this type of analysis on North Goonyella 8 or 9 months following his departure from his role at North Goonyella (this would be approximately in July or August 2019).  CW-1 advised that his work included producing models to help determine if re-opening North Goonyella was a viable option.  CW-1 explained that he ran a "couple of scenarios," including one in which Peabody were going to seal up all the north panels and then attempt to mine the south panels and another in which Peabody would seal up 9N and 10N and mine 11N.  CW-1 advised that "obviously they tried to get back into production as soon as possible," noting that he never got the sense that sealing up the mine permanently was ever an option and that Peabody wanted to recover the equipment and continue mining.  According to CW-1, the projected timetable to return to mining at North Goonyella at this time was between 2022 and 2025 and that the models were "pretty intensely scrutinized" as North Goonyella was the "jewel of the Australian platform."

194.    CW-4 recounted how at the time when Peabody stated that they had hoped to re-open the mine within a year, they sent a drone or unmanned camera into the mine and saw that

fire had been hot enough to melt the conveyor belt and cause damage to the infrastructure and longwall in the mine. CW-4 added that it was clear that the fire had "consumed" the mine and there was significant damage to the overall infrastructure of the mine.

195.    CW-4 heard from members of Peabody's Technical Services Team that they viewed the North Goonyella re-opening date as "unrealistic" given what they saw on the unmanned camera and the Australian mining rules. CW-4 reiterated that from the drone/camera images, they "saw enough" to see the damage was extensive and that it would take significantly longer to reopen the mine.

196.    CW-4 recalled that Peabody had recently changed their forecasting methods to simplify forecasting. CW-4 heard concerns about forecasting methods during the relevant time period and heard the forecasting mechanism being described as inappropriate and broken. According to CW-4, Peabody invested "enormous resources" into forecasting, and expected their forecasts "to be accurate." CW-4 stated that Peabody's forecasting team was re-forecasting every 1-2 weeks.

## I.    Defendants Misrepresent Peabody's Ability to Reopen the North Goonyella Mine and Resume Coal Production

197.    Despite the conditions of the mine in late 2018 and early 2019, after the fire Defendants repeatedly touted the speed at which the mine could safely re-open and coal production could resume. Rather than admit that Peabody really had no idea when the mine could safely reopen given so many unknowns, Defendants instead issued statements concretely projecting a timeline for the resumption of coal production which lacked a reasonable basis.

198.    Notwithstanding, every few months Defendants kept moving the goal posts, further pushing out the timeline for coal production, yet still promising robust tonnage levels for that coal production.

199.     Indeed, in the aftermath of the fire, Defendants made a series of statements as to when the North Goonyella mine would again produce a meaningful amount of coal. Defendants' statements conditioned investors to believe that the Company's plan to restart operations at North Goonyella were reasonable and had a high likelihood of regulatory approval, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks such that the QMI would likely recommend a safer approach that could cause additional delays in re-entering the mine. For example, Defendants stated:

(a)     On the resumption of coal production at Goonyella, Peabody stated, "*If the next panel (10 North, which is already developed) is accessible, production would be targeted for the second half of 2019, whereas southern panels (GM South) access would likely extend to 2020 given that development was in early stage*s." (10/30/18)

(b)     "[B]ased on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella. While we very much understand the concern, *based on what we know today, that conclusion is at best premature and at worst unwarranted*." (10/30/18, Defendant Kellow)

(c)     "*We're now progressing with a single base case that targets limited continuous mining volumes in late 2019 and will then have longwall production in the 10 North panel begin to ramp up in the early months of 2020*." (2/6/19, Defendant Kellow).

(d)     *"[B]ase case contemplates approximately 2 million tons of sales from North Goonyella in 2020*." (2/6/19, Defendant Kellow)

(e)     *"[E]everything is ready to flick the switch and to be able to reventilate…. just to reiterate, we're ready to go. So we're just working through that, what is the final part of the process*." (5/1/19, Defendant Kellow).

(f)    "***It's dotting the I's and crossing the T's around supporting documentation with respect to a lot of procedures and protocols that are on site***." (5/1/19, Defendant Kellow).

(g)    "***[W]e completed segmenting of the mine into multiple zones to facilitate a phase[d] reventilation and reentry. In addition, all physical activities in advance of reventilating the first segment of the mine have been completed***."  (5/1/19, Defendant Schwetz)

(h)    "Turning to North Goonyella, ***major progress has been made to-date including reventilation and re-entry of the mine***. We've also learned a substantial amount since we commenced activities underground earlier this month." (7/31/19, Defendant Kellow).

### J.    The Process for Reopening the Mine

200.    CW-9 recalled being at the mine for "months" after the event noting that there were several weeks of very high carbon monoxide levels and various "satellite fires" before things settled down.

201.    CW-9 explained that things would take a "long time" as it was necessary to re-ventilate the mine without putting people at risk and all the gas monitoring equipment required replacing. CW-9 explained that a concern about re-ventilating the mine is that even if the fire was extinguished through the use of inert gas, that heat itself remained within the mine and a re-opening of the mine brings in oxygen, which can cause another spon com event.

202.    CW-9 advised that by the middle of October 2018, daily meetings were scaled back and began occurring only on Monday, Wednesday, and Fridays and he received daily updates if there was a change in status. CW-9 explained that in order to re-enter the mine, risk assessments would have to be conducted and approval had to be given by the QMI inspector.

203.    CW-9 confirmed that the explosion had filled the mine with smoke and the mine was 84% methane, an issue that CW-9 believes may still exist today. CW-9 added that the gas

drainage system had "severed" because the heat from the explosion had evaporated the "water traps."  CW-9 explained that Peabody was aware they would not get a second chance at re-entry if things went wrong. CW-9 advised Peabody that they needed to get the re-entry right and, that if they went in and lost control again it would be difficult to get a second attempt to convince the inspector as getting it wrong would put people at risk.

204.    According to CW-9, Peabody had outlined three potential scenarios for re-entry: (i) essentially the mine would be fully functional again, (ii) they could enter the mine from the south side, forgetting about the north side (9N/10N), and (iii) the worst-case scenario would be that they could only mine the lower seam.

205.    CW-9 explained that even though QMI had announced it would be investigating the cause of the fire, the QMI's investigation would not occur simultaneously with the Company's recovery efforts as QMI did not want to divert resources away from the recovery process. CW-9 advised that he walled off two inspectors from the recovery process, so they could be available to conduct the investigation. CW-9 explained the investigation would focus on how the event happened and how the mine "lost control."

206.    In December 2018, sources close to the mine told mining journal *Australian Mine Safety Journal* ("*AMSJ*"), that the North Goonyella re-entry could be at least several months away even if conditions in the mine improved following ventilation. "The risk of another fire is always present at this mine" they told *AMSJ*.[59]

207.    A former QMI inspector told *AMSJ* that he felt concerned regarding the planned re-entry to the mine, saying "It's a highly dangerous scenario and one that must be managed by competent personnel." That inspector also told *AMSJ* that "[a] re-entry plan should not occur

---

[59] https://www.amsj.com.au/north-goonyella-still-far-away-from-re-entry/

without full public scrutiny and that he had serious concerns that the same 'Senior Management who somehow burnt this mine are competent to re-enter it. This is a key issue of trust…can you trust Peabody to do what it says it will? By not providing an effective method for controlling this mine fire, you have to wonder if they can re-enter it safely."[60]  Moreover, the Inspectorate stated that their sign off is required on plans to re-enter the mine, and once mine management has lost this trust, it woud be rational to assume that the Mine's plans would be more heavily scrutinized and result in more risk assessments and consequently, delays.

208.    In April 2019, in an exclusive statement issued to *Australian Mine Safety Journal*, Peabody said it had finalized the detailed planning and preparatory work at North Goonyella to support re-ventilation and re-entry of the mine at the appropriate time in consultation with the Queensland Mines Inspectorate.  Peabody also told *AMSJ* it had "made changes to its site management team at North Goonyella to ensure the right level of expert skill and capability is in place to oversee this next critical stage."[61]

209.    In late May 2019, Peabody commenced re-ventilation of Zone 1 of the mine. The mine's observed gas readings purportedly were within acceptable levels and Peabody said it would continue to closely monitor gas levels using the network of gas monitors installed at key locations in all four zones of the mine.[62]

210.    On May 25, 2019, Peabody reported that the ventilation fans installed at the mine's 1:7 and 1:4 drifts were turned on and new remote-activated emergency sealing doors were opened to circulate air through the main corridor of the mine.[63]

---

[60] https://www.amsj.com.au/north-goonyella-mine-progress-update/
[61] https://www.amsj.com.au/peabody-announces-management-changes-in-wake-of-north-goonyella/
[62] https://www.amsj.com.au/queensland-mines-rescue-on-standby-at-north-goonyella/
[63] *Id.*

211.     In mid 2019, former miner workers from the North Goonyella mine told the *AMSJ* that the probability of full re-entry, as Peabody had described to the market, was a "management pipe dream" given the impending uncertainties associated with how the coal reserve would respond when re-ventilated and the uncertainties of equipment and mine damage.[64]

212.     In June 2019, reports circulated that Queensland Mines Rescue Service personnel, on behalf of Peabody, were on standby to inspect Zone 1 once ventilation was complete and would enter the mine when safe and appropriate to do so. Peabody mine personnel were not permitted to re-enter the mine until the inspection was completed and entry was approved by the QMI.[65]

213.     Peabody also confirmed that as part of full preparedness planning, a mobile GAG unit was on site and ready to deploy if necessary. Peabody re-entered Zone 1 of the North Goonyella mine in consultation with the QMI, ten months after the fire shut the operation.

214.     CW-8 explained that while he was with the engineering team (after his stint as Planning Coordinator), the mine was split into three or four zones. According to CW-8, risk analyses were conducted prior to re-entry of the first zone to ensure that the risk was acceptable. CW-8 noted that they had successfully re-entered the first zone during his time with the engineering team, but as they neared the second zone of the mine, the information they gathered indicated that the risk was too great to continue on their current course. CW-8 advised that the engineering team held a number of brainstorming sessions and devised a number of different plans, but did not pull the trigger on any of those plans as none of them managed to decrease the risk to an acceptable level.

---

[64] https://www.amsj.com.au/grim-outlook-for-peabody-following-mine-fire/
[65] https://www.amsj.com.au/queensland-mines-rescue-on-standby-at-north-goonyella/

**K.     Peabody Releases the Initial Findings of its Internal Investigation of the North Goonyella Fire**

215.    On March 27, 2019, Peabody released its initial findings from its investigation of

the North Goonyella mine fire with Defendant Kellow stating: "We believe that the beginning of

the planned reventilation and re-entry activities warrant a sharing of our initial learnings at this

point."  The Goonyella findings purportedly were based on the Company's review of the events

surrounding the incident, which included the mine general manager's required investigation

report prepared in accordance with Section 201 of the Queensland Coal Mining Safety and

Health Act of 1999.

216.    In the Company's press release, entitled "Peabody Releases Initial Learnings

From North Goonyella Incident," Peabody concluded that the fire resulted from a planned

longwall move and admitted that its safety precautions were insufficient, stating that, as a result

of the fire, Peabody was "making changes in systems, processes and training, where warranted,

to put into place the improvements needed to successfully move forward from this incident."

These changes included improvements to ventilation controls, gas level monitoring, longwall

relocation processes, and underground sealing methods.

217.    The March 27, 2019 press release stated, in part:

> In early September, high gas levels caused the evacuation of
> personnel at North Goonyella during a planned longwall move
> from the 9 North panel to the 10 North panel.  Subsequently,
> elevated carbon monoxide detected from within the mine indicated
> oxidation of coal, which can occur when coal is exposed to oxygen
> for an extended time period.  Over a number of weeks, the
> company worked together with industry experts, and in
> consultation with the Queensland Mines Inspectorate (QMI), to
> take extensive steps to treat the oxidation from the mine surface.
> Actions were ultimately unsuccessful, and a fire occurred in late
> September.
>
> The company's review of the incident concluded that areas of the
> mine demonstrated both elevated methane levels and elevated

- 84 -

carbon monoxide levels following completion of coal production in the 9 North panel.  During the longwall move sequence, a change in gas management focus to reduce elevated methane levels in the 9 North panel, including changes to the mine's ventilation system to increase airflow, inadvertently intensified the oxidation of coal that was likely causing elevated carbon monoxide levels.

*   *   *

President – Australian Operations George Schuller said, "While this was a highly unusual combination of events, **Peabody is making changes in systems, processes and training, where warranted, to put into place the improvements needed to successfully move forward from this incident.  For example, we have already begun installing remote control ventilation systems at mine entrances**."

It is the company's intent that longwall production at North Goonyella will not recommence until all necessary modifications are undertaken.  Peabody's base case that targets limited continuous-miner volumes in 2019 **with longwall production beginning to ramp up in early 2020 remains unchanged with approximately 2 million tons of sales from North Goonyella in 2020.  Peabody continues to progress the execution of the multi-phased reventilation and re-entry of the mine in consultation with the QMI**.

*   *   *

**Discussion of Key Initial Learnings**

As a result of Peabody's comprehensive review, the company has developed initial learnings and steps to improve the longwall move process and other mining activities.

A) **Peabody will review ventilation controls and design used during the longwall "take-off" process to minimize the amount of air that enters the longwall panel goaf and interacts with exposed coal remaining within the goaf.**  Ventilation controls that were put into place in advance of the longwall take-off process may have permitted higher-than-expected volumes of ventilation air to enter the goaf during the longwall take-off process, resulting in oxidation.  Gas management and ventilation changes were made in and around the 9 North panel tailgate area in response to elevated levels of methane, which inadvertently intensified the oxidation.

- 85 -

B) **Evaluate decision-making processes to address the challenges of remotely managing an underground incident solely from the surface, which can lead to unclear or ambiguous results**.  For instance, as the incident approached late September and treatment of the oxidation event escalated, including injection of nitrogen from the mine surface into the 9 North panel goaf, fluctuating gas readings led North Goonyella mine personnel and expert third-parties to believe that the treatment plan was likely working due to a purging of gases from the goaf.

C) **Peabody also believes that the system used to monitor and analyze available mine gas data can be improved and better coordinated to identify early stages of oxidation events.** Additional training to the appropriate mine personnel will be implemented to recognize fire gas indicators, gas management and spontaneous combustion, and provide an understanding of a mine's ventilation history, with focus on identifying ventilation trends and key indicators of oxidation and developing heating for longwall mines.

D) **Peabody will modify the longwall removal planning process to reduce the number of days to complete the longwall take-off process to allow for earlier commencement of final sealing, incorporating additional contingency planning in the event the target cannot be achieved.**  The amount of time the North Goonyella mine's 9 North panel was idle increased the propensity for oxidation to occur in the longwall panel goaf.  Peabody will consider additional contingency measures, including installation of pre-drilled holes at the appropriate locations immediately behind the longwall chock line to allow oxygen inhibitors to be injected when longwall advance stops to mitigate against oxidation.

E) **Peabody will improve the Sealing Management Plan to provide greater clarity around the required steps for sealing the longwall panel (particularly in relation to how these steps interact and relate to the longwall move and re-installation plan).**  The improved plan will provide for the allocation of resources to ensure the Sealing Management Plan is followed as described.  Peabody will also provide additional training for underground personnel prior to sealing operations commencing.

F) **Peabody will hone its system for the management of Trigger Actions Response Plans (TARPs) to provide clearly defined trigger points, clear explanations of actions to be taken if trigger levels are reached, and improved methods, training and communications involving changing TARPs**.  Application and

progression of TARPs during the longwall take-off process varied
from that set out in the Sealing Management Plan, and
communication of TARPs was found to be inconsistent.  TARPs
describe actions that must be taken by mine personnel in response
to observation of certain conditions or triggers (e.g. gas levels) that
deviate from normal.  TARPs should clearly define their
applicability and the required action items when trigger points are
reached.

G) **Peabody will review the Principal Hazard Management
Plan (PHMP) for Spontaneous Combustion and Emergency
Response around the provision of clear and concise guidance in
relation to gas readings.**  The company will also implement a
regime for reviewing the PHMP at established intervals and
updating as required.

