# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700
_____

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1059

WRITER'S EMAIL ADDRESS
kdemasi@cravath.com

STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS

JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

_____

PARTNER EMERITUS
SAMUEL C. BUTLER

_____

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

April 30, 2021

<u>*In re Peabody Energy Corporation Securities Litigation*</u>
No. 1:20-cv-08024 (PKC)

Dear Judge Castel:

We are counsel to Peabody Energy Corporation ("Peabody" or the "Company"), Glenn L. Kellow and Amy B. Schwetz ("Individual Defendants", and together with Peabody, "Defendants"), in the above-captioned action. In accordance with paragraph 3.A of Your Honor's Individual Practices, we respectfully submit this pre-motion letter setting forth the grounds for Defendants' anticipated motion to dismiss Lead Plaintiff's Consolidated Amended Class Action Complaint (ECF No. 38) (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6). Under the Court's January 25, 2021 Order (ECF No. 32), Defendants' motion is due on June 7, 2021; Plaintiffs' opposition is due on July 22, 2021; and Defendants' reply brief is due on August 23, 2021. At this time, there are no scheduled conferences before the Court.

## I.    Factual Background.[1]

Peabody is a leading coal producer that owns and operates 17 active coal mines and various other inactive mines in the United States and Australia, including the North Goonyella Mine ("NGM") in Queensland, Australia. As Peabody disclosed throughout the class period, its business is subject to a number of "[r]isks inherent to mining", such as "fires and explosions from methane gas". (Compl. ¶ 253.) Such risks are particularly present in underground longwall mining—the method used at NGM—which "often causes methane and other dangerous, flammable gases to be released underground". (*Id.* ¶¶ 42, 48.) The Company disclosed that these risks "could materially and adversely

---

[1] Defendants take the factual allegations in the Complaint as true solely for purposes of a motion to dismiss under Rule 12(b)(6), but vigorously deny Plaintiffs' allegations.

affect [its] business, financial condition, prospects, operating results or cash flows".
(Peabody, 2017 Annual Report 24 (Form 10-K) (Feb. 26, 2018) (cited at Compl. ¶ 253).)

On September 1, 2018, the Company's monitoring systems detected elevated methane levels and high temperatures in a section of NGM.  (*See* Compl. ¶ 108.) Mine management in Australia acted quickly to safely evacuate all underground mine personnel.  (*See id*.)  Throughout September 2018, Peabody and numerous safety and health experts closely monitored the mine's "evolving conditions", including holding "[d]aily meetings" with inspectors from the Queensland Mine Inspectorate ("QMI").[2]  (*Id.* ¶¶ 143, 149.)  The strategy involved a number of approaches from the surface designed "to force gas from the mine and rob it of the oxygen that might promote a fire".  (*Id.* ¶ 143.)

Despite Peabody's best efforts—and, according to Plaintiffs, as a result of "significant errors" in "managing the spon[taneous] com[bustion] event" (*id.* ¶ 150)—conditions "got dramatically worse", eventually leading to a fire inside the mine.  (*Id.* ¶¶ 154-61.)  In an effort to keep everyone safe, "the Company moved its control room away from the site" and "moved the majority of its workforce to the North Goonyella camp", an employee residence "15 kilometers away".  (*Id.* ¶¶ 155-56.)  "Conditions at the mine at this point were in serious flux—changing by the hour and day."  (*Id.* ¶ 156.) Throughout this time, Plaintiffs allege that Individual Defendants Mr. Kellow (CEO) and Ms. Schwetz (former CFO) were part of a "North Goonyella Task Force" that was "in daily contact" with "Peabody Australia" in Brisbane, and was holding "regular meetings" at "a war room at headquarters in St. Louis" to keep abreast of the ever-changing situation. (*Id.* ¶ 162.)  During this period, the Company also issued public statements about the evolving conditions at North Goonyella.  (*Id.* ¶¶ 176-78.)  As early as September 20, 2018, publications such as *The Australian Financial Review* "detailed that the problems at the mine 'stretch[ed] beyond' just elevated gas readings" and criticized "mine management". (*Id.* ¶ 181.)  According to Plaintiffs, by September 23, 2018, "it was obvious the Company had a major fire on its hands".  (*Id.* ¶ 277.)  By September 27, 2018, "thick black smoke emanated from the main fan shaft," (*id.* ¶¶ 158-60), and Peabody reported that "[m]ine personnel have observed smoke coming from the mine, indicating a likely fire in a portion of the mine" (*id.* ¶ 276).  The next day, on September 28, Peabody confirmed there were "indications of a fire in a portion of the mine" and that the Company "continue[d] to actively work in conjunction with [QMI] and other third-party experts toward a plan to extinguish the fire and contain the impacts".  (*Id.* ¶ 280.)  In the months that followed, Peabody attempted to project when the mine could reopen.  (*Id.* ¶¶ 288-346.)  As of today, the mine is still not producing coal.

