# Labaton Sucharow

**Christine M. Fox**
Partner
212 907 0784  direct
212 907 0700  main
212 883 7584  fax
cfox@labaton.com

**New York Office**
140 Broadway
New York, NY 10005

May 6, 2021

**VIA ECF**

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

RE:    *In re Peabody Energy Corp. Securities Litigation*
         No. 1:20-cv-08024-PKC

Dear Judge Castel:

On behalf of Lead Plaintiff Oregon Public Employees Retirement Fund ("Plaintiff") and in accordance with paragraph 3.A of Your Honor's Individual Practices, we write in response to Defendants' pre-motion letter ("Ltr."), ECF No. 39, setting forth the grounds for Defendants' anticipated motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint," cited as "¶_"), ECF No. 38. Under the Court's January 25, 2021 Order (ECF No. 32), Defendants' motion is due on June 7, 2021; Plaintiff's opposition is due on July 22, 2021; and Defendants' reply brief is due on August 23, 2021. At this time, there are no scheduled conferences before the Court. If the Court is inclined to grant Defendants' motion or rule on Defendants' motion without further briefing, Plaintiff respectfully requests leave to amend.

Defendants preview that they will challenge *only* falsity and scienter in connection with Plaintiff's claim that Defendants Peabody ("Peabody" or the "Company"), former CEO Glenn Kellow ("Kellow") and former CFO Amy Schwetz ("Schwetz") violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. As set forth below, Plaintiff has adequately pled both elements at this stage.

## I.    THE FACTS

Peabody is the largest coal mining company in the world. The Company's mines are organized into six business segments, the largest of which is the Australian Metallurgical Mining segment, which accounts for approximately 23.1% of Peabody's revenues. ¶30. The North Goonyella Mine (the "NGM"), included within the Australian Metallurgical Mining segment, is Peabody's most profitable single operation and, in 2017 the NGM generated approximately 20% of Peabody's total operating profit. ¶36.

On April 3, 2017, the start of the Class Period, Peabody emerged from bankruptcy protection, still saddled with debt and facing demand declines in the U.S. ¶¶57-58. From that time through the beginning of September 2018, the Defendants repeatedly and falsely boasted of Peabody's record coal production, aided by the NGM, while simultaneously touting the Company's "record safety" and its "ongoing commitment to ensuring safe, productive operations," including at the NGM. ¶¶229, 234. During this time, for example, Defendants represented that the emerged Peabody "is proceeding with . . . an emphasis on safe and productive operations that are constantly working to move down the cost curve," ¶232; "[t]hrough all of our actions, Peabody maintains constant vigilance toward safety," ¶244; and "[r]ecord safety results [at the NGM] reflect 80% improvement since 2013," ¶251. Yet such statements about the NGM and the Company's overall commitment to safety (from the start of the Class Period through September 2018) failed to disclose, *inter alia*, that Peabody had failed to implement adequate safety controls at the NGM to prevent the risk of a spontaneous combustion event; failed to properly ventilate the NGM resulting in the build-up of methane gas and carbon dioxide; failed to follow its own safety procedures; and failed to properly train mine employees and sufficiently monitor for mine gas. As a result, the NGM was at heightened risk of experiencing a spontaneous combustion event. ¶277. Indeed, Defendants were on notice of the NGM's "outburst potential," history of spontaneous combustion and heating events, and "gassy" conditions even before Peabody's acquisition of the mine. ¶¶69-70.

On September 1, 2018, elevated methane levels and high temperatures were detected at the NGM. ¶108. Unfortunately, these conditions led to a fire inside the NGM, and black smoke began to billow out of the mine on September 22, 2018. ¶152. The fire was so significant that: (i) carbon monoxide levels skyrocketed from approximately 600 ppm to 28,000 ppm; (ii) Peabody's gas reading instruments melted or were destroyed by stratospheric temperatures and caving roofs; and (iii) the Company's workforce was prohibited from re-entering or even approaching the mine for months. ¶¶152-156. On September 28, 2018, days after photographs of smoke billowing from the NGM began circulating, Defendants finally confirmed that the NGM was on fire and that the Company did not expect any coal production from its most profitable mine in 4Q 2018. ¶178.

