UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE PEABODY ENERGY CORPORATION
SECURITIES LITIGATION

No. 20-cv-08024 (PKC)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED AMENDED COMPLAINT**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants Peabody Energy
Corp., Glenn L. Kellow and Amy B. Schwetz*

June 7, 2021

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ...................................................................2

    A.    Peabody's North Goonyella Mine. ............................................3

    B.    September 2018 Fire at North Goonyella Mine...........................4

    C.    Post-Fire Remediation Efforts. ................................................5

    D.    Plaintiffs File Suit More Than Two Years After the Fire. ..........8

ARGUMENT .......................................................................................9

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(**b**)...............................................................................9

    A.    The Complaint Fails To Plead Facts Supporting a Strong Inference of Scienter. ...........................................................10

        1.    Legal Standard To Plead Scienter...................................10

        2.    The Complaint Fails To Plead Scienter For Each Defendant....................................................................10

        3.    Plaintiffs Do Not Attempt To Plead Motive and Opportunity.................................................................11

        4.    Plaintiffs Fail To Plead Scienter Through Recklessness. ..............12

        5.    There Is a More Plausible, Non-Fraudulent Explanation for Defendants' Conduct. ...............................................15

    B.    Plaintiffs Fail To Plead a Misstatement or Omission of Material Fact.............................................................................16

        1.    Legal Standard To Plead Actionable Falsity. ................16

        2.    The Complaint Fails To Plead Any Actionable Misstatement or Omission. .........................................17

            (a)    General Statements About Peabody's Commitment to Safety (Compl. ¶¶ 228-67; Stmts. 1-22). ......................17

i

(b)     Statements About the Evolving Combustion Event
in Late September 2018 (Compl. ¶¶ 269-81; Stmts.
23-30)..............................................................................20

(c)     Projections About Re-opening the Mine from Late
September 2018 to October 2019 (Compl. ¶¶ 282-
337; Stmts. 31-60)...........................................................22

II.    PLAINTIFFS' CONTROL PERSON CLAIMS UNDER § 20(a) MUST
FAIL..................................................................................................25

CONCLUSION...........................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**Statutes & Rules**

Defendants Peabody Energy Corporation ("Peabody" or the "Company"), Glenn L. Kellow and Amy B. Schwetz ("Individual Defendants," and together with Peabody, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint (ECF No. 38) (the "Complaint," cited herein as "(¶ __)") with prejudice pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

On September 1, 2018, the safety monitoring systems at Peabody's coal mine in Queensland, Australia, detected elevated gas levels—a known risk of longwall mining.  The mine evacuated workers and immediately began mitigation efforts in collaboration with the Queensland Mine Inspectorate ("QMI").  Despite their best efforts, conditions did not improve and a fire broke out in the mine.  No one was injured, and work then began to contain the fire and to remediate the damage it caused.

More than two years later, Plaintiffs filed this lawsuit, seeking to turn this unfortunate incident into a manufactured claim for securities fraud.  According to Plaintiffs, the Company and two of its senior executives (then-CEO Glenn Kellow and then-CFO Amy Schwetz) defrauded the investing public for more than two and a half years, starting when the Company emerged from bankruptcy on April 3, 2017—more than a year before the fire occurred—through October 28, 2019, when the Company announced that the mine would remain closed for an extended period.  Plaintiffs make these bald allegations even though there is no claim that any Defendant benefited from the fraud; even though the risks of elevated gas levels in a mine were disclosed before and throughout the putative class period; and even though Plaintiffs concede that the situation at the mine was "ever-changing" and "extremely difficult to [] predict."  (¶ 130.)  Through perfect hindsight, Plaintiffs now allege that Peabody's safety systems were knowingly deficient, that Defendants deliberately concealed the nature and extent

of the fire and that Defendants' subsequent projections about when the mine might reopen were misleading.  But, even taking the allegations as true, Plaintiffs fail to offer any cogent theory of fraud.  Rather, the Complaint describes extensive safety protocols that kept personnel safe, diligent executive management who were very involved in monitoring evolving efforts to contain the fire and up-to-date disclosures about re-opening efforts as they progressed.

On its face, the Complaint fails to meet the exacting standards required to plead scienter or falsity—each of which is independently fatal.  *First*, the Complaint fails to "state with particularity facts giving rise to a strong inference that any defendant acted" with scienter pursuant to Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15 U.S.C. § 78u–4(b)(2)(A).  Plaintiffs fail to plead any motive to commit fraud, instead relying on the Individual Defendants' positions in the Company, insufficient and contradictory allegations of mismanagement from nine Confidential Witnesses ("CWs"), and the hindsight opinion of an unidentified "mining expert" that is disconnected from the alleged misstatements.  (*See infra* Section II.A.)  *Second*, the Complaint fails to adequately plead a single materially false or misleading statement.  Rather, Plaintiffs attempt to premise liability on statements—some of which are time-barred—that were either not false at the time they were made, are non-actionable puffery, or are forward-looking and opinion statements provided in disclosures that included proper warnings about forward-looking statements.  (*See infra* Section II.B.)  *Finally*, because Plaintiffs have failed to show any primary violation of the securities laws, their claim for control person liability under Section 20(a) also fails.  (*See infra* Section III.)

## STATEMENT OF FACTS[1]

Peabody is a leading coal producer that owns and operates 17 active coal mines

---

[1] These facts are based on Plaintiffs' allegations, taken as true solely for purposes of this motion, and on documents the Complaint incorporates by reference, of which the Court may take judicial notice.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

and various other inactive mines in the United States and Australia through its subsidiaries and affiliates.  On April 13, 2016, "after a multi-year decline in coal prices," Peabody filed for bankruptcy and was delisted from the NYSE.  (¶ 55.)  A year later, Peabody emerged from bankruptcy and once again began trading on the NYSE.  *(¶¶ 56-58.)*

A.      Peabody's North Goonyella Mine.

One of Peabody's underground coal mines is the North Goonyella Mine ("NGM"), in Queensland, Australia.  *(¶ 3.)*  The process Peabody used to excavate coal from NGM is called "longwall mining," a technique whereby a long, continuous panel of coal is mined in its entirety from the coal face.  (¶¶ 42-46.)  As Peabody disclosed throughout the class period, "[r]isks inherent to mining," such as "fires and explosions from methane gas," were present at NGM—indeed, these risks are particularly present in longwall mining, which "often causes methane and other dangerous, flammable gases to be released underground."  (¶¶ 42, 48, 253.)  Accordingly, the Company warned investors that these risks "could materially and adversely affect [its] business, financial condition, prospects, operating results or cash flows." (Peabody, 2017 Annual Report 24 (Form 10-K) (Feb. 26, 2018) (cited at ¶ 253).)

