**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PEABODY ENERGY CORP. SECURITIES LITIGATION | Civil Action No. 1:20-cv-08024-PKC<br><br>JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: (212) 907-0700

*Counsel for Lead Plaintiff Oregon
Public Employees Retirement Fund
and the Proposed Class*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   RELEVANT FACTS ............................................................................... 3

      A.    Inadequate Safety Measures at Peabody's North Goonyella Mine ....................... 3

      B.    The Fire ........................................................................................... 4

      C.    Plans to Reopen the NGM ...................................................................... 5

III.  PLAINTIFF HAS ADEQUATELY ALLEGED A 10(b) CLAIM.................................. 7

      A.    Plaintiff Has Pled Actionable Misstatements ............................................... 7

            1.    Defendants' Pre-Fire Statements Are Actionable...................................... 7

                  (a)   The Pre-Fire Statements Are Not Time-Barred ............................. 8

                  (b)   The Challenged Statements Are Not Puffery................................. 8

                  (c)   Defendants' Pre-Fire Statements Regarding the Status of the
                        North Goonyella Mine Are Actionable......................................... 11

            2.    Defendants' Post-Fire Statements Are Actionable ................................. 14

                  (a)   The Statements Were False and Misleading When Made ............ 14

                  (b)   Purported Forward-Looking Statements Are Actionable ............. 14

                  (c)   Purported Opinion Statements Are Actionable............................ 17

      B.    Plaintiff Has Adequately Pled Scienter....................................................... 19

            1.    The CWs Support a Finding of Scienter .................................................. 20

            2.    The NGM Was Core to Peabody's Business ............................................ 22

            3.    The Frequency of Defendants' Statements Supports Scienter.................. 23

            4.    The Longwall Mining Expert Supports Scienter ..................................... 24

            5.    Defendants Were On Notice of the NGM's Safety Issues........................ 24

            6.    The More Plausible Inference Is Defendants' Fraud ............................... 24

i

**Page**

IV.    PLAINTIFF HAS PLED ACTIONABLE CONTROL PERSON CLAIMS.................... 25

V.    CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................16, 24

*In re Abercrombie & Fitch Co. Sec. Litig*,
No. M21-83-TPG, 2003 WL 22705131 (S.D.N.Y. Nov. 17, 2003) ........................11

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................17

*In re Anadarko Petroleum Corp. Class Action Litig.*,
957 F. Supp. 2d 806 (S.D. Tex. 2013) ......................................................................10

*In re Avon Sec. Litig.*,
No. 19-cv-1420-CM, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .................... 17, 18, 22-23

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)..................................................................14, 15

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012).......................................................................10

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).......................................................................23

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011)........................................................................................8

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132-CM-THK, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)............16

*City of Warren v. World Wrestling Ent. Inc.*,
No. 20-cv-2031-JSR, 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)........................20

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)................................................................. 21-22

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017).........................................................................7

**Page**

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)...................................................................................25

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015)................................................................. 17-18

*Foley v. Transocean Ltd.*,
861 F. Supp. 2d 197 (S.D.N.Y. 2012)..............................................................10, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................13, 21

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................................15

*Giunta v. Dingman*,
893 F.3d 73 (2d Cir. 2018)................................................................................. 6-7

*Gross v. GFI Grp., Inc.*,
310 F. Supp. 3d 384 (S.D.N.Y. 2018).....................................................................16

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12-cv-8557-CM, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................23

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
298 F.R.D. 116 (S.D.N.Y. 2014) .........................................................................22

*Hou Liu v. Intercept Pharms., Inc.*,
No. 17-cv-7371-LAK , 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ....................................11

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)................................................................................22

*Leykin v. AT & T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007)........................13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)..............12, 13, 21

*Manavazian v. ATEC Grp., Inc.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) .....................................................................9

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)...............................................................11, 22

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012)............................................................9, 23

iv

**Page**

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011)................................................................................. 7, 10-11

*Meyer v. Jinkosolar Holdings Co., Ltd.,*
  761 F.3d 245 (2d Cir. 2014)........................................................................7

*In re Nokia Corp. Sec. Litig.,*
  No. 19-cv-3982, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021)..............................................16

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)........................................................................9, 25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.,*
  380 F.3d 1226 (9th Cir. 2004) ........................................................................24

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................19, 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015)....................................................................................17, 18

*In re Petrobras Sec. Litig.,*
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................10

*Pirnik v. Fiat Chrysler Autos., N.V.,*
  No. 15-cv-7199-JMF, 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..........................................9

*S.E.C. v. Bremont,*
  954 F. Supp. 726 (S.D.N.Y. 1997)....................................................................22

*In re Salix Pharms., Ltd.,*
  No. 14-cv-8925-KMW, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)....................................15

*In re Sibanye Gold Ltd. Sec. Litig.,*
  No. 18-cv-3721-KAM-PK, 2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020) ...........................11

*In re Sierra Wireless, Inc. Sec. Litig.,*
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)....................................................................16

*In re Signet Jewelers Ltd. Sec. Litig.,*
  389 F. Supp. 3d 221 (S.D.N.Y. 2019)....................................................................9

*Slayton v. Am. Exp. Co.,*
  604 F.3d 758 (2d Cir. 2010)........................................................................ 15-16

*In re Take-Two Interactive Sec. Litig.,*
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................................2, 7, 19

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  No. 17-cv-2169-LAK, 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ....................................13

*Tongue v. Sanofi,*
  816 F.3d 199 (2d Cir. 2016)...........................................................................18, 19

*Tung v. Bristol-Myers Squibb Co.,*
  No. 1:18-cv-1611-MKV, 2020 WL 5849220 (S.D.N.Y. Sept. 30, 2020)................................24

*In re Vale S.A. Sec. Litig.*,
  No. 19-cv-526-RJD-SJB, 2020 WL 2610979 (E.D.N.Y. May 20, 2020)..................3, 9, 15, 16

*In re Vale S.A. Sec. Litig.*,
  No. 1:15-cv-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017)................................10

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)................................................................7, 10, 14, 15

*Wilson v. LSB Indus., Inc.*,
  No. 15-cv-7614-RA, 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017).......................................16

**Statutes and Rules**

Mining Safety & Health Act .......................................................................... 1-2

S.E.C. Rule 10b–5, 17 C.F.R. 240.10b-5........................................................7, 13, 22

Lead Plaintiff Oregon Public Employees Retirement Fund ("Plaintiff") respectfully submits this opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint. ECF Nos. 42-44 ("Motion" or "MtD").[1]

