UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN RE PEABODY ENERGY CORP.                          20-cv-8024 (PKC)
SECURITIES LITIGATION
                                                    OPINION AND ORDER

------------------------------------------------------------x

CASTEL, U.S.D.J.

        This federal securities action relates principally to corporate disclosures relating

to a fire at the North Goonyella Mine ("NGM") in Queensland, Australia, that brought coal

production at the mine to a halt for well over a year.  The action is brought against Peabody

Energy Corporation ("Peabody"), its former Chief Executive Officer Glenn L. Kellow, and its

former Chief Financial Officer Amy B. Schwetz.  Lead plaintiff Oregon Public Employees

Retirement Fund asserts claims under sections 10(b) and 20(a) of the Securities Exchange Act of

1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §

240.10b-5, on behalf of itself and a class of shareholders who purchased Peabody common stock

from April 3, 2017 through October 28, 2019 (the "Class Period").

        More specifically, plaintiff alleges that defendants misled investors during the

Class Period in three ways.  First, following Peabody's April 3, 2017 exit from bankruptcy

proceedings, defendants misled investors about Peabody's commitment to safety— specifically,

to safely operating the NGM, Peabody's most profitable coal mine, which experienced a

crippling fire on September 22, 2018.  Second, defendants misled investors as to the existence of

the fire at the NGM, starting from the initial sighting of smoke from a mine shaft on September

22, 2018 until defendants confirmed the existence of an "ongoing" fire on September 28, 2018

that would likely result in no coal production at the NGM during the fourth quarter of 2018.[1] Third, defendants subsequently misled investors by providing false or unrealistically short timelines for the resumption of coal production at the NGM, before finally disclosing that Peabody's most profitable mine would not produce coal for at least another three years.

Defendants now move to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") (Doc 38) pursuant to Rule 12(b)(6), Fed. R. Civ. P., urging that the Complaint does not plausibly allege a claim for relief or allege fraud with the particularity required by Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"). Defendants also argue that plaintiff's claims are time-barred as to statements made prior to September 28, 2018.

As will be explained, the Complaint plausibly and adequately alleges that certain statements made by defendants misrepresented or omitted information that would be material to a reasonable investor. These statements failed to disclose the fact that the NGM was actually or likely on fire as of September 22, 2018, when black smoke could be seen billowing from the mine. The Complaint also raises a strong inference of scienter as to defendants for statements made subsequent to the smoke sighting on September 22, 2018 until Peabody's confirmation of the fire and halt to coal production on September 28, 2018. But, in other respects, the Complaint fails to identify actionable misstatements or omissions that would have been material to a reasonable investor, for both statements preceding the September 22, 2018 fire and statements following defendants' September 28, 2018 disclosure concerning the fire and halt in coal

---

[1] Peabody publicly disclosed on September 27, 2018 that "[m]ine personnel have observed smoke coming from the mine, indicating a likely fire in a portion of the mine. . . ." (Compl. ¶ 276.) Plaintiff rejects the adequacy of the disclosure of a "likely fire" on September 27 and relies on Peabody's disclosure of an "ongoing" fire at the mine on September 28. (See Doc 45 (Def. Br.) at 2 ("Yet, it was not until September 28, 2018 that Defendants disclosed (and the market learned of) the fire at the NGM.").)

production at the NGM.  The pre-fire statements quoted in the Complaint are vague expressions of enthusiasm or puffery, or are so general in nature that a reasonable investor would not consider them to be material.[2]  Defendants' post-disclosure estimates for reventilating, re-entering and resuming mining at the NGM were forward-looking statements or opinions based on incomplete and evolving information.

Defendants' motion to dismiss will therefore be granted in part and denied in part.

BACKGROUND

The Court summarizes the Complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor of the plaintiff as the non-movant.  See In re Hain Celestial Grp., Inc. Sec. Litig., 20 F.4th 131, 133 (2d Cir. 2021).

A.    Peabody and the North Goonyella Mine

Defendant Peabody is the largest coal mining company in the world with operations throughout the United States and Australia.  (Compl. ¶ 2.)  During the Class Period, Peabody owned and operated 23 coal mining operations, organized into six business segments. (Id.)  The largest of these segments is the Australian Metallurgical Mining segment, which contains seven Australian mines including the NGM.  (Id.)  The NGM, located in Queensland, Australia, is Peabody's "most profitable single operation" for coal mining—for example, in 2017, the NGM generated approximately $100 million, or around 20% of Peabody's total operating profit of $498 million.  (Id. ¶ 3.)

At the NGM, Peabody excavated coal using a method called "longwall mining," which requires heavy machines underground to cut large panels of coal typically 2 to 2.5 miles

---

[2] The Court, for reasons explained, declines to dismiss the pre-fire statements concerning safety on statute-of-limitations grounds.

long and 850 to 1500 feet wide.  (<u>Id.</u> ¶ 4.)  A longwall mining system consists of many mechanical and electrical components, such as hydraulic roof supports, conveyor systems, and cutting machines, all of which must be moved to a different section (or panel) of the mine once all the available coal from the current panel has been extracted.  (<u>Id.</u> ¶¶ 4-5.)  This transfer process is expensive and time-consuming.  (<u>Id.</u> ¶ 5.)  Longwall mining also often causes methane and other dangerous and flammable gases to be released underground and when production rates are high, there are elevated concentrations of such gases.  (<u>Id.</u> ¶ 6.)  When longwall mining equipment is repositioned within the mine, ventilation controls are changed, which can also create additional issues relating to gas levels.  (<u>Id.</u>)  Consequently, during the beginning and end of mining a specific longwall panel, elevated gas levels can leave the mine more prone to spontaneous combustion events as the increased flammable gases may interact with a heat source.  (<u>Id.</u>)  Therefore, it is imperative that mines utilizing longwall mining implement adequate safety measures to protect against such risks of combustion, including ventilation systems, methane drainage methods, gas monitoring controls, and airtight seals.  (<u>Id.</u>)

      B.    <u>Peabody's Emergence From Bankruptcy and Its Emphases on Safety</u>

On April 13, 2016, approximately a year before the start of the Class Period, Peabody filed for bankruptcy "after a multi-year decline in coal prices that strained Peabody's ability to service its $10.1 billion debt load" and was delisted from the New York Stock Exchange ("NYSE").  (<u>Id.</u> ¶ 55.)  On April 3, 2017, the beginning of the Class Period, Peabody emerged from bankruptcy and began trading again on the NYSE.  (<u>Id.</u> ¶ 56.)

Plaintiff asserts that a number of the defendants' post-bankruptcy statements about Peabody's commitment to safety, listed below, were materially false and misleading when made, because defendants failed to disclose the following adverse facts pertaining to the safety

practices at the NGM, which were known to, or recklessly disregarded by defendants: (a) Peabody's failure to implement adequate safety controls at the NGM to prevent the risk of a spontaneous combustion event; (b) Peabody's failure to properly ventilate the NGM, which resulted in the build-up of methane gas and carbon monoxide; (c) Peabody's insufficient systems for monitoring and analyzing mine gases; (d) insufficient and unprepared personnel at the NGM caused by layoffs before the Class Period; (e) insufficient training of mine employees at the NGM regarding potential ventilation and combustibility issues; (f) Peabody's failure to follow its own safety procedures; (g) Peabody's lack of emergency sealing procedures at the NGM; (h) Peabody's breach of safety obligations under the Mining Safety & Health Act and Peabody's environmental license; and (i) the resulting heightened risk of spontaneous combustion at NGM, which would jeopardize production at the NGM.  (Id. ¶ 230.)  Plaintiff also alleges that defendants (1) were aware of "improper staffing at the NGM and that this issue was relayed to management" via "audits in 2016 and 2017" (Pl. Br. at 24 (citing Compl. ¶¶ 87-88)) and (2) were "on heightened awareness as to the safety risks posed by the NGM" because "the mine had a history of spontaneous combustion and heating events" both "before and after Peabody's acquisition of the NGM."  (Pl. Br. at 24 (citing Compl. ¶¶ 359-62).)

Upon Peabody's exit from bankruptcy, defendant Kellow, Peabody's then-CEO, in a publicly available video from April 3, 2017, touted the "number of steps" Peabody had taken to "make sure [Peabody had] the most competitive business across all cycles," which included "achieving record safety."  (Compl. ¶ 229.)  "Another Peabody employee reiterated that, 'Safety is the most important—safety for us as employees, safety for our personal lives.'"  (Id.)

On May 4, 2017, Peabody reported its financial results for the first quarter of 2017.  (Id. ¶ 231.)  In its press release, Peabody emphasized its "sharp focus on creating value

. . . with an emphasis on safe and productive operations."  (Id. ¶ 232.)  Later in the day, Peabody

hosted a conference call for analysts, media representatives and investors to discuss the first

quarter results.  (Id. ¶ 234.)  During the call, in which defendants Kellow and Schwetz both

participated, Kellow stated that "I would, in closing, like to extend my appreciation to our

employees around the world for their ongoing commitment to ensuring safe, productive

operations and continued delivery of value."  (Id.)