H) **Within the Site Incident Management Team (SIMT),
Peabody will appoint an independent facilitator whose role will
be to assist the SIMT in the decision-making process (rather
than the technical aspects of SIMT decisions).**  The SIMT was
comprised primarily of North Goonyella mine management
personnel, though various other parties also provided input into the
SIMT's decision making process.  At times, it was challenging for
the SIMT to coordinate and address differing viewpoints from
multiple stakeholders.  Although these outside parties each play
critical roles in responding to a mine emergency, the varied
viewpoints need to be effectively managed and facilitated during
an incident.

I) **Peabody is taking action to install quickly closable remote
ventilation control devices at each mine drift as we progress
through the reventilation process.  In addition, Peabody will
evaluate options to remotely isolate portions of the longwall
panel to provide an option to quickly close these devices after
all personnel have been evacuated from the panel.**  Peabody's
ability to quickly seal the panel to extinguish the oxidation event
before it developed into a fire was impaired once the mine was
evacuated and exclusion zones were put in place.  Once an
oxidation event develops into a spontaneous combustion event, it is
difficult to extinguish from the mine surface.  The smaller the area
of the mine that is sealed from the source of combustion, the less
oxygen is available to support it and the quicker it begins to cool,
which should facilitate expeditious recovery.  These types of
devices could be closed by personnel as part of an evacuation
sequence, or through remote means.  Emergency seals, which can
be installed at chute and gate roads at longwall panels, will also be
considered as part of an emergency sealing process.

L.        **Initial Findings from QMI Investigation**

218.    On November 13, 2018, the QMI initiated its investigation into the events that occurred at the mine to determine the cause of the event, assess the response to it and make recommendations to reduce the possibility of future incidents and improve response.

219.    In July 2019, the QMI said that the Inspectorate "continued to provide advice to Peabody's North Goonyella mine personnel, to ensure that the level of risk to the safety and health of coal mine workers is at an acceptable level. This extends to having inspectors onsite since the spontaneous combustion event in September last year and throughout the more recent process of reviewing the operator's risk management activities ahead of mine re-entry."[66]  The QMI was also quoted as saying: "The Mines Inspectorate team will also re-enter the mine as part of our ongoing investigation to gather further information into the spontaneous combustion event." [67]

220.    On or about August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that Peabody had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation. Specifically, QMI noted that, pursuant to under the Coal Mining Safety and Health Act 1999, all Peabody employees chose not to be interviewed by the agency. Among other things, the following observations were included in the report:

(a)        "Review of the mine's records suggest that gas trends were not given sufficient consideration. This may have impacted the way in which TARPs were applied and actioned";

---

[66] https://www.amsj.com.au/government-report-into-north-goonyella-mine-fire-missing-in-action/

[67] *Id.*

(b)     "Some key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls do not appear to have been reviewed or countersigned by key personnel, as required under the mine's safety and health management system";

(c)     "There is evidence that some boreholes located deep within the 9N goaf region were insufficiently sealed, **allowing an ingress of oxygen into active goaves, with the potential to escalate conditions for spontaneous combustion**"; and

(d)     "There is evidence to suggest the mine did not follow its own procedures relating to major ventilation changes."[68]

221.    The Inspectorate also found evidence to suggest that the gas drainage system was being operated to focus on management of methane instead of the potential spontaneous heating event that was occurring underground and that the mine did not follow its own procedures relating to major ventilation changes.[69]

222.    In September 2020, two years after the fire, QMI (now Resources Safety & Health Queensland) told the *Mackay Daily Mercury* that its investigation into the fire at North Goonyella had concluded.[70] According to the QMI spokesman, "Preliminary findings from the incident were released on August 9, 2019, and further information about the investigation will be published once the compliance process has finali[z]ed."  QMI is still "considering potential compliance activity in relation to this incident," the spokesman said. A time frame for when this compliance activity process would be finalized was not provided by Queensland Resources Safety & Health.[71]

---

[68] https://www.dnrme.qld.gov.au/__data/assets/pdf_file/0005/1453361/north-goonyella-high-potential-incident.pdf

[69] https://www.i-q.net.au/main/inspectorate-releases-early-findings-on-coal-mine-fire

[70] https://www.amsj.com.au/inspectors-oversee-north-goonyella-mine-fire/

[71] *Id.*

223.    CW-9 explained that he believes the QMI Investigation Report was finalized in mid-2020 and should be available through a freedom of information request.

224.    As of March 2021, QMI had not "compelled" any mine employees to be interviewed and had not issued a final report on the fire at North Goonyella.

### M.    The Truth is Finally Disclosed Concerning the Inability to Open North Goonyella for Coal Production for At Least Three Years

225.    On October 29, 2019, Peabody reported its financial results for the third quarter 2019.  Peabody reported a loss of $0.77 per share as compared with positive third quarter 2018 earnings of $0.63 per share, missing analysts' consensus expectations by more than 50 percent. At the same time, Peabody disclosed for the first time that it would be a three year or longer delay before any meaningful coal could be produced at North Goonyella.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.    Overview of Defendants' Fraudulent Conduct

226.    Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of Peabody common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired Peabody common stock during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. As described below, Defendants created an impression of a state of affairs at Peabody that differed in a material way from the one that actually existed.

## B.    Defendants' Materially False and Misleading Statements and Omissions

227.    At the beginning of the Class Period, the North Goonyella mine reported record coal production. While Defendants touted these results, they misled investors about the sustainability of North Goonyella's coal production by failing to disclose that Peabody's inadequate safety measures had put the mine at a heightened risk of a spontaneous combustion event and complete shutdown.

### 1.    April 3, 2017 – Peabody Emerges from Bankruptcy

228.    The Class Period begins on April 3, 2017. On that date, Peabody announced that it had emerged from bankruptcy protection and that its stock would begin trading again on the NYSE under the ticker symbol "BTU."  In conjunction with that announcement, Peabody further declared that: "In the past year, Peabody has reduced debt by more than $5 billion from pre-filing levels at March 2016. In addition, *Peabody achieved record safety this past year*; protected jobs; served global customers; reduced costs and built cash and liquidity; strengthened the Australia platform; accelerated coal mine restoration; provided third-party bonding assurances; and was recognized globally for sustainability."

229.    On April 3, 2017, Defendant Kellow appeared in a publicly available video entitled, "Message from Glenn Kellow: Welcome to the New BTU."  In the three-minute video, Kellow stated: "We take pride fueling the world with modern energy and providing the building blocks of steel for vibrant communities.  We've taken a number of steps to make sure we have the most competitive business across all cycles.  This includes *achieving record safety*, reducing costs and fixed charges, accelerating land restoration, strengthening our balance sheet, taking a high-returns focus, and shaping our portfolio."  Another Peabody employee reiterated that, "*Safety is the most important – safety for us as employees, safety for our personal lives*."

230.    Defendants' statements about the Company's commitment to safety, contained in ¶¶ 228-229, were materially false and misleading when made in that Defendants failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella mine, which were known to or recklessly disregarded by Defendants:

(a)    The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)    The Company had failed to properly ventilate the North Goonyella mine resulting in the build-up of methane gas and carbon monoxide;

(c)    The Company's systems at North Goonyella to monitor and analyze mine gases were insufficient;

(d)    North Goonyella faced serious staffing issues and a lack of sufficient experienced personnel as a result of layoffs at the mine before the Class Period;

(e)    Training of mine employees at North Goonyella to recognize potential ventilation and combustibility issues was insufficient;

(f)    The Company failed to follow its own safety procedures, including its Sealing Management Plan;

(g)    The Company lacked emergency sealing procedures at North Goonyella;

(h)    The Company breached its safety obligations under the Mining Safety & Health Act and Peabody's environmental license; and

(i)    As a result, the North Goonyella mine was at a heightened risk of experiencing spontaneous combustion which could adversely affect its ongoing longwall move and the resumption of its record levels of coal production.

### 2.    May 4, 2017 - 1Q17 Financial Results

231.    On May 4, 2017, before the market opened, Peabody reported disappointing financial results for its first quarter 2017. Peabody reported that its revenue had increased 29 percent to $1.33 billion over the first quarter 2016, and that its net income increased $287.2 million to $122.1 million. However, clean pro-forma earnings of $1.21 were significantly lower than analyst consensus estimates of $1.86. The Company also reported EBITDA of $358 million versus consensus of $445 million.

232.    In the Company's press release, Defendant Kellow was quoted as stating that following the Company's emergence from bankruptcy, "The emerged Peabody is proceeding with a new balance sheet, improved industry fundamentals and a sharp focus on creating value This focus begins with ***an emphasis on safe and productive operations*** that are constantly working to move down the cost curve; carries forward with intense management of both the asset and liability side of our balance sheet; and extends to our financial strategies that are aimed at prioritizing higher returns for shareholders."

233.    Kellow also noted that, "Whilst several temporary issues in Australia prevented the quarter from meeting our full potential, our performance was greatly improved with excellent cash generation from our operations. We look forward to advancing with a strengthened balance sheet, rebounding shipments in Queensland, and retention of the Metropolitan Mine in New South Wales."  Regarding the results, Defendant Schwetz stated: "With profitable operations across the U.S. and Australian platforms, Peabody looks forward to generating cash, further reducing debt and returning cash to shareholders over time…We have a new capital structure and focused capital discipline that is designed to serve shareholders well through all cycles."

234.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings

call, which Defendants Kellow and Schwetz participated in, Kellow reiterated the Company's

continued focus on safety at its mines, stating: "I would, in closing, like to extend my

appreciation to our employees around the world for their ***ongoing commitment to ensuring safe,***

***productive operations and continued delivery of value***."

235.     In response to an analyst's question, Defendant Kellow discussed the importance

of the North Goonyella mine to Peabody's overall financial well-being, noting that "I think that

higher return is probably the key there, and I've said we'd regard the coal or the met coal

platform as being those high-margin mines in Coppabella on PCI and North Goonyella on hard

coking coal. So, I think in terms of capital allocations and capital priorities and the ability to

expand, I think our focus would first and foremost be around those mines with respect to

capital." He later repeated that those two mines are "what we believe are two high-quality, high-

margin mines in North Goonyella and Coppabella."

236.     On May 4, 2017, Amer Tiwana from Cowen issued an analyst report on Peabody

entitled, "1Q Results Miss on Weak Aussie Volumes."  In the report, Tiwana stated, in part:

> 1Q Results Lag Street Expectations. Peabody reported 1Q results
> that fell short of consensus estimates as the company reported
> revenues of $1.33 billion (vs. $1.52 billion) and EBITDAR of
> $370 million (vs. $455 million). . .
>
> *   *   *
>
> As we already mentioned, volumes were lighter than expected in
> Australia with both met (2.2 million tons vs. 3.3 million tons) and
> thermal (4.6 million tons vs. 5.5 million tons) declining from
> 4Q16. On the met side, however, this decline in volume was offset
> by improved price realizations ($150/mt vs. $125/mt). Adjusted
> EBITDA was basically flat in Australia at $185 million vs.
> 4Q16….We would note that, given the light volumes out of
> Australia in 1Q and the impact of Cyclone Debbie in 2Q, it would
> appear that Peabody will have to sell significantly more coal in
> 2H17 in order to meet its guidance.

237.    On May 4, 2017, JP Morgan also issued an analyst report on Peabody, entitled, "Slow start to the year on production timing" which opined that "Peabody has delivered a slow start to 2017 with Australian production lower than anticipated even before the impact of cyclone Debbie which should impact its met coal business in Q2. However, this miss seems to just be from timing differences since production guidance is RAISED for met coal. We continue to feel that the improved met coal prices we expect in H2 2017 will make up for most of the lost sales..."

238.    Defendants' statements about safety contained in ¶¶ 232, 234 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 3.    August 1, 2017 - 2Q17 Financial Results

239.    On August 1, 2017, before the market opened, Peabody reported its financial results for the second quarter 2017.  Peabody reported that its revenues had increased 21 percent to $1.26 billion from $1.04 billion (beating analyst expectations of $1.20 billion) and that its adjusted EBITDA increased $245.2 million from the same period in the prior year to $317.8 million, led by the Australian platform, which outpaced U.S. contributions and contributed an additional $181.6 million over the prior year.

240.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Schwetz acknowledged that, "[o]perationally, the second quarter [2017] marked the best six months of production over the past five years at the North Goonyella mine." Then, at the conclusion of the call, Defendant Kellow once again boasted of the Company's continued focus on safety at its mines, stating that he "would also like to extend my appreciation to all our employees both at the mines and in offices for their ***continued commitment to ensuring safe and productive environments***."

241.   Defendants' statements about safety contained in ¶ 240 were materially false and/or misleading for the same reasons set forth in ¶ 230.

242.   On August 1, 2017, Amer Tiwana of Cowen issued an analyst report on Peabody entitled, "Strong 2Q17, Risk/Reward Balanced After the Recent Rally." In the report, Tiwana stated, in part:

> **2Q Results Ahead of Street Expectations**. Peabody reported 2Q revenues of $1.258 billion, mostly in-line with consensus' estimate of $1.251 billion. BTU beat on EBITDA, however, with $318 million vs. $275 million consensus. In our view, the EBITDA beat is primarily attributable to strong cost performance in the Australia thermal and Western segments. Sequentially, revenues and EBITDAR were down from 1Q ($1.33 billion and $366 million, respectively). . . . EBITDA from the Australian ops is up dramatically y-o-y ($178 million vs. -$4 million) as 2Q16 proved to be the bottom for met coal prices (+114% y-o-y).

### 4.   October 25, 2017 - 3Q17 Financial Results

243.   On October 25, 2017, Peabody reported its financial results for the third quarter 2017 that beat analyst estimates. Peabody reported that its revenues of $1.48 billion and that its adjusted EBITDA increased $281.1 million from the prior year to $411.3 million. The press release quoted Defendant Schwetz as stating that "Peabody continues to take aggressive actions to reduce debt and advance the shareholder return initiatives we outlined in August."

244.   On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow represented that: "Through all of our actions, ***Peabody maintains constant vigilance toward safety***."

245.   Defendants' statements about safety contained in ¶ 244 were materially false and/or misleading for the same reasons set forth in ¶ 230.

246.     On October 25, 2017, Daniel Scott from MKM Partners issued an analyst report

on Peabody entitled, "Quick Read: Peabody Posts Solid 3Q Results," which reported the

following, in part:

> • Peabody puts up a solid quarter. Peabody this morning reported
> 3Q17 results, including adjusted EBITDA of $411 million, well
> above our $346 million estimate and consensus of $366 million.
> The company got solid contributions from essentially all aspects of
> its portfolio, highlighted by $197 million of EBITDA from its U.S.
> operations and $241 million from its Australian operations. Better
> than expected margins in the PRB and in Australian coking coal
> more than offset lower than expected export thermal results.
>
> \*   \*   \*
>
> • Australian results deliver, driven by coking coal. The company
> had solid results out of Australia, with coking coal gross margins
> more than double our model, offset somewhat by thermal results
> that were a bit below our estimates. Coking coal had sales of 3.5
> million tons (versus our 3.3 million tons), realized prices of
> $119.55/ton (versus our $109/ton), and costs of $78.42/ton (versus
> our $90/ton), for a gross margin of $41.13/ton (versus our
> $19/ton). On the thermal side, the company sold 5.2 million tons,
> just below our 5.3 million ton estimate. Gross margins were
> $19.06/ton, below our $24/ton estimate primarily on lower than
> modeled realized prices.
>
> • Guidance for 2017 tightened, hedged volume details for 2018
> introduced. The company updated sales volume guidance . . .
> Aussie coking coal raised on the bottom end of the range . . .

247.     On October 25, 2017, JP Morgan issued an analyst report on Peabody's results

entitled, "Strong Q3 Results; Reiterate OW," which highlighted the following:

> Peabody delivered a strong Q3 result beating our and consensus
> earnings estimates. This was driven by the expected catch-up in
> Australian met coal sales after the Q2 cyclone and a surprisingly
> strong PRB performance with 2017 production guidance lifted.
> The company has accelerated its debt repayment plans and is well
> on track for its 2017 goals. We reiterate our Overweight rating on
> this stock given its unusually low FV/ EBITDA multiple, which on
> a forward basis is ~4X when the normal range has been 5X to 8X
> for the sector. . . .Costs at the Australian operations were better
> than our numbers . . .