Plaintiffs now belatedly seek to transform this unfortunate incident into a claim for securities fraud.  With the benefit of hindsight, Plaintiffs allege that Peabody's safety systems were knowingly deficient; that Defendants deliberately concealed the nature and extent of the event; and that Defendants' subsequent projections about when the mine

---

[2] "QMI's role is to ensure that acceptable safety and health standards are established and practiced within the mining and quarrying industries."  (Compl. ¶ 53.)

might reopen were misleading.  But the Complaint fails to offer any cogent theory of fraud, nor any plausible—much less strong—inference that Defendants acted with scienter. Instead, the Complaint describes extensive safety protocols that kept all personnel safe, and diligent executive management who were "very involved" (meeting "multiple times per day, seven days per week") in an effort to contain and remediate the fire.  (*Id.* ¶ 371.) As Plaintiffs themselves concede, the "ever-changing conditions of the mine after the fire broke out[] made it extremely difficult to make predictions about" re-opening NGM (*id.*), "and a regular flow of new information . . . altered timelines" for re-entering the mine (*id.* ¶ 130).  The Complaint should be dismissed.

## II.    Summary of Plaintiffs' Claims.

Lead Plaintiff Oregon Public Employees Retirement Fund brings this class action on behalf of all persons who purchased or otherwise acquired Peabody stock between April 3, 2017, and October 28, 2019 (the "Class Period"), asserting claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

Plaintiffs allege that Defendants' public statements artificially inflated Peabody's stock price as of April 3, 2017—the day that Peabody emerged from bankruptcy—by failing to disclose that "adverse facts pertaining to the safety practices" at NGM put the mine at "heightened risk of experiencing spontaneous combustion".  (*Id.* ¶ 8.)  Plaintiffs allege that the "truth" was partially revealed on September 28, 2018, when the Company announced it was experiencing an ongoing fire at the mine (*id.* ¶ 9), even though Plaintiffs simultaneously plead that it was "obvious" there was a fire by September 23, 2018 (*id.* ¶ 277).  Plaintiffs further allege that, following the fire, Defendants continued to mislead investors about plans to reopen the mine by "assuring investors that the Company would be able to mine significant coal at the mine in the near-term" and failing to disclose "major issues that would impede, or at least significantly delay, any progress towards re-opening the mine".  (*Id.* ¶¶ 12-13.)  Plaintiffs allege the "truth" was fully revealed on October 29, 2019, when Peabody announced that the Company did not expect coal production from NGM "for three or more years".  (*Id.* ¶ 17.)

## III.    Plaintiffs Fail To State a Claim Under Section 10(b) and Rule 10b-5.

The Complaint falls far short of satisfying the heightened pleading requirements for securities fraud claims.  *First*, Plaintiffs do not plead particularized facts raising a "strong inference" of scienter.  *Second*, Plaintiffs do not adequately plead a single materially false or misleading statement.

### A.    The Complaint Fails To Plead Scienter.

To plead scienter under Section 10(b), Plaintiffs must "plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference [of scienter]. . . . A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the alleged facts." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

4

U.S. 308, 310 (2007).  "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017) (citation omitted).

Here, Plaintiffs have alleged no facts to support a cogent and compelling inference of scienter with respect to any of the Defendants.  The Complaint relies on boilerplate scienter allegations and points to statements from low-level confidential witnesses ("CWs") that are completely untethered to the Individual Defendants.  Indeed, the absence of particularized allegations is glaring with respect to Mr. Kellow and Ms. Schwetz—executives who Plaintiffs allege were working around the clock to understand a combustion event that was evolving in real-time.  (*See* Compl. ¶¶ 321-22.)  Plaintiffs plead no motive for Mr. Kellow or Ms. Schwetz to lie, nor any personal benefit that either allegedly received.[3]

Plaintiffs' attempt to plead scienter through "recklessness" likewise fails.  Plaintiffs allege that Defendants "should have" or "likely" received, or "had access to" information "reflecting the true facts regarding Peabody".  (*Id.* ¶¶ 10, 167-68, 353-54.)  But they fail to plead specific facts showing that *each Defendant* "knew facts or had access to non-public information contradicting their public statements" and "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility".  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534, 544 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  To attempt to meet this burden, Plaintiffs cite three sources of allegedly contrary information:  (1) purported statements from nine CWs that NGM was mismanaged (Compl. ¶¶ 59-214); (2) reports prepared by QMI that Plaintiffs claim "corroborate" the CWs' statements (*id.* ¶¶ 143-50); and (3) an unidentified mining expert who has apparently concluded—with the benefit of hindsight—that Peabody's re-opening plans for NGM were unrealistic.  None of these sources can establish scienter.