However, even after the disclosure of the fire and through the end of the Class Period, Defendants' post-fire misstatements and omissions continued to artificially inflate and/or artificially maintain Peabody's stock price, conditioning investors to believe that the Company's plan to quickly restart operations at the NGM was reasonable and had a high likelihood of success, all while concealing major issues that would impede any progress towards re-opening the mine. Indeed, Defendants made completely **unsupported** statements such as: "if the next panel . . . is accessible, production would be targeted for the second half of 2019," ¶295; "based on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella. . . . [But] that conclusion is at best premature and at worst unwarranted," ¶296; and "longwall production in the 10 North panel [will] begin to ramp up in the early months of 2020," ¶306. Further, Defendants falsely blamed reopening delays on the Queensland Mine Inspectorate ("QMI"), i.e., worker safety regulations, claiming that the QMI took longer than Peabody expected to approve the reopening plans. ¶12.

Labaton
Sucharow

Yet, according to Confidential Witnesses ("CWs"), internal Peabody documents, and a longwall mining expert retained by Plaintiff, and based on the information available to Defendants, it would take—at the very least—an additional 18 to 24 months from the fire (September 2018) to resume coal production at the NGM. Thus, statements by Defendants after the fire through the end of the Class Period, that coal production would resume in full force in 2019, later revised to 2020, were not just optimistic opinion statements—they were flat-out false statements based on a timeline provided to investors that was impossible given what was known to Defendants. Even North Goonyella's Union Lodge President told other mining union officials, in late September 2018, that only a "miraculous change in circumstance" would prevent critical mining equipment from being sealed in the mine, thus leading to a long-term interruption to coal production at the NGM. ¶176. The 18-24 month timeline advanced by Plaintiff's longwall mining expert is consistent with the internal models prepared by Peabody employees at the time, and what Defendant Kellow ultimately disclosed to the market at the end of the Class Period, on October 29, 2019. ¶ 345.[1]

Through a series of disclosures, Defendants slowly revealed the complete and utter infeasibility of restoring coal production at the NGM—cumulating on October 29, 2019, when Defendants finally disclosed the truth known all along, that it would take *three years or longer* before any meaningful coal could be produced at the NGM. ¶225. As a result of Defendants' fraud, investors suffered hundreds of millions of dollars of losses.

## II.    PLAINTIFF HAS PLED ACTIONABLE MISSTATEMENTS

### A.    Defendants' Pre-Fire Statements Are Actionable

#### 1.    The Challenged Statements Are Not Puffery

Defendants' statements about the NGM and the Company's overall commitment to safety—made from the start of the Class Period through September 2018—are actionable. ¶¶228-29, 232, 234, 240, 244, 249, 251, 253, 256, 258-60, 263, 256-66. Defendants repeatedly touted the Company's commitment to safety—such as its "record safety" (¶228) and its "ongoing commitment to ensuring safe, productive operations" (¶234), including at the NGM—while failing to disclose that Peabody had not implemented adequate safety controls at the NGM. ¶230. Thus, Defendants' statements are actionable.

Defendants argue that "*most of*" these statements are "classic examples" of corporate puffery and are immaterial as a matter of law. Ltr. at 6. But courts "must exercise great caution" when considering a puffery defense at the "motion to dismiss stage" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012).

---

[1] The CWs place Defendants Kellow and Schwetz in key meetings and confirm that Defendants received reports and other materials contradicting their public statements. *See, e.g.*, ¶¶162-75.



4

Nevertheless, Defendants pluck statements out of context and suggest that the Court should conclude, as a matter of law at the pleading stage, that the alleged misstatements are immaterial puffery. But courts are "neither required nor permitted to view such statements in isolation." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019). When viewed in context, Defendants' statements are actionable because they are concrete "misrepresentations of existing facts." *Novak v. Kasaks*, 216 F.3d 300, 315 (2000); *see also In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 n.15 (E.D.N.Y. May 20, 2020) (statement that "we are driven by our commitment to safety to people and to preserve the environment" is not puffery); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617-18 (S.D. W. Va. 2012) (finding defendants' statements touting its "safety" and being an "industry leader" in safety actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statement that company "adopts the best corporate governance practices," when viewed in context, was actionable).

For instance, Defendants cherry-pick Defendant Kellow's February 7, 2018, statement that Peabody was "ever vigilant on [its] journey of continuous improvement in safety" (¶249) and contend that it is immaterial as a matter of law. But this ignores a preceding sentence in which Kellow stated: "***our global safety performance continues to surpass industry averages***." *Id.* When viewed in context and read together, this is a "determinate, verifiable statement," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) that is not mere corporate puffery—i.e., Peabody's safety performance either does, or does not, "surpass industry averages." ¶249.[2] Indeed, it is misleading for failing to disclose that Peabody had actually failed to implement adequate safety protocols at its most profitable mine.