Coal mining in Queensland is heavily regulated, including by the Coal Mining Safety and Health Act of 1999 and the Coal Mining Safety and Health Regulation of 2017.  The administering inspectorate for the relevant regulations during the Class Period was the QMI. (¶¶ 53-54.)  QMI's role is to "ensure that acceptable safety and health standards are established and practiced within the mining and quarrying industries."  (¶ 53.)  The regulations require mining companies to notify QMI inspectors of various steps and processes undertaken at a coal mine, and to obtain written approval from QMI before certain actions—like reentering a sealed mine—are taken.  *See, e.g.*, *Coal Mining Safety and Health Regulation*, *2017* (Qld.) § 330.

3

B.    September 2018 Fire at North Goonyella Mine.

On September 1, 2018, the gas monitoring systems at NGM detected elevated methane levels and high temperatures in a section of the mine.  (¶ 108.)  Mine management in Australia acted quickly to safely evacuate all underground mine personnel.  (*Id.*)  Throughout September 2018, Peabody and numerous safety and health experts closely monitored the mine's "evolving conditions," including holding "[d]aily meetings" with QMI inspectors on the ground at NGM.  (¶¶ 143, 149.)  The strategy involved a number of approaches from the surface designed "to force gas from the mine and rob it of the oxygen that might promote a fire." (¶ 143.)  Despite Peabody's best efforts—and, according to Plaintiffs, as a result of "significant errors" in "managing the spon[taneous] com[bustion] event" (¶ 150)—conditions "got dramatically worse," eventually leading to a fire inside the mine.  (¶¶ 154-61.)  In an effort to keep everyone safe, "the Company moved its control room away from the site" and "moved the majority of its workforce to the North Goonyella camp," an employee residence "15 kilometers away."  (¶¶ 155-56.)  "Conditions at the mine at this point were in serious flux—changing by the hour and day."  (¶ 156.)

Throughout this time, Plaintiffs allege that Individual Defendants Mr. Kellow (former CEO) and Ms. Schwetz (former CFO) were part of a "North Goonyella Task Force" that was "in daily contact" with "Peabody Australia" in Brisbane, and was holding "regular meetings" at "a war room at headquarters in St. Louis" to keep abreast of the ever-changing situation.  (¶ 162.)  The Company issued multiple public statements providing the information it had at the time about the evolving conditions at NGM, including a Form 8-K and press release on September 19, 2018, stating that there were "temporarily elevated gas levels" at the mine, which had delayed operations for two and a half weeks.  (¶¶ 176-78.)  As early as September 20, 2018, publications such as *The Australian Financial Review* "detailed that the problems at the

mine 'stretch[ed] beyond' just elevated gas readings" and criticized "mine management."

(¶ 181.)  According to Plaintiffs, by September 22 or 23, 2018, "it was obvious the Company had

a major fire on its hands."  (¶¶ 151-52, 277.)  Peabody released an updated statement on

September 25, 2018, noting that "gas levels . . . have been variable and remain elevated," and

that "[t]he company is working with the [QMI] and third-party experts" to resolve the situation.

(¶¶ 274-75.)  On September 27, 2018, Peabody reported that "[m]ine personnel have observed

smoke coming from the mine, indicating a likely fire in a portion of the mine."  (¶ 276.)  The

next day, Peabody confirmed there were "indications of a fire in a portion of the mine" and that

the Company "continue[d] to actively work in conjunction with the [QMI] and other third-party

experts toward a plan to extinguish the fire and contain the impacts."  (¶ 280.)

     C.    <u>Post-Fire Remediation Efforts.</u>

     Peabody immediately "developed a multi-tiered plan in an effort to extinguish the

fire and contain the impacts," and within days, initial steps had "yielded visible results."

(¶¶ 288-89.)  The Company explained that the timeline for the "next phases of stabilization,

assessment, mine planning, re-entry and recovery" "remain[ed] uncertain," and that it was "too

early to offer meaningful insights into the financial effects" of the fire, though it did "expect[]

financial impacts to future periods."  (¶ 291.)

     On October 30, 2018, Peabody reported its financial results for the third quarter of

2018 and informed investors that with the fire contained, the Company was "transitioning to the

assessment/planning phase," which involved "mapping," "monitoring" and "imaging"—"actions

[that] come before advanced planning for re-ventilation, mine re-entry and potential restart of

operations."  (¶ 295.)  Peabody emphasized that "multiple scenarios" were being evaluated, and

that "production would be targeted" for "the second half of 2019" if the Northern panel could be

accessed, or 2020 if the Southern panels were required.  (*Id.*)  Pursuant to Section 330 of the

Coal Mining Safety and Health Regulation, 2017, reentry into a mine that has been sealed requires the written consent of a QMI inspector, and Mr. Kellow noted that "[a]ll phases involve review" by QMI.  (*Id.*)  Peabody reported the financial impact of its containment efforts and a charge for equipment lost to the fire.  (*Id.*)  Mr. Kellow clarified that, "based on what we know today," an "*entire loss* of North Goonyella" was "at best premature and at worst unwarranted." (¶ 296 (emphasis added).)

On February 6, 2019, Peabody reported its financial results for the fourth quarter of 2018.  The Company reported that it was executing a "stage-gate" approach at NGM, meaning it would "periodically re-evaluate progress."  (¶¶ 303-04.)  At the earnings call, Mr. Kellow noted the Company had previously identified two possible scenarios to resume coal production, but was "now progressing with a single base case that targets" production in late 2019 or 2020, and warned "there's still much work ahead of us."  (¶¶ 305-06.)  These targets were expressed as a "base case" because the Company had not yet re-entered the mine, but was assessing damage from the surface.  (¶ 306.)  Indeed, when an analyst asked, "you speak of the plan as being the base case. . . . If you get down there and you're pleasantly surprised, are there other cases which could perhaps get your mining earlier," Mr. Kellow responded to that hypothetical question by noting that "there may be some ability, but it's really too early to call that.  And we'll certainly be updating as we move through the project."  (¶ 308; 2/6/2019 Earnings Call Tr. at 13, Ex. AA.) This was because, as Plaintiffs acknowledge, surface-monitoring methods could not provide "Peabody with enough data to ascertain damage to all areas of the mine," preventing the Company from projecting re-entry with any level of certainty.  (¶ 312(c).)