## I.    INTRODUCTION

This case concerns Peabody, the world's largest coal miner, and a fire in September 2018 at its North Goonyella Mine (the "NGM"), the Company's most profitable mine.[2]

After emerging from bankruptcy on April 3, 2017, Peabody needed to ramp up coal production at the highly profitable NGM. But a laser focus on profitability overshadowed the Company's commitment to safety—and Defendants misled investors about the efforts Peabody employed to protect against significant mining-related safety risks. Plaintiff alleges that, during the Class Period (i.e., April 3, 2017 through October 28, 2019, inclusive), Defendants made material misrepresentations and omissions about Peabody's "record safety" and its "ongoing commitment to ensuring safe, productive operations," including at the NGM. In reality, and as detailed by the numerous confidential witnesses ("CWs") and internal documents cited in the Complaint, Defendants knowingly failed to implement adequate safety controls at the NGM to prevent the risk of a spontaneous combustion event. The inadequacies at the NGM included, for example: (i) serious staffing issues including a lack of experienced personnel; (ii) insufficient training; (iii) a failure to adhere to official procedures and regulations; and (iv) a constant prioritization of coal production over mine safety. ¶¶81-92. Moreover, in the weeks leading up to

---

[1] Defendants are Peabody Energy Corporation ("Peabody" or the "Company"), former CEO Glenn L. Kellow ("Kellow") and former CFO Amy B. Schwetz ("Schwetz"). Kellow and Schwetz are collectively referred to as the "Individual Defendants." The Consolidated Amended Class Action Complaint, dated March 19, 2021, is referred to as the "Complaint" (cited as "¶__"). ECF No. 38.

[2] Defendants submit, as Exhibit A to the DeMasi Declaration, a chart purportedly identifying each of the allegedly false statements and including one or more "Reason[s] for Dismissal" of each statement (i.e., puffery, opinion, forward-looking, and "No actionable falsity"). ECF No. 44-1. Plaintiff addresses Defendants' stated reasons for dismissal, and the corresponding statements at issue, herein.

the fire at the NGM, Peabody failed to properly ventilate the NGM, failed to follow its own safety procedures, and breached its safety obligations under the Mining Safety & Health Act and Peabody's environmental license. ¶¶94-161. The risk of these known inadequate safety measures materialized when, on September 22, 2018, a fire broke out at the mine. Yet, it was not until September 28, 2018 that Defendants disclosed (and the market learned of) the fire at the NGM. As a result of this disclosure, Peabody's stock price plummeted.

Defendants' fraud continued even after news of the fire emerged. After the fire erupted at the NGM, Defendants misled investors about (i) the devastation of the mine and the likelihood of serious multi-year delays in reopening the mine, (ii) projections as to when the mine would reopen, and (iii) the fact that given the raging fire and hazardous conditions, Defendants had no reasonable basis to represent when the mine would reopen and when coal production would resume. Instead, Defendants knowingly (or recklessly) assured the market of specific timelines for reentry of the NGM and the resumption of coal production and did so despite having access to information contrary to their public representations, as confirmed by CWs. It was not until October 29, 2019 that Defendants finally disclosed the truth, i.e., that it would take *three years or longer* before any meaningful coal would be produced at the NGM. On this news, Peabody's stock plunged.

Defendants' Motion, which challenges only falsity and scienter, is a scattershot effort to offer Defendants' own alternative version of numerous alleged facts. Defendants spin the narrative that Peabody's safety protocols were adequate throughout the Class Period and that despite their best efforts, they could not timely reopen the mine. However, at this stage, the facts alleged must be taken as true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Many of Defendants' other legal challenges are similarly unavailing. For example,

2

Defendants argue that the Complaint includes mainly protected forward-looking and opinion statements. But Defendants' post-fire statements include demonstrably false present-tense assertions. Further, Defendants' purported cautionary language was nothing more than inadequate "general warnings about operational risks." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *14 (E.D.N.Y. May 20, 2020). Defendants also ignore the implication of Plaintiff's scienter allegations, including that Defendants frequently attended key meetings and had access to key information, and instead argue that the case merely alleges corporate mismanagement or fraud by hindsight.

As detailed below, Defendants' Motion should be denied in its entirety.

## II.   RELEVANT FACTS

### A.   Inadequate Safety Measures at Peabody's North Goonyella Mine

Peabody is the largest coal mining company in the world. The NGM is Peabody's most profitable single operation—in 2017 the NGM alone generated approximately 20% of the Company's *total* operating profit. ¶36. At the NGM, Peabody employs a "longwall mining," a technique whereby a long, continuous panel of coal is mined in its entirety from the coal face. ¶¶42-46. Because of the serious risks with longwall mining, it is crucial that mines utilizing this technique implement adequate safety measures.

When Peabody emerged from bankruptcy protection on April 3, 2017 (and through September 2018), Defendants repeatedly boasted of Peabody's record coal production, aided by the NGM, while simultaneously—and falsely—touting the Company's "record safety" and its "ongoing commitment to ensuring safe, productive operations," including at the NGM. ¶¶57-58, 229, 234. During this time, for example, Defendants represented that Peabody "is proceeding with . . . an emphasis on safe and productive operations that are constantly working to move down the cost curve," ¶232; "[t]hrough all of our actions, Peabody maintains constant vigilance

toward safety," ¶244; "[r]ecord safety results [at the NGM] reflect 80% improvement since 2013," ¶251; and "[a] focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety," ¶258.

But these and other similar statements failed to disclose that Peabody did not: (a) implement adequate safety controls at the NGM to prevent the risk of a spontaneous combustion event; (b) properly ventilate the NGM, resulting in the build-up of methane gas and carbon dioxide; (c) follow its own safety procedures; (d) monitor and analyze mine gases; (e) properly train and adequately staff mine employees; and (f) follow its own Sealing Management Plan. As a result, the NGM was at heightened risk of experiencing a spontaneous combustion event. ¶277. Indeed, CW-6 disclosed how issues at the NGM extended much further back than 2018, when CW-6 specifically brought up staffing issues to management during yearly audits in 2016 and 2017—and yet nothing was done. ¶88. Moreover, Defendants were on notice of the need for sufficient safety protocols even prior to Peabody's acquisition of the NGM as reports identified the mine as having "outburst potential," and experiencing spontaneous combustion events in 1997, 1998, and 1999. ¶¶69-70. After the acquisition of the NGM by Peabody, the mine continued to experience spontaneous combustion and heating events, and frequent instances of elevated methane levels. ¶71.