On August 1, 2017, Peabody reported its financial results for the second quarter

of 2017.  (Id. ¶ 239.)  Later that day, Peabody hosted a conference call for analysts, media

representatives and investors to discuss Peabody's financial results.  (Id. ¶ 240.)  During the call,

in which defendants Kellow and Schwetz participated, Schwetz acknowledged that

"[o]perationally, the second quarter [2017] marked the best six months of production over the

past five years at the North Goonyella mine."  (Id.)  At the conclusion of the call, Kellow stated

that he "would also like to extend [his] appreciation to all [of Peabody's] employees both at the

mines and in offices for their continued commitment to ensuring safe and productive

environments." (Id.)

On October 25, 2017, Peabody reported its financial results for the third quarter of

2017.  (Id. ¶ 243.)  Later that day, Peabody hosted a conference call for analysts, media

representatives and investors to discuss Peabody's results, in which Kellow and Schwetz

participated.  (Id. ¶ 244.)  During this call, Kellow stated that "[t]hrough all of our action,

Peabody maintains constant vigilance toward safety."  (Id.)

On February 7, 2018, Peabody reported its financial results for the fourth quarter

and full year of 2017.  (Id. ¶ 248.)  Later that day, Peabody hosted a conference call for analysts,

media representatives and investors to discuss Peabody's results, in which Kellow and Schwetz

participated.  (Id. ¶ 249.)  During this call, Kellow stated that "[a]t the operational level, our global safety performance continues to surpass industry averages.  While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  As always, we are ever vigilant on our journey of continuous improvement in safety."  (Id.)  Later in the call, Kellow also stated that "As always, we begin with a focus on safe productive operations and return maximization."  (Id.)

On February 22, 2018, during Peabody's Analyst and Investor Day, defendants represented in an investor presentation that at the NGM, "[r]ecord safety results reflect 80% improvement since 2013."  (Id. ¶ 251.)

On February 26, 2018, Peabody filed its 10-K form with the Securities and Exchange Commission for 2017, which contained a section entitled "Risk Factors."  (Id. ¶ 253.)  Peabody's form noted that "[r]isks inherent to mining could increase the cost of operating [Peabody's] business," and that its "mining operations are subject to conditions that can impact the safety of [its] workforce, or delay coal deliveries or increase the cost of mining at particular mines for varying lengths of time.  These conditions include . . . fires and explosions from methane gas or coal dust.  (Id.)  Peabody also noted on its 10-K form that "[d]espite [Peabody's] efforts, such conditions could occur and have a substantial impact on [Peabody's] results of operations, financial condition or cash flows."  (Id.)  Similar disclosures regarding the risk of fires and explosions from methane gas also appeared in the following quarterly reporting forms: "1Q 2017 10-Q, 2Q 2017 10-Q, 3Q 2017 10-Q, 1Q 2018 10-Q, and 2Q 2018 10-Q."  (Id.)

On April 25, 2018, Peabody reported its financial results for the first quarter of 2018.  (Id. ¶ 255.)  It hosted a conference call for analysts, media representatives and investors to discuss Peabody's results, in which Kellow and Schwetz participated, with the former again

discussing Peabody's "ongoing focus on safe productive workplaces."  (Id. ¶ 256.)

Around May 2018, Peabody published its 2017 Corporate and Social Responsibility Report, in which it stated that Peabody "commit[s] to safety and health as a way of life," that "[s]afety is Peabody's first value, integrated into all areas of our business," and that a "focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety, production and panel development in 2017."  (Id. ¶ 258.)  The report also discussed a Peabody initiative called "Project Excellence"—"Peabody Australia's cost and productivity improvement plan that has driven initiatives critical to the platform's sustainability without compromising safety, achieving 2017 savings of about $130 million," while also achieving "its best-ever safety performance."  (Id.)  The report also stated that "Peabody will continue to carefully review its business practices, policies and safety standards to stay true to its corporate values," and that "[s]afety is essential to everything [Peabody does].  Each day, [Peabody's] vision is to operate safe and healthy workplaces that are incident free.  As [Peabody's] first value and a leading measure of operational excellence, [Peabody approaches] safety with both vigilance and humility, and [Peabody commits] to continuously improving [its] safety and health efforts."  (Id. ¶ 258-59.)  The report also included a letter from Kellow, in which he stated "Peabody's global safety performance continues to surpass industry averages.  The Australian platform achieved a record safety year in 2017, and we remain ever vigilant on our journey of continuous improvement in safety. . . . For all of us at Peabody, health and safety isn't just a statistic.  It's something that we commit to as a way of life."  (Id. ¶ 260.)

On July 24, 2018, Peabody reported its financial results for the second quarter of 2018.  (Id. ¶ 262.)  Later that day, Peabody hosted a conference call for analysts, media

representatives and investors to discuss Peabody's results, in which Kellow and Schwetz participated.  On the call, Kellow emphasized Peabody and its employees' "continued focus on safe and productive workplaces."  (Id. ¶ 263.)

In August 2018, Peabody stated in an Investor Presentation that its "[s]afety performance continues to outperform industry averages," and that it paid "[s]trong attention to operational excellence by committing to safe workplaces, maximizing resource recovery, improving environmental performance and restoring mined lands."  (Id. ¶ 265.)

On September 4, 2018, MKM Partners, a major brokerage firm that followed Peabody's financial performance, issued a note about an in-person meeting with Peabody senior management during the previous week, stating that "[s]enior management . . . were able to highlight their strong Australian platform, which is running EBITDA margins near 40%, supplemented by the large, low cost domestic thermal platform running near 20% . . . We view valuation as compelling especially against the current commodity strip, and are reiterating out [sic] Buy rating."  (Id. ¶¶ 266, 393.)

C.     The September 22, 2018 Fire

Leading up to the September 22, 2018 fire at the NGM, Peabody had been in the middle of a two-month longwall move of its mining equipment and systems from its 9 North ("9N") panel, which had already been mined, to its 10 North ("10N") panel, which was the next mine face to be mined.  (Id. ¶ 5.)

The NGM had already experienced high gas readings in late August of 2018.  On August 28, 2018, all workers had to evacuate the NGM due to high gas levels, which triggered the filing of a "High Potential Incident."  (Id. ¶ 104-05.)  According to a confidential witness (CW-6), in August 2018, the staff at Peabody had failed to follow the Sealing Management Plan

and there were shortcomings in the preparation phase during which gas levels are taken and the seals prepared, with CW-6 commenting that "the first seal had not even been prepared when the longwall had already been moved halfway." (Id. ¶¶ 97-98.) On August 30, 2018, miners were withdrawn again from the NGM due to elevated gas levels in the 9N Tailgate area. This withdrawal was corroborated by another confidential witness (CW-9). (Id. ¶ 106.) On August 31, 2018, miners were able to return underground at the NGM, only to be withdrawn again that afternoon. The nightshift miners were able to return underground later that day. (Id. ¶ 107.)

On September 1, 2018, sensors at the NGM again detected elevated gas levels, which required the immediate evacuation of all underground mine personnel at the NGM. (Id. ¶ 108.) Throughout September 2018, with mining halted at the NGM, Peabody monitored the mine's "evolving conditions," in consultation with Peabody's safety and health experts from Peabody's U.S. headquarters, and also held "[d]aily meetings" with Australian government inspectors from the Queensland Mines Inspectorate ("QMI") at the NGM. (Id. ¶¶ 143, 149.)

On September 19, 2018, as the NGM continued to experience elevated gas levels, Peabody issued a Form 8-K confirming that the longwall move at the NGM had been "interrupted by temporarily elevated gas levels," but that "services such as power, ventilation and normal water management activities in the mine continue, and the mine is shipping from inventories." (Id. ¶ 176.) Peabody also reported that "[l]ongwall move activities have been delayed for about two and a half weeks thus far and the company is working toward resuming operations," but that Peabody's 2018 metallurgical coal sales volume targets had not been revised." (Id.)

The conditions at NGM, however, continued to worsen throughout September, and on September 22, 2018, a fire erupted in the NGM, evinced by black haze coming out of the

mine's main fan shaft.  (Id. ¶¶ 151-61.)

Starting in the beginning of September 2018, Kellow and Schwetz were part of the Peabody "North Goonyella Task Force" that was "in daily contact" with "Peabody Australia" in Brisbane, holding "regular meetings" at "a war room at headquarters in St. Louis" in Missouri to monitor and respond to the changing situation at the NGM.  (Id. ¶¶ 162-72.)  Immediately after the evacuation at the NGM, the North Goonyella Task Force met via videoconference multiple times per day, seven days per week, although the frequency of the meetings lessened over time.  (Id. ¶ 165.)  According to a confidential witness (CW-4), members of the task force had access to much information from the NGM, including every piece of paper generated by the QMI government inspectors in Australia.  (Id. ¶¶ 167-68.)  Based in part on the amount of knowledge available to the task force and the "hallway conversation[s]" at Peabody headquarters, CW-4 thought that the task force knew that it would take longer to reopen the NGM than Peabody had represented to the market and that Peabody was "sugarcoating the seriousness of the fire," and was surprised that during investor calls and quarterly meetings, executives called the incident at the NGM a "heating event" and not a "fire."[3]  (Id. ¶¶ 171-72.)