### 5.    February 7, 2018 - 4Q17/FY 2017 Financial Results

248.    On February 7, 2018, Peabody reported its financial results for the fourth quarter and full year 2017. Peabody reported that revenues for the fourth quarter increased 5 percent over the prior year to $1.52 billion and full year 2017 revenues increased 18 percent over the prior year to $5.58 billion, driven by, among other things, higher Australian metallurgical and thermal coal pricing. Peabody further reported that fourth quarter adjusted EBITDA increased $122.2 million over the prior year to $416.2 million.

249.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow once again stated that: "At the operational level, ***our global safety performance continues to surpass industry averages***. While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  A***s always, we are ever vigilant on our journey of continuous improvement in safety***." He later reiterated this point: "***As always, we begin with a focus on safe productive operations*** and return maximization."

250.    Defendants' statements about safety contained in ¶ 249 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 6.    February 22, 2018 - Peabody's Analyst and Investor Day

251.    On February 22, 2018, during Peabody's Analyst and Investor Day, Defendants represented in an investor presentation that at the North Goonyella coal mine, ***"Record safety results reflect 80% improvement since 2013."***

252.    Defendants' statements about safety contained in ¶ 251 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 7.     February 26, 2018 – 2017 Financial Results

253.    On February 26, 2018, Peabody filed its 2017 Form 10-K with the SEC. The 2017 10-K contained a section entitled "Risk Factors." Among those provided, the Company included the following potential risk warning: "Risks inherent to mining could increase the cost of operating our business." Under the heading, the Company elaborated: "Our mining operations are subject to conditions that can impact the safety of our workforce, or delay coal deliveries or increase the cost of mining at particular mines for varying lengths of time. These conditions include . . . *fires and explosions from methane gas* or coal dust." The Company went on to say, "Despite our efforts, such conditions could occur and have a substantial impact on our results of operations, financial condition or cash flows."

(a)     These purported disclosures regarding the risk of fire and explosion from methane gas, appeared in the 1Q 2017 10-Q, 2Q 2017, 10-Q, 3Q 2017 10-Q, 1Q 2018 10-Q, and the 2Q 2018 10-Q.

254.    Peabody's risk disclosures about the potential for fires and explosions from methane gas, contained in ¶ 253, were misleading when made in that they failed to disclose the adverse facts set forth in ¶ 230 existing at the time Defendants Risk Disclosures were issued.

### 8.     April 25, 2018 - 1Q18 Financial Results

255.    On April 25, 2018, Peabody reported its financial results for the first quarter 2018. Peabody reported that revenues for the first quarter rose 10 percent over the prior year to $1.46 billion and that adjusted EBITDA increased 7 percent over the prior year to $363.9 million.

256.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow emphasized the Company and its employees' *"ongoing focus on safe productive workplaces."*

257.     Defendants' statements about safety contained in ¶ 256 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 9.     May 2018 - Corporate and Social Responsibility Report

258.     In or around May 2018, Peabody published its 2017 Corporate and Social Responsibility Report, in which it stated that Peabody *"commit[s] to safety and health as a way of life"* and that *"Safety is Peabody's first value, integrated into all areas of our business."* The report went on to state that: "*A focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety*, production and panel development in 2017." The report further discussed a Peabody initiative called "Project Excellence," which "is Peabody Australia's cost and productivity improvement plan that *has driven initiatives critical to the platform's sustainability without compromising safety*, achieving 2017 savings of about $130 million. The platform boasted *its best-ever safety performance* and reclaimed more than 1,200 acres of land." In addition, the report stated that "*Peabody will continue to carefully review its business practices, policies and safety standards to stay true to its corporate values.*"

259.     The report further summarized that "*Safety is essential to everything we do at Peabody. Each day, our vision is to operate safe and healthy workplaces that are incident free. As our first value and a leading measure of operational excellence, we approach safety with both vigilance and humility, and we commit to continuously improving our safety and health efforts*."

260.     Similarly, the report included a letter from Defendant Kellow in which he stated, "*Peabody's global safety performance continues to surpass industry averages. The Australian platform achieved a record safety year in 2017, and we remain ever vigilant on our journey of continuous improvement in safety.*" He is separately quoted as stating, "*For all of us at*

***Peabody, health and safety isn't just a statistic. It's something that we commit to as a way of life.***"

261.    Defendants' statements about safety contained in ¶¶ 258-260 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 10.    July 24, 2018 - 2Q18 Financial Results

262.    On July 24, 2018, Peabody reported its financial results for the second quarter 2018. Peabody reported that revenues for the second quarter increased 4 percent over the prior year to $1.31 billion, and that adjusted EBITDA increased $51.8 million over the prior year to $369.6 million.

263.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives, and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow once again emphasized the Company and its employees' ***"continued focus on safe and productive workplaces."***

264.    Defendants' statements about safety contained in ¶ 263 were materially false and/or misleading for the same reasons set forth in ¶ 230.

### 11.    August 2018 and September 2018 - Investor Presentations

265.    In August 2018, in an Investor Presentation, Defendants stated that Peabody's ***"[s]afety performance continues to outperform industry averages,"*** and that Peabody paid ***"[s]trong attention to operational excellence by committing to safe workplaces***, maximizing resource recovery, improving environmental performance and restoring mined lands."

266.    On September 4, 2018, MKM Partners issued a note about an in person meeting with Peabody senior management the prior week. The note stated: "***[S]enior management . . . were able to highlight their strong Australian platform, which is running EBITDA margins***

*near 40%, supplemented by the large, low cost domestic thermal platform running near 20%* .
. . We view valuation as compelling especially against the current commodity strip, and are
reiterating out Buy rating."

267.    Defendants' statements about safety and the strength of Peabody's Australian
mines, contained in ¶¶ 265-266 were materially false and/or misleading for the same reasons set
forth in ¶ 230.

### 12.    September 2018 – Reports of Fire at North Goonyella Mine Start to Emerge, Yet Defendants Continue to Downplay Risk

268.    On September 19, 2018, after Peabody had repeatedly touted its safety record at
North Goonyella since emerging from bankruptcy in April 2017, *The Australian Financial
Review*, based on information from North Goonyella miners concerned about their immediate
safety and their jobs in the future, reported that work had been suspended at the mine due to
elevated methane and carbon monoxide levels at the mine and reported that the problems at the
mine "stretch[ed] beyond" just elevated gas readings. According to *The Australian Financial
Review*:

> Multiple sources have indicated that the coal is generating
> excessive levels of heat, that this is the source of the gas
> accumulation and that management is uncertain why or where this
> unanticipated burst of heat is coming from. Those same sources
> estimate that mine management has no more than two weeks to
> solve both issues because a half-moved longwall 'cannot just sit
> down there for too long without moving.'

269.    Peabody flatly rejected the claims of the *Australian Financial Review* report that
the North Goonyella mine had a problem with super-heated coal and that the Company ran the
risk of losing the massive and expensive long-wall equipment that was in the process of being

moved to a new panel before the mine was evacuated.[72]  In fact, ***Peabody said that key services such as power, ventilation, and normal water management had been unaffected by the shutdown***.

270.    The September 19, 2018 *Australian Financial Review* article quoted Peabody as confirming the link between heat and gas levels, but downplaying the sense of urgency represented by the *Australian Financial Review's* sources.  According to Peabody: "***About 2 ½ weeks ago, an area of the North Goonyella mine began registering higher gas levels, suggesting modest elevated temperatures and low-level oxidation of some coal***. Mine management quickly assessed the facts [and] took appropriate steps," which, according to the Company were "***yielding success with current gas levels below their peak***." However, Peabody seriously downplayed the need for speed and any notion that its very expensive longwall equipment might be at risk.

271.    The Company also falsely reassured investors that 2018 coal production volumes would not be impacted by these issues, stating that "***the company had been trending to the upper end of its 2018 metallurgical coal sales volume targets, and those targets have not been revised***."

272.    That same day, September 19, 2018, Peabody issued a Form 8-K noting that:

> Peabody today confirmed that the longwall move at its North Goonyella Mine has been interrupted by temporarily elevated gas levels. Services such as power, ventilation and normal water management activities in the mine continue, and the mine is shipping from inventories*. **Longwall move activities have been delayed for about two and a half weeks thus far and the company is working toward resuming operations***.  Peabody is well over

---

[72] https://www.afr.com/companies/energy/cloud-over-peabodys-reputation-lingers-after-goonyella-fire-20181009-h16ex9

halfway through the two-month longwall move at this point.  ***The longwall move, which was expected to be completed in September, is now targeted for completion in the early part of the fourth quarter.  Prior to this time, the company had been trending to the upper end of its 2018 metallurgical coal sales volume targets, and those targets have not been revised.***  The company intends to provide further updates on or before its earnings release near the end of October.

273.  That same day, on September 19, 2018, the Company also issued a "Statement on North Goonyella Mine," which noted, in part:

About two and a half weeks ago during a scheduled longwall move, an area of the North Goonyella Mine in Australia began registering higher gas levels.  The mine also has recorded slightly elevated temperatures caused by low-level oxidation of some coal.  These types of events do occur from time to time in underground mines.

Mine management quickly assessed the facts, took appropriate steps, removed people from underground, contacted the Queensland Mines Inspectorate and industry experts, and began mobilizing resources to correct the situation.

Steps taken have included pumping nitrogen near the face to reduce levels, with recent indications that process is yielding success with current gas levels below their peak.

"The health and safety of employees is always the number-one priority at Peabody***.  Our gas monitoring and safety systems are designed specifically for these types of events and detected the elevated levels of gas in a timely manner,***" said Peabody President – Australia George Schuller.  "We will continue to conduct our response efforts in a safe and sustainable way, with our employees returning underground when it is safe to do so." … ***Services such as power, ventilation and normal water management activities in the mine continue***, and the mine is shipping from inventories.

***The longwall move, which was expected to be completed in September, is now targeted for completion in the early part of the fourth quarter.  Prior to this time, the company had been trending to the upper end of its 2018 metallurgical coal sales volume targets, and those targets have not been revised.***  The company will continue to communicate progress as it occurs.

274.     Several days later, on September 25, 2018, Peabody issued another Form 8-K, once again significantly downplaying the significance of the issues at the North Goonyella mine and the imminent risk of spontaneous combustion, stating, in part, that:

> **Peabody noted today that gas levels at its North Goonyella Mine have been variable and remain elevated.** The company is working with the Queensland Mines Inspectorate and third-party experts as *we continue a progressive plan aimed at reducing gas levels and accommodating a safe return to mining operations. Determination of the timing of completion of the longwall move and expected financial effects will be made when gas levels subside and personnel can safely resume longwall move activities.*

275.     That same day, September 25, 2018, the Company also issued an "Updated Statement" on North Goonyella, which noted, in part:

> Gas levels at Peabody's North Goonyella Mine in Queensland have been variable and remain elevated, with employees and other personnel remaining above ground . . .The company is working with the Queensland Mines Inspectorate and third-party experts as we continue a progressive plan aimed at reducing gas levels. Responsive steps taken to-date have included drilling boreholes for monitoring; pumping nitrogen; and sealing off one of the entries to the completed longwall mining area.
>
> *     *     *
>
> **Background**
>
> On September 1 during a scheduled longwall move, an area of the North Goonyella Mine in a remote area of the Bowen Basin in Australia began registering elevated gas levels caused by oxidation of some coal. Mine management quickly assessed the facts, took appropriate steps, removed people from underground, contacted the Queensland Mines Inspectorate and independent industry and scientific experts, and began mobilizing resources to correct the situation.
>
> **Peabody has relocated more than half of the major equipment associated with the originally planned** two-month longwall move when elevated gas levels were detected. The company has notified customers of expected impacts to October shipments from the extended longwall move.

> *Determination of the timing of completion of the longwall move and expected financial effects will be made when gas levels subside and personnel can safely resume longwall move activities*.

276. Two days later, on September 27, 2018, the Company issued another "Statement Regarding North Goonyella Developments," which noted that, "**Mine personnel have observed smoke coming from the mine, indicating a likely fire in a portion of the mine**… The company continues to work with the Queensland Mines Inspectorate and third-party personnel to mobilize resources and manage next steps to address the situation."

277. Defendants' statements about the nature and extent of the spontaneous combustion event at North Goonyella, contained in ¶¶ 269-275, were materially false and/or misleading when made in that they failed to disclose the following adverse facts which were known to or recklessly disregarded by Defendants:

(a)     The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)     The Company had failed to properly ventilate the North Goonyella mine resulting in the build-up of methane gas and carbon monoxide;

(c)     The Company's systems at North Goonyella to monitor and analyze mine gases were insufficient;

(d)     North Goonyella faced serious staffing issues and a lack of sufficient experienced personnel as a result of layoffs at the mine before the Class Period;

(e)     Training of mine employees at North Goonyella to recognize potential ventilation and combustibility issues was insufficient;

(f)     The Company failed to follow its own safety procedures, including its Sealing Management Plan;

(g)      The Company lacked emergency sealing procedures at North Goonyella;

(h)      The Company breached its safety obligations under the Mining Safety & Health Act and Peabody's environmental license;

(i)      In the days leading up to and following the September 1, 2018 evacuation at North Goonyella, the problems at the mine were way worse than just elevated methane gas readings. Indeed, mine management did not know why or where the unanticipated bursts of heat were coming from and how to address the heating events;

(j)      Based on the smoke coming out of the mine on September 23, 2018, it was obvious the Company had a major fire on its hands and would not be allowed back underground to rehabilitate the mine and resume the longwall move for some time;

(k)      Sealing of 9N and removal of the longwall took too long and the idle status of the mine for some period of time during the longwall move contributed to too much air getting into the mined-out area of 9N ("the longwall goaf") and oxidation;

(l)      The Company lacked the ability to properly and quickly seal the mine during evacuation;

(m)      The mine lacked emergency seals which would (i) have helped reduce airflow to the affected areas and (ii) control the fire;

(n)      The difficulties sealing the affected area of the mine were significantly exacerbated once everyone was above ground and exclusion zones were established;

(o)      As set forth at ¶ 179, on September 26, 2018, Luke Ludlow, former North Goonyella Union Lodge President sent an email to the leadership of the CFMEU: (i) informing his union peers of **massive spikes** in the levels of dangerous and volatile gases in the mine, (ii) confirming fears of a potential explosion inside the mine, and (iii) **warning that only a**

- 107 -

**"miraculous change in circumstance" in the days ahead would prevent critical mining equipment being sealed in the mine and  long-term interruption to coal production**; and

> (p)     As a result, the North Goonyella mine was at a heightened risk of: (i) complete shutdown, (ii) damage to the 9N longwall panel and much of the Company's equipment stuck underground at the 9N and 10N panels, and (iii) significant delays in the resumption of coal production.

278.    Moreover, Defendants' representation that Peabody would wait until mine personnel could safely resume longwall move activities to determine ***"the timing of completion of the longwall move and expected financial effects***" of the fire was also false.  Instead, Defendants provided investors with re-opening timelines and coal production plans long before mine personnel were even allowed to go back underground at North Goonyella, let alone resume longwall move activities (which still has not occurred as of the date of filing of this complaint).

> **13.     The Truth Begins to Emerge, But Defendants Continue to Mislead the Market**
>
>> **(a)     September 28, 2018 – Company Press Release About North Goonyella Fire (*First Partial Revelation of the Truth*)**

279.    Despite these attempts to downplay the fire-related issues at the North Goonyella mine, on September 28, 2018, five days after photographs of plumes of black smoke billowing from North Goonyella began circulating, Defendants finally confirmed that Peabody's most profitable mine was on fire and that its impacts were still uncertain.

280.    On September 28, 2018, after the market closed, Peabody issued a press release reporting that a fire was occurring within the mine and that as a result, the Company did "***not***

*expect any production from North Goonyella in the fourth quarter of 2018*." [73] Specifically, the

Company stated, in part:

> Peabody (NYSE: BTU) is providing an update on its report on conditions at its North Goonyella Mine in Queensland **following indications of a fire in a portion of the mine**. All employees were outside the exclusionary zone at the time of the incident.
>
> The company continues to actively work in conjunction with the Queensland Mines Inspectorate and other third-party experts toward a plan to extinguish the fire and contain the impacts.
>
> **Peabody does not expect any production from North Goonyella in the fourth quarter of 2018** and has a small amount of coal in inventory to ship.