*First*, most of the allegedly contradictory information does not actually contradict Defendants' public statements.  Even assuming (as we must, on this motion) that errors were made at NGM, that does not mean that Defendants were not still committed to safety.  Nor do decisions that, in hindsight, turn out to be wrong dictate a finding of fraud.  Rather, the "plausible opposing inference one could draw from the facts alleged" is much more compelling—namely that a disclosed risk (fires and explosions from methane gas or coal dust) materialized and, despite their around-the-clock efforts, Peabody and its management were unable to prevent the fire, and unable to reopen the mine on the timeline initially projected.  *Tellabs*, 551 U.S. at 310.  Nothing Plaintiffs plead is inconsistent with that more plausible, competing inference.

---

[3] To plead scienter through "motive and opportunity to commit fraud," plaintiffs must "'allege that defendants benefitted in some concrete and personal way from the purported fraud,' such as by profiting from insider sales at artificially inflated prices".  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 380 (S.D.N.Y. 2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).  There are no such allegations here.

*Second*, conclusory allegations are not substitutes for *facts*. Plaintiffs speculate that Defendants must have known, or recklessly disregarded, that their statements were false because the "Task Force" was "in daily contact" with mine personnel and "should have received" all documentation created by QMI. (Compl. ¶¶ 10, 162-68.) But allegations showing that a defendant "merely ought to have known [are] not sufficient to allege recklessness". *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Likewise insufficient is Plaintiffs' allegation that Mr. Kellow's and Ms. Schwetz's "positions with the Company . . . made them privy to confidential information". (Compl. ¶ 356); *see also Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012) ("Scienter cannot be inferred solely from the fact that, due to the defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any adverse information." (citation omitted)). Finally, the allegation that Defendants had "heightened awareness as to the safety risks" (Compl. ¶¶ 358-62) fails for the same reason: the Complaint lacks a single *fact* sufficient to show that any Defendant actually received information contradicting a public statement.[4]

*Third*, Plaintiffs cannot meet their burden by relying on the opinions of an unnamed mining expert who reviewed the facts in hindsight. (*Id.* at 1.) Whether a purported expert believes that Peabody should have known that its re-opening projections were unrealistic is irrelevant. No expert can offer any input into what was in Mr. Kellow's or Ms. Schwetz's mind at the time any statement was made. The Complaint should be dismissed in its entirety for failure to plead scienter.

B.    The Complaint Fails To Plead Any Actionable Misstatements.

Plaintiffs allege three categories of alleged misstatements: (1) general statements regarding Peabody's commitment to safety made between April 2017 and September 2018 (*id.* ¶¶ 228-67); (2) statements about the evolving combustion event at NGM made in late September 2018 (*id.* ¶¶ 268-81); and (3) statements regarding the Company's projections for the mine's re-opening made between late September 2018 and October 2019 (*id.* ¶¶ 288-337). Each category of statements is inactionable.

1.    General Statements About Peabody's Commitment to Safety (Compl. ¶¶ 228-67).

General statements about Peabody's commitment to safety made prior to September 28, 2018, are inactionable for two reasons: (1) they are time-barred as a matter

---

[4] Nor can Plaintiffs rely on the "core operations" doctrine to prove scienter. Plaintiffs allege that "[g]iven the critical importance of the North Goonyella mine to Peabody's overall business and operating profit", the misstatements could "not have occurred without the Individual Defendants' knowledge and approval". (Compl. ¶ 369.) But the core operations doctrine does not provide an independent basis for scienter, and typically applies only where the operation at issue constitutes nearly all of a company's business, not the 20% Plaintiffs allege. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

of law, and (2) they are inactionable puffery.