Defendants also made these repeated statements while aware that "the contrary was true," *Novak*, 216 F.3d at 315—i.e., Defendants knew or had access to adverse facts and information pertaining to the safety practices at the NGM. *See supra* at 2; *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) ("easily" concluding that statement that company was "substantially in compliance" with applicable regulatory requirements was actionable where complaint alleged the company was not in such compliance).

The cases Defendants cite are distinguishable. In *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017), the court noted that the challenged "aspirational" statements did not "convey[] a statement of measurable fact," *id.*, which, as explained, is not the case here. Further, in *In re BHP Billiton Ltd. Securities Litigation*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017), the court actually found certain statements challenged as puffery to be actionable because they contained "specific representations or guarantees of 'some concrete fact or outcome,'" *id.* at 79, like those here. The court in *Billiton* also noted that statements are not puffery where, as here, the challenged statements were made repeatedly throughout the class period and where safety was a

---

[2] Defendants argue that Plaintiff does "not even attempt to plead" that certain statements of historical fact from this period are actionable. Ltr. at 6 (citing ¶¶228, 249). But it is well-settled that Defendants had a duty to disclose "material fact[s] necessary" to make their statements not misleading. *Matrixx*, 563 U.S. at 37—and it was certainly misleading to tout the Company's safety record while failing to disclose adverse facts about ongoing safety lapses at Peabody's most profitable mine.



topic that was important to investors. *Id.* at 79-80; *see also Avon*, 2019 WL 6115349, at *16 (statements that are otherwise puffery are actionable when the company makes "repeated representations on the same topic").

###### 2.    Defendants' Pre-Fire Statements Regarding the Status of the North Goonyella Mine Are Actionable

In September 2018, Defendants made false and misleading statements about the status of the NGM, downplaying reports of elevated gas levels and related issues and assuring investors that, despite these reports, coal production volumes would not be impacted. ¶¶269-75.

Despite what Defendants argue, Plaintiff is not relying on "perfect hindsight" to allege that these statements were materially false and misleading. Ltr. at 7. Instead, relying on specific and concrete facts that come from internal documents, and statements of CWs, Plaintiff alleges that these statements were false and misleading because Defendants failed to disclose adverse facts regarding (a) Peabody's ongoing failure to implement adequate safety controls at the NGM and (b) the reality that the situation on the ground at the mine was far worse than investors were told.

Ignoring these well-pled factual allegations, Defendants contend that these statements are not actionable because Peabody's risk disclosures cautioned investors generally that fires and explosions are risks inherent to mining. Ltr. at 7. But the risk disclosures were "not 'meaningful' or 'sufficiently specific' because [Defendants] did not disclose that the risk factors were not merely hypothetical (i.e., they "could" happen), but were in fact "happening." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013).

Defendants' argument that Plaintiff has alleged nothing more than corporate mismanagement also fails: even if corporate mismanagement led to the issues that were not disclosed, it was the failure to disclose—not the fact of mismanagement—that Plaintiff alleges rendered the challenged statements misleading. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) ("mere fact that the conduct arguably constitutes mismanagement will not preclude a claim if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement").

###### 3.    The Pre-September 28, 2018 Alleged Misstatements Are Not Time-Barred

Defendants argue that the statute of limitations began to run prior to September 28, 2018 (the day Peabody publicly confirmed the fire at the NGM). According to Defendants, a "reasonably diligent plaintiff" would have had "reason to suspect the possibility of their claims even earlier" than September 28, 2018. Ltr. at 6. But this misstates the applicable standard governing when the statute of limitations is triggered in a case like this. The Second Circuit has made clear that the "securities fraud statute of limitations cannot begin to run until the plaintiff discovers—or a reasonably diligent plaintiff would have discovered—the facts constituting scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011). As a result,



even if it is true that a reasonably diligent plaintiff could have discovered that there might have been a fire at the NGM during the days leading up to when Peabody publicly confirmed it, this would not trigger the statute of limitations. Thus, the pre-September 28, 2018 alleged misstatements are not time-barred. Moreover, Defendants' denial, in mid-September 2018, of claims by the *Australian Financial Review* that the NGM had a problem with super-heated coal and that the Company was at risk of losing its massive and expensive long-wall equipment, and downplaying any sense of urgency surrounding the combustion conditions at the mine (¶¶268-270) belie any argument that the truth was on the market before September 28, 2018.