On March 27, 2019, Peabody released its "initial learnings" about the fire to "reduce the risk of such an event reoccurring at North Goonyella or any of our other mines in the

future," and to "strengthen the body of knowledge around underground mine ventilation and fire prevention."  (¶ 11(a); 3/27/2019 Press Release at 1-2, Ex. GG.)

On May 1, 2019, Peabody reported its financial results for the first quarter of 2019.  Ms. Schwetz reported that Peabody had successfully "segment[ed] the mine into multiple zones" and had completed "all physical activities *in advance of reventilating the first segment*." (¶ 321 (emphasis added).)  Mr. Kellow reiterated that, in light of the completion of these activities, "everything is ready to flick the switch and to be able *to reventilate*.  And that will enable us then to monitor and then reenter the mine and have a better assessment."  (¶ 319 (emphasis added).)  The Company also reported that it was "complying with a directive concerning documentation from the [QMI] . . . which has resulted in a multi-week delay to the initial project plan."  (¶ 316.)  Ms. Schwetz stated that "should our reventilation and reentry plan now progress as originally contemplated," Peabody expected coal production from NGM in 2020, but also that "[i]f further delays occur, we will evaluate our plans, including longwall production target[s]."  (¶ 321.)

Soon after, on May 24, 2019, the Company was indeed able to "flick the switch . . . to reventilate" the first segment of the mine ("Zone 1"), and on July 3, 2019, it was able to re-enter Zone 1 of the now segmented mine for the first time since the fire.  (¶¶ 319, 327-38.)

On July 31, 2019, Peabody reported its financial results for the second quarter of 2019.  The Company explained that, "[f]ollowing the recent reventilation and initial re-entry of the first zone of North Goonyella, additional information about the regulatory process and physical conditions is continuing to emerge," causing the Company to "assess[] prospective paths [and] timetables."  (¶ 332; 7/31/2019 Press Release at 6.)  Because  of the impact of "this new information" and its "likely influence [on] future progress," Peabody decided to suspend

North Goonyella guidance completely and undertake a "review [of] the project."  (¶ 335.)

Mr. Kellow informed investors that Peabody expected to "complete the evaluation within the

next 3 months" and would at that time "resume targets . . . around production, timetables and

costs when the preferred path is chosen."  (*Id.*)[2]

Three months later, on October 29, 2019, Peabody reported its financial results

for the third quarter of 2019 and informed investors that "[a]fter a detailed review and

assessment" of the mine post-entry, it had decided not to attempt to access the 10 North Panel

due to the "time, cost and required regulatory approach," but would "create value from the

substantial North Goonyella reserve base by mining the southern panels."  (¶ 342.)  Based on this

approach, Peabody noted that it "expects no meaningful North Goonyella volumes for three or

more years."  (*Id.*)  Mr. Kellow stated Peabody was "frustrated along with everyone by the

protracted timing," and emphasized that "the highly restrictive approach from QMI has required

a greatly disciplined approach from Peabody."  (¶ 345; 10/29/2019 Earnings Call Tr. at 4, 8.)

Mr. Kellow stated that the Company's new approach was "likely to give us a greater chance of

success in gaining approval of QMI."  (¶ 346.)  Today, the Company continues to work through

this approach.  Coal production at NGM has not yet restarted.

> D.     Plaintiffs File Suit More Than Two Years After the Fire.

On September 28, 2020—the two-year anniversary of Peabody's announcement

of the fire—Plaintiffs filed their initial complaint.  The Court subsequently appointed Lead

Plaintiff Oregon Public Employees Retirement Fund to bring this putative class action on behalf

of all persons who purchased or otherwise acquired Peabody stock between April 3, 2017, and

---

[2] On August 9, 2019, QMI released its initial findings about the incident.  (¶¶ 220-24; QMI Report, Ex. II.)
Plaintiffs misrepresent the QMI findings by stating they indicate "that the Company and its employees were not
cooperating with its investigation."  (¶ 11(b).)  The report says no such thing.  Rather, QMI noted that "persons of
interest have exercised their right under the Coal Mining Safety and Health Act 1999 not to be interviewed by the
inspectorate," which is simply a procedural option under Queensland law.  (QMI Report, Ex. II.)

October 28, 2019 (the "Class Period"), asserting claims for violations of Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934.  Plaintiffs allege that Defendants' public statements

artificially inflated Peabody's stock price as of April 3, 2017—the day that Peabody emerged

from bankruptcy—by failing to disclose that "adverse facts pertaining to the safety practices" at

NGM.  (¶ 8.)  Plaintiffs allege that the "truth" was partially revealed on September 28, 2018,

when the Company announced it was experiencing an ongoing fire at the mine.  (¶ 9.)  Plaintiffs

further allege that, following the fire, Defendants mislead investors about plans to reopen NGM

by "assuring investors that the Company would be able to mine significant coal at the mine in the

near-term" and failing to disclose issues that would delay re-opening the mine.  (¶¶ 12-13.)

Plaintiffs allege the "truth" was fully revealed on October 29, 2019, when Peabody announced

that it did not expect coal production from NGM "for three or more years."  (¶ 17.)