### B.    The Fire

On September 1, 2018, elevated methane levels and high temperatures were detected at the NGM. ¶108. High levels were noticeable even prior to September 1, 2018: CW-6 was aware that in late August, the mine reached a Level 3 trigger due to high gas readings, and CW-9 corroborated that on August 28, 2018, the mine reported the initial evacuation of all workers due to high methane levels, which triggered the filing of a "High Potential Incident." ¶¶104-05. CW-6 further explained that in August 2018, the staff at Peabody failed to follow the Sealing

Management Plan, ¶97, and that there were specific shortcomings in the preparation phase during which gas levels are taken and the seals are prepared. ¶98.

As a result, the mine conditions worsened, and a fire erupted in the NGM on September 22, 2018. ¶¶152-56. On September 28, 2018, Defendants finally confirmed that the NGM was on fire and that the Company did not expect any coal production from its most profitable mine in the fourth quarter of 2018 (the three months following the disclosure of the fire). ¶178.

During this time, according to CW-4, the Individual Defendants were part of a "North Goonyella Task Force" that was in daily contact with Peabody Australia in Brisbane, holding regular meetings at a "war room" at headquarters in St. Louis regarding the condition of and actions being taken at the NGM. ¶¶162-72. The purpose of the North Goonyella Task Force was specifically to (i) discuss what was happening at the mine, (ii) receive information from Australia, and (iii) make decisions. *Id.* Immediately after evacuation, the North Goonyella Task Force met via videoconference multiple times per day, seven days per week. *Id.* According to CW-4, members of the North Goonyella Task Force should have received every piece of paper generated by the Queensland Mine Inspectorate ("QMI") in Australia, i.e., the administering inspectorate for the relevant safety and health regulations during the Class Period (¶¶53-54, 168). Thus, the Individual Defendants were made aware of the critical condition of the mine following the eruption of the fire.

### C.    Plans to Reopen the NGM

Just after the fire, Defendants conditioned investors to believe that the Company's plan to quickly restart operations at the NGM was reasonable and had a high likelihood of success, all while concealing major issues that would impede any progress towards re-opening the mine. For example, Defendants falsely represented: "production would be targeted for the second half of 2019," ¶295; "longwall production in the 10 North panel [will] begin to ramp up in the early

months of 2020," ¶306; and "everything is ready to *flick the switch* and to be able to reventilate . . . just to reiterate, we're ready to go," ¶319.

Yet, according to CWs and a longwall mining expert retained by Plaintiff, and based on the information available to Defendants at the time, it would take—at the very least—an additional 18 to 24 months from the fire (September 2018) to resume coal production at the NGM. Indeed, on September 26, 2018, the North Goonyella Union Lodge President sent an email to the leadership of the Queensland branch of Construction, Forestry, Mining and Energy Union (CFMEU), warning that only a "miraculous change in circumstance" in the days ahead would prevent critical mining equipment from being sealed in the NGM—standing in stark contrast to Defendants' contrary statements to the market just two days later. ¶180. And in mid-2019, former mine workers from the NGM told the *Australian Mine Safety Journal* that the probability of full re-entry, as Peabody had described to the market, was a "management pipe dream." ¶211. Thus, Defendants' post-fire statements that coal production would resume in full force in 2019, later revised to 2020, were false and misleading.

Through a series of disclosures, Defendants slowly revealed the protracted timeline for restoring coal production at the NGM—cumulating on October 29, 2019, when Defendants finally disclosed the truth—i.e., that it would take *three years or longer* before any meaningful coal could be produced at the NGM. ¶225. On this news, Peabody's shares fell $3.56 per share, or 22 percent, closing at $12.48 per share. ¶348. Later, on February 21, 2020, Peabody disclosed that it was unable to extract coal from the southern panels of the NGM and the Company's "operations, financial condition and cash flows could be materially and adversely impacted," and even questioned whether the NGM could "return[] to active operations." ¶352. Peabody's stock never recovered. On March 15, 2021, the Company's stock closed at approximately $4.00 per

6

share, down from Class Period highs of more than $47 per share. ¶18.

## III.    PLAINTIFF HAS ADEQUATELY ALLEGED A 10(b) CLAIM

In reviewing a motion to dismiss, the Court must "accept all factual allegations . . . as true," *Tellabs*, 551 U.S. at 322, and draw "all reasonable inferences in the [Plaintiff's] favor," *Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018).

"To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants . . . made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs." *In re Eletrobras Sec. Litig.,* 245 F. Supp. 3d 450, 462 (S.D.N.Y. 2017). Defendants challenge only falsity and scienter.

### A.    Plaintiff Has Pled Actionable Misstatements

To support a finding of liability, Rule 10b–5 expressly requires an actual statement, one that is either "untrue" outright or "misleading" by virtue of what it omits to state, i.e., "half-truths." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) ("half-truths"—true statements that create a materially misleading impression—support claims for securities fraud).

Pure omissions (i.e., "a complete failure to make a statement") can also be actionable when a defendant has a duty to disclose the omitted facts. *Id.* at 239. A duty to disclose can arise directly from Rule 10b-5's requirement to disclose "material fact[s] necessary" to make statements not misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); The Second Circuit has clarified that: "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

#### 1.    Defendants' Pre-Fire Statements Are Actionable

The Complaint properly alleges actionable misstatements—from the start of the Class

7

Period, April 3, 2017, until when the fire at the NGM was disclosed—concerning the safety measures the Company had purportedly taken, in general, and more specifically at the NGM.

### (a)    The Pre-Fire Statements Are Not Time-Barred

Defendants argue that the statute of limitations began to run prior to September 28, 2018 (the day Peabody publicly confirmed the fire at NGM). MtD at 18. According to Defendants, a "reasonably diligent plaintiff would have discovered the possibility of their claims even earlier" than September 28, 2018. *Id.* Put another way, Defendants argue that investors learned of the facts constituting the fraud (i.e., that the risk of inadequate safety measures materialized by way of the fire at NGM), even before Peabody publicly confirmed that a fire existed.