D.    Peabody's Delayed Disclosure of Smoke and Fire at the NGM

On September 25, 2018, days after the fire erupted at the NGM, Peabody issued another Form 8-K, stating, in part, that:

> Peabody noted today that gas levels at its North Goonyella Mine
> have been variable and remain elevated.  The Company is working
> with the Queensland Mines Inspectorate and third-party experts as
> we continue a progress plan aimed at reducing gas levels and
> accommodating a safe return to mining operations.  Determination
> of the timing of completion of the longwall move and expected
> financial effects will be made when gas levels subside and
> personnel can safely resume longwall move activities.

---

[3] The Complaint does not identify specific instances in investor calls and quarterly meetings where executives called the September 22, 2018 fire a "heating event," as opposed to a "fire."

(Id. ¶ 177.)  The report did not mention smoke or fire at the NGM.  (Id.)  Also on September 25,

2018, Peabody issued an "Updated Statement" on the NGM, noting in part:

> Gas levels at Peabody's North Goonyella Mine in Queensland
> have been variable and remain elevated, with employees and other
> personnel remaining above ground . . . The company is working
> with the Queensland Mines Inspectorate and third-party experts as
> we continue a progressive plan aimed at reducing gas levels. . . .
>
> Peabody has relocated more than half of the major equipment
> associated with the originally planned two-month longwall move
> when elevated gas levels were detected.  The company has notified
> customers of expected impacts to October shipments from the
> extended longwall move.
>
> Determination of the timing of completion of the longwall move
> and expected financial effects will be made when gas levels
> subside and personnel can safely resume longwall move activities.

(Id. ¶ 275.)

Two days later, on September 27, 2018, Peabody reported that "[m]ine personnel

have observed smoke coming from the mine, indicating a likely fire in a portion of the mine."

(Id. ¶ 276.)  The next day, on September 28, 2018, five days after photographs of black smoke

billowing from the NGM allegedly began circulating in the public, Peabody confirmed that the

NGM was on fire, that the fire was "ongoing," that its impacts were still uncertain, and that

Peabody did not expect any coal production from the NGM in the fourth quarter of 2018.  (Id.

¶¶ 178, 280-81.)  On this news, Peabody's stock fell $5.54, or 13.5 percent, closing at $35.64 on

September 28, 2018, down from the previous day's close of $41.18.  (Id. ¶ 282.)

      E.    Peabody's Changing Estimates for Resuming Mining at the NGM

After confirming the fire at the NGM and that coal production would not take

place at the NGM in the fourth quarter of 2018, Peabody gave varying timelines over the next

year for reopening the NGM for production.

Plaintiff asserts that the defendants' projections were materially false and misleading when made, because defendants failed to disclose the following adverse facts—summarized as relevant below—pertaining to the feasibility of resuming coal production at the NGM, which were known to, or recklessly disregarded by defendants: (a) the difficulty of accessing and sealing fire areas through boreholes on the surface, which were still being drilled until at least November 2018; (b) the deterioration of mine conditions caused by the idling of mining operations at the longwall; (c) the likelihood that a substantial portion of longwall mining equipment was lost to the fire; (d) the fact that it would likely take 12-15 months to acquire substitute longwall equipment; (e-f) the fact that the time needed to install replacement roof supports—set for delivery in mid-to-late 2019—and other logistical issues would have made early 2020 the earliest possible start date for resuming mining activities, even assuming that Peabody could successfully seal the old 9N panel and access the 10N panel; (g) defendants' relative lack of new information on which to base mining projections given the limited access to the NGM; (h) the fact that attempts to access the 10N panel would require navigating "the most impacted areas of the mine under unusual and protracted measures"; and (i) logistical difficulties stemming from having to let go and later recalling mine personnel during the idling of mining operations at the NGM.[4]  (Id. ¶¶ 298, 312.)

On October 30, 2018, when Peabody reported its financial results for the third quarter of 2018, Kellow stated in a press release that the quarter "ended with substantial

---

[4] The Complaint, in pleading scienter, repeatedly refers to a "longwall mining expert," an unidentified expert engaged by plaintiff for the purpose of this litigation, not by defendants as they were responding to the elevated gas levels and eventual fire at the NGM.  The information reviewed by the "Plaintiff's longwall mining expert" allegedly "included information, (e.g., reports and models) that is now publicly available, but was available only to defendants at the time they issued the allegedly false statements.  Plaintiff relies on its expert to opine on the feasibility of Peabody's reopening timelines, from which they argue scienter can be inferred (i.e., that defendants could not have reasonably believed in the timeline to reopen NGM that was represented to the market)."  See Pl. Br. at 24.

challenges at the North Goonyella Mine" and that they were "entering the assessment and planning phase of the North Goonyella Mine," which "comes before re-ventilation, re-entry and any potential restart of operations." (Id. ¶ 294-95.)  Peabody's press release further stated that "multiple scenarios are being evaluated should mining be able to resume.  If [10N] is accessible, production would be targeted for the second half of 2019, whereas southern panels . . . access would likely extend to 2020 given that development was in early stages."  (Id. ¶ 295.)  On a conference call later that day, Kellow stated to analysts, media representatives and investors that while Peabody understood the market was apparently contemplating "an entire loss of North Goonyella . . . based on what we know today, that conclusion is at best premature and at worst unwarranted," and reiterated that coal production at the NGM would restart in the second half of 2019.  (Id. ¶ 296.)  Following Peabody and Kellow statements on October 30, 2018, Peabody's share prices rose by 3.4 percent.  (Id. ¶¶ 297, 301-02 (noting that financial analysts equated Peabody and Kellow's reassurances regarding the NGM to the price increase).)

On February 6, 2019, Peabody reported its financial results for the fourth quarter of 2018, noting that it would be "accelerating a safe return to operations at North Goonyella," and "[a]s part of Peabody's recovery plan for North Goonyella, the team is executing a multi-phased re-ventilation and re-entry project targeted to commence in the first quarter 2019."  (Id. ¶ 304.)  Peabody further announced that with "regard to the company's North Goonyella Mine, Peabody has now identified a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020.  The base case contemplates approximately 2 million tons of sales from North Goonyella in 2020."  (Id. ¶ 305.)  Later that day, Kellow, on a call with analysts, media representatives and investors, reiterated that "longwall production in the 10 North panel [will] begin to ramp up in the early months of 2020,"

and that "our base case [scenario] contemplates approximately 2 million tons of sales from North Goonyella in 2020." (Id. ¶ 306.)  Also during the call, Kellow stated that "the vast majority of the mine remains unaffected." (Id. ¶ 307.)  At the end of trading, Peabody's stock fell $3.80, or 10.6 percent, closing at $32.05 on February 6, 2019, down from the previous day's close of $35.85. (Id. ¶ 311.)

On May 1, 2019, Peabody reported its financial results for the first quarter of 2019. (Id. ¶ 315.)  In its press release, Peabody stated that "[s]hould the company's reventilation and re-entry plan now progress as originally contemplated, Peabody would expect to produce approximately 2 million tons from North Goonyella in 2020." (Id. ¶ 317.)  Later that day, Peabody hosted a conference call for analysts, media representatives, and investors to discuss Peabody's financial results, in which the Individual Defendants participated. (Id. ¶ 318.)  During the call, in response to a question regarding the "worst case scenario" at the NGM, or "what happens if things don't go the way we hope they do," Kellow responded that the QMI's review has "put us behind down some weeks," but that reventilating the mine "could be imminent.  It could be a little bit longer than that. . . . as I said, everything is ready to flick the switch and to be able to reventilate.  And that will enable us then to monitor and then reenter the mine and have a better assessment. . . . But just to reiterate, we're ready to go.  So we're just working through that, what is the final part of the process." (Id. ¶ 319.)  Similarly, when asked whether there had been an "administrative hold-up" from the QMI, Kellow replied, "[i]t's dotting the I's and crossing the T's around supporting documentation with respect to a lot of procedures and protocols that are on site." (Id. ¶ 320.)

Schwetz also spoke on the May 1, 2019 call, noting that as "to North Goonyella, in the first quarter, we completed segmenting of the mine into multiple zones to facilitate a

phased reventilation and reentry.  In addition, all physical activities in advance of reventilating the first segment of the mine have been completed."  (Id. ¶ 321.)  Schwetz further stated that although there had been "a multi-week delay to our initial project plan" resulting from complying with government directives, "[s]hould our reventilation and reentry plan now progress as originally contemplated, we would expect to produce approximately 2 million tons from North Goonyella in 2020.  If further delays occur, we will evaluate our plan, including longwall production target."  (Id. ¶ 321.)  By the end of the day, Peabody's stock fell $1.61, or 5.6 percent, closing at 27.16 on May 1, 2019, down from the previous day's close of $28.77.  (Id. ¶ 322.)