281.    Notwithstanding the ongoing mine fire, the Company reasserted its standing

guidance for Queensland coking coal production, which it claimed would range between 11-12

million tons. "***It is too early to assess the full financial impact to future periods as a result of***

***the ongoing issue***. However, with strong performance from other mines, the company is

maintaining its full-year 2018 metallurgical coal sales volume targets of 11 – 12 million tons."

282.    On this news, ***Peabody's stock fell $5.54, or 13.5 percent***, closing at $35.64 on

September 28, 2018, down from the previous day's close of $41.18.

283.    On September 28, 2018, *The Daily Mercury* quoted a long-time underground

operator at the North Goonyella mine as stating that employees had been told not to talk about

the incident: "We're told 'don't talk to the media, don't talk to the media' but I think people have

a right to know."

---

[73] Text that is **bolded and underlined** indicates the partial revelation of the truth or the materialization of previously undisclosed risks.

284.    On September 28, 2018, John Bridges of J.P. Morgan Securities issued an analyst

alert on Peabody entitled, "North Goonyella fire; share action looks overdone."  In the report,

Bridges noted the following:

> After reporting delays to the longwall move at North Goonyella
> due to combustion gases, there is now a fire at the mine. While
> pictures of the event are alarming, mine fires do happen. The
> company does not expect production from North Goonyella in
> Q4'18 but has maintained its 2018 met coal guidance, although
> without the near premium met coal from this mine, the average
> selling price will likely be lower. Peabody has also disclosed it has
> insurance cover up to $125m after a $50m deductible. It had been
> trying to smother the fire using inert gas but presumably the
> smoldering coal found an oxygen source leading to the smoky
> pictures in the Australian press.
>
> Fires bring out the regulators and the fire masters. Fires bring in
> conservative government regulators and specialist fire fighters.
> This probably explains in part the limited information flow from
> the company as it now has senior partners in the process.
>
> Because of the risk of explosion the regulators have created an
> exclusion zone around the mine. This poses something of a
> problem since the mine now needs remotely operated equipment to
> seal off the shaft accesses to the fire burning 1,000 feet below.
>
> Fires are not uncommon. The back areas behind a longwall
> machine are inaccessible and can contain methane. Should a spark
> ignite the methane a fire can start. . .**We don't believe a profitable
> mine should be shuttered by a fire.**
>
> We estimate at the current met coal price around $200/t North
> Goonyella should be generating ~$50m of EBITDA a quarter.
> **Although Peabody has not disclosed how the losses are
> calculated for the insurance cover, it seems likely that the
> deductible will be exceeded during this event but hopefully the
> losses won't exceed the full $125m cover. This suggests that the
> ~$600m that has been removed from the Peabody share price
> is excessive and could be 10X the uninsured loss. We'd be
> buyers of what looks like an unjustified sell-of**f.

285.    On October 1, 2018, Christopher LaFemina from Jefferies issued an analyst report

on Peabody entitled. "Fire at North Goonyella Is a Setback."  In the report, LaFemina noted:

According to multiple reports, Peabody's North Goonyella mine in Australia has a fire at its operation. Peabody released a short statement, commenting that the company has restricted access to the mine via an exclusion zone, following reports of elevated gas levels and smoke coming from the mine. Peabody then released a follow-up statement confirming the fire and that the company is working to extinguish it. Peabody now expects no production from North Goonyella in 4Q18. However, Peabody maintained its full-year 2018 met coal sales guidance of 11-12Mt given strong performance from other mines. We expect this issue to spill over into 2019 as coal mine fires can be very difficult to extinguish, and we believe a 6+ month shutdown is possible. . . . We had expected North Goonyella to contribute approximately $130M of EBITDA in 2018 (2.6Mt at an EBITDA margin of ~$50/t). On our estimates, this mine has an NPV of $350M, or ~$2.90 per BTU share. Peabody has said that it has insurance which may apply beyond a deductible of $50 million. Even if the total loss to the company is less than $50 million, this operational issue is likely to be an overhang on the BTU share price for the next 6+ months. We lower our price target from $55/sh to $48/sh as we assume a $50m loss to the company and we assume a higher WACC (increasing from 7% to 8%) due to greater perceived risk. **While we are concerned about the potential impact of this fire, we believe the 13.5% collapse in the BTU share price last Friday fully reflects the increased risks**, and we maintain our Buy rating on BTU shares as a result.

286.     Defendants' statements about the nature and extent of the spontaneous combustion event at North Goonyella, contained in ¶¶ 280-281, were materially false and/or misleading when made in that they failed to disclose the following adverse facts pertaining to the North Goonyella mine which were known to or recklessly disregarded by Defendants:

(a)     A lack of proper ventilation controls during the longwall take-off process permitted too much air to enter the mined-out area in 9N resulting in oxidation;

(b)     The system the Company used to monitor and analyze mine gas was insufficient.  Changes to the mine's ventilation system to increase airflow had intensified the oxidation of coal which ultimately resulted in the fire;

(c)     Training of mine employees to recognize potential ventilation and combustibility issues was insufficient;

(d)     Sealing of 9N and removal of the longwall system took too long and the idle status of the mine for some period of time during the longwall move contributed to too much air getting into the mined-out area of 9N ("the longwall goaf") and led to oxidation;

(e)     The Company's Sealing Management Plan was not properly followed by its employees;

(f)     The Company lacked the ability to properly and quickly seal the mine during evacuation;

(g)     The mine lacked emergency seals which would (i) have helped reduce airflow to the affected areas, and (ii) control the fire;

(h)     The difficulties sealing the affected area of the mine were significantly exacerbated once everyone was above ground and exclusion zones were established; and

(i)     As a result, the North Goonyella mine was at a heightened risk of: (i) complete shutdown, (ii) damage to the 9N longwall panel and much of the Company's equipment stuck underground at the 9N and 10N panels, and (iii) significant delays in the resumption of coal production.

(j)     Moreover, Defendants' statement that, "***Peabody does not expect any production from North Goonyella in the fourth quarter of 2018***," was a gross understatement as it was highly unlikely, if possible at all, that the Company would be granted underground access by the end of 2018, much less be able to resume production on the longwall at 10N soon thereafter. Based on the plumes of black smoke coming out of the mine on September 22, 2018,

it was obvious the Company had a major fire on its hands and would not be allowed back underground to rehabilitate the mine and resume the longwall move for some time.

287.    As set forth in more detail below, Defendants also knew or were reckless in not knowing by September 28, 2018 (four weeks after having evacuated the mine) that:

(a)    Peabody would lose the 78 Roof Supports still on the 9N longwall face. This meant they could not begin longwall mining on 10N until they acquired at least 78 new Roof Supports. At this point, longwall production in 10N could not begin, even in a best case scenario, for at least 12-18 months – or until at least early 2020.

(b)    The idle status of the mine (again, idle for four weeks so far) threatened conditions at the longwall face.  According to a longwall mining expert, if the longwall is not operating for a period of time (i.e., is idle) or a longwall move is paused mid--move, speed in recovery is critical, as conditions deteriorate over time – especially roof conditions in the mine. This not only makes the recovery operations more dangerous, it also increases the amount of additional work required. The Roof Supports weigh about 32 tons a piece and cost millions of dollars.  When they are moved, there is a significant pressure on the floor of the mine as they move, which damages the floor and usually causes ongoing repair work to the floor to keep the roadways passable.  When there are delays, and especially as water builds up on the floor, those roadways deteriorate very quickly. This creates additional delays in the recovery process.

(c)    As a result, there would be major delays in reopening the North Goonyella mine and resuming the longwall move and restarting coal production.

**(b)    September 30, 2018 – October 11, 2018: Peabody Releases Updates On Goonyella Fire**

288.    On September 30, 2018, Peabody provided an operational update on North Goonyella.  According to the update, the fire was ongoing, and it was too early to assess the

"extent of impacts." But the Company was "[w]orking in consultation with the Inspectorate and third-party experts," and was "*moving safely and as quickly as possible to address the situation*." Peabody also announced it "*ha[d] developed a multi-tiered plan in an effort to extinguish the fire and contain the impacts at its North Goonyella Mine in Queensland.*"

289.   On October 2, 2018, Peabody provided another update on North Goonyella claiming its efforts to contain the fire were working. According to the "Update," initial steps taken to extinguish the fire and contain impacts at the mine had "*yielded visible results, with only a slight amount of what appears to be either steam or white smoke emanating at this time from only the one mine shaft*."

290.   On October 11, 2018, Peabody provided a further update "on progress to contain impacts of the previously reported fire at the North Goonyella Mine in Queensland."  The Company represented, among other things, that: (i) *it was "continuing the initial sealing of the completed longwall panel" and planned to "permanently seal the area where high methane levels were concentrated*"; (ii) *"three of the mine's five openings remain temporarily sealed to reduce air flow into the mine"*; (iii) sampling of underground gases showed "general downward trends in the past two weeks"; (iv) it was utilizing existing boreholes to expand gas level monitoring of the mine; (v) it would "*continue to evaluate potential next phases of stabilization, assessment, mine planning, re-entry and recovery"*; and (vi) the Queensland Mines Inspectorate had initiated an investigation into the events related to North Goonyella.

291.   With respect to the financial impact of the mine closure and remediation and reopening of the mine, Peabody stated: "While still too early to offer meaningful insights into the financial effects or timing of next steps, *the company expects financial impacts to future periods*. Peabody intends to provide an initial look at financial and other impacts at the time of

third quarter earnings, including recording a provision for the third quarter related to equipment expected to be sealed in the completed longwall panel... While the timeline remains uncertain, *the company will continue to evaluate potential next phases of stabilization, assessment, mine planning, re-entry and recovery*."

292.    Defendants' statements about the nature and extent of the fire at the North Goonyella mine contained in ¶¶ 288- 291 were materially false and/or misleading for the same reasons set forth in ¶¶ 277, 278, 286, 287.

293.    However, even after the fire and the announcement of both an internal and a governmental investigation, Defendants continued to mislead investors about the Company's plan to restart operations at North Goonyella, falsely assuring investors that the Company would be able to mine significant coal at the North Goonyella mine in the near-term, while continuing to conceal major issues that would impede any progress at the mine and which would ultimately cause QMI to reject its plans. Specifically, Defendants' statements conditioned investors to believe that its plan to restart operations at North Goonyella was reasonable and had a high likelihood of regulatory approval, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks such that QMI would likely mandate a safer, more cost-prohibitive approach that would cause major delays in restarting the mine.

### (c)    October 30, 2018 - 3Q18 Financial Results

294.    On October 30, 2018, Peabody reported its financial results for the third quarter 2018. Peabody reported revenues of $1.41 billion compared to $1.48 billion in Q317, net income attributable to common stockholders of $71.5 million, diluted earnings per share from continuing operations of $0.63 and Adjusted EBITDA of $372.1 million compared to $411.3 million in Q317. In its press release announcing its earnings, Defendant Kellow stated:

During a quarter that ended with substantial challenges at the North Goonyella Mine, Peabody's large, diversified platform generated solid results, led by our Australian thermal coal segment . . . . While our operational focus is on our current platform, entering the assessment and planning phase of the North Goonyella Mine, and completing the accretive Shoal Creek metallurgical coal mine acquisition in Alabama, our financial approach is unchanged. We are committed to generating cash, maintaining financial strength, investing wisely and returning cash to shareholders - demonstrated by our expanded share buyback program and increased dividend per share.

295.   With respect to North Goonyella, the Company stated that activities at the mine were transitioning from the containment phase to the assessment/planning stage.  The press release, stated, in part:

> **North Goonyella Update**: Mine personnel are continuing with concrete sealing of the completed longwall panel, and the company is transitioning to the assessment/planning phase of managing the previously reported incident at North Goonyella. This next phase involves mapping of the heated area and monitoring of temperatures, gas levels, seismic activity, surface air quality and camera imaging. ***These actions come before advanced planning for re-ventilation, mine re-entry and potential restart of operations***…
>
> \* \* \*
>
> *Financial Elements*: Consistent with actions taken and conditions known to date, Peabody has recorded a $49.3 million charge for estimated equipment loss, including 78 shields and ancillary equipment sealed in the completed 9 North panel area.[74] The majority of this charge is expected to have a cash impact related to leased equipment. The current book value of North Goonyella following the charge is $284 million, including unmined panels in the north and south portions of the current seam, lower-seam reserves and surface facilities. The mine also contains $61 million in leased equipment not within the sealed and mined-out 9 North panel.
>
> In the fourth quarter, Peabody estimates $20 to $25 million in containment, monitoring and planning costs, along with approximately $15 to $20 million in costs to keep the mine in idle

---

[74] Roof Supports are also known as shields.

status pending any future re-entry. ***The company intends to take all steps to work safely, progress the plan and look to mitigate costs while pursuing options for a resumption of activities at the appropriate time...***

* * *

*Future Scenarios*: As Peabody enters the next phase, the North Goonyella team will continue to work from the surface and obtain greater knowledge of underground conditions in the mine. ***The assessment and planning phase comes before re-ventilation, re-entry and any potential restart of operations***. All phases involve review and collaboration with the Queensland Mines Inspectorate.

Multiple scenarios are being evaluated should mining be able to resume. ***If the next panel (10 North, which is already developed) is accessible, production would be targeted for the second half of 2019, whereas southern panels (GM South) access would likely extend to 2020 given that development was in early stages***. The company is exploring all reasonable mine-planning steps given the long-lived nature of reserves and compelling margins of the mine during times of strong industry conditions.

296.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives, and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow represented to investors that Peabody would, in fact, be able to restart operations at North Goonyella relatively soon. Kellow stated, "based on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella. While we very much understand the concern, ***based on what we know today, that conclusion is at best premature and at worst unwarranted***" reiterating that coal production in North Goonyella would restart in the second half of 2019.

297.    As a result of Defendants' misrepresentations and omissions, Peabody's stock price was artificially inflated and/or artificially maintained.  Indeed, Defendants' statements drove the price of Peabody's shares up by 3.4 percent.

298.    Defendants' statements about the resumption of coal production at 10 North, in the second half of 2019, contained in ¶¶ 295-296, were materially false and/or misleading when made in that they failed to disclose the following adverse facts pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine which were known to or recklessly disregarded by Defendants:

(a)    Once the mine was evacuated and "strict exclusion zones" were set up above ground, Peabody could only gain access to control the fire and seal the fire areas (9N) through boreholes on the surface which, according to MREs, the Company was still drilling until at least November 2018. Moreover, even surface areas of the mine were severely "limited" in access. According to a longwall mining expert, Peabody likely would not get miners back underground at North Goonyella before the end of 2018 and coal production on the longwall at 10N would not resume for at least 12 months after underground access was permitted;

(b)    The longwall remaining in "idle" status without being sealed further threatened conditions underground. According to a longwall mining expert, if a longwall move is stopped mid-move, speed in recovery (resuming operations) is critical, as mine conditions deteriorate over time – especially roof conditions.  This not only makes the recovery operations more dangerous, it increases the amount of work required during recovery. When there are delays in a longwall move and water builds up on the mine floor (which is exactly what happened here), mine roadways deteriorate very quickly and there is a serious risk of significant roof damage (which is exactly what happened here) – which would make access to those mine faces much more difficult and recovery more time-consuming.  Moreover, if a longwall is not operating for a long period of time, it significantly changes the production levels and profit structure of the mine.