*First*, claims under Section 10(b) must be brought within two years of "when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'". *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010). Here, Plaintiffs filed their lawsuit on September 28, 2020, two years *to the day* after Peabody confirmed that a fire was occurring at NGM. While Plaintiffs try to assert that it was the September 28, 2018 statement that revealed the earlier safety-related statements to be false (Compl. ¶¶ 286, 386), Plaintiffs' own allegations demonstrate that they had reason to suspect the possibility of their claims even earlier. Indeed, Plaintiffs allege that it was publicly known that "higher gas levels" and "elevated temperatures" at NGM prompted an evacuation (Sept. 19, 2018); that "problems at the mine . . . 'stretch[ed] beyond' just elevated gas readings" (Sept. 20, 2018); that "black smoke billowed out of the mine" (Sept. 22, 2018); that it was "obvious" that the mine was on fire (Sept. 23, 2018); and that "[m]ine personnel have observed smoke coming from the mine, indicating a likely fire in a portion of the mine" (Sept. 27, 2018). (*Id.* ¶¶ 152, 181, 270, 275, 276-77.) This substantial information more than two years before Plaintiffs filed their Complaint renders all alleged misstatements prior to September 28, 2018 time-barred.

*Second*, even if timely, the pre-fire safety statements are not actionable as a matter of law. Most of the statements in this category are classic examples of inactionable puffery: "general statements about reputation, integrity, and compliance with ethical norms", which are "too general to cause a reasonable investor to rely upon them". *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539, 2017 WL 1102666, at *21 (S.D.N.Y. Mar. 23, 2017) (citation omitted). For example, Plaintiffs cite statements that Peabody was "ever vigilant on [its] journey of continuous improvement in safety"; had an "ongoing focus on safe productive workplaces"; referred to safety as its "first value"; and thanked employees "for their ongoing commitment to ensuring safe, productive operations". (Compl. ¶¶ 228-66.) Courts in this district have had "little trouble concluding" that such statements from mining companies are "'precisely the type of puffery' that the Second Circuit has 'consistently held to be inactionable'". *In re Vale*, 2017 WL 1102666, at *22 (citation omitted)); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (dismissing similar safety-related statements as "simply too general and/or aspirational to be actionable").

The only other alleged misstatements from this period are statements of historical fact regarding Peabody's safety record, *i.e.*, that the Company "achieved record safety" in 2017 and the Company's "global safety performance continues to surpass industry averages". (Compl. ¶¶ 228, 249.) Plaintiffs do not even attempt to plead that these factual statements were false at the time they were made—nor could they. *See In re Sibanye Gold Ltd. Sec. Litig.*, No. 18-CV-3721, 2020 WL 6582326, at *14–16 (E.D.N.Y. Nov. 10, 2020) (finding that disclosures about safety program were not misleading where factual statements about the decline in fatalities were true).

2.      Statements About the Evolving Combustion Event in Late
        September 2018 (Compl. ¶¶ 268-81).

Plaintiffs next allege that a handful of statements in late September about the status of the heightened gas levels at NGM and subsequent fire were false or misleading.  Specifically, from September 19 to September 28, 2018, Peabody made several disclosures to update the public on the evolving situation at NGM, acknowledging that elevated gas levels had caused an evacuation of the mine (Sept. 19, 2018); then that "[m]ine personnel ha[d] observed smoke coming from the mine, indicating a likely fire in a portion of the mine" (Sept. 27, 2018); and finally that there were indeed "indications of a fire in a portion of the mine" (Sept. 28, 2018).  (Compl. ¶¶ 273, 276, 280.)  Based on perfect hindsight, Plaintiffs now allege that these statements "downplayed" the true state of affairs and omitted more granular information (without ever pleading that Defendants actually knew that information at the time they made the statements).  These statements are likewise inactionable.

The Complaint offers no well-pleaded allegations that Defendants' statements about the evolving situation at NGM were false at the time they were made.  As an initial matter, investors were well aware through Peabody's consistent risk disclosures that fires and explosions were some of the "[r]isks inherent to mining".  (*Id.* ¶ 253.)  Once such an event occurred, moreover, even Plaintiffs concede that "[c]onditions at the mine at this point were in serious flux—changing by the hour and day" (*id.* ¶ 156), and the Company provided ongoing updates based on the information it had at the time.  Plaintiffs complain that Defendants allegedly omitted technical details from their updates, but even assuming Defendants were aware of such details, their statements are not "automatically render[ed] . . . misleading due to the omission of another fact concerning the same topic".  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-CV-2169, 2019 WL 1368787, at *12 (S.D.N.Y. Mar. 26, 2019).  Indeed, most of these purported omissions are at most allegations of site mismanagement (*see* Compl. ¶¶ 120-61 (CWs allege Peabody "[m]ishandle[d]" event; chose incorrect Trigger Action Response Plan; undertook incorrect approach to ventilation))—not facts showing that the Company's statements were false when made.  These are allegations of corporate mismanagement, which are not actionable under the securities laws.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. at 562, 574 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477–79 (1977)) ("This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud.  This is not the law.").