### B.    Defendants' Post-Fire Statements Are Actionable

Defendants' statements post-fire concerning the Company's plan to restart operations at the NGM also are actionable. ¶¶280-81, 288-91, 295-96, 304-10, 317, 319-22, 327, 329, 334-36. More specifically, Defendants falsely assured investors that Peabody would be able to mine significant coal at the NGM in the near-term, while failing to disclose significant issues that would impede, or at least significantly delay, the ability to re-open the mine. While Defendants argue that certain statements concerning ongoing and completed remediation efforts are not alleged to be false because those statements were literally true (Ltr. at 8), this ignores, again, that even literally true statements are actionable when they create a materially misleading impression, *see supra* at 4, which is the case here. As detailed below, Defendants' remaining arguments are also misplaced.

### 1.    Purported Forward-Looking Statements Are Actionable and the Statutory Safe Harbor Does Not Apply

Defendants argue that a certain unidentified portion of statements are inactionable forward-looking statements that are protected by the statutory safe harbor. Ltr. at 8. However, many of the challenged statements are not forward-looking at all. In fact, while the subjects of these statements might be couched in forward-looking language, many of the statements contain a present-tense assertion of expectations, and those assertions were demonstrably false. *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 246 (2d Cir.2016) (non-forward-looking aspect of a statement is not subject to the safe harbor); *Galestan v. OneMain Holdings, Inc.,* 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("statements are not protected by the safe harbor provision because they were statements of present fact.").

With respect to those statements that are arguably forward-looking, these statements are alleged to be misleading for what they fail to disclose—and it is well-settled "the safe harbor does not apply to material omission," even where the omission makes misleading forward looking projections. *Aeropostale*, 2013 WL 1197755, at \*12; *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*3 (S.D.N.Y. Mar. 2, 2017) (same). Indeed, Plaintiff alleges—with the input of a longwall mining expert—that Defendants' statements about the timing of re-opening of the mine concealed adverse facts that Defendants knew of or recklessly disregarded. *See supra* at 2-3; *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (finding falsity based, in part, on analysis of plaintiffs' expert consultants that determined that



company should have reported losses on certain of its contracts). It is the failure to disclose these facts, while instead assuring investors that the mine would re-open on a more favorable timeline, that renders Defendants' purportedly forward-looking statements false and misleading. The safe harbor therefore does not apply. *Avon*, 2019 WL 6115349, at *15 (the safe harbor "does not protect optimistic statements about future performance for which defendant[s] have no basis, and where they already 'know that certain risks have become reality'").

In addition, because these statements were known to be misleading when made, the safe harbor does not apply. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); *Gross v. GFI Grp., Inc.,* 310 F. Supp. 3d 384, 393 (S.D.N.Y. 2018) (safe harbor is no shield if "statement was knowingly false when made"). The safe harbor also does not apply because Defendants' boilerplate cautionary language was not sufficiently meaningful. *See Vale*, 2020 WL 2610979, at *14 ("general warnings about operational risks" or the "possibility of a dam collapse and breach of risk management protocols" do not insulate liability).

### 2.    Purported Opinion Statements Are Actionable

Defendants also argue that a certain unidentified portion of these statements are inactionable statements of opinion. Ltr. at 8-9. But many of the challenged statements are not opinions at all. For example, the statement that "Peabody **has now identified** a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020" (¶305) is a statement of fact. *Omnicare*, 575 U.S. at 183 (a "fact is 'a thing done or existing' or '[a]n actual happening'"). The same is true of many other alleged post-fire misstatements. *E.g.*, ¶¶281, 288-91, 295, 304-10, 319-21, 329, 334-36.

Even those statements that arguably contain opinions are actionable as Defendants either: (i) did not genuinely hold the expressed opinions; *or* (ii) omitted material facts about the basis for the opinion, which rendered the statements misleading. *Omnicare*, 575 U.S. at 192-93, 185-95. Plaintiff need not establish that Defendants did not believe their stated opinions for those statements to be actionable. *Id.* at 185-95. Indeed, "[t]hat [Defendants] may have believed [their statements] to be accurate is irrelevant, even when read as an opinion statement." *Avon*, 2019 WL 6115349, at 17. The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts "conflict with what a reasonable investor would take from the statement itself." *Id.* This is established when the opinion "'contain[s] one or more embedded factual statements that can be proven false' or 'implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted.'" *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020) (opinion statements sustained).