## ARGUMENT[3]

## I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b).

On a motion to dismiss under Rule 12(b)(6), the Court must accept well-pleaded

allegations as true, but "it does not credit 'mere conclusory statements'."  *Glaser v. The9, Ltd.*,

772 F. Supp. 2d 573, 585 (S.D.N.Y. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A "complaint must allege enough facts to state a claim to relief that is plausible on its face."  *Id.*

(citation omitted).  A "complaint alleging securities fraud must satisfy Rule 9(b) . . . , which

requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'"  *ATSI*

*Commc'ns*, 493 F.3d at 99 (citation omitted) (quoting Fed. R. Civ. P. 9(b)).  The complaint must

be dismissed if the allegations "permit no reasonable inference stronger than the 'mere

---

[3] For the Court's convenience, we set forth in Exhibit A to the DeMasi Declaration a chart showing the full text for each of the 58 statements that the Complaint alleges to be false or misleading.  References to "Stmt." numbers herein correspond to the list in Exhibit A.  The full, original public statements, of which the Court may take judicial notice, *see ATSI Commc'ns*, 493 F.3d at 98, are attached as DeMasi Decl. Exs. B through FF, and are cross-referenced in Exhibit A.

possibility of misconduct.'" *Glaser*, 772 F. Supp. 2d at 585 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

To state a claim under Section 10(b), Plaintiffs must sufficiently allege (1) a misstatement or omission of material fact; (2) that each defendant acted with the requisite state of mind, *i.e.*, scienter; (3) that investors relied on the misrepresentation in connection with the purchase or sale of securities; (4) that their losses were caused by the material misstatements or omissions; and (5) economic loss, *i.e.*, damages. *See id.* at 585. Here, the Complaint fails for *at least* two reasons: failure to adequately plead scienter and falsity.

A.    <u>The Complaint Fails To Plead Facts Supporting a Strong Inference of Scienter.</u>

   *1.*    *Legal Standard To Plead Scienter.*

To plead scienter under Section 10(b), Plaintiffs must "plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference [of scienter]. . . . A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *see also* 15 U.S.C. § 78u–4(b)(2)(A); Fed. R. Civ. P. 9(b). A strong inference of scienter "can be pleaded with adequate particularity through allegations showing either '(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388 (2d Cir. 2021) (citation omitted). However, "[r]ecklessness in the security fraud context is more than just a 'heightened form of negligence,' [it] must approximate 'actual intent.'" *Id.* (citation omitted).

   *2.*    *The Complaint Fails To Plead Scienter For Each Defendant.*

"In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant." *In re Banco Bradesco S.A. Sec. Litig.*,

277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017) (citation omitted).  The Complaint is devoid of any

individualized scienter allegations, instead pleading that as CEO and CFO, Mr. Kellow's and

Ms. Schwetz's "positions with the Company and their access to material non-public information"

is proof of fraudulent intent.  (¶¶ 28, 353-57.)  But "[c]ourts in this Circuit have long held that

accusations founded on nothing more than a defendant's corporate position are entitled to no

weight."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of

Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).  Nothing in the Complaint about

Mr. Kellow (whom Plaintiffs plead worked "seven days per week" with "a sense of urgency" to

address the issues at NGM) or Ms. Schwetz (whom Plaintiffs claim was a "substantial participant

in the fraud" even though her three alleged misstatements are limited to a single earnings call

almost eight months *after* the fire and two years after the start of the class period) raises any—

much less a strong—inference of scienter.[4]  (¶¶ 26, 165-70, 321-22.)  That alone is reason to

dismiss the Individual Defendants.  *See In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000

WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (where Plaintiffs fail to "raise a strong inference

of fraudulent intent on the part of" certain individual defendants, "the Complaint must be

dismissed as to them").

### 3. Plaintiffs Do Not Attempt To Plead Motive and Opportunity.

The Complaint fails to plead scienter through "motive and opportunity to commit

fraud," which requires Plaintiffs to "'allege that defendants benefitted in some concrete and

personal way from the purported fraud,' such as by profiting from insider sales at artificially

---

[4] Nor does Mr. Kellow's departure from Peabody in May 2021 "[a]dd[] to the scienter analysis." (Dkt. No. 40 at 10 n.6.)  Not a single allegation connects his departure—which occurred almost three years after the fire and almost two years after the close of the putative class period—to the events at NGM; rather, public documents show that his departure was part of regular succession planning, and that Mr. Kellow will continue to provide consulting services to the Company for a year following the transition.  (*See* Peabody, Form 8-K (Mar. 18, 2021).)  Absent facts linking the departure to the alleged fraud, "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter."  *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020).  Notably, Plaintiffs make no such allegation about Ms. Schwetz's departure in 2020.  (¶ 26.)

inflated prices." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 380 (S.D.N.Y. 2004)

(quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  Plaintiffs plead no motive for

Mr. Kellow or Ms. Schwetz to lie, nor any personal benefit that either allegedly received.  The

sole motive alleged is that all Defendants together were motivated to "boost the Company's

bottom line" by increasing coal production and cutting safety costs.  (¶ 57.)  But the "desire to

maintain the fact or appearance of corporate profitability" is insufficient absent allegations of

"concrete benefits distinct from general profitability."  *In re Citigroup*, 330 F. Supp. 2d at 380.

> 4. *Plaintiffs Fail To Plead Scienter Through Recklessness.*

Because no Defendant had any motive to defraud investors, Plaintiffs seek to

prove scienter through "strong circumstantial evidence of conscious misbehavior or

recklessness." *In re Gen. Elec.*, 844 F. App'x at 388 (citation omitted).  To do so, Plaintiffs must

plead particularized facts showing *each Defendant* "knew facts or had access to non-public

information contradicting their public statements" and "understood that their public statements

were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re

Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534, 544 (S.D.N.Y. 2015) (citations omitted), *aff'd sub

nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  To attempt to meet this burden, Plaintiffs

cite three sources of allegedly contrary information:  purported statements from nine CWs that

NGM was mismanaged (¶¶ 59-214); reports prepared by QMI that Plaintiffs claim "corroborate"

the CWs' statements (¶¶ 143-50); and an unidentified mining expert who has apparently

concluded—with the benefit of hindsight—that Peabody's re-opening plans for NGM were

unrealistic (¶¶ 287, 298-99, 324).  None of these sources can establish scienter.