But Defendants misstate the applicable standard governing when the statute of limitations is triggered in a case like this. The Second Circuit has made clear that the "securities fraud statute of limitations cannot begin to run until the plaintiff discovers—or a reasonably diligent plaintiff would have discovered—the facts constituting scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011). Thus, the "limitations period commences not when a reasonable investor would have begun investigating" (i.e., after the fire was disclosed), "but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *Id.* at 174.[3]

### (b)    The Challenged Statements Are Not Puffery

Defendants argue that their statements concerning the Company's overall commitment to safety are "general" and inactionable puffery. MtD at 18-19. However, Defendants' narrow reading of the misrepresentations (¶¶228-29, 232, 234, 240, 244, 249, 256-66), made from the

---

[3] Moreover, Defendants' denial, in mid-September 2018, of claims by the *Australian Financial Review* that the NGM had a problem with super-heated coal and that the Company was at risk of losing its massive and expensive long-wall equipment, and downplaying any sense of urgency surrounding the combustion conditions at the mine (¶¶268-70), belie any argument that the truth was on the market before September 28, 2018.

start of the Class Period through September 2018, is wrong. Defendants point to Defendant

Kellow's statement that Peabody has an "ongoing commitment to ensuring safe, productive

operations" (¶234) and that they are "focus[ed] on safe productive operations and return

maximization" (¶249) as statements of puffery. But Defendants ignore the fact that they failed to

disclose that Peabody, as evidenced by information from the CWs, had not implemented

adequate safety controls at the NGM. *See, e.g.*, ¶83 (According to CW-5, the Peabody culture

was to "push the boundaries of what was safe."). In reality, Defendants made these statements,

and others like them, while aware that "the contrary was true," *Novak*, 216 F.3d at 315—i.e.,

Defendants knew or had access to adverse facts and information pertaining to the safety practices

at the NGM. *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5,

2016) ("easily" concluding that the statement that company was "substantially in compliance"

with regulatory requirements was actionable where complaint alleged the opposite); *Manavazian

v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001) ("positive characterizations of [a]

[c]ompany's current and future business conditions . . . made while [defendants] were aware that

an adverse business trend rendered those statements misleading" are not puffery).[4]

    In light of the contrary information available to Defendants at the time, the supposed

puffery statements are in fact concrete "misrepresentations of existing facts." *Novak*, 216 F.3d at

315. Many courts have found similar statements to be actionable. *See Vale*, 2020 WL 2610979,

at *12 n.15 (statement that "we are driven by our commitment to safety to people and to preserve

the environment" is not puffery); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230-

31 (S.D.N.Y. 2019) (code of conduct statements actionable and noting that materiality depends

on analyzing context-specific factors); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597,

---

[4] All citations omitted and emphases added unless otherwise noted.

9

617-18 (S.D. W. Va. 2012) (finding defendants' statements touting its "safety" and being an "industry leader" in safety actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statement that company "adopts the best corporate governance practices," when viewed in context, was actionable).

At bottom, courts "must exercise great caution" when considering a puffery defense at the "motion to dismiss stage" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012).

Defendants' cited cases are distinguishable. In *In re Vale S.A. Securities Litigation*, the court noted that the challenged statements, contrary to the ones here, did not "convey[] a statement of measurable fact." 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017). Further, Defendants point to *In re Anadarko Petroleum Corp. Class Action Litigation,* where "generalized statements about [a company's] commitment to safety," and "safety as the number one priority," were inactionable puffery. 957 F. Supp. 2d 806, 821 (S.D. Tex. 2013). But there, unlike the facts demonstrated here, the court dismissed the statements because plaintiffs did not make "any genuine attempt to demonstrate why Defendants' statements were misleading." *Id.* at 821 n.5.[5]

Defendants next take aim at certain statements because they are purportedly "statements of historical fact regarding Peabody's safety record" and therefore are not false. MtD at 19-20. But it is well-settled that "literally true statements that create a materially misleading impression . . . will support claims for securities fraud." *Vivendi*, 838 F.3d at 240. Indeed, Defendants had a duty to disclose "material fact[s] necessary" to make their statements not misleading, *Matrixx*,

---

[5] Further, Defendants' reliance on *Foley v. Transocean Ltd.* is inapplicable because plaintiffs there dropped the statements during oral argument and the court did "not engage in a formal analysis of these statements." 861 F. Supp. 2d 197, 205 n.7 (S.D.N.Y. 2012).

563 U.S. at 37—and it was certainly misleading to tout the Company's safety record while failing to disclose adverse facts about ongoing safety lapses at Peabody's most profitable mine.[6] In addition, Defendants' only case in reliance is inapplicable.[7]

Lastly, Defendants argue that the September 4, 2018 (¶266) statement is inactionable because Plaintiff fails to "identify the speakers and [instead] attribute[] the comments only to 'management.'" MtD at 20 (quoting *Hou Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831, at *6 (S.D.N.Y. Mar. 26, 2020)). However, in *Intercept*, the court highlighted that the comments were attributed to "management" (opposed to senior management) and distinguished *In re Abercrombie & Fitch Co. Securities Litigation*, 2003 WL 22705131 (S.D.N.Y. Nov. 17, 2003), where the plaintiff's reference to "management" in an analyst report was sufficient because, as the *Intercept* court stated, "the management team was 'small and tightly knit.'" 2020 WL 1489831, at *6 n.75. Akin to *Abercrombie*, Defendants' false statement, as described by MKM Partners, was made by **senior** management, and senior management has long been held sufficient as a basis for finding fraud on behalf of a company. *See, e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("courts have readily attributed the scienter of management-level employees to corporate defendants.").

### (c)     Defendants' Pre-Fire Statements Regarding the Status of the North Goonyella Mine Are Actionable

In September 2018, Defendants continued to mislead investors concerning the

---

[6] Defendants' sole challenge to ¶¶251, 253 is that they are not false. But these statements are actionable for the reasons described herein. *See* Section III.A.1(b).

[7] In *In re Sibanye Gold Ltd. Securities Litigation*, 2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020), the literally true statement was not alleged to be misleading by a failure to disclose. *Id.* at *15 ("Plaintiffs do not identify information about miner safety or compensation that Defendants failed to disclose."). Defendants also attempt to introduce fact evidence to prove the statement that Peabody's "safety performance continues to surpass industry averages." MtD at 19; ¶249. Aside from this being a fact inquiry that is wholly inappropriate at this stage and that the statement remains actionable for what it fails to disclose, the evidence provided by Defendants is unverifiable (i.e., it is unclear that the coal mining incident rate uses the same per-hours worked denominator as Peabody—200,000).

Company's safety—this time, issuing false and misleading statements, even in the face of direct questions from local media, about the status of the NGM, downplaying reports of elevated gas levels and related issues, and assuring investors that, despite these reports, coal production volumes would not be impacted. ¶¶269-75, 278.