On May 24, 2019, Peabody announced in a press release that it was proceeding with ventilation of Zone 1 of the NGM, reiterating that it "expected longwall production in 2020."  (Id. ¶ 327.)

On July 3, 2019, Peabody announced in a press release that it had commenced re-entry of Zone 1 of the NGM, ten months after the NGM had ceased operations.  (Id. ¶ 329.) Zone 1 represented approximately 25 percent of the area to be re-entered and was the least damaged area of the mine.  (Id.)

On July 31, 2019, Peabody reported its financial results for the second quarter of 2019.  (Id. ¶ 331.)  In its reporting, Peabody noted additional delays for resuming mining operations at the NGM, citing the "challenging" regulatory environment for "a far slower rate of progress than originally contemplated."  (Id. ¶ 332.)  In its report, Peabody suspended its previous guidance for coal production in 2020 at the NGM and informed investors that it was reevaluating: (1) its re-entry plan, (2) the viability of its previous base case for accessing the 10N panel and (3) accessing the NGM through its southern panels.  (Id. ¶ 333.)  Later that day, Peabody hosted a conference call for analysts, media representatives and investors to discuss

Peabody's results.  (Id. ¶ 334.)  During the call, Kellow noted that for "North Goonyella, major progress has been made to-date including reventilation and re-entry of the mine.  We have also learned a substantial amount since we commenced activities underground earlier this month. While the milestones achieved in recent weeks have been significant, we also progressed at a much slower rate than originally contemplated."  (Id.)  He pointed out that last quarter, Peabody "noted that if further delays were to occur, the Company would reevaluate" its plans for the NGM, and because Peabody "did in fact experience great delays than . . . anticipated," Peabody was "suspending North Goonyella-related targets at this time" and expected to complete the evaluation of new targets for production within the next three months.  (Id. ¶ 335.)  By the end of the day, Peabody's stock price fell $1.06, or 4.8 percent, closing at $21.06 on July 31, 2019, down from the previous day's close of $22.12.  (Id. ¶ 338.)

On October 29, 2019, the end of the Class Period, Peabody reported its financial results for the third quarter of 2019.  (Id. ¶ 342.)  Peabody also disclosed for the first time that restarting coal production at the NGM would take three or more years and cost at least $50 to $75 million for the development of the southern panel starting in the second half of 2020 (which would likely take 18-24 months to develop), due, in part, to Peabody's determination that it was not feasible to access the 10N panel and that it would instead need to pursue re-entry of the mine at the 6 South ("6S") panel.  (Id.)  Later that day, on a call for analysts, media representatives and investors, Kellow reiterated these new developments regarding the years-long cessation in mining production as well as costs for developing the 6S panel instead of the 10N panel.  (Id. ¶¶ 344-45.)  After these announcements, Peabody's share prices fell roughly 22 percent, or $3.56 per share, closing at $12.48 per share, down from the previous day's close of $16.04.  (Id. ¶ 348.)

MOTION TO DISMISS STANDARD

    A.    <u>Rule 12(b)(6) Standard</u>

        To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  <u>Iqbal</u>, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u> at 679.  A complaint must include non-conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to plausible.'"  <u>Id.</u> at 680 (quoting <u>Twombly</u>, 550 U.S. at 570).

        In addition to a complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

    B.    <u>The Heightened Pleading Standard of Rule 9(b) and the PSLRA</u>

        "A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." <u>Set Cap. LLC v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 75 (2d Cir. 2021).  Under Rule 10b-5, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "[T]he PSLRA specifically requires a complaint to

demonstrate that the defendant made '[m]isleading statements and omissions . . . of a material

fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter

requirement'), id. § 78u-4(b)(2)."  Emp. Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794

F.3d 297, 305 (2d Cir. 2015).  "The plaintiff may satisfy this requirement by alleging facts (1)

showing that the defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI,

493 F.3d at 99.  "'[I]n determining whether the pleaded facts give rise to a 'strong' inference

of scienter, the court must take into account plausible opposing inferences.'"  Id. (quoting

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 336 (2007)).  A complaint "therefore

must allege with particularity facts that give rise to 'a strong inference' that [defendants] acted

consciously and recklessly in omitting or misrepresenting financial information."  Ind. Pub. Ret.

Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016).

        Similarly, Rule 9(b) states: "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  "To satisfy the pleading standard

for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were

fraudulent.'"  Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 305 (quoting Rombach

v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  "This pleading constraint serves to provide a

defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident

charges of wrongdoing, and protect him against strike suits."  ATSI, 493 F.3d at 99.

"Although pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'" Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 150 (2d Cir. 2021) (quoting In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 161 (2d Cir. 2021)).  As with any other motion to dismiss, "'[i]n considering a motion to dismiss a 10(b) action, [courts] must accept all factual allegations in the complaint as true and must consider the complaint in its entirety.'"  Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

DISCUSSION

A.      The Motion to Dismiss Claims as to Statements Before September 28, 2018 as
        Untimely Will Be Denied

As a threshold matter, defendants move to dismiss claims as to defendants' statements regarding Peabody's commitment to safety made between April 3, 2017 and September 28, 2018 as untimely, urging that a reasonably diligent plaintiff would have discovered the alleged falsity of the statements before September 28, 2018.  The Court concludes that the Complaint, including those documents incorporated by reference or on which the Complaint heavily relies, do not, as a matter of law, establish that a reasonably diligent plaintiff would have discovered the material misstatements or omissions.  The motion to dismiss as untimely claims or portions of claims premised upon pre-September 28, 2018 misstatements or omissions will be denied.  Of course, the matter may look differently on a fully developed record.

A plaintiff may bring a private action under the Exchange Act "not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  Defendants rely only upon the two-year limitation period under section 1658(b)(1).  "[T]he [two-year] limitations period does not begin to run until

the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered 'the facts

constituting the violation,' including scienter—irrespective of whether the actual plaintiff

undertook a reasonably diligent investigation." Merck & Co. v. Reynolds, 559 U.S. 633, 653

(2010) (quoting 28 U.S.C. § 1658(b)(1)).  "Until the plaintiff has uncovered—or a reasonably

diligent plaintiff would have uncovered—enough information about the defendant's knowledge

or intent to satisfy [the PSLRA's] pleading standard, he has not 'discovered' the fact of scienter,

and the [two-year] statute of limitations cannot begin to run."  City of Pontiac Gen. Employees'

Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

    "The lapse of a limitations period is an affirmative defense that a defendant must

plead and prove."  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).  A

claim may be dismissed as untimely under Rule 12(b)(6) if untimeliness is demonstrated on the

face of the complaint, by documents integral thereto, and by matters of which a court may take

judicial notice.  Id.

    The initial complaint in this action was filed on September 28, 2020.  (Doc 1.)

Defendants assert that the claims regarding Peabody's statements of commitment to safety

accrued prior to September 28, 2018 because "to the extent the fire on September 28, 2018,

revealed Peabody's prior safety statements to be false, so too would the substantial information

disclosed more than two years before plaintiffs filed their Complaint.  Defendants note that it

was "publicly known that 'higher gas levels' and 'elevated temperatures' at NGM prompted an

evacuation (Sept. 19, 2018), that 'black smoke billowed out of the mine' (Sept. 22, 2018), that it

was 'obvious' that the mine was on fire (Sept. 23, 2018); and that smoke 'indicate[ed] [sic] a

likely fire in a portion of the mine' (Sept. 27, 2018).  (Def. Br. at 18.)  The Court cannot

conclude as a matter of law that a reasonable investor knowing these facts or any other facts that

could be discovered through diligence would know that defendants had made material misstatements or omissions.

Defendants also point to information in the Complaint from "[f]ormer Peabody employees, former contractors working on site at the time, and former mining inspectors responsible for" the NGM (Compl. ¶ 59).  The information appears to have been developed and assembled long after the events in question to support plaintiff's claim that defendants knew or were reckless in not knowing of serious but undisclosed hazards at the NGM for pre-September 28, 2018 statements.  That Peabody's employees, its contractors and mine inspectors, all with special access to the NGM, knew of certain potential hazards does not establish as a matter of law that through the exercised of diligence a reasonably investor without equivalent access would have known or could have known essentially the same information.

Defendants' motion to dismiss the claims regarding the pre-September 28, 2018 statements as untimely will therefore be denied.