(c)     A significant portion of the longwall system at North Goonyella had been "sealed" underground and was likely damaged. Longwall panels are typically 2 to 2.5 miles long and 850 to 1350 feet wide, so it would have been nearly impossible, if not completely impossible given the state of the North Goonyella mine with the fire still not under control and gas levels fluctuating widely, to even attempt to: (i) gain re-entry to the mine; (ii) assess the condition of the longwall panel stuck underground in 9N; and (iii) move the damaged equipment from 9N to 10N before confirming the fire was completely extinguished in 9N and rehabilitating damaged segments of the mine;

(d)     According to a longwall mining expert, if the longwall equipment was unrecoverable or lost to the fire, it would likely take at least 12-15 months to locate, acquire, and customize a substitute longwall panel for reentry and coal production at 10N.[75] Indeed, the majority of the Roof Supports (the part of the longwall system used to hold the mine roof up during a longwall move and during coal production – seen at ¶ 45), each weighing approximately 32 tons a piece, were stuck underground and also likely heavily damaged. According to MREs prepared by QMI in September 2018, certain of the Roof Supports in 9N were "leaking off" and losing contact with the roof after mine evacuation, and at least ten (10) Roof Supports required re-pressurizing. Indeed, five months after mine evacuation, the Company disclosed: (i) several roof falls (meaning the Roof Supports sealed in 9N were certainly damaged); and (ii) damaged conveyor belts on the longwall panel sealed in 9N;

---

[75] The Company claimed that $61 million in leased equipment was not "within the sealed and mined-out 9 North panel." It appears this leased equipment was within the mine though - maybe at the 10N longwall face (meaning it too was stuck underground and potentially damaged or irretrievable).

(e)     If Peabody was, in fact, able to seal the 9N face, and mine the 10N panel in a timely manner, the Company still would have to replace the lost Roof Supports with those scheduled for delivery at North Goonyella in mid to late 2019.  Assuming that longwall system was delivered on time, it still would have required weeks to transport the system and Roof Supports to the new longwall face (10N), install them, and complete the commissioning to make them operational.  At this point, resuming coal production early 2020 would have been the earliest possible start date for Peabody, if 10N was accessible.

(f)     Thus, resumption of coal production could not have happened unless and until Peabody was able to: (i) control the fire; (ii) obtain 78 or more new Roof Supports; (iii) access its operations underground (still prohibited in October 2018 and ultimately only allowed eight months later in July 2019);  (iv) rehabilitate the accessed area in order to prepare for mining at 10N; and (v) transport the new Roof Supports underground to the 10N longwall face. According to a longwall mining expert, even in a best-case scenario where all of these steps happened in 2019 (over the intervening 12-15 months), coal production could not resume at 10N before the beginning of 2020, assuming Peabody could re-enter the mine and resume rehabilitative work before the end of 2018. Otherwise, resumption of coal production would have been delayed until later in 2020.

(g)     Given the idle status of the mine between September 28, 2018 and October 30, 2018 (no underground access and limited above-ground access, and a limited ability to remotely seal the affected areas on fire), it is likely that the Company acquired very little new information regarding the viability of recovery and reentry in the four weeks since the fire was announced on September 28, 2018.

(h)     By Defendants' own admission one year later, on October 29, 2019, "attempts to access the 10 North panel would have required us to explore and mediate the most impacted areas of the mine under unusual and protracted measures";

(i)     Further delays in restarting mine operations at North Goonyella would mean mine personnel would have to be let go (to contain costs at the mine) and later recalled back if, and when, longwall operations resumed; and

(j)     As a result, there would be further delays in reopening the North Goonyella mine and restarting coal production.

299.   Moreover, Defendants' statements about alternatively accessing the mine through the undeveloped southern panels (i.e., 6 South) and resuming of coal production there in 2020, contained in ¶ 295, were materially false and/or misleading when made in that they failed to disclose the adverse facts listed above in ¶ 298 pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine, and also failed to disclose the following additional adverse facts which were known to or recklessly disregarded by Defendants:

(a)     According to a longwall mining expert, since development of the southern panels at North Goonyella was in its early stages before the fire, Peabody would not be able to mine the 6 South area without significant construction work to prepare the area for the longwall – something that would have taken at least 12-18 months after the Company could safety re-enter the mine.

(b)     In order to prepare the southern area for longwall mining, Peabody would have needed to accomplish the steps listed below which likely would have taken at least an additional 18-24 months, scores of new equipment, and well over $25 million dollars. And this

aggressive schedule assumes Peabody was permitted to re-enter the mine within 2-4 months

from October 30, 2018 (which obviously ultimately did not happen).[76]

       (c)     The plan to move to the 6 South panel also required Peabody to obtain re-

entry access to the mine in order to seal off the fire at 9N and be able to pull back to the 6 South

panel and resume operations.  Since the mine plan before the fire only consisted of mining the

9N and 10N panels, there was at least 18-24 months of pre-production work that would have

been required before the Company could move to the southern panels.  Preparation work

included, but not limited to the below, would have been required to be completed before any coal

would have been produced: (i) construction work to establish ventilation, belt conveyor, and

roadways; (ii) actual development mining to develop the 6S panel itself; (iii) rehabilitation work

to maintain the tailgate entry for the 6S longwall – this would be an entry in the 5S panel that

was mined in 1998; (iv) transporting all of the longwall equipment to the area; and (v)

procurement of suitable longwall mining equipment to replace all of the equipment (including

the sizeable panel and Roof Supports) lost underground (and which the Company confirmed in

its insurance claim was "unrecoverable" underground).

       (d)     If Peabody was forced to move to 6S, its spare set of equipment at the

mine also would not be accessible as it likely was already on the 10N panel.  Thus, Peabody

would need to have the equipment from 9N all rebuilt.  Additionally, while the Roof Supports

are the last equipment to be recovered, there is another set of electrical equipment, hydraulic

pumps, and other auxiliary equipment that also remains in place until the Roof Supports are

---

[76] This timeline is supported by statements made by Defendant Kellow on October 29, 2019 ("A
panel of this length should require about 18 to 24 months to develop based on typical
development rates, and then we would have been in a position to begin longwall production.")
(¶ 345).

recovered.  In this case, if Peabody could not access 9N or 10N, it would have lost both sets of

its longwall equipment, and so would be forced to source new replacements of all longwall

equipment (or wait until its new longwall system was delivered in mid to late 2019).

300.    Moreover, Defendants failed to disclose that coal production in the Southern

panels (including 6 South) would be less profitable than coal production in the North panels

given that the Southern panels at North Goonyella were very short (as compared to the Northern

panels) due to the mine's geologic conditions.  Even if Peabody was able to access and bring

longwall mining in the South panels, the Company's coal production forecasts should have been

revised downward due to the necessity for more frequent longwall moves occasioned by the

shorter Southern panel.  Historically, Peabody's coal production at North Goonyella peaks

during years where they do not have a longwall move.  A move to the shorter Southern panels

would have required much more frequent production interruptions due to more frequent longwall

moves.

301.    Analysts equated Defendants' reassurances regarding North Goonyella to the

rising stock value, with J.P. Morgan reporting on October 30, 2018 that "[t]he market has

warmed to Peabody's recovery plan for North Goonyella with the stock rising 4.7% compared

with the S&P's +0.85 so far today. **As CEO Kellow suggested, some investors seem to believe

the mine was lost to a fire, and Peabody's plan shows that closure is neither the company's

#1 or #2 scenario**."

302.    MKM Partners echoed this sentiment in a report dated October 30, 2018, stating

that the **"[u]pdate on North Goonyella [was] encouraging," as "[t]he base case goal it

appears is to resume longwall mining in 2H19, which we view as positive news as the shares

appeared to reflect a total loss assumption**."

**(d)      February 6, 2019 - 4Q18/ FY 2018 Financial Results (*Second Partial Revelation of the Truth*)**

303.      However, just months later, on February 6, 2019, before the market opened, Peabody reported disappointing earnings for the fourth quarter 2018 (revenues of $1.4 billion, an 8 percent decline from fourth quarter 2017), weak Q4 2018 coal production ("reflecting 43 percent lower metallurgical volumes, primarily due to lack of production from North Goonyella,"), and a soft 2019 outlook. Fourth quarter Adjusted EBITDA of $273.7 million was down by $142.5 million as compared to the prior year. Full-year 2018 revenues modestly exceeded the prior year, even with lower coal volumes, due to increased pricing.  Full-year 2018 income from continuing operations, net of income taxes totaled $645.7 million and net income attributable to common stockholders totaled $544.4 million, with Adjusted EBITDA of $1.38 billion.

304.      Despite weak quarterly revenues due to North Goonyella's idle status, Peabody would be "accelerating a safe return to operations at North Goonyella," and, ***"[a]s part of Peabody's recovery plan for North Goonyella, the team is executing a multi-phased re-ventilation and re-entry project targeted to commence in the first quarter 2019.*** The stage-gate approach provides an opportunity to periodically re-evaluate progress, costs and investments."

305.      Peabody then provided a very specific timeline for resuming longwall production at North Goonyella, stating: "***With regard to the company's North Goonyella Mine, Peabody has now identified a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020.  The base case contemplates approximately 2 million tons of sales from North Goonyella in 2020***."

306.     During the trading day, Peabody held a conference call for analysts, media

representatives, and investors to discuss the Company's 4Q18 results. During the earnings call,

which Defendants Kellow and Schwetz participated in, Defendant Kellow stated, in part:

> Let's now move onto North Goonyella on Slide 11. You'll recall,
> we'd identified 2 scenarios previously should we ever resume
> production at the mine. One of those scenarios has normal
> production resuming in the second half of 2019, with the other
> scenario targeting the second half of 2020. ***We're now progressing
> with a single base case that targets limited continuous mining
> volumes in late 2019 and will then have longwall production in
> the 10 North panel begin to ramp up in the early months of 2020***.
>
> ***While there's still much work ahead of us, our base case
> contemplates approximately 2 million tons of sales from North
> Goonyella in 2020***. . . . At this time, all personnel remain
> aboveground and have utilized remote control cameras, gas
> monitoring and other equipment to evaluate underground
> conditions.
>
> Assessment tools have revealed some damage within the mine in
> the form of several roof falls and damaged conveyor belts in
> limited areas. The majority of images suggest multiple areas of the
> mine is largely unaffected. When an underground mine lacks
> ventilation and pumping, it tends to build up methane gas and
> water, and that's been occurring since September. We are
> continuing to work towards reducing water levels through ongoing
> pumping activities. All of our actions have been conducted in
> coordination with the Queensland mines inspector.
>
> Our approach for North Goonyella at this point begins with
> execution of a multiphase project to advance reventilation and
> reentry. . .  Our current assessment indicates idling and
> reventilation and reentry costs to average approximately $30
> million to $35 million per quarter in 2019. We're estimating
> CapEx of approximately $110 million in 2019, that's primarily
> associated with the previously planned purchase of a new longwall.
>
> While our initial plan was to begin using the new longwall at GM
> South after completion of the 10 North panel. Our current plan is
> to now mine 10 North with a new longwall as well.
>
> Wrapping up inflows and outflows related to North Goonyella, we
> also expect cash outlays related to equipment settlements, which
> have already been accrued. In addition, we're anticipating to collect

insurance proceeds of $125 million in 2019, and we've recently
filed that claim.[77]

307.    In response to a question from Jeremy Ryan Sussman of Clarksons Platou

Securities about whether the Company had increased confidence in "ultimately getting back in

the mine and seeing longwall production by 2020," Defendant Kellow stated, in part:

> Well, as we said, the fourth quarter was largely about initially
> consignment in the early part and then we set about doing an
> assessment of the conditions underground through use of thermal
> imaging, the ability to get cameras down to look at parts of the
> mine*. **And certainly, as we've indicated, the vast majority of the
> mine remains unaffected**. There was some damage around some
> roof falls, some affected segments of conveyor belt that we think
> needs to be rectified, and that has helped to assist in this what --
> this sort of stage reventilation process that we're talking about and
> reentry process.
>
>  So we've now gone about segmenting the mine in 3, 3.5 zones.
> And we intend to, in turn, reventilate and reenter each of those
> segments in a staged way. That will give us the ability to do further
> assessments at each stage as we advance. But that's the plan that
> we have outlined to date and we are managing this as a project. We
> recognize the amount of dollars involved. We think the returns and
> value are there, and we'll continue to run this project through our
> investment filters. But that's what we know to date and execution
> of the reventilation or reentry is what we're undertaking at this
> point.

---

[77] According to Peabody's 2019 Form 10-K: "During the year ended December 31, 2018,
Peabody recorded $58.0 million in containment and idling costs related to the events at North
Goonyella and a provision of $66.4 million for expected equipment losses. As work progressed
and more information became available, Peabody recorded an additional $111.5 million in
containment and idling costs and an additional provision of $83.2 million related to equipment
losses during the year ended December 31, 2019. The combined provision includes $50.7 million
for the estimated cost to replace leased equipment, $45.6 million related to the cost of Company-
owned equipment, $39.7 million related to unrecoverable longwall panel development and $13.6
million of other charges, which represents the best estimate of loss based on the assessments
made at December 31, 2019. In March 2019, we entered into an insurance claim settlement
agreement with our insurers and various re-insurers under a combined property damage and
business interruption policy and recorded a $125 million insurance recovery, the maximum
amount available under the policy above a $50 million deductible. We have collected the full
amount of the recovery."

- 126 -

308.     In response to a question from John David Bridges from JP Morgan regarding whether Peabody would be able to get North Goonyella up and running before 2020, Defendant Kellow represented: "***We'll look to debottleneck as we go and sort of stress the critical pass through that project outcome. The team are focused on safely and quickly moving through this and executing against the project plan. So there may be some ability, but it's really too early to call that. And we'll certainly be updating as we move through the project***."

309.     In response to a question as to whether coal production could resume **before** 2020, Kellow falsely stated: "***but it's really too early to call that***."  For the reasons set forth above, there was literally no chance of coal production resuming in 2019 (in the next nine months).

310.     However, Defendant Kellow continued to mislead the market regarding the likelihood that production at the mine would restart in the near-term, reiterating that: "While there is so much work ahead of us, ***our base case contemplates approximately 2 million tons of sales from North Goonyella in 2020***."

311.     On this news, ***Peabody's stock fell $3.80, or 10.6 percent***, closing at $32.05 on February 6, 2019, down from the previous day's close of $35.85.

312.     Defendants' statements about resumption of coal production at 10N in the "early months of 2020" (within 10-12 months), contained in ¶¶ 304-310, were materially false and/or misleading when made in that they failed to disclose the adverse facts listed in ¶ 298 pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine, and also failed to disclose the following additional adverse facts which were known to or recklessly disregarded by Defendants:

(a)     Five months of idle time at the mine, with no indication of when the fire would be completely under control, or when mine workers would be allowed back underground, would seriously delay resumption of longwall mining until at least 2021.  Indeed, as of February 6, 2019, Peabody was still assessing mine damage (and preparing forecasts for future coal production) using only: (i) remote control cameras which provided only limited visibility into only certain sections of the mine; (ii) thermal imaging to detect areas where increased levels of heat were measured and/or the fire was still present; (iii) remote gas monitoring from the mine surface; and (iv) other remote controlled equipment to evaluate underground conditions post fire.

(b)     While Peabody had disclosed some damage within the mine including: (i) several roof falls, (ii) damaged conveyor belts on the longwall panel sealed in 9N, (iii) additional build-up of methane gas, and (iv) flooding in the mine in the intervening five months which required pumping water from the surface of the mine, Defendants failed to disclose the implications of this damage to the Company's timeline for resuming coal production.  For example, the Roof Supports sealed in 9N were certainly damaged and required replacement and sealing the entire area at 9N was the only logical option to eliminate oxygen from getting to the area.

(c)     Moreover, Peabody's statement that "*the vast majority of the mine remains unaffected*" lacked any basis in fact since no mine personnel had yet been permitted underground at the mine. Thermal imaging and remote-control cameras would not have provided Peabody with enough data to ascertain damage to all areas of the mine or even damage to the longwall face at 10N. In addition, the Company's statements were inconsistent with its $125 million insurance claim for, among other things, "combined property damage."

(d)     Even assuming Peabody intended to use its newly commissioned longwall panel (scheduled for delivery to North Goonyella in mid to late 2019) at 10N, it would likely take several months after delivery of that equipment to get it ready for mine insertion and coal production given the precarious conditions still existing at the mine in February 2019.

(e)     Even in a best case scenario, if Peabody were able to re-ventilate a few segments (or Zones) of the mine and then re-enter the mine (with QMI approval) by mid 2019, it would still take many months to be able to resume any rehabilitation work underground.