3.      Projections About Re-opening the Mine from Late September 2018
        to October 2019 (Compl. ¶¶ 228-337).

After the fire, Peabody made regular disclosures to investors about the ongoing work to segment, re-ventilate and re-enter the mine, as well as various possible scenarios for the future production and sale of coal from NGM.  And when Peabody received new information that was "likely [to] influence[] future progress", it suspended all North Goonyella guidance and informed investors "new targets around North Goonyella production timing and costs" would be announced after the Company re-evaluated its

plans.  (Compl. ¶¶ 333-35.)  These alleged misstatements are (1) not false or misleading, and are (2) non-actionable opinion statements and forward-looking statements.

*First*, statements about ongoing and completed remediation efforts (for example, that Peabody had "completed segmenting of the mine into multiple zones" or that "reventilation and re-entry of the mine" had occurred (*id.* ¶¶ 321, 334)) were not false or misleading at the time they were made.  While additional delays may have occurred after these statements, the relevant inquiry is whether the Company had indeed engaged in those remediation efforts at the time—Peabody "either had done so or it had not as of that time, and what occurred afterwards . . . is irrelevant".  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371–72 (S.D.N.Y. 2018) (finding that statements that the company had completed "a series of remedial works" were not false or misleading despite later spills of cyanide solution).  The after-the-fact opinion of Plaintiffs' mining expert has no bearing on whether Defendants' statements were accurate *at the time they were made*.  (*See, e.g.*, Compl. ¶ 298.)

*Second*, the alleged misstatements about possible timing to re-open the mine and projections of future coal production are both inactionable forward-looking statements and opinion statements.  Forward-looking statements are inactionable if they are identified as such and accompanied by meaningful cautionary statements.  15 U.S.C. § 78u-5(c)(1) (2018).  Statements that "project[] results in the future" are "plainly forward-looking". *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (stating that it is a "common-sense proposition that words such as 'expect' identify forward-looking statements"). Defendants' statements regarding production "targets" and what Peabody "expect[s] to produce" (Compl. ¶¶ 273, 317, 321) are "projections . . . falling with the statutory definition of 'forward-looking statement'".  *In re Barrick Gold*, 341 F. Supp. 3d at 375 (dismissing allegations based on statements about Barrick's gold production guidance). And Defendants' projections about the anticipated timing of various steps in the remediation process, like that a "multiphased reventilation and re-entry project [was] *targeted* to commence in the first quarter 2019" or that the Company was "progressing with a single *base case* that *targets* limited continuous mining volumes in late 2019" (Compl. ¶¶ 296, 306 (emphases added)), are forward-looking on their face.  Each of these statements was also accompanied by meaningful, specific cautionary statements like "there's still much work ahead of us"; "it's really too early to call"; and it is "still too early to offer meaningful insights into the financial effects or timing of next steps", in addition to the warnings regarding forward-looking statements recited at Peabody's earnings calls and in public filings.  (*Id.* ¶¶ 291, 306, 308-09.)

These statements are also nonactionable statements of opinion.  "Statements that express expectations about the future rather than presently existing, objective facts are . . . statements of opinion", including statements like "'we still expect . . . growth;' '[we are] on the right track;' and 'operationally . . . things are moving along exactly in line with what we thought'".  *Lefkowitz v. Synacor, Inc.*, No. 18-cv-2979, 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) (citations omitted).  Plaintiffs have failed to plead facts that would render Defendants' opinion statements actionable or that show allegedly

omitted information rendered the statements "misleading to a reasonable investor". *Id.* at *6; *see also Tongue*, 816 F.3d at 211 (finding that statements about expected timing of FDA approval of drug were not misleading despite omission of FDA concerns).

## IV.    Plaintiffs Fail To Plead a Control-Person Claim.

For the same reasons described above, and because Section 20(a) claims are "predicated on a primary violation of securities law" that Plaintiffs have failed to sufficiently allege, Plaintiffs' control person claims must also be dismissed. *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

## V.    Conclusion.

For all of these reasons, Defendants anticipate filing a motion to dismiss Plaintiffs' claims in their entirety on June 7, 2021.  Should the Court wish, we are also of course prepared to discuss our contemplated grounds for dismissal at a pre-motion conference.

Respectfully submitted,

*/s/ Karin A. DeMasi*

Karin A. DeMasi

Hon. P. Kevin Castel
     Daniel Patrick Moynihan United States Courthouse
          Courtroom 11D
               500 Pearl Street
                    New York, New York 10007

By ECF

Copy to:

All Counsel of Record