This is the case here. For example, the February 6, 2019 statement that "[w]e're now progressing with a single base case that targets limited continuous mining volumes in late 2019 and will then have longwall production in the 10 North panel begin to ramp up in the early months of 2020"



(¶306) contains an embedded factual statement (i.e., that Peabody is "now progressing") that can be proven false. The statement (and others like it) also omitted material facts that conflict with what a reasonable investor would take from the statement, including adverse facts pertaining to the feasibility of Peabody's plan to restart coal production at the NGM. ¶298. These statements are therefore actionable. *See Avon*, 2019 WL 6115349, at *17 (opinion statements actionable where defendants omitted information making statement misleading).

## III.    PLAINTIFF HAS ADEQUATELY PLED SCIENTER

The Court must consider "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007) (emphasis added). Scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 323-24.  Plaintiff meets its burden if the allegations of scienter are at least as compelling as the nonculpable explanation. *Id*.; *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) (a "tie . . . goes to the plaintiff").

Contrary to Defendants' assertion that "Plaintiffs have alleged no facts to support a cogent and compelling inference of scienter with respect to any of the Defendants," Ltr. at 4, Plaintiff has indeed met its burden by alleging: (1) CWs, who place Defendants in key meetings and in receipt of reports and other materials contradicting their public statements; (2) that the NGM was core to Defendants' business success post-bankruptcy; (3) the frequency of Defendants' fraudulent statements about the NGM; (4) the opinion of a highly qualified mining expert; and (5) that the NGM was historically a safety risk.[3]

**First**, the CWs establish, through particularized allegations, that the Individual Defendants and Peabody senior officials[4] possessed actual knowledge of the alleged fraud, including, for example, a lack of safety controls at the NGM and that it would take significantly longer to reopen the NGM than the Company had represented to the market—if reopening was even a possibility. *See, e.g.*, ¶¶87-92,184-96. More specifically, the CWs confirm that the Individual Defendants attended frequent meetings where highly relevant information was discussed, ¶¶163-65, and received models and reports, such as "every piece of paper generated by the QMI in Australia," ¶168, and there was "no shortage of people looking at the models" that forecasted the

---

[3] Defendants also claim Plaintiff has not pled that Defendants possessed motive and opportunity. Ltr. at 4. However, the Complaint alleges that following its emergence from bankruptcy, "Peabody was motivated to massively ramp up coal production at its most profitable mines while cutting safety costs in order to boost the Company's bottom line." ¶57. Moreover, the law is clear that Plaintiff does not need to plead a motive to sufficiently allege scienter. *See Tellabs*, 551 U.S. at 325 ("absence of a motive [] is not fatal.").

[4] "While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442–43 (S.D.N.Y. 2005) (regional VP and corporate finance VP sufficient to impute scienter).

**Labaton Sucharow**

NGM's reopening, ¶173. [5] *See E\*Trade*, 712 F. Supp. 2d at 198 ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter."); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (scienter adequately pled where specific reports alleged "should have alerted them to the problems they later allegedly misrepresented."). The QMI reports cited in the Complaint corroborate the CWs' testimony. *Cf. Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (crediting corroboration of witnesses).

Defendants attack the CWs as "low-level" and "completely untethered to the Individual Defendants." Ltr. at 4. This is untrue and misrepresents the law on CWs. For example, CW-1 was one of two individuals "in charge of the financial projections," at Peabody's Australian headquarters, ¶185, and CW-4 stated that the North Goonyella Task Force, which included the Individual Defendants, and was created in September 2018, would meet multiple times per day, seven days a week, to discuss the ongoing events at the NGM, ¶¶163-65. Further, there simply is no requirement that a CW have direct contact with a defendant for its allegations to be credited. *Avon*, 2019 WL 6115349, at \*21 ("Applying the *Novak* standard is fatal to Defendants' argument. The notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law."); *Plumbers & Pipefitters Nat. Pension Fund. v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (same).