As an initial matter, these purported facts do not contradict Defendants' public

statements, but rather merely provide additional technical details about the mine's operations or

complaints about management on the ground.  But "an inference of scienter does not follow from

the mere fact of non-disclosure of relevant information" absent "sufficient factual allegations" that Defendants knew or were reckless in failing to know that their public statements were inaccurate. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016) (citation omitted). Plaintiffs completely fail to connect these allegations of mismanagement to the public statements. Plaintiffs allege that Defendants "should have" or "likely" received, or "had access to" information "reflecting the true facts regarding Peabody," either "by virtue of their receipt or access to information" or because "their positions with the Company [] made them privy to confidential information." (¶¶ 10, 167-68, 353-57.) And Plaintiffs vaguely argue that the "fraudulent scheme . . . could not have been perpetrated . . . without the knowledge and complicity, or at least, the reckless disregard, of Peabody personnel at the highest levels of the Company." (¶ 354.) But conclusory allegations such as these are not substitutes for *facts*. "Scienter cannot be inferred solely from the fact that, due to the defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any adverse information." *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012) (dismissing Complaint alleging defendant must have been aware of safety issues due to "high-level corporate position"). Instead, the Complaint "must specifically identify the reports or statements containing this information" and "establish 'what the [d]efendants knew and when they knew it.'" *Id.* (citations omitted). Plaintiffs' Complaint does neither.

Plaintiffs ask the Court to infer scienter by virtue of (1) Defendants' participation in daily "Task Force" meetings, without identifying the allegedly contradictory information presented at such meetings; (2) Defendants' "daily contact" with mine personnel, without pleading facts that show mine personnel informed Defendants of any contradictory facts; (3) the fact that Defendants "should have received every piece of paper generated by the QMI," without

13

pleading that Defendants did in fact review technical reports from QMI or that these "papers" alerted Defendants to contradictory facts; and (4) the existence of "models" and "projections" for reopening the mine that were "heavily scrutinized," without even alleging that those models contradicted public statements.[5]  Allegations that a defendant "merely ought to have known [are] not sufficient to allege recklessness." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  And Plaintiffs, of course, cannot meet their burden by relying on the opinion of an unnamed mining expert who reviewed the facts in hindsight.  (Compl. at 1.)  The expert purports to opine about when Peabody was "likely" to "get miners back underground"; the "likely" time to acquire new equipment; and the duration of construction work that the expert believed would allow Peabody to mine the South panel (¶¶ 298-99)—but the expert does not (and, as a non-percipient witness, cannot) supply contradictory, contemporaneous facts *known by Defendants.  See Tung v. Bristol-Myers Squibb Co.*, No. 1:18-CV-01611, 2020 WL 5849220, at *5 (S.D.N.Y. Sept. 30, 2020) (expert's opinion that contradicted defendant's statements was insufficient to plead scienter where expert provided no facts showing knowledge by defendants).

      Plaintiffs offer three categories of purported "additional evidence of scienter," none of which is sufficient to save the Complaint.  *First*, Plaintiffs' allegation that Defendants acted with scienter because they had "heightened awareness as to the safety risks" at NGM (¶¶ 359-62) amounts to an allegation that Defendants committed fraud because they were aware of the risks inherent to longwall mining.  This allegation fails for the same reason described

---

[5] Notably, CW-1, a purported Manager of Financial Modeling, alleges that initial estimates to reopen the mine were "12-15 months," which aligns with Defendants' statements that a "base case" contemplated production in late 2019 or 2020.  (¶¶ 186, 305.)  In any event, the CWs allege that "as time went on, forecasting's reliability decreased and their risk for inaccuracy increased," that Peabody was re-forecasting every 1-2 weeks, and that "there was an effort . . . to address the problems related to forecasting."  (¶¶ 173, 188, 189, 192, 196.)  These allegations undermine any inference of scienter because they make clear that the timeline to reopen the fire was in flux and uncertain.

above:  the Complaint lacks a single *fact* sufficient to show that any Defendant actually received information contradicting a public statement.  *Second*, the "critical importance" of NGM "to Peabody's overall business and operating profit" (¶ 369) does not support scienter.  To the extent Plaintiffs attempt to invoke the "core operations" doctrine, this doctrine "at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citation omitted) (noting that "several courts in this Circuit have expressed doubts as to the doctrine's continuing import after the enactment of the PSLRA").  And the doctrine typically applies "only where the operation at issue constitute[s] nearly all of a company's business," *id.* (citation omitted), not the 20% of Peabody's operating profit that Plaintiffs allege.  (¶¶ 364-65.)  *Third*, the CWs' purported knowledge does not save Plaintiffs' Complaint.  Taking the CWs' allegations as true, the Complaint at most pleads that certain employees knew of problems with NGM's safety procedures; recognized errors in the strategy to control the fire; and believed that projections for reopening were too ambitious.  (¶¶ 74-92, 94-142, 159-75, 183-96.)  As the Second Circuit recently explained, these allegations are insufficient to plead corporate scienter because they "provide[] no connective tissue between those employees and the alleged misstatements," leaving the Court to "guess what role those employees played in crafting or reviewing the challenged statements and whether it would otherwise be fair to charge the Corporate Defendants with their knowledge."  *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).

> 5.  *There Is a More Plausible, Non-Fraudulent Explanation for Defendants' Conduct.*

The Complaint also fails for the fundamental reason that Plaintiffs have offered no cogent theory of fraud.  Under *Tellabs* and its progeny, "a court must consider plausible, nonculpable explanations for the defendants' conduct" in addition to drawing inferences favoring

the plaintiff in a Rule 12(b)(6) motion to dismiss; the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 198 (quoting *Tellabs*, 551 U.S. at 314). Here, the Complaint fails that basic test, and is replete with examples of Defendants' good faith efforts to manage a difficult and evolving situation.[6] Even assuming as true (as we are obligated to do on this motion) Plaintiffs' allegation that errors were made at NGM and that the Company made mistakes in projecting a timeline to reopen the mine, the "plausible opposing inference one could draw from the facts alleged" is much more compelling, *Tellabs*, 551 U.S. at 310—namely that a disclosed risk (fires and explosions from methane gas or coal dust) materialized and, despite their around-the-clock efforts, Peabody and its management were unable to prevent the fire and unable to reopen the mine on the timeline initially projected, all the while "doing everything in their power to get North Goonyella up and running" and providing disclosure of the most up-to-date information along the way. (¶ 173.) Nothing Plaintiffs plead is inconsistent with that more plausible, competing inference. *Cf. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (even a more plausible "inference of negligence" requires dismissal for failure to plead scienter).