Plaintiff is not relying on "pure hindsight" to allege that these statements were materially false and misleading. MtD at 20. Instead, relying on specific and concrete facts that come from internal documents, and statements of CWs, Plaintiff alleges that these statements were false and misleading because Defendants failed to disclose adverse facts regarding (a) Peabody's ongoing failure to implement adequate safety controls at the NGM, and (b) the reality that the situation on the ground at the mine was far worse than investors were told, as evidenced by documents cited in the Complaint, which show that senior Peabody personnel attended meetings where the true status of the mine was discussed. ¶¶143-61. These facts show that Defendants knew (or were reckless in not knowing) that their public statements downplayed the true situation at the NGM.[8]

Defendants further contend that the "Complaint offers no well-pleaded allegations that Defendants' statements were false when made." MtD at 20-21. Not so. For example, on September 19, 2018, Defendants affirmatively disclosed that Peabody was not revising its sales targets for 2018. But, documents show that, at the same time they were saying this, Defendants did not know where the fire was coming from, let alone how to contain it. ¶¶273, 277. This is exactly the kind of "contemporaneous falsity" that Defendants point to as a requirement. MtD at 20 (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (statements require a showing of falsity "*at the time they were made*")).

---

[8] Defendants' argument that two witnesses "contradict themselves" is flawed on grounds that they equate "experience[]" and "tenure," arguing that a lack of experience contradicts long tenure. MtD at 21. But these terms are not mutually exclusive. Further, when read together, the CWs' testimony confirm that the mine lacked sufficient personnel. At a minimum, this remains a fact issue.

In addition, Defendants' attempt to re-characterize Plaintiff's allegations as "omit[ing] technical details from their updates," is itself misleading. MtD at 20-21. The statements issued by Defendants in September 2018 are false and misleading because of contrary concrete facts known by Defendants *as well as* because Defendants did not disclose material information that otherwise made their public statements misleading. *See* ¶277.[9] Further, Defendants' reliance on *In re Tempur Sealy International*, 2019 WL 1368787, at *12 (S.D.N.Y. Mar. 26, 2019), is misplaced. There, the court held that plaintiffs did plead the "very *existence* of the alleged omitted facts." *Id.* at *12. Here, however, Defendants specifically detail the status of the NGM, which was in direct contrast to Defendants' public disclosures.

Lastly, Defendants attempt to transform Plaintiff's well-pled fraud allegations into a narrative of corporate mismanagement. MtD at 21 (citing *Lululemon*, 14 F. Supp. 3d at 562; *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007)).[10] But even if corporate mismanagement led to the issues that were not disclosed, it was the failure to disclose—not the fact of mismanagement—that Plaintiff alleges rendered the challenged statements misleading. *See E*Trade*, 712 F. Supp. 2d at 192 ("mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement").

---

[9] That the conditions at the NGM were "changing by the hour and day" (¶156) further supports the falsity of Defendants' statements and the total lack of reasonable basis of Defendants' stated re-opening timeline for the NGM. For example, Defendants' September 19, 2018 statement that the Company was "yielding success with current gas levels below their peak," was misleading because the gas levels were "fluctuating widely" and Defendants could not even determine why or where the unanticipated bursts of heat were occurring. ¶¶154, 277.

[10] Defendants' cited example—*AT & T Corp.*, 423 F. Supp. 2d at 241—is wholly irrelevant. In that case, unlike here, the plaintiffs alleged a fraudulent scheme under Rule 10b-5(a) and (c) involving "corporate abuse, misconduct and diversion of assets." Crucially, the court distinguished plaintiffs' cited cases on grounds that in those cases, the "defendants either made materially false or misleading statements upon which investors relied in purchasing or selling securities," whereby in *AT & T Corp.*, "the alleged misrepresentations and omissions themselves could not have caused a drop in At Home's stock price." *Id.* at 242.

### 2.   Defendants' Post-Fire Statements Are Actionable

Defendants' post-fire statements concerning the Company's timeline to restart coal production at the NGM also are actionable. ¶¶280-81, 288-91, 295-96, 304-10, 312(c), 317, 319-22, 327, 329, 334-36. More specifically, Defendants falsely assured investors that Peabody would be able to mine significant coal at the NGM in the near-term, while failing to disclose significant issues that would impede, or at least significantly delay, the ability to re-open the mine and restart the longwall mining process.

### (a)   The Statements Were False and Misleading When Made

Defendants contend that "statements that describe completed steps in the Company's efforts to reopen the mine are not actionable because they are accurate reports of a historical fact." MtD at 22. Defendants appear to think that Plaintiff's argument is that these statements are false because of "events that transpired after these statements were made." *Id.*[11] However, these statements are misleading for what they omit. For example, the statement that the Company had undertaken "reventilation and re-entry of the mine" (¶334) "create[s] a materially misleading impression," *Vivendi*, 838 F.3d at 240, by failing to disclose the true extent of the damage of the NGM and that it could not be reopened for *at least* 18 months. ¶324.

### (b)   Purported Forward-Looking Statements Are Actionable

Defendants next argue that "statements about [Peabody's] plans to reopen the mine and anticipated future coal production" are inactionable forward-looking statements that are protected by the statutory safe harbor. MtD at 23.[12] However, many of the challenged statements are not forward-looking at all. *See id.*, citing ¶295 (that Peabody "*intends* to take all steps" to

---

[11] For this reason, any reliance on *In re Barrick Gold Corp. Securities Litigation* is misplaced. 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018).

[12] Defendants also claim, without support, that ¶¶271-72 are forward-looking. MtD at 23. But, for the same reasons articulated herein, the statements are actionable. *See* Section III. A. 2(b).

14

resume activities at the mine); ¶295 (*has "targeted"* production volumes); ¶317 ("*expect[s]* to produce approximately 2 million tons from North Goonyella in 2020) (emphasis added).