B.    Whether the Complaint Adequately Alleges Material Misstatements and Omissions

i.    Applicable Law

To state a claim for relief under section 10(b) and Rule 10b-5, a complaint must allege that a material misstatement or omission caused economic loss in connection with the purchase or sale of a security.  See Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019).  An alleged misrepresentation is material if "there is a substantial likelihood that a reasonable person would consider it important" in deciding whether to buy or sell the stock.  Id. at 63 (quotation marks omitted).  "Such a statement must, in the view of a reasonable investor, have significantly altered the 'total mix' of information made available."  Id. at 63 (quotation marks omitted).  "A challenged statement must be 'misleading, evaluated not only by literal truth, but by context and

manner of presentation.'"  IWA Forest Indus. Pension Plan v. Textron Inc., 14 F.4th 141, 145

(2d Cir. 2021) (quoting Singh, 918 F.3d at 63).  A court should not substitute an alternative,

"benign" explanation for a defendant's statement if the facts described in the complaint

sufficiently allege that a statement was misleading.  Id. at 147.

               In contrast to a misstatement, "'an omission is actionable under the securities laws

only when the corporation is subject to a duty to disclose the omitted facts.'"  In re Morgan

Stanley Info. Fund Sec. Litig., 592 F.3d 347, 361 (2d Cir. 2010) (quoting In re Time Warner Inc.

Securities Litigation, 9 F.3d 259, 267 (2d Cir. 1993)).  Section 10(b) and Rule 10b-5 "do not

create an affirmative duty to disclose any and all material information," but they do require

disclosure when it is necessary "'to make . . . statements made, in the light of the circumstances

under which they were made, not misleading.'"  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S.

27, 44 (2011) (quoting 17 CFR § 240.10b-5(b)).  "Even when there is no existing independent

duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell

the whole truth."  Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014); accord

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) ("Such a duty may arise

when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or

misleading.") (quotation marks omitted).

               In applying section 10(b) and Rule 10b-5, the statements and knowledge of an

individual officer or executive are attributed to the corporation in connection with actions that

this person causes the corporation to take.  See, e.g., Affiliated Ute Citizens of Utah v. United

States, 406 U.S. 128, 154 (1972) (the section 10(b) liability of the company "of course, is

coextensive with that of [the individual defendants]"); S.E.C. v. Ballesteros Franco, 253 F. Supp.

2d 720, 729 (S.D.N.Y. 2003) (noting "the self-evident proposition that a corporation can act only

through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation.") (Koeltl, J.) (collecting cases).  The complaint must raise a strong inference that the scienter of the individual defendant can be imputed to the corporate entity, and, "[i]n most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008).

> ii.   The Complaint Alleges Actionable Omissions as to Certain of Defendants' Statements Preceding Their September 28, 2018 Confirmation of Fire at the NGM

The Complaint asserts that defendants omitted any references to smoke or fire at the NGM in Peabody's September 25, 2018 Form 8-K and Peabody's September 25, 2018 "Updated Statement" (both noting elevated gas levels but omitting any discussion of smoke or fire at the NGM).  (Compl. ¶¶ 274-75.)  According to plaintiff, these statements were materially false and/or misleading when made because they failed to disclose, among others, the fact that by September 23, 2018, based on the smoke coming out of the mine, it was "obvious the Company had a major fire on its hands."  (Id. ¶ 277.)

Given that the September 25, 2018 Form 8-K and the "Updated Statements" affirmatively disclosed and discussed the elevated gas levels that had caused the September 1, 2018 evacuation of the NGM, as well as the cessation of mining activity and the longwall move from 9N to 10N, defendants had a duty to disclose the whole truth about the situation at the NGM: that as of September 22, 2018, black smoke had been seen rising from the NGM's main fan shaft, and there was likely a fire burning somewhere below at Peabody's most profitable mine.  The failures to disclose these details to investors, if proven, could be found to be material omissions of fact.

On the other hand, Peabody's statements on September 19, 2018 (Compl. ¶ 269-73), which was issued before smoke was sighted on September 22, 2018, are not actionable misrepresentations of material fact. Peabody appears to have provided ongoing updates regarding the conditions at the NGM, such as elevated gas levels and heat levels in September leading up to confirmation of the smoke and fire, conditions which Plaintiff itself describes as "in serious flux—changing by the hour and day." (Id. ¶ 156.) Furthermore, while Defendants did not revise their coal sales volume targets in the mid-September statements, they did share that the "longwall move, which was expected to be completed in September, is now targeted for completion in the early part of the fourth quarter," indicating that defendants were responding to the "changing" conditions at the mine as they monitored it.

The motion to dismiss for failing to allege a material misrepresentation or omission of fact will therefore be denied as to the statements in paragraphs 274 and 275, but granted as to the statements in paragraphs 269 to 273.

C.   **Defendants' Motion to Dismiss Certain Statements as Non-Actionable Puffery or Opinions Will be Granted**

i.   **Defendants' Post-Bankruptcy Statements Regarding Peabody's Commitment to Safety Will be Dismissed as Non-Actionable Puffery**

Broad statements of optimism are typically non-actionable puffery. Abramson v. Newlink Genetics Corp., 965 F.3d 165, 173 (2d Cir. 2020). Unlike "specific, factual" statements, "vague descriptions [that] offer only generally optimistic opinions" are not actionable under section 10(b) and Rule 10b-5. In re Synchrony, 988 F.3d at 170. For example, a speaker engages in puffery when he claims to be "pretty confident" and "pretty positive" about the future, or makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices . . . ." Id. Such statements "are 'too general to

cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" Id. (quoting ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)). Puffery is "actionable only when the speaker 'knew that the contrary was true.'" Abramson, 965 F.3d at 174.

Many of the statements alleged to be actionable by plaintiff fall comfortably within the category of non-actionable puffery:

- "Safety is the most important—safety for us as employees, safety for our personal lives." (Compl. ¶ 229 (Kellow in April 3, 2017 Message).)

- Peabody's "sharp focus on creating value . . . . begins with an emphasis on safe and productive operations." (Id. ¶ 232 (May 4, 2017 Financial Results).)

- "I would, in closing, like to extend my appreciation to our employees around the world for their ongoing commitment to ensuring safe, productive operations and continued delivery of value." (Id. ¶ 234 (Kellow on May 4, 2017 Investor Call).)

- "[I] would also like to extend my appreciation to all our employees both at the mines and in offices for their continued commitment to ensuring safe and productive environments." (Id. ¶ 240 (Kellow on August 1, 2017 Investor Call).)

- "Peabody maintains constant vigilance toward safety." (Id. ¶ 244 (Kellow on October 25, 2017 Investor Call).)

- "[Peabody's] ongoing focus on safe productive workplaces." (Id. ¶ 256 (April 25, 2018 Financial Results).)

- "[Peabody] commits to safety and health as a way of life . . . . Safety is Peabody's first value, integrated into all areas of our business. . . . [Peabody] has driven initiatives critical to the platform's sustainability without compromising safety . . . . Peabody will continue to carefully review its business practices, policies and safety standards to stay true to its corporate values." (Id. ¶ 258 (May 2018 Corporate and Social Responsibility Report).)

- "Safety is essential to everything we do at Peabody.  Each day, our vision is to operate safe and healthy workplaces that are incident free.  As our first value and a leading measure of operational excellence, we approach safety with both vigilance and humility, and we commit to continuously improving our safety and health efforts."  (Id. ¶ 259 (May 2018 Corporate and Social Responsibility Report).)

- "[W]e remain ever vigilant on our journey of continuous improvement in safety. . . . For all of us at Peabody, health and safety isn't just a statistics.  It's something that we commit to as a way of life."  (Id. ¶ 260 (Kellow Letter in May 2018 Corporate and Social Responsibility Report).)

- "[Peabody's] continued focus on safe and productive workplaces."  (Id. ¶ 263 (July 24, 2018 Financial Results).)

- "[S]enior management . . . were able to highlight their strong Australian platform."  (Id. ¶ 266 (September 4, 2018 MKM Partners Note).)

These general and self-congratulatory statements about Peabody's commitment to safety are "precisely the type of puffery that this and other circuits have consistently held to be inactionable.'"  In re Synchrony, 988 F.3d at 170.  While, as noted, puffery may be actionable if the declarant knew the contrary to be true, plaintiff has not plausibly alleged that the declarants of these general statements and opinions about Peabody's safety culture knew that the statements were false.

Plaintiff also bases its claims on certain statements by defendants which invoke Peabody's specific safety record:

- "Peabody achieved record safety this past year."  (Compl. ¶ 228 (April 3, 2017 Announcement).)

- "At the operational level, our global safety performance continues to surpass industry averages.  While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  As always, we are ever vigilant on our journey of continuous improvement in safety. . . . As always, we begin with a focus on safe productive operations."  (Id. ¶ 249 (February 7, 2018 Investor Call).)

- "Record safety results [at the NGM] reflect 80% improvement since 2013."  (Id. ¶ 251 (February 22, 2018 Investor Presentation).)