(f)     Further, even if coal production could somehow miraculously resume in the "early months" of 2020, it would have been nearly impossible for the Company to mine "approximately 2 million tons of sales from North Goonyella in 2020" because it would be mid 2020 before the Company had accomplished the steps set forth herein at ¶ 298 and ¶ 312, and mining 2 million tons in less than a full year would have been impossible based on historical levels of annual coal production at North Goonyella.

313.    Analysts bought Defendants' story, with Clarksons Platou Securities Inc. noting, that even though higher-than-expected projected capital expenses and the anticipated costs of reopening North Goonyella weighed on Peabody's shares, "with that said, we view 2019 as a bit of a transition year, **given the headwinds at North Goonyella should subside by 2020**."

314.    Credit Suisse further noted on March 20, 2019 that "Seaborne met volumes are suppressed in the near term, **but recover in 2020," as "the return of North Goonyella . . . position[s] Peabody well to generate above mid-cycle EBITDA as the base business continues to perform well and volumes normalize in 2020**." It further reported that "**we believe management has developed a solid plan of action going forward that has been well**

received by the market [and b]ased on our conversations with management, we are confident in Peabody's ability to execute on their plan going forward."

   (e)  **May 1, 2019 - 1Q19 Financial Results (*Third Partial Revelation of the Truth*)**

315. On May 1, 2019, Peabody reported financial results for the first quarter 2019 that beat analysts' estimates. Peabody reported first quarter revenues of $1.25 billion, net income attributable to common stockholders of $124.2 million; diluted earnings per share from continuing operations of $1.15; and Adjusted EBITDA of $253.9 million (down $110 million compared to the prior year primarily due to lower met coal volumes and costs associated with the North Goonyella fire), which met analyst consensus only because reported EBITDA included a $33.9m benefit from the insurance recovery.[78]

316. In the press release, Peabody also reported that it was "**currently complying with a directive concerning documentation from the Queensland Mines Inspectorate, following a thorough review, which has resulted in a multi-week delay to the initial project plan**."

317. Yet Defendants continued to mislead the market regarding the possibility of coal production resuming at North Goonyella in 2020, stating: "Should the company's reventilation and re-entry plan now progress as originally contemplated, ***Peabody would expect to produce approximately 2 million tons from North Goonyella in 2020***. If further delays occur, the company will re-evaluate its reventilation and re-entry plans, including longwall production

---

[78] The Company also announced that during the quarter, it reached an agreement on the North Goonyella insurance settlement and recognized the maximum allowable North Goonyella claim of $125.0 million. Of this total, $33.9 million countered ongoing recovery costs and was recorded as a benefit to Adjusted EBITDA. The remaining $91.1 million of the insurance claim related to equipment losses from current and prior quarters was excluded from Adjusted EBITDA, given those charges also were excluded from Adjusted EBITDA when incurred. The North Goonyella charge of $24.7 million related to additional losses identified in the first quarter and represents the best estimate of potential loss on assessments to date.

targets, quarterly project costs and capital expenditures." This two-million ton estimate for 2020 did not include coal inventory remaining at North Goonyella before the fire which was sold earlier in 2019.

318.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives, and investors to discuss Peabody's results. During the earnings call, Defendants Kellow and Schwetz discussed short-term logistics challenges the Company faced in the quarter in the U.S.; port restrictions in China; wet weather and train derailments in Australia; and a cyclone in Mozambique.

319.    In response to a question from Mark Andrew Levin at Seaport Global Securities regarding the "worst case scenario" at North Goonyella, or "what happens if things don't go the way we hope they do," Defendant Kellow falsely reassured investors:

> [W]e've essentially done all of the engineering, all of the activities required to reventilate that first segment. As Amy indicated, gas levels would support our ability to do that. So we are ready to go from our perspective. The Queensland Inspectorate who had been working with us as we've continued to progress and develop the plans and done the activities on site have asked to review a number of documents in terms of working through the details of that. That has put us behind down some weeks and where we thought we would be. And it's difficult to sort of quantify how long that will take place. ***It could be imminent. It could be a little bit longer than that. Our focus at this point is working through that process, responding to their request for information and then being able to -- as I said, everything is ready to flick the switch and to be able to reventilate. And that will enable us then to monitor and then reenter the mine and have a better assessment. At that point, we'd look to reexamine the overall timing and sequencing on the project plan. But just to reiterate, we're ready to go. So we're just working through that, what is the final part of the process***."

320.    In response to a question from an analyst confirming that there had been no rejection of Peabody's Goonyella reopening plan and that the Company was facing just an "administrative hold-up" from QMI, Kellow stated: "***It's dotting the I's and crossing the T's***

*around supporting documentation with respect to a lot of procedures and protocols that are on site.*"

321.    Defendant Schwetz reiterated this point, noting: "Related to North Goonyella, in the first quarter, *we completed segmenting of the mine into multiple zones to facilitate a phased reventilation and reentry. In addition, all physical activities in advance of reventilating the first segment of the mine have been completed.*"   Schwetz also stated:

> Gas readings are at acceptable levels, and we are currently complying with a directive concerning documentation from the Queensland Mines Inspectorate following a thorough review. This has resulted in a multi-week delay to our initial project plan. ***Should our reventilation and reentry plan now progress as originally contemplated, we would expect to produce approximately 2 million tons from North Goonyella in 2020***. If further delays occur, we will evaluate our plans, including longwall production target, quarterly project costs and capital expenditures.

322.    Defendant Schwetz also falsely assured the market that, "***We are anticipating a strong second half of 2019 that will contribute more than half of our full year adjusted EBITDA***."

323.    On this news, ***Peabody's stock fell $1.61, or 5.6 percent***, closing at $27.16 on May 1, 2019, down from the previous day's close of $28.77.

324.    Defendants' statements about resumption of coal production at 10N by mid 2020 (a "multi-week" delay from prior representations of longwall coal production by early 2020): contained in ¶¶ 319-322, were materially false and/or misleading when made in that they failed to disclose the adverse facts listed in ¶ 298 and ¶ 312 pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine, and also failed to disclose the following additional adverse facts which were known to or recklessly disregarded by Defendants:

(a)     By May 1, 2019, the mine had been idle for eight months, mine personnel still had not been allowed back underground further delaying any plans for resumption of the longwall move and coal production, and all Peabody had been able to accomplish was to remotely segment the mine and begin to remotely re-ventilate the first of 3.5 segments in the mine.

(b)     According to a longwall mining expert, it would take at least 18-24 months for coal production to resume at 10N, if it ever resumed, given that the Company still needed to accomplish the following: (i) get the fire under control; (ii) conclude re-ventilation of Zone 1 of the mine, believed to be the least affected area of the mine; (iii) re-ventilate Zone 2, an area more affected by the fire than Zone 1; (iv) get approval from QMI for mine re-entry; (v) re-enter the mine with QMI personnel;  (vi) get approval from QMI for all new or revised mining protocols and plans; (vii) testing and confirmation that the mine was safe for union personnel to resume underground work; (viii) remediate all flooding, water and other damage in the requisite segments/Zone of 9N and 10N; and (ix) moving the new longwall panel and Roof Supports into place at 10N after confirming compatibility of the Roof Supports, associated electronics, and new longwall (ordered but not yet delivered to North Goonyella as of May 1, 2019).

325.     Moreover, Defendants' statements about the production of 2 million tons of coal at North Goonyella in 2020 contained in ¶ 321, were materially false and/or misleading when made in that they failed to disclose the adverse facts set forth at ¶ 312, plus the following adverse facts pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine:

(a)     the Company could not mine 2 million tons in 2020 for multiple reasons, including that it would be mid 2020 before the Company had accomplished the steps set forth

above in ¶ 298 and ¶ 312, and mining 2 million tons in less than a full year would have been impossible based on historical levels of another set of annual coal production at North Goonyella.

326.    Once again, analysts believed Defendants' statements. On May 1, 2019, J.P. Morgan reported that: "The company also reported that it is ready to re-enter the first portion of the North Goonyella mine but has been delayed as the Queensland Mine regulator reviews documents." Deutsche Bank reported on the same date that "North Goonyella undergoing multi-week delay due to Queensland Mines Inspectorate review, but guide of 2m st of production of 2020 remains unchanged."

> **(f)     May 24, 2019 – Press Release Announcing Company Proceeding With Re-ventilation of First Segment of North Goonyella Mine**

327.    On May 24, 2019, Peabody announced it, in consultation with the QMI, it was proceeding with the ventilation of Zone 1 of the North Goonyella Mine.  Peabody reiterated that it "***expected longwall production in 2020,***" and Defendant Kellow stated that the re-ventilation of Zone 1 marked "an important first step in the next phase of activities aimed at resuming normal operations at North Goonyella."

328.    Defendants' statements about the timing of the resumption of coal production contained in ¶ 327 were materially false and/or misleading for the same reasons set forth in ¶¶ 298, 312 and 324.

> **(g)     July 3, 2019 – Press Release Announcing Company Proceeding With Re-Entry Of Zone One of North Goonyella Mine**

329.    On July 3, 2019, Peabody announced, in consultation with the QMI, it had commenced re-entry of Zone 1 of the North Goonyella mine, 10 months after the fire shut down operations at the mine – a "part of a comprehensive, phased reventilation and safe re-entry plan

for the mine." George J. Schuller Jr., Peabody's Australia President, stated, in part: "Following

the reventilation of Zone 1 of the mine, ***our team is ready to return underground and move us***

***yet one step closer to resuming normal operations***."   The release noted that Zone 1 represented

approximately 25 percent of the area to be re-entered and was the area of the mine least affected

by the fire, water, and heat damage.

330.     Defendants' statements about resuming normal coal operations contained in ¶ 329

were materially false and/or misleading for the same reasons set forth in ¶¶ 298, 312 and 324.

### (h)     July 31, 2019 - 2Q19 Financial Results

331.     On July 31, 2019, Peabody reported its financial results for the second quarter

2019. Peabody reported revenues of $1.15 billion (down from $1.31 billion in Q2 2018 primarily

resulting from a 28 percent reduction in metallurgical coal sales volumes); net income

attributable to common stockholders of $37.1 million; diluted earnings per share from continuing

operations of $0.37; and Adjusted EBITDA of $228.0 million compared to $369.6 million in

Q218.  Defendant Kellow stated, in part: "We look forward to the second half of 2019 as we

target higher metallurgical coal volumes." The Company announced it expected:

> [S]econd-half Adjusted EBITDA contributions for the overall
> business to be largely in line with first half results based on current
> pricing levels, with the fourth quarter expected to be stronger than
> the third quarter.  Second half Adjusted EBITDA reflects the
> impact of North Goonyella costs, joint venture transaction-related
> expenses and two mines reaching the end of their economic life.
> In the second half of 2019, the company is anticipating progressive
> increases in both seaborne thermal and seaborne metallurgical coal
> volumes.

332.     The Company also reported additional delays to its re-entry into the mine, stating:

"Following substantial delays, the company proceeded with re-entry and exploration of the first

zone earlier this month.  The regulatory environment continues to be challenging given the

unprecedented nature of the recovery actions. Advancement during the recovery phase has been

subject to the discretion of the regulatory authority, special protocols and substantial related administrative requirements which has resulted in a far slower rate of progress than originally contemplated. . . . Based on these changes, the North Goonyella project team is assessing prospective paths, timetables and costs to maximize value."

333.    As a result, Peabody suspended its guidance for coal production in 2020 at the North Goonyella mine and informed investors that it was reevaluating: (i) its re-entry plan; (ii) whether its base case to access the 10 North panel remained viable based on timing, costs and project risk; and (iii) accessing the mine through its southern panels.  "Given ongoing activities, Peabody is suspending North Goonyella guidance at this time, and intends to provide new targets around North Goonyella production timing and costs in accordance with the determined path. The company expects to complete its evaluation within the next three months." Peabody also announced that it had "commenced a review of the company's organizational structure and functional support activities" and later announced its new structure would be more focused, in part, on safety.

334.    On the same date, during the trading day, Peabody hosted a conference call for analysts, media representatives and investors to discuss Peabody's results. During the earnings call, which Defendants Kellow and Schwetz participated in, Defendant Kellow once again falsely touted the Company's progress in re-entering the mine, stating: "Turning to North Goonyella, ***major progress has been made to-date including reventilation and re-entry of the mine***. We have also learned a substantial amount since we commenced activities underground earlier this month. While the milestones achieved in recent weeks have been significant, we also progressed at a much slower rate than originally contemplated.

335.   Defendant Kellow also stated:

As you recall last quarter, we noted that if further delays were to occur, the Company would reevaluate our plans for the mine. We did in fact experience greater delays than we would have anticipated …. ***Because this new information likely influences our future progress, now it is the right time the review the project and determine if delays can't be overcome, current plans should be advanced or other alternatives should be pursued to create the most value out of this significant asset***.

Let's focus a moment on the prospective paths we are assessing. Right now, our team is performing extensive value engineering activities aimed at maximizing returns on a risk adjusted NPV basis and payback period as well as reducing spending on non-critical items. ***Paths we are pursuing includes determining the base case to access the 10 North panel, remains the most attractive given the timing, cost and project risk. But we are also evaluating an alternative route through the second zone to the Southern panels of the mine, among other scenarios.***

***Note that all paths full preserve the opportunity to access more than 40 million tons of high quality hard coking coal from the lower seam reserves overtime as well as potential for commercial alternatives.***

Given our ongoing activities, we are suspending North Goonyella-related targets at this time and intend to resume targets at around production, timetables and costs when the preferred path is chosen and we would expect to complete the evaluation within the next 3 months.

336.   In response to a question from Daniel Walter Scott from MKM Partners regarding whether the North Goonyella mine would be closed, Defendant Kellow represented that the Company was exploring ways to reopen portions of the Goonyella mine:

**Daniel Walter Scott, MKM Partners**

Glenn, looks like a real good quarter. Shares are getting hit a little bit, I assume, on the North Goonyella developments. Is there a scenario where potentially this mine would be closed or is this -- are you really just trying to find the most optimal way to continue production?

**Glenn L. Kellow**

*From our perspective, we're looking at the most optimum way to create value and to continue to capture value, so that's the scenarios around which was at -- the base case of accessing 10 North. We talked in the past about alternatives, and at this point, we're continuing to evaluate an alternative path of moving through the second zone and optimizing or accessing those southern panels. And in any scenario, having reentered the mine and particularly having opened up now Zone A, opens up the lower seems available to us. So this is about seeking to maximize the value, given what we now know about the operating conditions, particularly the regulatory environment, the protocols that we're operating under.*

**Daniel Walter Scott, MKM Partners LLC**

But given the reserve life, it sounds like it's highly unlikely that this mine will be closed because it's – just finding a way to get to the coal most economically?

**Glenn L. Kellow**

That's exactly right from our perspective. We believe this is a tremendous mine with great infrastructure and significant reserves of high quality hard coking coal. We want to make sure that we execute the right path using appropriate evaluation.

337.    Defendant Kellow also noted that the Company would update the market on its Goonyella plans within the next three months: "Our original approach to access 10 North is something that we're considering as to whether it's still remains attractive based on timing, cost and what we reflect now as risk. I mentioned the alternative, which would probably be accessing through that second zone and accessing the Southern panels through that zone, they're all things that we've got under evaluation at this point in time. And really, we'll get back to you as soon as we can, but we would expect that evaluation within the next 3 months."

338.    On this news, **Peabody's stock fell $1.06, or 4.8 percent**, closing at $21.06 on July 31, 2019, down from the previous day's close of $22.12.

339.    Defendants' statements about the resumption of coal production at North Goonyella, contained in ¶¶ 334-336, were materially false and/or misleading when made in that they failed to disclose the adverse facts listed in ¶¶ 298, 312 and 324 pertaining to the feasibility of Peabody's plan to restart coal production at the North Goonyella mine, and also failed to disclose the following additional adverse facts which was known to or recklessly disregarded by Defendants:

(a)    According to CW-1, by approximately July or August 2019, the projected timetable to return to mining at North Goonyella was between 2022 and 2025.