**Second**, that the NGM was core to Peabody's business is further support for a finding of scienter. *Lexmark*, 367 F. Supp. 3d at 37 (scienter is "buttressed" by the inference "that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue"); *Avon*, 2019 WL 6115349, at \*20 (crediting scienter where "it would be absurd to suggest that [] senior management was unaware of a widespread delinquency problem in the company's single largest market"). Here, the NGM was: (i) Peabody's single most profitable mine, responsible for 20% of its annual operating profit (¶¶36-37); (ii) described by Defendant Kellow as a "high margin mine" that is the "core of [Peabody's] met coal platform," and as a result, the mine's success was essential to driving the Company's overall success as it emerged from bankruptcy at the start of the Class Period. ¶37. Defendants argue that the core operations theory "typically applies only where the operation at issue constitutes nearly all of a company's business." Ltr. at 5, n.4. But this court has applied the theory where an "agreement was a 'significant source of income'— 18% of projected [] revenues" and thus, "critical to the long term viability" of the company. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013). Moreover, mine safety was crucial to Peabody's *entire* business. ¶365.

**Third**, Defendants spoke frequently of the NGM throughout the Class Period. ¶366. Given the multitude of statements concerning the NGM during the Class Period, as well as its importance

---

[5] Further, the North Goonyella's Union Lodge President, tasked with mine worker safety, told other mining union officials, in late September 2018, that only a "miraculous change in circumstance" would prevent critical mining equipment from being sealed in the mine, thus leading to a long-term interruption to coal production at the NGM. ¶179.

## Labaton Sucharow

to the Company's profit, it is unreasonable to think that the Individual Defendants, both of whom were responsible for tracking or reporting Peabody's revenue, would be unaware of the financial significance and performance of the NGM. *Massey*, 883 F. Supp. 2d at 620-21 ("frequent statements" regarding the mining company's "commitment to safety" and "accomplishments of their safety goals" support an inference that defendants knew of the safety violations). In addition, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval. ¶¶368-69.

**Fourth**, the timeline advanced by Plaintiff's longwall mining expert further supports a finding of scienter. Plaintiff does not rely on the expert to opine on "what was in [Defendants'] mind" (Ltr. at 5)—this is a red herring. Instead, Plaintiffs' expert provides detailed factual allegations regarding the feasibility of Peabody's reopening timeline from which scienter can be inferred, especially when viewed holistically with the Complaint's other scienter allegations. *See, e.g.*, *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th Cir. 2004) (expert analysis supported an inference of scienter).

**Fifth**, both before and after Peabody's acquisition of the NGM, the mine had a history of spontaneous combustion and heating events; thus, Defendants were on heightened awareness as to the safety risks posed by the NGM. ¶¶359-62.[6]

For the same reasons, Plaintiff has adequately pled that Defendants were reckless in not knowing that (1) the NGM lacked adequate safety controls, and (2) given the conditions of the mine post-fire, it would be a significant period of time (i.e., years) before the mine could be remediated, reopened, and coal production could resume. *Novak*, 216 F.3d at 308 (scienter may be established by showing recklessness in the form of "refusal to see the obvious."). As alleged, the truth concerning the Company's safety controls and a realistic timeline for when the NGM could be reopened was information that Defendants "had access to" and "suggest[ed] that their public statements were not accurate," which is sufficient to establish scienter. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

## IV.    PLAINTIFF HAS PLED ACTIONABLE CONTROL PERSON CLAIMS

The Complaint alleges that the Individual Defendants are control persons and participated in the drafting, preparation, and dissemination of the false and misleading statements. ¶¶372–82. Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim. Ltr. at 9. As explained herein, a primary claim is well pled.

## V.    LEAVE TO AMEND

In the event the Court grants Defendants' motion to dismiss, Plaintiff respectfully requests leave to amend the Complaint. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 313

---

[6] Adding to the scienter analysis, Defendant Kellow was terminated by Peabody on March 18, 2021. ¶25.

**Labaton Sucharow**

11

(S.D.N.Y. 2008) ("general policy that leave to amend should be granted liberally in cases alleging securities fraud").

## VI.    CONCLUSION

For the reasons stated above, Defendants' proposed motion to dismiss is futile. Should the Court wish, Plaintiff is available for a pre-motion conference.

Respectfully submitted,

/s/ *Christine M. Fox*

LABATON SUCHAROW LLP
Michael P. Canty
Christine M. Fox
Mark S. Willis (*pro hac vice* forthcoming)
Charles Farrell
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email: mcanty@labaton.com
          cfox@labaton.com
          mwillis@labaton.com
          cfarrell@labaton.com

*Counsel for Lead Plaintiff Oregon Public Employees Retirement Fund and the Proposed Class*