      B.    <u>Plaintiffs Fail To Plead a Misstatement or Omission of Material Fact.</u>

         *1.*    *Legal Standard To Plead Actionable Falsity.*

        The Complaint also fails for the independent reason that the alleged misstatements and omissions are not actionably false. "Under Rule 9(b) and the PSLRA, a plaintiff must identify with particularity the statement or statements alleged to be false or

---

[6] For example, the CWs explain that "Peabody corporate set up a war room at headquarters in St. Louis"; created a "Task Force" which "met multiple times a day, seven days per week" after the fire; and that "there was a sense of urgency among North Goonyella Task Force members," with Mr. Kellow "demand[ing] 2:00 AM CT meetings with Peabody's C-Suite executives when there was news about" NGM. (¶¶ 162, 165-66.) The CWs further explain that the "ever-changing conditions of the mine after the fire broke out[] made it extremely difficult to make predictions" and that "a regular flow of new information . . . altered timelines." (¶¶ 10, 130.)

misleading and the reason or reasons why that is so." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*,

No. 17-cv-2169, 2019 WL 1368787, at *6 (S.D.N.Y. Mar. 26, 2019) (citing *Novak*, 216 F.3d at

306). Importantly, a statement is only actionable if it "was false *at the time it was made*. A

statement believed to be true when made, but later shown to be false, is insufficient. In such a

circumstance, there is a lack of actionable falsity." *In re Lululemon*, 14 F. Supp. 3d at 571

(citation omitted). Alleged omissions may be actionable when "disclosure is necessary to avoid

rendering existing statements misleading by failing to disclose material facts." *Menaldi v. Och-*

*Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016). But this does not

"automatically render statements of fact on a certain topic misleading due to the omission of

another fact concerning the same topic." *In re Tempur Sealy*, 2019 WL 1368787, at *12.

> 2. *The Complaint Fails To Plead Any Actionable Misstatement or Omission.*

Plaintiffs allege three categories of misstatements: (1) general statements

regarding Peabody's commitment to safety made between April 2017 and September 2018,

which are time-barred and inactionable puffery (¶¶ 228-67; Stmts. 1-22); (2) statements about

the evolving combustion event at NGM made in late September 2018, which were not false when

made (¶¶ 268-81; Stmts. 23-30); and (3) statements regarding the Company's projections for the

mine's reopening made between late September 2018 and October 2019, which are inactionable

forward-looking and opinion statements (¶¶ 282-337; Stmts. 31-60).

> (a) General Statements About Peabody's Commitment to Safety
> (Compl. ¶¶ 228-67; Stmts. 1-22).

General statements about Peabody's commitment to safety made prior to

September 28, 2018, are inactionable for two reasons: (1) they are time-barred as a matter of

law, and (2) they are inactionable puffery.

*First*, claims under Section 10(b) must be brought within two years of "when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation.'" *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010).  Plaintiffs filed their lawsuit on September 28, 2020, two years *to the day* after Peabody confirmed a fire was occurring at NGM.  While Plaintiffs assert that it was the September 28, 2018, statement that revealed the earlier safety-related statements to be false (¶¶ 286, 386), Plaintiffs' own allegations demonstrate that a reasonably diligent plaintiff would have discovered the possibility of their claims even earlier.  Indeed, Plaintiffs allege it was publicly known that "higher gas levels" and "elevated temperatures" at NGM prompted an evacuation (Sept. 19, 2018); that "problems at the mine . . . 'stretch[ed] beyond' just elevated gas readings" (Sept. 20, 2018); that "black smoke billowed out of the mine" (Sept. 22, 2018); that it was "obvious" that the mine was on fire (Sept. 23, 2018); and that smoke "indicate[ed] a likely fire in a portion of the mine" (Sept. 27, 2018).  (¶¶ 152, 181, 270, 275-77.)  To the extent the fire on September 28, 2018, revealed Peabody's prior safety statements to be false, so too would the substantial information disclosed more than two years before Plaintiffs filed their Complaint.  This is particularly obvious with respect to the September 27, 2018, disclosure of smoke and a "likely fire", which Plaintiffs are careful to omit from their allegations since any purported safety issues were revealed at the latest by that date.  The alleged safety-related misstatements made prior to September 28, 2018, are time-barred.

*Second*, even if timely, the pre-fire safety statements are classic examples of inactionable "puffery," defined as "general statements about reputation, integrity, and compliance with ethical norms" which are "too general to cause a reasonable investor to rely upon them."[7]  *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *21 (S.D.N.Y. Mar. 23, 2017) (citation omitted).  For example, Plaintiffs accuse Mr. Kellow of committing

---

[7] *See* Stmts. 1-8, 11-19, 21.

securities fraud when he stated at an earnings call:  "I would, in closing, like to extend my appreciation to our employees around the world for their ongoing commitment to ensuring safe, productive operations and continued delivery of value" (¶ 234; Stmt. 4); or that, "[a]s always, we begin with a focus on safe productive operations and return maximization" (¶ 249; Stmt. 8). Courts have had "little trouble concluding" that such statements from mining companies are "'precisely the type of puffery' that the Second Circuit has 'consistently held to be inactionable.'"  *In re Vale*, 2017 WL 1102666, at *22 (citation omitted); *see also In re Anadarko Petroleum Corp. Class Action Litig*., 957 F. Supp. 2d 806, 821 (S.D. Tex. 2013) ("[G]eneralized statements about BP's 'commitment to safety,'" and "'safety as the number one priority,'" were inactionable puffery); *Foley*, 861 F. Supp. 2d at 204 n.7.

The Complaint also alleges certain statements of historical fact regarding Peabody's safety record are fraudulent.[8]  For example, Plaintiffs allege Mr. Kellow's statement that Peabody's "global safety performance continues to surpass industry averages.  While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  As always, we are ever vigilant on our journey of continuous improvement in safety" mislead investors regarding the true state of safety controls at NGM.  (¶ 249; Stmt. 7.)  But Peabody's safety performance had indeed surpassed industry averages,[9] and Mr. Kellow explained that was the case even while the "incidence rate edged up overall."  (*Id.*) Without facts showing these statements were false when they were made—which do not exist and are not pleaded—such "disclosure of accurate historical data . . . regarding the improvement in miner safety . . . cannot sustain a claim for violation of federal securities law."  *In re Sibanye*

---

[8] *See* Stmts. 1-2, 7, 9-10, 13-14, 17, 20, 22.
[9] *See* Peabody, 2017 Annual Report 2 (Form 10-K) (Feb. 26, 2018) (noting 2017 "global safety incidence rate of 1.38 incidents per 200,000 hours worked"); *compare with* Mine Safety and Health Administration 2017 Incident Rates, https://arlweb.msha.gov/STATS/PART50/WQ/2017/table1.pdf (coal mining incident rate of 3.499 in 2017).