While these statements, as well as others that Defendants challenge (i.e., ¶¶271–72, 273, 286(j), 290–91, 295, 304–06, 308–09, 312, 317, 319, 321–22, 327, 335–36), might be couched in forward-looking language, many of the statements contain a present-tense assertion of expectations—and those assertions were demonstrably false. *Vivendi*, 838 F.3d at 246 (non-forward-looking aspect of a statement is not subject to the safe harbor); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("statements are not protected by the safe harbor provision because they were statements of present fact."). Defendants' reliance on *Barrick* is misplaced. 341 F. Supp. 3d at 378. There, the plaintiffs, contrary to here, failed to plausibly allege that the purported forward-looking statements were "made with actual knowledge that it was false or misleading." *Id.*

### (i)   Inadequate Risk Disclosures

In addition, Defendants' purportedly forward-looking statements are not accompanied by meaningful cautionary language, but rather mere boilerplate. *See Galestan*, 348 F. Supp. 3d at 304 (boilerplate cautionary language not meaningful); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (same). For example, Defendants point to a press release on May 1, 2019, which was purportedly "not [a] guarantee[] of future performance or events." MtD at 23-24. But this language, as well as Defendants' purportedly "more particularized cautionary language," *id.*, is insufficient. *See Vale*, 2020 WL 2610979, at *14 ("general warnings about operational risks" or the "possibility of a dam collapse and breach of risk management protocols" do not insulate liability); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) ("defendants' caution to warn of potential deterioration in AEFA's own portfolio"

15

was not meaningful and "verges on the mere boilerplate").[13]

Also inadequate as "general warnings about operational risks," *Vale*, 2020 WL 2610979, at \*14, were Peabody's "Risk Factors," included in its Form 10-Ks and 10-Qs during the Class Period, stating that the "mining operations are subject to conditions that can impact the safety of our workforce, . . . include[ing] . . . fires and explosions from methane gas or coal dust." ¶253.

> **(ii)    The Statements Were Made with Knowledge of their Falsity**

Assuming, arguendo, that Defendants' statements did include meaningful cautionary language, the safe harbor still does not apply because these statements were known to be false and misleading when made. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 393 (S.D.N.Y. 2018) (safe harbor is no shield if "statement was knowingly false when made").

> **(iii)    The Safe Harbor Does Not Apply to Material Omissions**

In addition, it is well-settled that "the safe harbor does not apply to material omission[s]," even where the omission makes misleading forward-looking projections. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*12 (S.D.N.Y. Mar. 25, 2013) ("safe harbor does not apply to material omissions"); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*3 (S.D.N.Y. Mar. 2, 2017) (same). Indeed, Plaintiff alleges—aided by the input of a longwall

---

[13] For the same reasons, *In re Nokia Corp. Securities Litigation* is inapplicable, where the court dismissed forward-looking statements because "they were accompanied by 'meaningful cautionary statements' expressly warning and directly relating to the risk that brought about [p]laintiff's loss." 2021 WL 1199030, at \*20 (S.D.N.Y. Mar. 29, 2021). Defendants' further reliance on *In re Sierra Wireless, Inc. Securities Litigation* is also inapplicable. 482 F. Supp. 2d 365, 380-81 (S.D.N.Y. 2007). There, defendants disclosed of specific, "contingent" events, such as when a "critical mass" of networks and a "significant user base" would arise, upon which was cautionary language accompanied the statements concerning product to market plans. *Id.* Defendants made no similar, specific warnings.

mining expert—that Defendants' statements about the timing of re-opening of the mine concealed adverse facts that Defendants knew of or recklessly disregarded. *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (finding falsity based, in part, on analysis of plaintiffs' expert consultants who determined that the company should have reported losses on certain of its contracts). It is the failure to disclose these facts, while assuring investors that the mine would re-open on a more favorable timeline, that also renders Defendants' purportedly forward-looking statements false and misleading. The safe harbor therefore does not apply. *In re Avon Sec. Litig.*, 2019 WL 6115349, at *15 (S.D.N.Y. Nov. 18, 2019) (safe harbor "does not protect optimistic statements about future performance for which defendant[s] have no basis, and where they already 'know that certain risks have become reality'").

### (c)    Purported Opinion Statements Are Actionable

Defendants also argue that certain statements are inactionable statements of opinion. MtD at 24 (citing ¶¶281, 288, 291, 295–96, 305–06, 308–09, 317, 319–22, 327, 329, 334–36). But these challenged statements are not opinions at all. For example, the statement that "Peabody ***has now identified*** a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020" (¶305) is a statement of fact. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (a "fact is 'a thing done or existing' or '[a]n actual happening'"). Further, Defendants appear to propose a new rule, without support, that "no reasonable investor could consider the 'base case' to be a presently existing, objective fact." MtD at 24. This is not the law. Even statements containing the words "we believe" or "we think" do not necessarily "transform defendants' representation . . . into a statement of opinion." *Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015)); *see also Omnicare*, 575 U.S. at 193 ("But those magic words ['we believe' or 'we think'] . . . remain perfectly capable of misleading investors.").

17

Even those statements that arguably contain opinions are actionable as Defendants either: (i) did not genuinely hold the expressed opinions; or (ii) omitted material facts about the basis for the opinions, which rendered the statements misleading. *Omnicare*, 575 U.S. at 192-93, 185-95. Plaintiff need not establish that Defendants did not believe their stated opinions for those statements to be actionable. *Id*. at 185-95. Indeed, "[t]hat [Defendants] may have believed [their statements] to be accurate is irrelevant, even when read as an opinion statement." *Avon*, 2019 WL 6115349, at 17. Rather, the core inquiry is whether the omitted facts "conflict with what a reasonable investor would take from the statement itself." *Id*.

This is the case here. For example, the February 6, 2019 statement that "[w]e're now progressing with a single base case that targets limited continuous mining volumes in late 2019 and will then have longwall production in the 10 North panel begin to ramp up in the early months of 2020" (¶306) contains an embedded factual statement (i.e., that Peabody is "now progressing") that can be proven false. The statement (and others like it) omitted material facts that conflict with what a reasonable investor would take from the statement, including adverse facts pertaining to the feasibility of Peabody's plan to restart coal production at the NGM. ¶298. These statements are therefore actionable. *See Avon*, 2019 WL 6115349, at *17 (opinion statements actionable where defendants omitted information making statement misleading).

Finally, Defendants cite *Tongue v. Sanofi* for the point that plaintiffs must consider opinion statements "in light of all [the] surrounding text." 816 F.3d 199, 210 (2d Cir. 2016). This is true and actually cuts in Plaintiff's favor. For example, Defendants, in disclosing that they had "developed a multi-tiered plan in an effort to extinguish the fire and contain the impacts at [the NGM]" also bolstered assurances of accuracy by stating that they were "[w]orking in

18

consultation with the Inspectorate and third-party experts." ¶288.[14] Moreover, *Tongue* stated that "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments."  816 F.3d at 210. This is exactly the case here: Defendants issued repeated "baseless, off-the-cuff judgments" about when the NGM would reopen.