- "A focus on improving culture and doing business better lifted the North Goonyella Underground Mine to records for performance in safety, production, and panel development in 2017. . . .  [Peabody Australia] has boasted its best-ever safety performance."  (Id. ¶ 258 (May 2018 Corporate and Social Responsibility Report).)

- "[S]afety performance continues to outperform industry averages . . . [Peabody pays strong] attention to operational excellence by committing to safe workplaces."  (Id. ¶ 265 (August 2018 Investor Presentation).)

Although these general and self-congratulatory statements reference specific facts (e.g., that Peabody's global safety performance continues to surpass industry averages), they too are non-actionable.  Plaintiff again does not plausibly allege that the declarants knew that the statements and the referenced facts were untrue when they were made.  Indeed, the Complaint does not specifically allege that the referenced data is false.  Instead, plaintiff argues that defendants' general statements regarding company safety culture were misrepresentations based on a paragraph in the Complaint that lists the various safety issues specific to the NGM, which they allege were known to defendants.  (See, e.g., Compl. ¶ 249 (citing id. ¶ 230).)  Specifically, plaintiff argues that defendants were on notice of safety issues at the NGM because (1) "[w]hen Peabody acquired the [NGM] in April 2004, it was well-known throughout Peabody and the mining community that the [NGM] was historically a safety risk (id. ¶ 359); (2) the NGM was of "critical importance" to Peabody (id. ¶ 369); and (3) in 2016 and 2017 audits, a confidential witness brought up staffing issues at the NGM, which drew agreement from Peabody's former "VP Health Safety and Environment," but failed to result in additional support (id. ¶ 87-88).

These allegations do not plausibly state a claim of securities fraud.  According to the Complaint itself, defendants, while making general statements regarding safety, also publicly disclosed the risks of mine fires and explosions and their ability to disrupt the company's mining

28

operations.  (See, e.g., Compl. ¶ 249 ("[O]ur incidence rate edged up overall."); id. ¶¶ 253-54

("[Peabody] included the following potential risk warning: '. . . . Our mining operations are

subject to conditions that can impact the safety of our workforce . . . .  These conditions include

. . . fires and explosions from methane gas . . . .  Despite our efforts, such conditions could occur

and have a substantial impact on our results of operations, financial condition or cash flows.' . . .

These purported disclosures regarding the risk of fire and explosion from methane gas, appeared

in the 1Q 2017 10-Q, 2Q 2017[] 10-Q, 3Q 2017 10-Q, 1Q 2018 10-Q, and the 2Q 2018 10-Q.").)

The allegations of the Complaint taken in their full context shows nothing more than that

defendants, when talking up Peabody's commitments to safety, also disclosed the possibility of

failure and its potential consequences.  In the context of other disclosures of the risks of "fires

and explosions" that could have a "substantial impact" on operations, defendants' truthful

references to specific data points related to safety were not materially misleading.

   The motion to dismiss certain statements as non-actionable will therefore be

granted as to the statements quoted in paragraphs 228-29, 232, 234, 240, 244, 249, 251, 253,

256, 258-60, 263 and 265-66.

   ii. Defendants' Statements on the Resumption of Mining Operations at the
     NGM Are Non-Actionable Forward-Looking Statements or Opinions

   The PSLRA contains a safe-harbor provision for "forward-looking statements."

In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016).  "Under that provision a

defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by

meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the

plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that

it was false or misleading.'"  Id.  A forward-looking statement is protected under the safe-harbor

provision if any of the three prongs applies.  Id.  To be adequately identified, a forward-looking

statement need not "be contained in a separate section or specifically labeled." Slayton v. Am. Exp. Co., 604 F.3d 758, 768 (2d Cir. 2010).  "[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking."  Id.  Statements or words that "project[] results in the future," such as the word "expect," are forward-looking.  Id.

Relatedly, "[a] reasonable person understands, and takes into account, the difference . . . between a statement of fact and one of opinion."  Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 187 (2015).  "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016).  "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  Id. at 210 (quoting Omnicare, 575 U.S. at 189).

At the same time, a speaker need not disclose all possible doubts or countervailing views, and "whether an omission makes an expression of opinion misleading always depends on context."  Id. at 189-90.  Reasonable investors understand that opinions are drawn from competing facts and would not expect every known fact to align with the opinion of the speaker. Id. at 190.  "So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." Id. at 190.  The Supreme Court has accordingly "cautioned against an overly expansive reading" of Omnicare, and proving liability for an opinion-based statement "is no small task for an investor . . . ."  Sanofi, 816 F.3d at 210.  A plaintiff cannot rely on Omnicare to allege "fraud by hindsight" or pursue claims where an opinion is merely irrational or over-optimistic.  See, e.g.,

Woolgar v. Kingstone Companies, Inc., 477 F. Supp. 3d 193, 224-26 (S.D.N.Y. 2020) (Abrams, J.).

Plaintiff asserts that defendants' post-fire statements concerning Peabody's timeline for restarting coal production at the NGM are actionable because defendants falsely assured investors that Peabody would be able to mine significant coal at the NGM in the near-term, while failing to disclose significant issues that would impede, or at least significantly delay, the ability to re-open the mine and restart the longwall mining process.  (Pl. Br. at 14 (citing Compl. ¶ 280-81, 288-91, 295-96, 304-10, 312(c), 317, 319-322, 327, 329, 334-36).)

a.     September 28, 2018 Press Release

In a September 28, 2018 press release confirming the fire at the NGM, Peabody reported that it did "not expect any production from North Goonyella in the fourth quarter of 2018," and that "[i]t is too early to assess the full financial impact to future periods as a result of the ongoing issue."  (Compl. ¶ 280-81.)

These are non-actionable forward-looking statements.  First, there is no evidence that defendants believed its straightforward prediction (that there would be no coal produced in the fourth quarter from a burning mine) was false or misleading.  Defendants' second statement, that they are unsure of the full financial impact of the fire on the company, is also a forward-looking statement that is accompanied by meaningful cautionary language: it is too early to tell, presumably because the mine was still on fire.

b.     September 30, 2018 – October 11, 2018 Updates

On September 30, 2018, Peabody provided an operational update on the NGM, first noting that "the fire was ongoing, and it was too early to assess the 'extent of impacts.'" (Compl. ¶ 288.)  It then provided various updates such as the company's consultation with the

31

local government agency, the fact that it was "moving safely and as quickly as possible to address the situation," that it "ha[d] developed a multi-tiered plan in an effort to extinguish the fire and contain the impacts."  On October 2, 2018, Peabody noted that initial steps taken to extinguish the fire and contain impacts had "yielded visible results, with only a slight amount of what appears to be either steam of white smoke emanating at this time from only the one mine shaft."  (Id. ¶ 289.)  On October 11, 2018, Peabody reported that it was continuing to implement various measures to contain the impacts of the fire and evaluate potential next phases of stabilization, assessment, mine planning, re-entry and recovery.  (Id. ¶ 290.)  Peabody also noted that while it was "still too early to offer meaningful insights into the financial effects or timing of next steps, the company expects financial impacts to future periods. . . . the timeline remains uncertain."  (Id. ¶ 291.)

    These are non-actionable forward-looking statements or opinions.  The September 30, 2018 and October 11, 2018 statements are both forward-looking statements (that Peabody would in effect continue to evaluate and assess the situation) accompanied by meaningful cautionary language (that it was too early to ascertain the impacts of the fire).  The October 2, 2018 statement is an opinion statement (that the efforts to extinguish the fire yielded visible results), with no evidence that it was misleading when considered "in a broader frame" of an ongoing response to a major fire.  Sanofi, 816 F.3d at 190.

    c.  October 30, 2018 3Q18 Financial Results and Conference Call

    On October 30, 2018, in reporting its financial results for the third quarter of 2018, Peabody noted that it was now transitioning to an assessment and planning phase, which would precede eventual re-ventilation, re-entry, and restart of mining operations.  Peabody also noted that it "intends to take all steps to work safely, progress the plan and look to mitigate costs

while pursuing options for a resumption of activities at the appropriate time."  (Compl. ¶ 295.)

As to when that may be, Peabody stated that "[m]ultiple scenarios are being evaluated should

mining be able to resume.  If the next panel (10 North, which is already developed) is accessible,

production would be targeted for the second half of 2019, whereas southern panels (GM South)

access would likely to extend to 2020 given that development was in early stages."  (Id.)

These are non-actionable forward-looking statements and opinions.  Peabody's

stated intent to work safely, for example, is a forward-looking statement with no evidence that it

was made with actual knowledge that it was false or misleading.  It is also an opinion statement,

without evidence of an omission that would make the opinion misleading.  As to the timelines

given, they were forward-looking targets or estimates accompanied by meaningful cautionary

language, noting that "multiple scenarios [we]re being evaluated" and explicitly conditioning

estimates on whether "the next panel . . . is accessible."