340.    Analysts connected this stock drop to the news about North Goonyella, *with J.P. Morgan* reporting on July 31, 2019 that "we expect the North Goonyella news will dominate and depress the market's reaction to [other positive Company news]," and, later that day confirming, "[t]he market did not react well to Peabody's announcement of delays at North Goonyella."

341.    Analysts accepted this story, with *Deutsche Bank* noting on August 4, 2019 that "Key catalysts for the stock include . . . progress at North Goonyella where we expect the market has now rebased down, so any announcements could be positive."

## VI.    THE FULL TRUTH IS REVEALED

342.    On October 29, 2019, Peabody reported its financial results for the third quarter of 2019.  Peabody reported a loss of ($0.77) per share as compared with positive third quarter 2018 earnings of $0.63 per share, **missing analysts' consensus expectations by more than 50 percent**. **Peabody disclosed for the first time that restarting coal production at the North Goonyella mine would take three or more years and cost at least $50 to $75 million for the development of the southern panel starting in the second half of 2020 (which would likely take 18-24 months to develop) due, in part, to the fact that the Company had determined it was not feasible to access the 10 North Panel and it would need to pursue re-entry of the**

**mine at the 6 South panel**. The Company also indicated it would take an impairment charge of approximately $60 million and advised the market that that it would shed many of its employees at North Goonyella to reduce the holding costs of the mine prior to recommencing operations. The Company stated, in part:

> **After a detailed review and assessment of North Goonyella, Peabody has determined that due to the time, cost and required regulatory approach to ventilate and re-enter the rest of the mine, the company will not pursue attempts to access the 10 North Panel through existing mine workings. Instead, the company has identified a preferred path to create value from the substantial North Goonyella reserve base by mining the southern panels, beginning with the 6 South panel**. . . Following planned ventilation, the company intends to re-enter Zone B and assess conditions with a target of developing the southern panels that contain approximately 20 million tons of high-quality, hard coking coal.
>
> *   *   *
>
> **Based on the planned approach, the company expects no meaningful North Goonyella volumes for three or more years, with development coal to be produced in the second half of 2020**.
>
> Assuming successful ventilation and re-entry of Zone B, Peabody estimates 2020 project capital costs of approximately $50 million to $75 million beginning in the second half of the year with development of 6 South. The company will continue to refine capital and cost estimates as work progresses through Zone B.

343.    The press release noted that due, in part, to these developments, Peabody required a refinancing, a more than $200 million increase to its revolving credit facility, an extension to the duration of $540 million of notes, and amendments to its existing credit facility.

344.    During the subsequent earnings call for analysts, media representatives and investors, Defendant Kellow stated that: "Overall, we believe the highly restrictive approach from QMI has required a greatly disciplined approach from Peabody. As such, we have identified a preferred path, which . . . represent[s] significant lower risk, the best path to return to

regular way mining and maximizes the value of a mine with a potential life of several decades."

Defendant Kellow went on to explain that even the beginning steps of that new plan were still "contingent on obtaining pre-approval from QMI." Kellow also noted that, "we continue to be focused on finding a way to bring North Goonyella back online in a way that's commercially prudent."

345.   Defendant Kellow also stated:

> Our progress continues at North Goonyella. To date, we've stabilized the mine, ventilated and reentered Zone A, preserved the opportunities to excess reserves and ensured the safety of every individual on site. In July, we noted we're evaluating paths to recognize value from this asset given the long delays where tasks that should have taken days were taking weeks and even months. **We have since completed our detailed review and assessment and we'll forego attempts to access the 10 North panel that would have required us to explore and mediate the most impacted areas of the mine under unusual and protracted measures.** . . . **we have identified a preferred path, which is to mine the southern middle seam reserves, beginning with the 6 South panel.** We believe this path represents significantly lower risk, the best path to return to regular way of mining and maximizes the value of a mine with a potential life of several decades.
>
> Peabody's preferred path will include the ventilation of Zone B using boreholes from the surface. Incremental spending for ventilation is contingent on obtaining pre-approval from QMI, and that process is underway. Following plant ventilation, we intend to reenter Zone B and assess conditions with the target of developing the southern panels. These panels include approximately 20 million tons of high-quality hard coking coal. At this point, we have completed most of the essential work needed in Zone A. Let me be clear, all steps we've taken thus far have not only been necessary but beneficial to preserve access to an additional 65 million tons of hard coking coal in the lower seam. Development of that longer-term project is now in the pre-feasibility stage.
>
> During our review, we considered a host of options, including . . . to mine the southern panels from the surface to access multiple seams. Given current variants such as the cost of the box cut, timing of permits and cash flows, this was determined not to be the preferred path. At this point, we believe it's far easier to control

money than time. Given the expected length of time to ventilate Zone B, we are significantly lowering labor requirements and planned holding costs. As such, we reduced most of the remaining salaried and hourly workforce and are looking to offer potential employment opportunities to fill vacancies at other Peabody mines where practical.

\* \* \*

Assuming the successful ventilation or reentry at Zone B, we estimate 2020 project capital costs of approximately $50 million to $75 million beginning in the second half of the year with development of 6 South. A panel of this length should require about 18 to 24 months to develop based on typical development rates, and then we would have been in a position to begin longwall production. As you would expect, we will continue to refine capital and cost estimates as work progresses through Zone B. I'll reiterate that we are not committing to incremental capital until we've ventilated and explored Zone B. We will also look to mitigate cash outlays by selling development tons into the market.

\* \* \*

The first initial milestone will be getting -- which is unusual but based on discussions and negotiations, attempting to get a preapproval of our plan with QMI prior to undertaking and committing to the reentry of Zone B. Based on whether we assess that, as Amy's -- and move our way through, it's our intention then that we move into development. This is a 3,200-kilometer … length of panel initially, and that would require about an 18- to 24-month development. Now you would get development tons or significant development tons out through that process, **but longwall production wouldn't occur until the end of that 24 months or 18- to 24-month period.**

346.    In response to a question from Christopher Michael Terry from *Deutsche Bank*

about what had changed since Peabody first reentered the Goonyella mine after the September

2018 fire, Defendant Kellow stated, in part:

So a couple of dimensions to that. And I think I'd say it's been the approach as part of the regulatory protocols that we've been operating under that are different to what we envisaged when we started. I don't think we've seen anything significant as we described on the call last time that was unusual in what we were expecting versus what we would have anticipated as bad

- 142 -

conditions. But tackling those conditions, and working our way through on what has been a highly -- well, an unprecedented process in Queensland, although it's not unprecedented globally, has meant the protocols that we're operating with under has just required a different technical approach. And that, in turn, has led to a significantly greater time.

As we look ahead, if we extrapolated that time, and to some degree the uncertainty of gaining approval for elements within that from QMI, it just became impossible to predict being able to reach the 10 North panels in a commercial way. That's enabled us to focus on the Zone B reentry process, which in turn is likely to give us a greater chance of success in gaining approval of QMI, which will then enable us to get into regular way of mining in terms of back to the regular way, gate-road development of the longwall operation. So -- but the long answer is the regulatory protocols, which we've described in the past have really necessitated, I think, a different approach and a de-risked-based approach as we work our way through.

347.    With respect to the outside review of the Company's organizational structure announced on July 31, 2019 (second quarter 2019), Peabody was in the process of a reorganization more "squarely focused on safety, cost and volume."

348.    On this news, Peabody's stock fell $3.56, **or 22 percent**¸ closing at $12.48 on October 29, 2019, down from the previous day's close of $16.04.

349.    Analysts were taken by surprise, with *Deutsche Bank* reporting on October 29, 2019 that "[a]t North Goonyella, the company will now change its focus to the southern panels and **does not expect material production for 3+ years now (vs an original plan of 2020)**." It also stated that "[t]he next few quarters will likely be a further transition period for the company, with the additional work at North Goonyella."

350.    Analysts at *BMO Capital Markets* noted in a October 29, 2019 report, that the North Goonyella disclosures represented a "significant ongoing headwind in our view."

## VII.   POST-CLASS PERIOD EVENTS

351.    On February 5, 2020, Peabody announced its results for Q4 2019 ended

December 31, 2019 including a net loss of $289.8 million, a stark contrast to the Company's

$252.6 million in net income in the prior corresponding year quarter December 31, 2018.

352.    In the Company 2019 Form 10-K filed on February 21, 2020, the Company

finally disclosed that it was unable to extract coal from the southern panels of the North

Goonyella Mine and Peabody's "**results of operations, financial condition and cash flows**

**could be materially and adversely impacted. In addition, the costs that may be incurred to**

**return the mine to active operations (if the mine returns to active operations) are uncertain**

**and could be significant.**" Specifically, the 2019 Form 10-K disclosed the following:

> Our North Goonyella Mine in Queensland, Australia experienced a
> fire in a portion of the mine during September 2018 and mining
> operations have been suspended since then. During the first quarter
> of 2019, we completed segmenting of the mine into multiple zones
> to facilitate a phased reventilation and re-entry of the mine. We
> commenced reventilation of the first zone of the mine during the
> second quarter of 2019 and subsequently re-entered the area in the
> third quarter. Following these activities and a detailed review and
> assessment of North Goonyella, we determined that due to the
> time, cost and required regulatory approach to ventilate and re-
> enter the rest of the mine, we will not pursue attempts to access
> certain portion of the mine through existing mine workings, but
> instead will move to the southern panels. We are currently in
> discussions with the Queensland Mines Inspectorate (QMI)
> regarding ventilation and re-entry of the second zone of the current
> mine configuration. Based on the planned approach, **we expect no**
> **meaningful production from North Goonyella for three or**
> **more years**. In 2020, we are commencing a commercial process
> for North Goonyella in conjunction with the existing mine
> development. The process comes in response to expressions of
> interest from potential strategic partners and other producers.
> Commercial outcomes could include a strategic financial partner,
> joint venture structure or complete sale of North Goonyella. Based
> on the success of discussions with QMI and/or progression of the
> commercial process being launched, we will determine the
> appropriate level, if any, and timing of capital expenditures. **If**
> **after exploring all reasonable mine-planning steps focused on**

**resuming mining activities at the North Goonyella Mine and other commercial outcomes, we determine that we are unable to extract coal from the southern panels of the mine, our results of operations, financial condition and cash flows could be materially and adversely impacted. In addition, the costs that may be incurred to return the mine to active operations (if the mine returns to active operations) are uncertain and could be significant**. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information regarding our North Goonyella Mine.

## VIII.   ADDITIONAL EVIDENCE OF SCIENTER

353.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding Peabody, their control over, or receipt, or modification of Peabody's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

354.    Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of Peabody personnel at the highest levels of the Company.

355.    The Individual Defendants permitted Peabody to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

356.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Peabody, their control over, receipt, and/or modification of Peabody's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Peabody, participated in the fraudulent scheme alleged herein.

357.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Peabody stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Peabody's business, operations, and management as well as the intrinsic value of Peabody stock, and caused Plaintiff and members of the Class to purchase Peabody shares at artificially inflated prices.

358.    The following allegations all support a strong inference of scienter:

(a)     Both before and after Peabody's acquisition of the North Goonyella mine, the mine had a history of spontaneous combustion and heating events; thus Defendants were on heightened awareness as to the safety risks posed by the mine;

(b)     Before the fire in September 2018, the North Goonyella mine was Peabody's most profitable single operation generating approximately 20% of Peabody's total operating profit in 2017; and

(c)     Statements by former Peabody employees, former contractors working on site at the mine, former mining inspectors responsible for the North Goonyella mine, and

regulatory reports prepared by the QMI: (i) confirm that throughout the Class Period, Peabody failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event, and (ii) provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions both before and after the fire.

### A. Defendants Were on Heightened Awareness As To The Safety Risks Posed by the North Goonyella Mine

359.   When Peabody acquired the North Goonyella mine in April 2004, it was well-known throughout Peabody and the mining community that the mine was historically a safety risk. Because the North Goonyella mine was "gassy" and at risk for spontaneous combustion events, constant monitoring of mine gases was required.

360.   After the acquisition of North Goonyella by Peabody, the mine continued to experience spontaneous combustion and heating events, and frequent instances of elevated methane levels. From mine acquisition in April 2004 through the spon com event on September 1, 2018, the North Goonyella mine: (i) repeatedly recorded elevated levels of methane gas in the mine; (ii) periodically recorded the presence of ethylene (dangerous even in minute levels) in the mine; (iii) experienced frequent mandated withdrawals of mine personnel; and (iv) received countless MREs and HPIs from regulators who met often with mine personnel to discuss health and safety risks at the mine.

361.   Former Peabody employees confirm that during the Class Period, Peabody management in the U.S. dictated what happened at the North Goonyella mine site and applied significant pressure on mine management, always "pushing for more." An overly aggressive coal production schedule and aggressive forecasts from Peabody U.S. led mine management at North Goonyella to prioritize coal production over mine safety throughout the Class Period. ¶ 84.

362.    Thus, Defendants were on heightened awareness as to the safety risks posed by the North Goonyella mine.

**B.    The North Goonyella Mine Was Peabody's Most Profitable Operation Generating Approximately 20% of the Company's Operating Profit**

363.    The North Goonyella coal seam is considered one of the three (3) premier met quality coal mines in the world and its met coal commands compelling margins for Peabody during times of strong industry conditions. Indeed, North Goonyella ships a high-quality hard coking coal that typically realizes at or near the benchmark for premium or high-quality hard coking coal.

364.    According to media reports, the mine has coal reserves amounting to 175 million tons of coking coal -- one of the largest coal reserves in the world. The mine's costs have typically averaged at or above the high end of Peabody's met coal cost per ton, with a target range of $85 to $95 per short ton.

365.    The North Goonyella mine is Peabody's most profitable single operation and in 2017, it generated approximately $100 million, or approximately 20%, of Peabody's total operating profit of $498 million.

366.    The Individual Defendants frequently spoke of the North Goonyella mine and its importance to the Company.  For example:

(a)    On August 1, 2017, Defendant Kellow represented that North Goonyella was "running at its best performance in 5 years."

(b)    On October 25, 2017, Defendants Schwetz and Kellow both boasted of "record production and strong sales volumes the from North Goonyella Mine."

(c)      In May 2017, Defendant Kellow acknowledged the importance of the mine, describing North Goonyella as a "high margin mine" that is the "core of [Peabody's] met coal platform."

367.   Because the North Goonyella mine was the Company's "most profitable single operation" and core to its "met coal platform," the mine's success was essential to driving the Company's overall success as it emerged from bankruptcy at the start of the Class Period.

368.   Given the multitude of statements concerning North Goonyella during the Class Period, as well as its importance to the Company's profit, it is unreasonable to think that the Individual Defendants, both of whom were responsible for tracking or reporting Peabody's revenue would be unaware of the financial significance and performance of the North Goonyella mine.

369.   Given the critical importance of the North Goonyella mine to Peabody's overall business and operating profit, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

**C.      Statements By Former Employees, Contractors, and Inspectors Provide Factual Support For a Strong Inference of Scienter Throughout the Class Period**

370.   Statements by former Peabody employees, former contractors working on site at the mine, former mining inspectors responsible for the North Goonyella mine, and regulatory reports prepared by the QMI: (i) confirm that throughout the Class Period, Peabody failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event, and (ii) provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions both before and after the fire.

371.    Indeed, the witnesses and documents confirm that:

• Peabody management in the U.S. dictated what happened at the North Goonyella mine site in Australia and applied significant pressure on mine management, always "pushing for more." An overly aggressive coal production schedule and aggressive forecasts from Peabody U.S. led mine management at North Goonyella to prioritize coal production over mine safety throughout the Class Period. ¶¶ 81-86.

• Indeed, mine personnel at North Goonyella often cut corners and failed to adhere to the requirements set out by official procedures and regulations for the sake of speed. ¶ 86.

• Staffing cuts at the North Goonyella mine in 2015 left the mine starved of leadership in important mine management positions, including in the Health and Safety group, which remained understaffed as the workload at the mine increased significantly starting in 2017. ¶¶ 87-89.

• Training of mine personnel in issues related to health and safety was insufficient in the time leading up to the mine fire in September 2018. ¶¶ 87-91.  The Company's initial findings of its investigation, released in March 2019, confirm insufficient ventilation and combustibility training for North Goonyella mine personnel. ¶¶ 216-217.