*Gold Ltd. Sec. Litig.*, No. 18-cv-3721, 2020 WL 6582326, at *15 (E.D.N.Y. Nov. 10, 2020).

Finally, Plaintiffs allege a September 4, 2018, statement made in an analyst report regarding Peabody's "strong Australian platform" was misleading (¶ 266; Stmt. 22), but fail to "identify the speakers and [instead] attribute[] the comments only to 'management,'" rendering this statement inactionable. *Hou Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371, 2020 WL 1489831, at *6 (S.D.N.Y. Mar. 26, 2020).

(b)      Statements About the Evolving Combustion Event in Late
         September 2018 (Compl. ¶¶ 269-81; Stmts. 23-30).

Plaintiffs next allege that a handful of statements in late September about the status of the heightened gas levels at NGM and subsequent fire were false or misleading.  From September 19 to September 28, 2018, Peabody made several disclosures to update the public on the evolving situation at NGM, acknowledging that elevated gas levels had caused an evacuation of the mine (Sept. 19, 2018); then that "[m]ine personnel ha[d] observed smoke coming from the mine, indicating a likely fire in a portion of the mine" (Sept. 27, 2018); and finally that there were indeed "indications of a fire in a portion of the mine" (Sept. 28, 2018).  (¶¶ 273, 276, 280; Stmts. 23-30.)  Based on pure hindsight, Plaintiffs now allege that these statements (other than September 27, which Plaintiffs ignore) "downplayed the severity" of the situation and omitted more granular information, without ever pleading Defendants actually knew that information when they made the statements.  (¶ 171.)  These statements are likewise inactionable.

The Complaint offers no well-pleaded allegations that Defendants' statements were false when made, and "without contemporaneous falsity, there can be no fraud."  *In re Lululemon*, 14 F. Supp. 3d at 571.  The Company provided ongoing updates based on the information it had at the time, which Plaintiffs concede was "changing by the hour and day." (¶ 156.)  Plaintiffs allege Defendants omitted technical details from their updates, but the

securities laws "do[] not mandate disclosure of all facts that 'would be interesting' in light of and in relation to a disclosed fact."  *In re Tempur Sealy Int'l*, 2019 WL 1368787, at 12.  And even assuming Defendants were aware of such details, their statements are not "automatically render[ed] . . . misleading due to the omission of another fact concerning the same topic."  *Id.*

Critically, Plaintiffs fail to identify any concrete information in Defendants' possession at the time the disclosures were made that contradicted the Company's public statements.[10]  Rather, these allegations—taken in the light most favorable to Plaintiffs—at most suggest that after the discovery of excess gas at NGM, containment efforts were mismanaged. (*See, e.g.*, ¶¶ 122, 133, 137-38 (CWs "instructed Peabody to select a more appropriate" Trigger Action Response Plan, questioned the "decision to inject methane into the mine" and were "frustrated" by the "drilling locations" of boreholes).)  "This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud. This is not the law."  *In re Lululemon*, 14 F. Supp. 3d at 562 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-79 (1977) (allegations of deficient quality controls and testing were not actionable under the securities laws); *see also Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006) ("[C]ourts repeatedly have found that allegations constituting nothing more than . . . nondisclosures of mismanagement, cannot support claims under § 10(b) of the Exchange Act." (citation omitted)), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

Finally, Plaintiffs allege that "smoke billowed out of the mine on September 22, 2018," relying solely on a purported employee cellphone photo of smoke and a Mine Record Entry ("MRE") that does not even mention smoke or fire.  (¶ 152.)  To be clear, the September 27, 2018, MRE, which Plaintiffs intentionally omit, *does* report the appearance of smoke for the

---

[10] Indeed, far from contradicting the Company, the CWs' allegations actually contradict themselves.  For example, some CWs allege that Peabody "faced serious staffing issues and a lack of experienced personnel," while others claim NGM had "considerably older and longer-tenured staff than [] other mines."  (¶¶ 59, 89(b).)

first time—the *very same day* that Defendants disclosed they had "observed smoke coming from the mine indicating a likely fire."  (¶¶ 151-52, 276; 9/22-23/2018 and 9/27/2018 MREs, Ex. HH.) (inspector "attended North Goonyella Coal Mine on the 27 September 2018 at 1800hrs due to a report of thick black smoke emitting from the main fan shaft").)  Plaintiffs fail to show any of these statements were false or misleading at the time they were made.

(c)    Projections About Re-opening the Mine from Late September 2018 to October 2019 (Compl. ¶¶ 282-337; Stmts. 31-60).

Peabody's post-fire statements about the ongoing work to segment, re-ventilate and re-enter the mine, as well as various possible scenarios for the future production and sale of coal from NGM, are likewise not actionable because the statements (1) were not false or misleading when made, (2) are forward-looking statements and/or (3) are statements of opinion.

*First*, statements that describe completed steps in the Company's efforts to reopen the mine are not actionable because they are accurate reports of a historical fact.[11]  For example, Peabody's statements that it had sealed "three of the mine's five openings" (¶ 290; Stmt. 36), that it had "completed segmenting of the mine" (¶ 321; Stmt. 52) and that it had undertaken "reventilation and re-entry of the mine" (¶ 334; Stmt. 57) were based on objective, verifiable facts existing at the time.  These statements are not rendered false or misleading by events that transpired after these statements were made.  *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371-72 (S.D.N.Y. 2018) (statements that company had completed "a series of remedial works" were not false or misleading despite later spills of cyanide solution).  Moreover, the *opinions* offered by Plaintiffs' purported anonymous mining expert (*see, e.g.*, ¶ 298) have no bearing on whether Peabody's statements about the status of its remediation efforts were *false when made*, and are an impermissible attempt to "proceed with allegations of 'fraud by

---

[11] *See* Stmts. 31-38, 40, 47, 51-52, 56-57.

hindsight.'" *Novak*, 216 F.3d at 309.