## B.      Plaintiff Has Adequately Pled Scienter

The Court must consider "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis added). Scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 323-24. Plaintiff meets its burden if the allegations of scienter are at least as compelling as the nonculpable explanation. *Id.*; *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc*., 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) (a "tie . . . goes to the plaintiff").

Plaintiff has met its burden here, alleging: (1) statements from CWs who place Defendants in key meetings and in receipt of specifically described reports and other materials contradicting their public statements; (2) that the NGM was core to Defendants' business success post-bankruptcy; (3) the frequency of Defendants' fraudulent statements about the NGM; (4) the opinion of a highly qualified mining expert; and (5) that Defendants were on notice of the NGM's safety issues even before the Class Period.[15]

---

[14] Defendants' claim that their statements are inactionable because they are shrouded in "repeated expressions of uncertainty," MtD at 25, does nothing to detract from Defendants' concrete statements concerning the definite timeline of NGM's reopening that were knowingly false when made. *See supra* Section III.A.2(b).

[15] Defendants claim that the Complaint fails to plead scienter through motive and opportunity. MtD at 11-12. But the law is clear that Plaintiff has no obligation to plead a motive to sufficiently allege scienter. *See Tellabs*, 551 U.S. at 310 ("absence of a motive . . . is not fatal."). The Complaint does not attempt to plead scienter by alleging "motive and opportunity," but instead alleges that the circumstances of the fraud were consistent with Defendants' motive "to massively ramp up coal production at its most profitable mines while cutting safety costs in order to boost the Company's bottom line." ¶¶57-58

### 1.    The CWs Support a Finding of Scienter

Defendants claim that the Complaint is "devoid of any individualized scienter allegations." MtD at 10-11. But this ignores Plaintiff's CW allegations, which, through particularized facts, establish that the Individual Defendants and Peabody senior officials possessed actual knowledge of the alleged fraud, including the lack of safety controls at the NGM and that it would take significantly longer to reopen the NGM than Defendants had represented to the market. *See, e.g.*, ¶¶87-92,184-96. Defendants instead assert the unremarkable proposition that "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." MtD at 11 (citing *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)). But this effectively transforms the Complaint into allegations concerning ***only*** Defendants' senior positions. That is patently wrong. Further, while allegations concerning Individual Defendants' senior positions and their sophistication, ¶356, are *alone* insufficient to establish scienter, they do add to the holistic analysis of scienter. *See City of Warren v. World Wrestling Ent. Inc.*, 2020 WL 4547217, at *9 (S.D.N.Y. Aug. 6, 2020) (confidential witness allegations, "in light of the defendants' senior positions at [the company]," supported an inference of scienter).

Defendants' reliance on *Foley* for the point that "[s]cienter cannot be inferred ***solely*** from the fact that, due to the defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any adverse information," MtD at 13 (citing 861 F. Supp. 2d at 212) (emphasis added), fails for the same reason. Plaintiff is not asking for the *inference* that Defendants had access to adverse internal documents solely from their senior positions. Rather, Plaintiff explicitly pleads facts to support that Defendants actually had such access. Contrary to *Foley*, which held that plaintiff did not "plead facts establishing that [defendant] was aware of each and every report that was eventually entered into the databases,"

20

861 F. Supp. 2d at 213, the CWs here confirm that Defendants received models and reports, such as "every piece of paper generated by the QMI in Australia," ¶168, and there was "no shortage of people looking at the models" that forecasted the NGM's reopening, ¶173.[16]

Defendants contend that Plaintiff's allegations "merely provide additional technical details about the mine's operations or complaints about management on the ground" and do not "connect these allegations of mismanagement to the public statements." MtD at 12. But that is not the case. Rather, Plaintiff alleges that contrary to Defendants' public statements, the Company: (i) cut corners on safety through improper staffing at the NGM and that this issue was relayed to management, ¶¶87-88 (staffing issues were raised in the Safety and Way of Life audits in 2016 and 2017); and (ii) forecasted the NGM's reopening (which was handled by mine management) much later than the timelines presented to the market, ¶¶185-86 (by October 2018, management was estimating that it would take *at least* 18 months for the mine to be operational).

Defendants further rely on *Lululemon* to assert that Plaintiff's claim fails because it has not shown that the information Defendants had access to contradicts their public statements. MtD at 13-14 (citing 14 F. Supp. 3d at 574). But *Lululemon* held, critically, that plaintiff "[did] not contain the kind of required specific factual allegations (by CWs or otherwise) that suggest if, when, or how" defendants knew about the issues related to their allegedly false statements. *Id.* at 580. Here, Plaintiff does precisely that. For example, the CWs assert that Defendants attended frequent meetings where highly relevant information was discussed. ¶¶163- 65; *see E*Trade*, 712 F. Supp. 2d at 198 ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter."); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637

---

[16] In addition, the Complaint cites the September 26, 2018 email from the North Goonyella's Union Lodge President to the leadership of the CFMEU, warning that only a "miraculous change in circumstance" in the days ahead would prevent critical mining equipment from being sealed in the NGM. ¶179. As a result, the risks were well-known.

(S.D.N.Y. 2010) (scienter adequately pled where specific reports alleged "should have alerted them to the problems they later allegedly misrepresented."). Moreover, the QMI reports cited in the Complaint corroborate the CWs' testimony. *Cf. Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (crediting corroboration of witnesses).[17]

Lastly, Defendants' reliance on *Jackson v. Abernathy* is misplaced. 960 F.3d 94, 99 (2d Cir. 2020); MtD at 15. *Jackson* held that the junior employees, who purportedly knew about the problems, did not themselves possess scienter, and plaintiffs' "general allegations" did not adequately allege scienter based on the ***unidentified officers*** who were apparently alerted to the problems. 960 F.3d at 99.[18] Thus here, unlike in *Jackson*, Plaintiff pleads scienter on the part of the very individuals in senior management positions who knew about the true safety deficiencies and knew about the actual timeline (or lack thereof) for reopening the NGM, which has long been held sufficient. *See Marsh*, 501 F. Supp. 2d at 481.