Kellow's statements on a conference call later that day with analysts, media

representatives, that "based on what we know today, [the conclusion that the NGM was lost

entirely] is at best premature and at worst unwarranted" (id. ¶ 296) is similarly a forward-looking

statement (that they do not expect the NGM to be lost entirely), accompanied by meaningful

cautionary language (that this prediction is based on what defendants knew at the time).

                    d.      February 6, 2019 4Q18 / FY 2018 Financial Results and
                           Conference Call

On February 6, 2019, Peabody reported its financial results for the fourth quarter

of 2018 as well as for the fiscal year of 2018.  (Compl. ¶ 303.)  In the report, Peabody stated that

"[a]s part of Peabody's recovery plan for North Goonyella, the team is executing a multi-phased

re-ventilation and re-entry project targeted to commence in the first quarter 2019.  The stage-gate

approach provides an opportunity to periodically re-evaluate progress, costs and investments."

(Id. ¶ 304.)  Peabody also stated that it "has now identified a base case that targets limited continuous-miner volumes in 2019 with longwall production beginning to ramp up in early 2020. The base case contemplates approximately 2 million tons of sales from North Goonyella in 2020."  (Id. ¶ 305.)

These are non-actionable forward-looking statements.  The multi-phased re-ventilation and re-entry project was "targeted" to commence in the first quarter 2019 and was accompanied by meaningful cautionary language that such a "stage-gate approach" will provide opportunities to periodically re-evaluate progress, indicating that Peabody's plans may change. Similarly, the limited longwall production may have been "targeted" for starting in 2019 and ramping up in early 2020, but is couched as a "base case," indicating that other cases exist and the base-case scenario may need to be altered as progress is re-evaluated periodically in the "stage-gate approach" referenced within the same report.

On a conference call later that day with analysts, media representatives and investors, Kellow provided updates as to assessments—such as images of mine areas— and repeated the "base case" referenced in the financial results report, adding that "[w]hile there's still much work ahead of us, our base case contemplates approximately 2 million tons of sales from North Goonyella in 2020."  (Compl. ¶¶ 306, 310.)  In answering questions, Kellow noted that "as we've indicated, the vast majority of the mine remains unaffected," seemingly based on "an assessment of the conditions underground through use of thermal imaging."  (Id. ¶¶ 307, 312(c).)  And when asked about whether Peabody would be able to get the NGM up and running before 2020, Kellow replied: "We'll look to debottleneck as we go and sort of stress the critical pass through that project outcome.  So there may be some ability, but it's really too early to call that.  And we'll certainly be updating as we move through the project."  (Id. ¶¶ 308-09.)

Again, the references to the "base cases" are non-actionable forward-looking statements, accompanied by meaningful cautionary language such as "there's still much work ahead of us," "[w]e'll look to debottleneck as we go . . . . it's really too early to call . . . . we'll certainly be updating as we move through the project."

Kellow's claim that the "vast majority of the mine is unaffected," is a non-actionable opinion.  The Court reviews his statement "as is appropriate, in a broader frame," Sanofi, 816 F.3d at 214 (quoting Omnicare, 575 U.S. at 190), as opposed to simply viewing his statement "in a vacuum." Id.  First, Kellow's claim is qualified by the statement "[a]nd certainly, as we've indicated," which refers to his earlier comments on the same conference call that "[a]ssessment tools have revealed some damage within the mine in the form of several roof falls and damaged conveyor belts in limited areas.  The majority of images suggest multiple areas of the mine is largely unaffected." (Compl. ¶ 306.)  Viewed in a broader frame, Kellow is stating that assessment tools and images of multiple areas of the mine suggested that the vast majority of the mine was unaffected.  Accordingly, plaintiff's arguments that Kellow's opinion lacked any basis in fact and that thermal imaging and remote-control cameras were insufficient to ascertain damage to all areas of the mine are unavailing.  Kellow's statement, when reviewed in the appropriate context, was an opinion based on available data.  It is not rendered misleading and actionable just because Peabody was actually unable to "ascertain damage to all areas of the mine"—the opinion was an estimate which referred to the fact that Peabody was going off the imaging data as they were coming in.  Furthermore, Kellow's statement references reports that "*we've* indicated" (id. ¶ 307 (emphasis added)), thus also incorporating Peabody's contemporaneous report that same day emphasizing Peabody's "stage-gate approach" with

potentially periodic "re-evaluat[ion of] progress, costs and investments" to its "base case."  (Id. ¶ 304-05.)

  e.    May 1, 2019 1Q19 Financial Results and Conference Call

On May 1, 2019, Peabody reported its financial results for the first quarter of 2019, stating that "[s]hould the company's reventilation and re-entry plan now progress as originally contemplated, Peabody would expect to product approximately 2 million tons from North Goonyella in 2020.  If further delays occur, the company will re-evaluate its reventilation and re-entry plans, including longwall production targets, quarterly project costs, and capital expenditures."  (Compl. ¶ 317.)  This is a non-actionable forward-looking statement.  Peabody's forward-looking statement (that it was expecting approximately 2 million tons from the NGM in 2020) was accompanied by meaningful cautionary language (that this estimate was contingent on Peabody's ability to adhere to its original reventilation and re-entry plan, and that should delays occur, the timeline will be reevaluated).

On a conference call later that day with analysts, media representatives and investors, Kellow responded to an investor question about possible setbacks in Peabody's timeline, noting that reventilation, which would "enable [them] then to monitor and then reenter the mine and have a better assessment . . . reexamine the overall timing and sequencing on the project plan" "could be imminent," or "it could be a little bit longer than that," as they worked with the local government inspectors to clear procedural and regulatory hurdles.  (Compl.¶ 319.)  Kellow noted that as to a potential administrative hold-up, "[i]t's dotting the I's and crossing the T's around supporting document with respect to a lot of procedures and protocols that are on site."  (Id. ¶ 320.)  These statements are non-actionable opinions.  As explained further below, reviewing the statement in the broader surrounding context (discussing the status of reventilation

efforts while working with the QMI), plaintiff does not plausibly allege that there were omissions that would make a reasonable investor think that Peabody was actually far from starting reventilation.

On the same conference call, Schwetz stated that "we completed segmenting of the mine into multiple zones to facilitate a phase reventilation and reentry.  In addition, all physical activities in advance of reventilating the first segment of the mine have been completed."  Schwetz also stated that "should our reventilation and reentry plan now progress as originally contemplated, we would expect to produce approximately 2 million tons from North Goonyella in 2020.  If further delays occur, we will evaluate our plans." (Compl. ¶ 321.) Schwetz also noted that "[w]e are anticipating a strong second half of 2019 that will contribute more than half of our full year adjusted EBITDA."  (Id. ¶ 322.)  Schwetz's statements regarding production and earnings targets are non-actionable forward-looking statements accompanied by meaningful cautionary language, discussing the possibility of further delays or deviations from the original reventilation and reentry plan.  Schwetz's statements regarding the segmentation of the mine and preparations for reventilation are non-actionable opinions.

A reasonable investor taking all of the defendants' statements in their full and broader context would correctly understand that a reliable prediction of the resumption of mining operations at NGM could not be made and that delays may occur.  Stripped of conclusory labels, the Complaint does not plausibly allege the falsity of the predictions, estimates and qualifications that Peabody placed on the timing of reventilation or the resumption of operations.  Indeed, as the Complaint itself notes, Peabody announced that the NGM was being reventilated approximately two months later.  (Id. ¶ 329.)

f.     May 24, 2019 Press Release

On May 24, 2019, Peabody stated in a press release that it "expected longwall production in 2020," while Kellow stated that the reventilation of Zone 1 of the NGM marked "an important first step in the next phase of activities aimed at resuming normal operations at North Goonyella."  (Compl. ¶ 327.)  Plaintiff alleges that Peabody's statement of its expectation was false and misleading.  The Court concludes that the challenged statement is a non-actionable opinion.  The statement comes a few weeks after the May 1, 2019 report and conference call in which defendants cautioned that Peabody's production estimates were subject to reevaluation, such as delay from administrative requirements.  In this broader context, plaintiff does not allege omissions from Peabody's stated opinion that would make it misleading—e.g., that there had since been adverse administrative action or some other omitted fact that would "conflict with what a reasonable investor would take from the statement itself."  Sanofi, 816 F.3d at 210 (quoting Omnicare, 575 U.S. at 189).  Similarly, the challenged statement is also a non-actionable forward-looking statement (that Peabody was expecting longwall production in 2020), which plaintiff, stripping its Complaint of conclusory allegations and legal labels, does not plausibly allege was not actually believed or made with knowledge of falsity or reckless disregard of the truth.