• Throughout 2017 and the first half of 2018, Peabody consistently measured levels of methane gas in the North Goonyella mine that exceeded 2.5%.  Although the mining safety regulations mandated withdrawal (or evacuation) of mine workers when methane levels exceeded 2.5%, mine management often failed to withdraw its team and instead worked through elevated gas levels risking mine worker safety. ¶¶ 93-94.

• The constant pressure to get things done quickly, including the longwall move, and a lack of coordination among leadership contributed to the incorrect and dangerous sequence of events leading to the mine fire. ¶ 98.

• Following the evacuation of the North Goonyella mine on September 1, 2018, senior Peabody executives in the United States including Defendant Kellow were in daily contact with North Goonyella mine management regarding the condition of and actions being taken at the mine. ¶¶ 162-172.

- 150 -

• In September 2018, Peabody corporate set up a war room at its headquarters in St. Louis, Missouri ("HQ") and created a North Goonyella Task Force which held regular meetings to: (i) discuss what was happening at the mine, (ii) receive information from Australia, and (iii) make decisions. The members of the North Goonyella Task Force included: (i) Defendant Kellow; (ii) Defendant Schwetz; (iii) Charles Meintjes (EVP of Corporate Services and CCO); (iv) Kemal Williamson (President of U.S. Operations and Group Executive Operations, Australia before that); (v) Charles Lilly (technical services group) who traveled to North Goonyella from the US and acted as an onsite technical expert for the War Room Team; (vi) Mike Breneman (Safety Director, Americas/U.S. Operations February 2015 – June 2020) and (vii) George Schuller (President – Australia). ¶¶ 162-172.

• Immediately after evacuation, the North Goonyella Task Force met via videoconference multiple times per day, seven days per week. Over time, the frequency of the Task Force meetings lessened. ¶¶ 162-172.

• Peabody U.S. had access to significant information on the North Goonyella mine and the fire. Members of the North Goonyella Task Force should have received every piece of paper generated by the QMI concerning the mine conditions. ¶¶ 162-172.

• Defendant Kellow was very involved with the post fire recovery and remediation efforts at North Goonyella and often would demand 2:00 AM CT meetings with Peabody's C-Suite executives when there was any news about the North Goonyella mine. ¶¶ 162-172.

• Defendant Schwetz also was "very involved" with Peabody's operations and likely attended nearly all of the North Goonyella Task Force meetings. ¶¶ 162-172. Defendant Schwetz also had oversight on forecasting for coal production, and periodically attended weekly sales and trade meetings. ¶¶ 162-172.

• During the time between the mine evacuation on September 1, 2018 and when the Company reported the existence of the fire on September 28, 2018, countless errors were made in trying to locate the fire source and address the elevated gas levels and associated risk. These errors included, but were not limited to: (i) utilizing the incorrect TARPs; (ii) drilling boreholes for gas insertion and release in the wrong areas of the mine and/or failing to drill the boreholes deep enough; (iii) failing to collect gas samples from the tube bundle for an entire week; (iv) pumping nitrogen into the wrong sections of the mine in an attempt to control the fire; and (v)

remediation efforts which caused carbon monoxide levels to skyrocket from approximately 600 ppm to 1500 ppm and then to 28,000 ppm and hydrogen levels to jump from approximately 1600 ppm to highs over 36,000 ppm. ¶¶ 143-150.

• As of late September 2018, the mine was "not in a good way" and it looked like Peabody might have to seal a 3rd longwall in the mine unless there was a "***miraculous change in circumstance in the coming days***." ¶ 179. If Peabody had to seal the 3rd longwall block, "then the future of North Goonyella [was] up in the air." The alternative, according to a mine union representative, was to seal up the whole mine, a disaster for Peabody. ¶ 179.

• After the North Goonyella evacuation on September 1, 2018, Defendant Kellow said things in quarterly Peabody conference calls that did not match reality. ¶ 171. Moreover, Peabody downplayed the severity of what happened at the mine in its calls with investors and sugarcoated the seriousness of the fire. ¶ 171.

• The ever-changing conditions of the mine after the fire broke out, made it extremely difficult to make predictions about North Goonyella. ¶ 130.

• Peabody's initial projections for North Goonyella's re-opening after the fire were very ambitious. As time went on, the reliability of the North Goonyella forecasting decreased and the risk for inaccuracy increased. ¶¶ 188-192.

• Peabody's headquarters in the U.S. was very involved with and interested in forecasts for the resumption of coal production at North Goonyella. ¶¶ 183-196.

• By no later than October 2018, Peabody management knew it would take at least 18 months for the mine to be operational again. ¶ 186.  Nonetheless, Defendants represented to the market in October 2018, that if the 10 North panel could be accessed, coal production would resume in the second half of 2019 (which was between 4 and 9 months shorter than internal Company estimates showed). ¶¶ 295-296.

• The North Goonyella Task Force, which included Defendants Kellow and Schwetz, knew, or should have known, that it would take significantly longer to reopen the North Goonyella mine than the Company represented to the market. ¶¶ 162-175.

• At the time when Peabody was stating that they hoped to re-open the mine within a year, they learned through remote cameras and drones sent into the mine that the fire had melted the longwall

conveyor belt and caused damage to the longwall. Indeed, the fire had "consumed" the mine and there was significant damage to the overall infrastructure of the mine. ¶ 187.

• Members of Peabody's Technical Services Team viewed Peabody's mine re-opening timeline as "unrealistic" given what they observed on the remote cameras and drones and based on mining rules in Australia. From the drone/camera images, they "saw enough" to understand the damage in the mine was extensive and that it would take significantly longer to reopen the mine. ¶195.

• In mid 2019, former mine workers from the North Goonyella mine stated that the probability of full re-entry at the mine, as Peabody had described to the market, was a "management pipe dream" given the impending uncertainties associated with how the coal reserve would respond when re-ventilated and the uncertainties of equipment and mine damage. ¶ 211.

• By July or August 2019, the projected timetable to return to mining at North Goonyella was sometime between 2022 and 2025. The models forecasting this potential reopening were scrutinized by: (i) Andrew Muir (former Director Financial Projects): (ii) Peter Baker (former Senior Vice President, Queensland Operations); (iii) George Schuller (former President – Australia) and (iv) "all the financial people in the U.S." There was "no shortage of people looking at the models." ¶¶ 173, 193.

• Thus, Defendants lacked a sufficient basis for Peabody's projections, starting in September 2018, regarding the timing and amount of coal production from North Goonyella.

## IX.  CONTROL PERSON ALLEGATIONS

372.  The Individual Defendants, by virtue of their high-level positions with the

Company, directly participated in the management of the Company and were directly involved in

the day-to-day operations of the Company at the highest levels. The Individual Defendants

participated in drafting, preparing, and/or approving the public statements and communications

complained of herein and were aware of, or recklessly disregarded, the material misstatements

contained therein and omissions therefrom, and were aware of their materially false and

misleading nature.

373.    Defendant Kellow has served at all relevant times as the CEO of Peabody and member of Peabody's Board of Directors.

374.    Defendant Schwetz was, at all relevant times, EVP and CFO.

375.    During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a)    The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)    The Company failed to follow its own safety procedures; and

(c)    As a result, the North Goonyella mine was at a heightened risk of shutdown.

376.    Moreover, as set forth herein, Defendants failed to disclose the material adverse facts pertaining to the feasibility of Peabody's plan to restart the North Goonyella mine after disclosure of the fire on September 28, 2018.

377.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

378.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about

Peabody's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

379.   As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

380.   The Individual Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Peabody's publicly traded common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding the Company's business.

381.   The scheme: (i) deceived the investing public regarding Peabody's operations and the true value of Peabody's common stock, and (ii) caused Lead Plaintiff and other members of the Class to purchase or otherwise acquire Peabody's common stock at artificially inflated prices, which fell as the true condition of Peabody's North Goonyella mine was revealed.

382.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. Each of the Individual Defendants were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

## X.    LOSS CAUSATION/ECONOMIC LOSS

383.    During the Class Period, as detailed herein, Peabody and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Peabody common stock and operated as a fraud or deceit on the Class Period purchasers of Peabody common stock by making the materially false and misleading statements and omissions recited above.

384.    When the truth was revealed and became known to the market, the price of Peabody common stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of Peabody common stock at artificially inflated prices during the Class Period, Lead Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in Peabody common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

385.    The truth about the risks at the North Goonyella mine were revealed through a series of disclosures beginning on September 28, 2018 when the Company officially reported that a fire was occurring within the North Goonyella mine and that as a result, the Company did

"not expect any production from North Goonyella in the fourth quarter of 2018." The truth

concerning the future of the North Goonyella mine was fully revealed on October 28, 2019.

**A.    September 28, 2018 – First Partial Revelation of the Truth**

386.   The truth about the risks at the North Goonyella mine were partially revealed on

September 28, 2018 when Peabody issued a press release, after the market closed, reporting that

a fire was occurring within the mine and that as a result, the Company did "not expect any

production from North Goonyella in the fourth quarter of 2018."

(a)    On this news, Peabody's stock fell $5.54, or 13.5 percent, closing at

$35.64 per share on September 28, 2018, down from the previous day's close of $41.18 per

share.

(b)    In the immediate aftermath of the fire, an article by *The Daily Mercury*

published on September 28, 2018 quoted a long-time underground operator at the North

Goonyella mine as stating that employees had been told not to talk about the incident: "We're

told 'don't talk to the media, don't talk to the media' but I think people have a right to know."

(c)    However, the Company's stock price remained artificially inflated, as

Defendants continued to conceal the truth regarding how long it would take before the Company

could resume coal production at North Goonyella.

**B.    February 6, 2019 – Second Partial Revelation of the Truth**

387.   The truth about the problems at the North Goonyella mine were partially revealed

on February 6, 2019, before the market opened, when the Company announced disappointing

earnings for the fourth quarter 2018 and a soft 2019 outlook due to remediation costs and lack of

production at the North Goonyella mine. Specifically, during the earnings call later that day,

Defendant Kellow revealed that production at the North Goonyella mine would not resume in

2019 but was instead targeted to "begin to ramp up in the early months of 2020."

- 157 -

(a)      On this news, Peabody's stock fell $3.80, or 10.6 percent, closing at $32.05 per share on February 6, 2019, down from the previous day's close of $35.85 per share.

(b)      However, the Company's stock price remained artificially inflated, as Defendants continued to conceal the truth regarding how long it would take before the Company could resume coal production at North Goonyella.

### C.      May 1, 2019 – Third Partial Revelation of the Truth

388.      The truth about the problems at the North Goonyella mine were partially revealed on May 1, 2019, before the market opened, when in connection with its first quarter 2019 results, Peabody reported a multi-week delay in reopening the Goonyella mine. The Company also disclosed that "[i]f further delays occur, the company will re-evaluate its reventilation and re-entry plans, including longwall production targets, quarterly project costs and capital expenditures."

(a)      On this news, Peabody's stock fell $1.61, or 5.6 percent, closing at $27.16 per share on May 1, 2019, down from the previous day's close of $28.77 per share.

(b)      However, the Company's stock price remained artificially inflated, as Defendants continued to conceal the truth regarding how long it would take before the Company could resume coal production at North Goonyella.

### D.      October 29, 2019 – Final Revelation of the Truth

389.      On October 29, 2019, before the market opened, the full extent of Defendants' fraud was revealed when, in connection with the release of the Company's disappointing financial results for the third quarter 2019, Peabody disclosed for the first time that QMI's strict restrictions on restarting operations at the North Goonyella mine would result in a three (3) or more year delay before any meaningful coal could be produced.

(a)     On this news, Peabody's stock fell $3.56, or 22 percent¸ closing at $12.48 per share on October 29, 2019, down from the previous day's close of $16.04 per share.

390.    Defendants' conduct resulted in Class Members, including Lead Plaintiff, selling their shares of Peabody stock for less than the fair value of that stock, which caused them to suffer injury and loss.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS

391.    Lead Plaintiff alleges that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing. Such statements artificially inflated or artificially maintained the price of Peabody's publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that common stock during the Class Period. Because Defendants chose to speak on the issues described in Section V, it was important that Defendants not mislead investors or withhold material information. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Peabody and its coal mining business in Australia, and specifically concerning the North Goonyella mine, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

392.    Lead Plaintiff is entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Lead Plaintiff and other members of the Class purchased Peabody's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

393.    At all relevant times, the market for Peabody common stock was an efficient market for the following reasons, among others:

(a)     Peabody stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's 2017 Form 10-K filed on February 26, 2018, the Company had 129,717,428 shares outstanding demonstrating a very active and broad market for Peabody common stock;

(c)     Peabody filed periodic public reports with the SEC;

(d)     Peabody regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures; and

(e)     Peabody was followed by several securities analysts employed by major brokerage firm(s), including Cowen & Co, J.P. Morgan, MKM Partners, Jefferies, Deutsche Bank, Seaport Global Securities, BMO Capital Markets, Credit Suisse, and Clarksons Platou Securities, which wrote reports that were distributed to the sales force and certain customers of

their respective brokerage firm(s), were publicly available, and entered the public marketplace; and

(f)      Unexpected material news about Peabody was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

394.    As a result of the foregoing, the market for Peabody's common stock promptly digested current information regarding Peabody from publicly available sources and reflected such information in Peabody's common stock price. Under these circumstances, all persons and entities who purchased or otherwise acquired Peabody's common stock during the Class Period suffered similar injury through their purchase of Peabody at artificially inflated prices, and the presumption of reliance applies.

## XII.   NO SAFE HARBOR

395.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

396.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

397.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

398.     In the alternative, to the extent that the statutory safe harbor is determined to

apply to any forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements were

made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, or the forward-looking statement was authorized or approved by an executive

officer of Peabody who knew that the statement was false when made.

## XIII.   CLASS ACTION ALLEGATIONS

399.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or

otherwise acquired the publicly traded common stock of Peabody during the period from April 3,

2017 through October 28, 2019, inclusive, and were damaged thereby (the "Class"). Excluded

from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who

is an individual; (iii) any person who was an officer or director of Peabody during the Class

Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a

controlling interest; (v) Peabody's employee retirement and benefit plan(s) and their participants

or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

400.     The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Peabody's common stock was actively traded on the

NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and

can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are

hundreds or thousands of members in the proposed Class. Record owners and other members of

the Class may be identified from records maintained by Peabody or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

401.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d)    whether the price of the Company's common stock was artificially inflated; and

(e)    the extent of damage sustained by Class members and the appropriate measure of damages.

402.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

403.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

404.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.   COUNTS

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

405.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

406.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff and the Class, against Peabody and the Individual Defendants.

407.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class; and (b) artificially manipulate the price of Peabody common stock.

408.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Peabody common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

409.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

410.    Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Peabody common stock and were aware of the dissemination

- 164 -

of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

411.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Peabody common stock.

412.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

413.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Peabody common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

414.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

415.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Lead Plaintiff and the Class, against the Individual Defendants.

416.    As alleged above, Peabody violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of Peabody's stock.

417.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its

scheme during the Class Period.  Thus, Peabody is primarily liable under Section 10(b) of the Exchange Act.

418.    As set forth above, the Individual Defendants had control over Peabody and made the materially false and misleading statements and omissions on behalf of Peabody within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

419.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Peabody, in turn, controlled the Individual Defendants and all of its employees.

420.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XV.   PRAYER FOR RELIEF

421.   WHEREFORE, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)   Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as a class representative, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

(b)   Determining and declaring that Defendants violated the Exchange Act, as charged in Counts I-II, by reason of the acts, omissions and, status of control alleged herein;

(c)   Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon; and

(d)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

(e)   Granting such other and further relief as the Court deems just and proper.

## XVI.  JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  March 19, 2021

LABATON SUCHAROW LLP

*/s/ Christine M. Fox*
Michael P. Canty
Christine M. Fox
Mark S. Willis (*pro hac vice forthcoming*)
Charles Farrell
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email:   mcanty@labaton.com
        cfox@labaton.com
        mwillis@labaton.com
        cfarrell@labaton.com

**Counsel for Lead Plaintiff Oregon Public Employees Retirement Fund and the Proposed Class**