        *Second*, Peabody's statements about its plans to reopen the mine and anticipated future coal production "project[] results in the future" and are therefore protected under the PSLRA's safe harbor for forward-looking statements. *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010); 15 U.S.C. § 78u–5(c)(1).[12]  Peabody's statements that it "intends to take all steps" to resume activities at the mine (¶ 295; Stmt. 39), has "targeted" production volumes for a future date (¶ 295; Stmt. 41) and "expect[s] to produce approximately 2 million tons from North Goonyella in 2020" (¶ 317; Stmt. 49) are "projections . . . falling with the statutory definition of 'forward-looking statement.'"  *In re Barrick Gold*, 341 F. Supp. 3d at 375 (dismissing allegations based on statements about Barrick's gold production guidance); *see also In re Nokia Corp. Sec. Litig.*, No. 19-cv-3509, 2021 WL 1199030, at *18–20 (S.D.N.Y. Mar. 29, 2021) (statements regarding anticipated timing of 5G rollout were "plainly forward-looking").

        A "defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at 766 (noting the safe harbor is "written in the disjunctive").  As an initial matter, the "safe harbor applies because [P]laintiffs' failure to plead scienter demonstrates that [P]laintiffs have not alleged that [D]efendants knew their statement was false or misleading."  *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 n.93 (S.D.N.Y. 2006) (citation omitted).  Furthermore, these statements were surrounded by both warnings regarding the uncertainty of forward-looking statements,[13] and more particularized cautionary language—for example, that it was "too early to

---

[12] *See* Stmts. 25-26, 28, 31, 36-37, 39-41, 43-46, 48-50, 53-55, 58-60.  Note that Stmts. 25, 26 and 28 are statements from the pre-fire period regarding metallurgical coal sales volume targets.

[13] *See, e.g.*, 5/1/2019 Press Release at 17-18, Ex. BB (¶¶ 315-17) ("This press release contains forward-looking statements within the meaning of the securities laws" which "provide management's current expectations or

offer meaningful insights into the financial effects [of the fire] or timing of next steps" (¶ 291; Stmt. 37); that it was "too early to call" when coal production could resume at NGM (¶ 308; Stmt. 48); and that the reentry process "involve[d] review and collaboration with the [QMI]" and "assessments at each stage" (¶¶ 295, 307; Stmts. 40, 47).  *See, e.g.*, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380-81 (S.D.N.Y. 2007) (forward-looking statements regarding product release timeline that was "contingent on other factors" were inactionable).  Plaintiffs fail to plead an actionable claim for any of the forward-looking statements that they challenge.

*Third*, these statements are also inactionable statements of opinion.[14]  *See Lefkowitz v. Synacor, Inc.*, No. 18-cv-2979, 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) (statements that "express expectations about the future" like "we still expect . . . growth" and "[we are] on the right track" are opinion statements (citations omitted)), *aff'd sub nom. Shreiber v. Synacor, Inc.*, 832 F. App'x 54 (2d Cir. 2020).  For example, Peabody told investors that it was "anticipating a strong second half of 2019 that will contribute more than half of our full year adjusted EBITDA" (¶ 322; Stmt. 54); and with respect to NGM that it had "now identified a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020" (¶ 305; Stmt. 44); and that "[p]aths we are pursuing include[] determining the base case to access the 10 North panel . . . [b]ut we are also evaluating an alternative route" (¶ 335; Stmt. 59).  Statements about Peabody's prospective "paths" and "base case" are by definition forward-looking and opinion statements; a "base case" is a possible expected scenario in the future, and no reasonable investor could consider the "base case" to be a presently existing, objective fact.

---

predictions of future conditions, events or results" and "speak only as of the date they are made and reflect the company's good faith beliefs, assumptions and expectations, but they are not guarantees of future performance or events")

[14] *See* Stmts. 32, 34, 37, 41-42, 44-46, 48-51, 53-60.

Statements of opinion are only actionable if "(1) the speaker did not hold the belief she professed, (2) [] the supporting fact[s] she supplied were untrue, or (3) the stated opinion . . . omit[ted] information whose omission ma[de] the [opinion] misleading to a reasonable investor." *Lefkowitz*, 2019 WL 4053956, at *6 (internal citations omitted).  The purported omissions alleged by Plaintiffs do not meet this standard; reasonable investors recognize that opinions "rest on a weighing of competing facts," *id.*, and consider such statements "in light of all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information." *Tongue*, 816 F.3d at 211 (citation omitted).  No reasonable investor could ignore Peabody's repeated expressions of uncertainty.  (*See, e.g.*, ¶ 291; Stmt. 37 (It is "still too early to offer meaningful insights into the financial effects or timing of next steps"); ¶ 295; Stmt. 41 ("Multiple scenarios are being evaluated should mining be able to resume"); ¶ 304; Stmt. 43 (Peabody would "periodically re-evaluate progress" through its "stage-gate approach" to NGM recovery).)  And the *opinions* of Plaintiffs' purported longwall mining expert do not provide sufficient evidence of omitted *facts* to render Defendants' genuine opinions about its "contemplated" "base case" scenario for reopening the mine actionable.

## II.     PLAINTIFFS' CONTROL PERSON CLAIMS UNDER § 20(a) MUST FAIL.

To establish control person liability, Plaintiffs must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.  Because Plaintiffs' Complaint fails to allege any primary violation of Section 10(b), it likewise cannot establish control person liability.  *See id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully move for this Court to dismiss the Complaint in its entirety and with prejudice.

Date:  June 7, 2021

Respectfully submitted,


CRAVATH, SWAINE & MOORE LLP,

by
          _/s/ Karin A. DeMasi_
          Karin A. DeMasi
          Carolyn Young

Worldwide Plaza
   825 Eighth Avenue
   New York, NY 10019
      (212) 474-1000
         kdemasi@cravath.com
         cyoung@cravath.com


*Attorneys for Defendants Peabody Energy
Corporation, Glenn L. Kellow and Amy B.
Schwetz*

26