### 2.    The NGM Was Core to Peabody's Business

The fact that the NGM was core to Peabody's business is further support for a finding of scienter. *Lexmark*, 367 F. Supp. 3d at 37 (scienter is "buttressed" by the inference "that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue"); *Avon*, 2019

---

[17] Defendants contend that the mine reopening forecast described by CW-1 aligns with Defendants' "base case" scenario of "approximately 2 million tons of sales from North Goonyella in 2020" shared with the market on February 6, 2019 (approximately nine months before the end of the Class Period). MtD at 14, n.5; ¶305. But, CW-1 states that by the time he left North Goonyella for another position with Peabody in late October 2018 (more than three (3) month prior to Defendants' statement), the estimate was that the NGM would not be operational for at least 18 months (¶186), or before May 2020 which directly conflicts with Defendants' public statements of a full year's worth of coal production by the end of 2020. *See, e.g.*, ¶312(f). Defendants further claim that the inference of scienter is undermined by the CW statements that the timeline to reopen the mine was more uncertain as time went on. Yet this is exactly the kind of reckless disregard on Defendants' part that is sufficient to establish scienter. *See S.E.C. v. Bremont*, 954 F. Supp. 726, 730 (S.D.N.Y. 1997) ("Representations and opinions . . . given without basis and in reckless disregard of their truth or falsity establish scienter under Rule 10b–5.")

[18] The Second Circuit did not consider other allegations that the junior employees conveyed information to a particular individual defendant because plaintiffs "chose not to appeal" that portion of the lower court's decision. *Id.*

22

WL 6115349, at *20 (crediting scienter where "it would be absurd to suggest that [ ] senior management was unaware of a widespread delinquency problem in the company's single largest market"); *City of Pontiac Gen. Emps.' Ret. Sys. V. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012) (Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter, albeit in dicta in a non-precedential opinion.") (citation omitted). Here, the NGM was: (i) Peabody's single most profitable mine, responsible for 20% of its annual operating profit (¶¶36-37); and (ii) described by Defendant Kellow as a "high margin mine" that is the "core of [Peabody's] met coal platform." ¶37. As a result, the mine's success was essential to the Company's overall success as it emerged from bankruptcy at the start of the Class Period. *Id.* Defendants argue that the core operations theory "typically applies 'only where the operation at issue constitute[s] nearly all of a company's business.'" MtD at 15. But this court has applied the theory where an "agreement was . . . 18% of projected [] revenues" and thus, "critical to the long term viability" of the company. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). Moreover, mine safety was crucial to Peabody's entire business. ¶365.

### 3.    The Frequency of Defendants' Statements Supports Scienter

Defendants do not dispute that they spoke frequently of the NGM throughout the Class Period. ¶366. Given the multitude of statements concerning the NGM during the Class Period, and the fact that the Individual Defendants were both responsible for tracking or reporting Peabody's revenue, Defendants knew the financial significance of the NGM to the Company's overall revenues. ¶¶266, 268. See *Massey*, 883 F. Supp. 2d at 620-21 ("frequent statements" regarding the mining company's "commitment to safety" and "accomplishments of their safety goals" support an inference that defendants knew of the safety violations).

#### 4.      The Longwall Mining Expert Supports Scienter

The timeline advanced by Plaintiff's longwall mining expert further supports a finding of scienter. Defendants appear to misunderstand the purpose of the expert. Plaintiff's expert analyzed the information pled—which included information (*e.g.*, reports and models) that is *now* publicly available, but was available only to Defendants at the time they issued the false statements—to provide detailed factual allegations regarding the feasibility of Peabody's reopening timeline from which scienter can be inferred (i.e., that Defendants could not have *reasonably* believed in the timeline to reopen NGM that was represented to the market). This supports an inference of scienter, especially when viewed holistically with the Complaint's other scienter allegations. *See, e.g., Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th Cir. 2004) (expert analysis supported an inference of scienter).[19]

#### 5.      Defendants Were On Notice of the NGM's Safety Issues

Both before and after Peabody's acquisition of the NGM, the mine had a history of spontaneous combustion and heating events; thus, Defendants were on heightened awareness as to the safety risks posed by the NGM. ¶¶359-62. As a result, the mine's history is additive of scienter. *AOL Time Warner, Inc.*, 381 F. Supp. 2d at 219-20 (that defendant was on notice of "history of accounting problems," contributing to a finding of the inference of scienter).

#### 6.      The More Plausible Inference Is Defendants' Fraud

When viewing the facts holistically, as the Court must, the more plausible inference is that Defendants were, at a minimum, reckless in not knowing that: (1) the NGM lacked adequate safety controls; and (2) given the conditions of the mine post-fire, it would be a significant

---

[19] Defendants' cite to *Tung v. Bristol-Myers Squibb Co.*, cuts in Plaintiff's favor—"a plaintiff can rely on expert testimony to bolster the factual allegations of its complaint, but the Court may not consider any legal conclusions offered by the expert." 2020 WL 5849220, at *5 (S.D.N.Y. Sept. 30, 2020). The Complaint alleges just that.

period of time (i.e., years) before the mine could be remediated, reopened, and coal production could resume. *Novak*, 216 F.3d at 308 (scienter may be established by showing recklessness in the form of "refusal to see the obvious.").

Defendants' attempt to repackage this case as one where Defendants, despite their best efforts, were unable to prevent a fire and reopen the affected mine on the timeline initially projected, misses the point and disregards the specific facts demonstrating Defendants' contemporaneous knowledge of the conditions of the NGM. MtD at 15-16. As alleged, even though Defendants **may** have attempted to put out the fire in the fall of 2018, and reopen the mine as quickly as possible, the truth concerning the Company's safety controls and a realistic timeline for when the NGM could be reopened was information that Defendants "had access to" and, "suggest[ed] that their public statements were not accurate," which is plainly sufficient to establish scienter. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

## IV.    PLAINTIFF HAS PLED ACTIONABLE CONTROL PERSON CLAIMS

The Complaint alleges that the Individual Defendants are control persons and participated in the drafting, preparation, and dissemination of the false and misleading statements. ¶¶372–82. Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim. MtD at 25. As explained herein, a primary claim is well pled.

## V.    CONCLUSION

For the reasons stated above, Defendants' Motion should be denied in its entirety.[20]

Respectfully submitted,

---

[20] In the event the Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend the Complaint. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 313 (S.D.N.Y. 2008) ("general policy that leave to amend should be granted liberally in cases alleging securities fraud").

*/s/ Christine M. Fox*

LABATON SUCHAROW LLP
Michael P. Canty
Christine M. Fox
Ross Kamhi
Charles Farrell
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email:  mcanty@labaton.com
      cfox@labaton.com
      rkamhi@labaton.com
      cfarrell@labaton.com

*Counsel for Lead Plaintiff Oregon Public Employees Retirement Fund and the Proposed Class*

26