g.     July 3, 2019 Press Release

On July 3, 2019, Peabody announced, in consultation with the QMI, that it had commenced re-entry of Zone 1 at the NGM as a "part of a comprehensive, phased reventilation and safe re-entry plan for the mine."  As part of this announcement, Peabody's Australia President, George J. Schuller Jr., stated in part that "our team is ready to return underground and move us yet one step closer to resuming normal operations."  (Compl.¶ 329.)  Plaintiff argues

that this statement regarding the team's readiness to return underground and progress towards resuming normal operations was misleading.  The statement is a non-actionable opinion. Reviewing the statement in the broader surrounding context (Peabody's repeatedly stated plan to first reventilate, then re-enter, and finally resume mining) plaintiff does not adequately allege that there were omissions that would make a reasonable investor think that Peabody's reventilation was not a positive step to resuming normal operations or that Peabody's team was not ready to return underground to the reventilated Zone 1 as planned.

        h.        <u>July 31, 2019 2Q19 Financial Results and Conference Call</u>

On July 31, 2019, Peabody reported its financial results for the second quarter of 2019.  (Compl. ¶ 331.)  On a conference call later that day with analysts, media representatives and investors, Kellow stated that "major progress has been made to-date including reventilation and re-entry of the mine," but that because of "greater delays than we would have anticipated" they were currently evaluating alternative plans for extracting coal from the NGM, such as accessing the southern panels at the NGM instead of the 10N panel as originally planned.  (<u>Id.</u> ¶ 334-36.)  Reviewing the statements in their broader surrounding context—that delays, which defendants previously cautioned could lead to adjustments to their base case scenario and reopening timelines, did in fact come to pass—the Court concludes that the statements are non-actionable opinions.   Plaintiff does not plausibly allege that there were omissions in these opinion statements or that they were not actually believed when made.

Finally, as generally applicable to the forward-looking and opinion statements above, the Complaint itself notes that "no one knew at the time exactly when the mine was going to re-open" (<u>id.</u> ¶ 186) and that the estimates to re-open the mine "just went up as they went along," for example, when "Peabody discovered that things had melted or that equipment had

become buried underground." (<u>Id.</u> ¶ 187.)  This is a far cry from making things up as they went along, as the Complaint implies.

The Complaint also specifically notes that "[b]y July or August 2019, the projected timetable to return to mining at North Goonyella was sometime between 2022 and 2025.  The models forecasting this potential reopening were scrutinized by [inter alia] 'all the financial people in the U.S.'  There was 'no shortage of people looking at the models.'" (Compl. ¶ 371.)  This, however, further supports the Court's conclusions as to the forward-looking and opinion statements above.  The Complaint does not allege that when defendants were making statements in the September 2018 to July 2019 time period, they had yet reviewed models predicting a 2022 to 2025 return.[5]  Indeed, once Peabody finally commenced reventilation and re-entry of the NGM by early July 2019 and presumably acquired more meaningful data as to the mine's conditions, defendants noted in their next update to the public that they were actively reevaluating their base case scenarios.  And in the very next update to the public on October 29, 2019, presumably after looking at the at-issue models projecting a 2022 to 2025 return, defendants told the public that the NGM would not return to operations for another "three or more" years, which lined up with the projection range from the new models.  (<u>Id.</u> ¶ 342.)

The motion to dismiss will therefore be granted as to the statements in paragraphs 280-81, 288-91, 295-96, 304-10, 312(c), 317, 319-22, 327, 329 and 334-36.

D.    <u>The Complaint Adequately Alleges Scienter as to Peabody, Kellow and Schwetz</u>

Defendants urge that in addition to failure to allege falsity, plaintiff's claims should be dismissed because the Complaint does not adequately allege scienter under the PSLRA and Rule 9(b).  "To establish scienter, 'a complaint may (1) allege facts that constitute strong

---

[5] The Complaint alleges that the models were available at some unspecified point in July 2019 or August 2019 but does not affirmatively alleged that this point was at or prior to the July 2019 statements.

circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud.'" Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021) (quoting Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004)). Courts should "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering '*all* of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323, 326 (2007)). In order to raise a strong inference of scienter, "a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." Id. (emphasis in original; quoting ATSI, 493 F.3d at 99). Facts that fall outside the relevant period can be considered in determining whether a complaint alleges scienter. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."). "While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." Employees' Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306.

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the Company] or its officers 'benefitted in some concrete and personal way from the purported fraud.'" ECA, Loc. 134, 553 F.3d at 198 (quoting Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this

inquiry.  Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  Id. (citations omitted).

Scienter may also be alleged through strong circumstantial evidence of conscious misbehavior or recklessness.  Set Cap. LLC, 996 F.3d at 78.  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  Employees' Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306 (quoting ECA, Local 134, 553 F.3d at 199).  For example, where defendants concealed or misrepresented facts that would have disclosed an existing threat to monthly income and growth prospects, the complaint alleged a "conscious decision" to mislead investors.  Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204, 215-16 (2d Cir. 2020).

"Conscious recklessness" can be alleged through facts showing a state of mind that approximates actual intent.  See id. at 214-15.  "In securities fraud cases alleging a material omission, our recklessness standard requires that Plaintiffs allege a clear duty to disclose, and further allege facts supporting a strong inference of 'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  Id. at 213 (quoting Stratte-McClure, 776 F.3d at 106).  "In other words, the facts alleged in the Complaint must support the conclusion that [an omission] was at least 'highly unreasonable and . . . represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  Id. at 215 (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir.

2009)).  "'[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'"  Id. (quoting Novak, 216 F.3d at 308).  "Thus, in determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct."  Id.

"Where a defendant is a corporation, [the PSLRA] requires pleading facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'"  Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020) (quoting Teamsters Local 445, 531 F.3d at 195).  "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter."  Id.  "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker."  Id.  Scienter may be imputed to the corporation if the allegations point to deliberate acts of fraud, as opposed to an unintentional error caused by mere mismanagement.  Id.

As to the September 25, 2018 omissions noted above, plaintiff's allegations raise a cogent and compelling inference of scienter against Peabody, Kellow and Schwetz.  Here, plaintiff's theory of scienter is based on conscious misbehavior or recklessness.  As discussed, by September 22, 2018, when black smoke was first seen coming out of the main fan shaft at the NGM, Peabody had assembled the North Goonyella Task Force (which included Kellow and Schwetz to monitor the NGM after it was evacuated on September 1, 2018 due to elevated gas levels during a longwall move from the 9N panel to the new 10N panel.  The Task Force

consistently and constantly monitored the mine's "evolving conditions," consulted with

Peabody's safety and health experts from U.S. headquarters, and held daily meetings with

Australian government inspectors on site at the NGM.  In other words, the defendants knew,

either on September 22, 2018, or shortly thereafter, that there was smoke and likely fire at the

NGM.  And yet, on September 25, 2018, days after black haze was seen coming out of the main

fan shaft of Peabody's most profitable mine, Peabody, Kellow and Schwetz allowed not one but

two statements to be issued to the public that omitted any references to smoke or fire.  The

Complaint plausibly alleges that this omission was highly unreasonable and, at the pleading

stage, supports a strong inference of conscious recklessness approximating actual intent, and not

merely a heightened form of negligence.  Such allegations raise a cogent and compelling

inference that connects the allegedly misleading statements to defendants Peabody, Kellow and

Schwetz.  As the Court has previously noted, the issue may look very differently on a complete

factual record.

      The motion to dismiss for lack of scienter will be denied as to the statements in

paragraphs 274 and 275.

      E.    The Complaint Adequately Alleges Control Person Liability

      "Controlling-person liability is a form of secondary liability, under which a

plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and

culpable participation by the defendant in the perpetration of the fraud."  Suez Equity Invs., L.P.

v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001).  "To establish a prima facie case of

control person liability, a plaintiff must show (1) a primary violation by the controlled person,

(2) control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at

108.   "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" <u>S.E.C. v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

The Complaint alleges that defendants Kellow and Schwetz, as Peabody's then-CEO and then-CFO, respectively, during Peabody's primary § 10(b) violation—the omission as to the smoke and fire at the NGM in the September 25, 2018 statements—were active members of the North Goonyella Task Force during the month of September following the September 1, 2018 evacuation caused by elevated gas levels.  This task force not only monitored the situation at the NGM, but also helped coordinate Peabody's responses to it, including the statements made to the public during this time.  These allegations establish that Kellow and Schwetz not only had the power to direct or cause the direction of the management and policies of Peabody by virtue of their positions and membership in the task force, but also that they were, in a meaningful sense, culpable participants in the allegedly fraudulent statements on September 25, 2018.

CONCLUSION

The Court has considered all the arguments of the parties, whether or not they are expressly referenced here.  Defendants' motion to dismiss the Complaint is GRANTED in part and DENIED in part.  Specifically, the motion to dismiss is DENIED as to the statements quoted in paragraphs 274 and 275 of the Complaint.  It is GRANTED as to the statements quoted in paragraphs 228-29, 232, 234, 240, 244, 249, 251, 253, 256, 258-60, 263, 265-66, 269-273, 280-81, 288-91, 295-96, 304-10, 312(c), 317, 319-22, 327, 329 and 334-36 of the Complaint.

The Clerk is respectfully directed to terminate the motion and the related letter motion.  (Doc 42, 46.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 7, 2022