**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————— x
                                         :   Case No. 1:20-cv-08024-PKC

IN RE PEABODY ENERGY CORP.        :
SECURITIES LITIGATION               :

                                           :

                                           :

                                           :

                                           :
————————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF LEAD**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVE AND CLASS COUNSEL**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     SUMMARY OF FACTS ......................................................................................... 4

        A.      Company Background and the North Goonyella Mine ............................... 4

        B.      Mine Evacuation and Failed Containment Efforts.................................... 5

        C.      A Fire Breaks Out at North Goonyella No Later Than September 22, 2018.......... 5

III.    PROCEDURAL BACKGROUND.......................................................................... 6

IV.     ARGUMENT ....................................................................................................... 7

        A.      Securities Class Actions Are Well-Suited for Class Certification........................ 7

        B.      Rule 23(a) Is Satisfied............................................................................. 8

                1.      Numerosity Is Established ............................................................. 8

                2.      Commonality Is Established .......................................................... 9

                3.      Typicality Is Established.............................................................. 10

                4.      Adequacy Is Established .............................................................. 11

                5.      The Proposed Class Is Ascertainable ......................................... 13

        C.      Rule 23(b)(3) Is Satisfied ...................................................................... 14

                1.      Predominance Is Established ....................................................... 14

                        a.      Reliance Is Presumed Under *Affiliated Ute* .................................. 14

                        b.      The Fraud-on-the-Market Presumption of Reliance Applies........ 16

                        c.      Damages Are Measurable by a Common Methodology.............. 22

                2.      Superiority Is Established ............................................................ 23

        D.      Class Counsel Satisfies the Requirements of Rule 23(g)....................................... 25

V.      CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
　406 U.S. 128 (1972)............................................................................14, 15

*Amchem Prods., Inc. v. Windsor*,
　521 U.S. 591 (1997)...................................................................................12

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
　222 F.3d 52 (2d Cir. 2000).....................................................................11, 12

*In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA)
Litig.*,
　281 F.R.D. 134 (S.D.N.Y. 2012) .............................................................10, 11

*In re Barrick Gold Sec. Litig.*,
　314 F.R.D. 91 (S.D.N.Y. 2016) ...............................................................12, 23

*Barrows v. Becerra*,
　24 F.4th 116 (2d Cir. 2022) ..........................................................................7

*Basic Inc. v. Levinson*,
　485 U.S. 224 (1988)....................................................................................16

*Cammer v. Bloom*,
　711 F. Supp. 1264 (D.N.J. 1989) ............................................................ *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
　310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................17, 18, 19, 22

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
　2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................ 1, 7-8, 24

*In re China N.E. Petro. Holdings Ltd. Sec. Litig.*,
　2017 WL 11564337 (S.D.N.Y. Aug. 8, 2017)..................................................15

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
　2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)...................................................8

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
　502 F.3d 91 (2d Cir. 2007)...........................................................................24

*In re Deutsche Bank AG Sec. Litig.*,
　328 F.R.D. 71 (S.D.N.Y. 2018) .....................................................................24

ii

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................16

*Espinoza v. 953 Assocs. LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) ...........................................................................8

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  312 F.R.D. 332 (S.D.N.Y. 2015) .........................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...................................................................................10

*Fogarazzo v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) .........................................................................15

*Ft. Worth Gen. Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) .........................................................................13

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968).................................................................................24

*Gruber v. Gilbertson*,
  2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)......................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................14, 16

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ................................................................. *passim*

*In re JPMorgan Chase & Co.*,
  2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015).....................................................22

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
  311 F.R.D. 373 (S.D.N.Y. 2015) .........................................................................24

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................3, 21

*Kurtz v. Costco Wholesale Corp.*,
  818 F. App'x. 57 (2d Cir. 2020) (Summary Order).................................................8

*Martínek v. AmTrust Fin. Servs., Inc.*,
  2022 WL 326320 (S.D.N.Y. Feb. 3, 2022)..........................................9, 10, 13, 17

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014).........................................................9, 21, 22

*N.J. Carpenters Health Fund v. Res. Cap., LLC,*
   272 F.R.D. 160 (S.D.N.Y. 2011) ..................................................................13

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.,*
   772 F.3d 111 (2d Cir. 2014)............................................................................8

*Pearlstein v. BlackBerry Ltd.,*
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ............................................. *passim*

*In re Perrigo Co. PLC Sec. Litig.,*
   493 F. Supp. 3d 291 (S.D.N.Y. 2020)...........................................................12

*In re Petrobras Secs.,*
   862 F.3d 250 (2d Cir. 2017)........................................................7, 14, 16, 21

*In re Pfizer Inc. Sec. Litig.,*
   282 F.R.D. 38 (S.D.N.Y. 2012) .....................................................................11

*Pirnik v. Fiat Chrysler Autos., N.V.,*
   327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................8, 19

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,*
   277 F.R.D. 97 (S.D.N.Y. 2011) ......................................................................9

*Roach v. T.L. Cannon Corp.,*
   778 F.3d 401 (2d Cir. 2015)........................................................7, 22, 23

*In re Smith Barney Transfer Agent Litig.,*
   290 F.R.D. 42 (S.D.N.Y. 2013) .....................................................................15

*Strougo v. Barclays PLC,*
   312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................15, 19

*In re SunEdison, Inc. Sec. Litig.,*
   329 F.R.D. 124 (S.D.N.Y. 2019) (Castel, J.) ...............................................10

*Sykes v. Mel S. Harris & Assocs., LLC,*
   780 F.3d 70 (2d Cir. 2015)............................................................................23

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.,*
   546 F.3d 196 (2d Cir. 2008)...........................................................................21

*In re Teva Sec. Litig.,*
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ...............................................9, 22

*In re Vale S.A. Sec. Litig.,*
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .................................................23

*Villella v. Chem. & Mining Co. of Chile, Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) ...................................................................................10, 18

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...........................................................................1

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).......................................................................2, 14, 17, 22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................................................................7

*Williams v. KuCoin*,
   2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) .................................................................24, 25

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ......................................................................10

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .....................................................................................18, 19

*Yi Xiang v. Inovalon Holdings, Inc.*,
   327 F.R.D. 510 (S.D.N.Y. 2018) ...........................................................................................9

## Statutes & Rules

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j(b)........................................7, 23

Securities Exchange Act of 1934 Section 20(a), 15 U.S.C. § 78t(a) ...........................................7

Fed. R. Civ. P. 23(a) ......................................................................................................... *passim*

Fed. R. Civ. P. 23(b) ......................................................................................................... *passim*

Fed. R. Civ. P. 23(g) .....................................................................................................1, 12, 25

S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5 ...............................................................................7, 16

17 C.F.R. § 239.13 ...................................................................................................................19

Lead Plaintiff Oregon Public Employees Retirement Fund ("Plaintiff" or "OPERF") respectfully submits this memorandum of law in support of its Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g), seeking: (i) certification of a class of investors in the publicly traded common stock of Peabody Energy Corporation ("Peabody" or the "Company"), defined below; (ii) OPERF's appointment as Class Representative; and (iii) appointment of Labaton Sucharow LLP ("Labaton") as Class Counsel.

## I.  PRELIMINARY STATEMENT

This action arises out of Defendants'[1] material misrepresentations and omissions concerning a crippling fire at Peabody's then-most profitable mine at North Goonyella, Queensland, Australia.  Plaintiff seeks to certify a class of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Peabody Energy Corporation during the period from September 22, 2018 through September 28, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2]

This securities action is well-suited for class certification under Rule 23.  *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially

---

[1] "Defendants" are Peabody Energy Corporation, Peabody's former CEO Glenn L. Kellow ("Kellow"), and its former CFO Amy B. Schwetz ("Schwetz").

[2] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Peabody during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Peabody's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

amendable to class certification.").[3]  As explained further below, such actions are routinely certified in this District, and the Second Circuit has repeatedly emphasized that securities actions readily meet the requirements of Rule 23.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (holding that the burden to establish market efficiency "is not an onerous one").

Certification under Rule 23 is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  "Common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to the other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  The proposed Class satisfies these requirements.

*First*, with more than 120 million shares of Peabody common stock outstanding throughout the Analysis Period,[4] during which time an average of over 1 million shares traded daily, there are likely thousands of Class members, easily satisfying the numerosity requirement.

*Second*, this Action involves many common issues of law and fact.  Common questions of law and fact include whether: (1) Defendants' public statements during the Class Period misrepresented or omitted material facts; (2) Defendants knew or recklessly failed to discover that their statements were false and misleading; (3) the price of Peabody's common stock was artificially inflated as a result of Defendants' alleged misstatements and omissions; and (4) the Class suffered damages.

---

[3] Unless otherwise stated, all quotation marks, internal citations, and alterations are omitted and all emphasis is added.

[4] The Analysis Period is from September 22, 2017 through September 28, 2019 as the Class Period of seven trading days is arguably insufficiently long to provide data for certain analyses.

***Third***, OPERF's claims are typical of the claims of the Class because, like all other Class members, it purchased Peabody common stock at prices artificially inflated by Defendants' alleged false and misleading statements and omissions.  When the truth was revealed, the price of Peabody's common stock declined, injuring OPERF and the Class.  The injuries suffered by OPERF and the Class arise from the same alleged misconduct.

***Fourth***, OPERF is an institutional investor that will adequately protect the interest of the Class.  OPERF is the type of large institutional investor that Congress envisioned as best positioned to lead securities class actions.  OPERF's interests do not conflict with other Class members' interests, and along with its counsel, OPERF has prosecuted – and will continue to prosecute – this Action vigorously on behalf of the entire Class.  Additionally, OPERF's chosen counsel, Labaton, is highly experienced and has successfully prosecuted numerous, complex securities fraud class actions.

***Fifth***, common questions of law and fact predominate over any individual questions.  The primary elements of Plaintiff's claims – including falsity, materiality, scienter, and loss causation – are issues that affect all Class members equally and are subject to common proof.  The same is true for the element of reliance, as the "fraud-on-the-market" presumption of reliance applies. During the Class Period, Peabody common stock traded on the NYSE which "courts presume to be an efficient market."  *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 217 (S.D.N.Y. 2021).  Additionally, Plaintiff's expert, Chad Coffman ("Coffman"), has confirmed that the market for Peabody common stock was efficient throughout the Class Period, determining that each market efficiency factor set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), weighs in favor of market efficiency.  *See infra*, IV.C.1.b., Ex. 1 (the

"Coffman Rpt.").[5] Common issues concerning damages likewise predominate.  The out-of-pocket measure that will eventually be used to calculate Class members' damages has been repeatedly endorsed for securities class actions.

*Sixth*, the class action device is the superior method for fairly and efficiently adjudicating this action.  Given the large number of investors who purchased Peabody common stock during the Class Period, it would be far too costly and inefficient for each individual Class member to file and litigate separate actions.

Since this action easily meets each of these requirements, Plaintiff respectfully requests that the Court grant its Motion for Class Certification and certify the Class.

## II.     SUMMARY OF FACTS

### A.     Company Background and the North Goonyella Mine

At the time of the filing of the Complaint, Peabody was the largest coal mining company in the world, owning and operating 23 mines in the United States and Australia.  ¶29.[6]  The Company's largest business segment was Australian Metallurgical Mining, which operated the North Goonyella mine (the "NG mine" or "North Goonyella"), the Company's most profitable mine having generated approximately $100 million of Peabody's total operating profit of $498 million in 2017.  ¶¶30-36.  Defendants repeatedly touted the importance of the NG mine to the public, including Defendant Kellow's contention that it was the "core of [Peabody's] met coal platform."  ¶37.  In July 2018, just months before the fire destroyed the NG mine, Peabody

---

[5] Citations to "Ex. __" refer to the exhibits attached to the accompanying Declaration of Christine M. Fox in Support of Plaintiff's Motion for Class Certification.

[6] Citations to "¶__" refer to paragraphs of the Consolidated Amended Class Action Complaint (the "Complaint"); ECF No. 38.

announced a mine life extension at North Goonyella, as it introduced a new mining area at the mine that would see longwall mining continue at the NG mine until 2026.  ¶39.

### B.      Mine Evacuation and Failed Containment Efforts

In late August 2018, the month before the September 2018 fire at the NG mine, high methane and ethylene detections at the site led to evacuations of the mine.  ¶¶102-107.  The final evacuation of the mine took place on September 1, 2018, when carbon monoxide levels reportedly reached 700 ppm.  ¶¶108-109.  Following the September 1, 2018 evacuation, Peabody personnel were not allowed, with extremely limited exceptions, back into the North Goonyella mine until July 2019.  ¶110.  Throughout September 2018, Peabody attempted to contain the threat from the elevated gas levels.  ¶¶111-19.  Yet, the gas levels remained high, and the temperature readings were getting "hotter and hotter."  ¶¶131-34.  Australian regulators, who were monitoring the developments at the North Goonyella mine on an at least daily basis following the evacuation as well, confirmed these volatile and risky conditions.  ¶¶143-50.  On September 19, 2018, Peabody issued a Form 8-K declaring that operations at North Goonyella had been "interrupted by temporarily elevated gas levels."  ¶¶176, 271-73.

### C.      A Fire Breaks Out at North Goonyella No Later Than September 22, 2018

Peabody's containment efforts throughout September 2018 failed, as the gas levels and temperature of the NG mine remained too high.  *See* ¶151.  No later than September 22, 2018, reports of black smoke billowing out of the mine circulated, as did accounts of a haze coming out of the main fan shaft.  ¶152.  On September 23, 2018, a MRE discussed the "acceleration of the spontaneous combustion event," as the carbon monoxide levels soared from 600 ppm to 1,500 ppm and hydrogen levels peaked at 1,600 ppm.  ¶¶152-53.  The next day, on September 24, 2018, the carbon monoxide levels skyrocketed to 28,000 ppm while the hydrogen levels fluctuated wildly between 2,000 ppm and 36,000 ppm.  ¶154.  Around this time, Peabody lost its

ability to record gas readings at the mine, as it continued to employ containment efforts, moved its control room away from the site, and relocated a majority of its workforce approximately 15 kilometers away.  ¶¶155-56.

On September 25, 2018, Peabody again issued a statement on Form 8-K downplaying the frightening and dangerous situation at the NG mine.  ¶177.  Peabody stated that "gas levels at [the] North Goonyella Mine have been variable and remain elevated."  ¶¶177, 274-75.  Later that same day, Peabody issued a second Form 8-K – an "Updated Statement" – reiterating that the mine was experiencing "elevated gas levels" and insisting that "Peabody has relocated more than half of the major equipment" left underground at the site of the fire.  ¶275. On September 27, 2018, the Australian mine regulator, issued a directive to suspend operations at the North Goonyella mine and to withdraw personnel from the site until an acceptable level of risk was achieved.  ¶158.  That same day, Peabody issued a statement noting that "[m]ine personnel have observed smoke coming from the mine, indicating a likely fire in a portion of the mine."  ¶276. The next day, on September 28, 2018, the QMI issued an order that no personnel were to enter the mine.  ¶160.  Also on September 28, 2018, Peabody issued another Form 8-K, belatedly confirming that the Company's most profitable mine was on fire, that the fire was "ongoing." ¶¶178, 279-80.  In response, Peabody's stock fell $5.54 per share, or 13.5%, closing at $35.64 per share, down from the previous day's closing price of $41.18 per share.  ¶282.

## III.   PROCEDURAL BACKGROUND

OPERF is the retirement and disability fund for public employees in Oregon, with approximately $95 billion in total pension assets under management as of June 30, 2022.[7]

---

[7] OPERF's Assets Under Management were approximately $75.6 billion as of March 2021 when the Complaint was filed. ¶23.

OPERF purchased or otherwise acquired Peabody common stock during the Class Period and suffered significant losses when the truth that was concealed by Defendants' misstatements and omissions was revealed to the market. *Id.*

On January 12, 2021, OPERF was appointed Lead Plaintiff in this Action. ECF No. 26. On March 19, 2021, OPERF filed the Complaint alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules promulgated thereunder, including U.S. Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, against Peabody, Glenn Kellow, and Amy Schwetz. ECF No. 38.

On March 7, 2022, the Court issued an Order granting in part and denying in part Defendants' motion to dismiss. ECF No. 50. The Court sustained Plaintiff's allegations of misstatements and omissions related to the September 2018 fire at North Goonyella. *Id.* The Parties subsequently agreed to, and the Court approved, a case schedule directing Plaintiff to file this motion by July 15, 2022. ECF No. 60.

## IV.   ARGUMENT

### A.   Securities Class Actions Are Well-Suited for Class Certification

To certify the Class, Plaintiff must establish that the proposed class satisfies the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022). Further, the Second Circuit recognizes an implied "ascertainability" requirement, a "modest threshold" that "is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 257 (2d Cir. 2017). Additionally, Plaintiff must also demonstrate that the proposed class satisfies Rule 23(b). *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). "Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially

amendable to class certification" and the Second Circuit has instructed district courts to interpret Rule 23 liberally.  *See Chi. Bridge & Iron Co.*, 2020 WL 1329354 at *2.  Ultimately, "the Second Circuit's general preference is for granting rather than denying class certification" (*see Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011)) and "[d]oubts about whether Rule 23 has been satisfied should be resolved in favor of certification" (*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *3 (S.D.N.Y. Aug. 22, 2017)).

Class certification is appropriate where, as here, the requirements of Rule 23 are satisfied by a preponderance of the evidence.  *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x. 57, 60 (2d Cir. 2020) (Summary Order).  The inquiry at this stage is not whether Plaintiff will ultimately prevail on the merits, but whether the requirements of Rule 23 are met; thus, the Court "should not assess any aspect of the merits unrelated to a Rule 23 requirement."  *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 (S.D.N.Y. 2018) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").  As demonstrated below, all requirements of Rule 23 are met here.

### B.     Rule 23(a) Is Satisfied

#### 1.     Numerosity Is Established

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  Although "the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," it "is presumed for classes larger than forty members."  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014).  "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021).

Here, the proposed Class consists of thousands of members.  Additionally, during the Class Period, Peabody's stock was heavily traded on the NYSE, with between 100.3 million and 130.7 million shares of Peabody common stock outstanding during the Analysis Period and therefore the Class Period.  Coffman Rpt. ¶66. Joinder of this large number of investors would be impractical and the "numerosity" requirement is thus satisfied.  *See Martínek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *5 (S.D.N.Y. Feb. 3, 2022) (certifying class where 36 million shares outstanding); *AMC*, 338 F.R.D. at 211 (certifying class where between 34.3 million and 55.1 million shares outstanding).

### 2.    Commonality Is Established

The Rule 23(a)(2) requirement that there are questions of law or fact common to the class is a "low hurdle" that Plaintiff easily overcomes here.  *See Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 522 (S.D.N.Y. 2018).  "Even a single common question of law or fact may suffice to satisfy the commonality requirement." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011).  In securities actions, the commonality requirement is satisfied "[w]here plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014); *see also In re Teva Sec. Litig.*, 2021 WL 872156, at *4 (D. Conn. Mar. 9, 2021) (same).

Here, all Class members' claims arise out of the same misrepresentations and omissions by Defendants and are subject to common proof.  Questions of law or fact common to the Class include: (i) whether Defendants' statements were materially false and misleading; (ii) whether Defendants omitted to state material facts required to make their statements not misleading; (iii) whether the underlying misrepresentations and omissions were made with scienter; (iv) whether the price of Peabody common stock was artificially inflated during the Class Period; and (v)

whether Defendants' misrepresentations and omissions caused Class members to suffer economic loss. *See Pearlstein*, 2021 WL 253453, at *7 (commonality satisfied by common issues including whether defendants made misrepresentations, whether misrepresentations were material, and whether defendants acted with scienter); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (such issues are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff"). Indeed, here, "[a]ll class members' entitlement to relief would turn on whether the misstatements and omissions were false, misleading and material, and whether purchasers of the [common stock] shares suffered losses resulting therefrom." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 140 (S.D.N.Y. 2019) (Castel, J.). Thus, commonality is established.

### 3.      Typicality Is Established

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Courts have made clear that "the typicality requirement is not demanding." *See Martínek*, 2022 WL 326320 at *6; *Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019). To show typicality, the plaintiff must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see also Pearlstein*, 2021 WL 253453, at *7 (same). "In a securities class action, when plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." *In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

Here, the typicality requirement is easily met.  Like other members of the Class, OPERF purchased shares of Peabody common stock during the period in which the stock price of Peabody shares was artificially inflated as a result of Defendants' omissions and misrepresentations.  Further, like the Class, OPERF was harmed when the truth concealed by those omissions and misrepresentations was publicly revealed.  ¶¶279-282, 386.  The proof necessary for Plaintiff to prevail on its individual claims is the same proof that is required to prove the claims of the rest of the Class.  *See Bank of Am.*, 281 F.R.D. at 139 (typicality established where "class plaintiffs assert that they acquired BofA securities at prices allegedly inflated by defendants' misstatements and/or omissions, and have an interest in maximizing their recovery").  Accordingly, typicality is established.

### 4.    Adequacy Is Established

Rule 23(a)(4) requires that the proposed class representative "will fairly and adequately protect the interests of the class."  Courts assess two components in their adequacy analysis: "First, class counsel must be qualified, experienced and generally able to conduct the litigation, and second, the class members must not have interests that are antagonistic to one another." *AMC*, 338 F.R.D. at 212. Indeed, "[c]ourts rarely deny class certification on the basis of inadequacy" and only do so "in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying the claims, or are so lacking in credibility that they are likely to harm their case."  *AMC*, 338 F.R.D. at 212; *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012).

In complex securities litigations, the "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61-62 (2d Cir. 2000).  In *Baffa*, the Second Circuit held it was sufficient that the proposed class representative "understood that the

[] investments were the subject of [the] litigation" and "that he and others had sustained a loss

due to the alleged fraud." *Id.* at 62.  Indeed, a plaintiff is adequate where it "participate[s] in

discovery by producing documents and submitting to depositions" and "follow[]s every key

event in the litigation," while "delegat[ing] a significant degree of decision-making authority to

[its] attorneys."  *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 295 (S.D.N.Y. 2020).

Here, both elements of Rule 23(a)(4)'s adequacy requirement are easily satisfied.  First,

Labaton Sucharow LLP is a sophisticated law firm with considerable experience in complex

securities cases and is therefore "qualified, experienced and generally able to conduct the

litigation."  *See* Ex. 2; *AMC*, 338 F.R.D. at 213.  Plaintiff respectfully submits that proposed

counsel is one of the most experienced securities class action firms in the country, having

recovered more than $18 billion for investors since 1995.  Because Labaton has devoted

substantial time and resources to the litigation and will continue to do so, Labaton satisfies Rule

23(g) and should be appointed as Class Counsel.

Second, OPERF "possess[es] the same interest and suffer[ed] the same injury as the class

members," *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-626 (1997), and no actual or

potential conflicts exist between Plaintiff and any proposed Class member relating to recovering

the damages they suffered due to their purchases of Peabody stock at artificially inflated prices.

Plaintiff's interests are directly aligned with the interests of the proposed Class members, who

were injured by the same misstatements and omissions, and have the same interest in

establishing Defendants' liability and obtaining the maximum recovery and it is in Plaintiff's

interest to vigorously prosecute this action on behalf of itself and the Class.  *See Perrigo*, 493 F.

Supp. 3d at 295; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103-104 (S.D.N.Y. 2016).

Furthermore, OPERF understands the nature of the claims and its fiduciary duties to the putative class, which it has diligently fulfilled for more than two years. On July 7, 2022, Brian deHaan, Senior Assistant Attorney General at Oregon Department of Justice, which oversees litigation matters for OPERF pursuant to Oregon statute, was deposed. His testimony demonstrates that OPERF's knowledge of the case far exceeds the "general knowledge [] sufficient to show adequacy" in this Circuit. *See N.J. Carpenters Health Fund v. Res. Cap., LLC*, 272 F.R.D. 160, 164 (S.D.N.Y. 2011); *see also Ft. Worth Gen. Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 134 (S.D.N.Y. 2014) (same).

### 5.    The Proposed Class Is Ascertainable

Though not a required showing under Rule 23, "[t]he standard for ascertainability is not demanding.  It is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015).  This implied requirement dictates that "a class must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member, and must be defined by objective criteria that are administratively feasible, such that identifying its members would not require a mini-hearing on the merits of each case." *Martínek*, 2022 WL 326320, at *8.  The proposed Class is defined as follows: All persons or entities who or which purchased or otherwise acquired the publicly traded common stock of Peabody Energy Corporation during the period from September 22, 2018 through September 28, 2018, inclusive (the "Class Period"), and were damaged thereby.[8]  Here, "[t]he proposed class definition clearly delineates the class's boundaries by the dates of investors' transactions" in Peabody stock, and

---

[8] The exclusions are defined at footnote 2, *supra.*

"[a]scertaining the members of the class will be easily administrable by reference to investor records." *Pearlstein*, 2021 WL 253453, at *13.  Consequently, ascertainability is met.

### C.      Rule 23(b)(3) Is Satisfied

Once a proposed class representative shows that the class meets the four requirements of Rule 23(a), the court determines whether the action can be maintained under one of the three subsections of Rule 23(b).  Here, the proposed Class satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute.

#### 1.      Predominance Is Established

The Supreme Court has held that "the predominance requirement is a test readily met in certain cases alleging … securities fraud." *AMC*, 338 F.R.D. at 214.  The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions… can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof."  *See Petrobras*, 862 F.3d at 270.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*").  Here, issues of both law and fact predominate over any individual issues.

##### a.      Reliance Is Presumed Under *Affiliated Ute*

As the Complaint alleges, a presumption of reliance is appropriate here under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the fraud claims are grounded partly in Defendants' material omissions.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017); ¶391.  In cases "involving primarily a failure to disclose, positive proof of reliance is not

a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.[9]  Rather, "[a]ll that is necessary is

that the facts withheld be material in the sense that a reasonable investor might have considered

them important in the making of [their investment] decisions." *Id.* at 153.  In this District,

"[w]hen a defendant's fraud consists primarily of omissions, "[r]equiring a plaintiff to show a

speculative set of facts, i.e., how he would have behaved if omitted material information had

been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith*

*Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (describing the *Affiliated Ute*

doctrine as a "pragmatic one.").[10]  Indeed, the *Affiliated Ute* presumption reflects the reality that

where information is omitted "reliance as a practical matter is impossible to prove." *Gruber v.*

*Gilbertson*, 2019 WL 4439415, at *6-7 (S.D.N.Y. Sept. 17, 2019).

　　This case fits squarely within the intended application of the *Affiliated Ute* presumption.

Plaintiff's claims arise from Defendants' alleged material omissions regarding the existence of a

fire at the NG mine in September 2018.  ¶¶391-394.  Defendants had an obligation to disclose

this material information in order to not render misleading Defendants' statements in the

September 25, 2018 Form 8-Ks.  ¶¶391-394.  Accordingly, reliance is presumed under *Affiliated*

*Ute*.  *See, e.g.*, *AMC*, 338 F.R.D. at 216 (granting class certification and applying *Affiliated Ute*

where defendants omitted material information); *Gruber*, 2019 WL 4439415 at *7 (granting

class certification and applying *Affiliated Ute* where action "primarily omissions case"); *In re*

*China N.E. Petro. Holdings Ltd. Sec. Litig.*, 2017 WL 11564337, at *5 (S.D.N.Y. Aug. 8, 2017).

---

[9] Additionally, the "existence of affirmative misrepresentations" does not "preclude
[plaintiffs] from relying on the *Affiliated Ute* presumption" at the class certification stage.
*Strougo v. Barclays PLC*, 312 F.R.D. 307, 319 (S.D.N.Y. 2016).

[10] The *Affiliate Ute* presumption "is not undermined simply because a defendant makes
misstatements at the same time it omits material information." *Fogarazzo v. Lehman Bros., Inc.*,
232 F.R.D. 176, 186 (S.D.N.Y. 2005).

### b.     The Fraud-on-the-Market Presumption of Reliance Applies

To the extent Defendants argue that Plaintiff's claims are based on affirmative misstatements, Plaintiff may also easily demonstrate it is entitled to a presumption of reliance based upon the "fraud-on-the-market" theory, as established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)) and reaffirmed in *Halliburton II*, which provides that a proposed class representative may: "[S]atisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." 573 U.S. at 283-84.  To invoke the *Basic* presumption of reliance, Plaintiff must establish that (1) the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011).  Here, Plaintiff has made these requisite showings.

*First*, concerning publicity, Plaintiff alleges that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or artificially maintained the market price of Peabody's stock.  *See, e.g.*, ¶¶391-394.  *Second*, on market timing, Plaintiff alleges that it purchased Peabody stock during the Class Period, and suffered losses when the artificial inflation came out of the stock price when the truth was disclosed.  ¶¶383-86.  *Finally*, Peabody stock traded in an efficient market, as demonstrated below; thus, all prerequisites for the fraud-on-the-market presumption are satisfied.

In the Second Circuit, the burden on Plaintiff to show market efficiency "is not an onerous one."  *Petrobras*, 862 F.3d at 278.  Establishing market efficiency at the class certification stage is a flexible inquiry, as the Second Circuit has "repeatedly [] declined to adopt

a particular test for market efficiency." *Waggoner*, 875 F.3d at 94.  Accordingly, there are no

"distinct requirements" in proving market efficiency; rather, the Second Circuit has endorsed

"opting instead for a holistic analysis based on the totality of the evidence presented."

*Waggoner*, 875 F.3d at 96-97.  Here, based on both direct and indirect evidence, Plaintiff has

established that Peabody common stock traded in an efficient market during the Class Period,

and the presumption of reliance applies.

Importantly, during the Class Period, Peabody common stock was listed and actively

traded on the NYSE, which "courts presume to be an efficient market."  *See Martínek*, 2022 WL

326320, at *12; *AMC*, 338 F.R.D. at 217; *see also Carpenters Pension Tr. Fund of St. Louis v.

Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015) (NYSE listing "weighs in favor of finding

market efficiency").

In addition, when assessing whether a security trades in an efficient market, courts

generally consider the following non-exhaustive list of factors, called the *Cammer* factors:

> (1) average weekly trading volume; (2) the existence of a
> significant number of analyst reports; (3) the existence of market
> makers and arbitrageurs in the security; (4) the eligibility of the
> company to file an S-3 registration statement; and (5) a history of
> immediate movement of the stock price caused by unexpected
> corporate events or financial releases.

*Martínek*, 2022 WL 326320, at *9 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J.

1989).

Here, each *Cammer* factor supports a finding that Peabody stock traded in an efficient

market during the Class Period, as shown in the expert report of Chad Coffman, CFA.  Mr.

Coffman analyzed each *Cammer* factor (as well as several other) and concluded that the market

for Peabody's common stock was efficient during the Analysis Period and therefore the Class

Period.  *See generally* Coffman Rpt. ¶¶21-64.

17

*Peabody Common Stock Had a High Weekly Trading Volume.*  Courts consistently hold that "a turnover of two percent or more of outstanding shares gives rise to a strong presumption of market efficiency."  *AMC*, 338 F.R.D. at 217 (citing *Cammer*, 711 F. Supp. at 1286); *see also Villella*, 333 F.R.D. at 54 (finding weekly trading volume of 4.4% sufficient under *Cammer*). Here, the weekly trading volume for Peabody common stock during the Analysis Period was 4.5%, far exceeding the 1% or 2% threshold in *Cammer*.  Coffman Rpt. ¶29.  The average weekly trading volume was 5.11 million shares.  *Id.*

*Peabody Common Stock Was Thoroughly Covered By Analysts.*  "*Cammer* recognizes that a stock covered by a significant number of analysts is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors."  *Carpenters Pension*, 310 F.R.D. at 79.  At least 14 securities analysts from major financial institutions published reports on Peabody's securities during the Analysis Period (Coffman Rpt. ¶¶32-34), resulting in at least 256 individual analyst reports on Peabody from September 22, 2017 to September 28, 2019, further supporting a finding of market efficiency.  *See Villella*, 333 F.R.D. at 54 (coverage by 15 analyst firms supported finding of market efficiency); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (coverage by at least three analysts supported finding of market efficiency).

*There Were Numerous Market Makers for Peabody Common Stock.*  The third *Cammer* factor considers the existence of the market makers and traders who increase liquidity in the market.  *Carpenters Pension*, 310 F.R.D. at 79.  As *Cammer* explained, market makers and arbitrageurs "ensure completion of the market mechanism" and "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87.  At all relevant times, Peabody common stock traded on the

NYSE with at least 106 market makers during the Analysis Period.  Coffman Rpt. ¶¶40-42.  That Peabody stock traded on the NYSE with scores of market makers is additional strong evidence that its common stock traded in an efficient market. *See Pearlstein*, 2021 WL 253453, at *16.

***Peabody Was Eligible to File Form S-3 Registration Statements***.  The fourth *Cammer* factor examines whether a company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve straight months and has a public float of at least $75 million.  17 C.F.R. § 239.13.  "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447.  Peabody satisfied the condition for S-3 registration eligibility throughout the Analysis Period, and therefore throughout the Class Period.  Coffman Rpt. ¶¶43-45.

***Peabody's Stock Price Reacted to New, Company-Specific Information During the Class Period.***  The final *Cammer* factor asks whether Plaintiff can make a *prima facie* showing that, during the Class Period, Peabody's stock price quickly responded to the release of new, Company-specific, "unexpected" news.  *Cammer*, 711 F. Supp. at 1287.  This Court has recognized that when "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact." *Pirnik*, 327 F.R.D. at 44-45, n. 3.  Thus, here, where each of the first four *Cammer* factors strongly supports a finding of market efficiency, an "event study" establishing the fifth *Cammer* factor is not "necessary to demonstrate [market] efficiency."  *Strougo*, 312 F.R.D. at 320.  Nonetheless, the evidence submitted in the Coffman Report, which includes an event study, demonstrates a causal connection between new, Peabody-specific information and the reactions in the market price of Peabody common stock.  Coffman Rpt. ¶¶46-64.

As detailed in his expert report, Mr. Coffman has shown through empirical analyses based on the results of his event study that Peabody's stock price reacted in an efficient manner to new information about the Company.  Coffman Rpt. ¶¶47-64.  Using a well-established methodology, Mr. Coffman first created regression models to control for market and industry wide factors that might influence the price of Peabody common stock.  Coffman Rpt. ¶¶50-51. These models allowed him to isolate the change in Peabody's common stock price that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model (which, as noted above, controls for market and industry factors).  Coffman Rpt. ¶¶53-54.

Then, Mr. Coffman performed empirical analysis based on the generally accepted and commonly utilized event study methodology on two sets of days: (1) days during the Analysis Period on which Peabody made earnings announcements, and (2) days during the Analysis Period on which no news articles or analyst reports about Peabody were released, and the Company did not make SEC filings or issue press release.  *Id.* at ¶¶56-64.  Because it is more likely that material, new information about the Company would be released to the market on days with earnings announcements than on days with no identified news released or Company SEC filings or press releases, in an efficient market, one would expect to find a greater percentage of earnings announcement days with a statistically significant stock price movement – i.e., a movement that could not be accounted for by random chance alone.

Indeed, that is precisely what Mr. Coffman found.  His analysis shows that Peabody common stock exhibited a statistically significant price change at the 95% confidence level or greater on 50.00% of the earnings announcement days compared to only 2.33% of the days with no Peabody-related news having statistically significant reactions – a difference across those two

sets of days that is itself highly statistically significant.  *Id.* at ¶59 & n.67.  Furthermore, both the magnitude of the average change in the price of the Peabody common stock and its daily trading volume were statistically significantly higher on earnings announcement days as compared to days without news, analyst reports, SEC filings, or press releases.  *Id.* at ¶¶60-63.  Based on this analysis, Mr. Coffman concluded that there was "a clear cause-and-effect relationship between new material news and changes in the market price of Peabody Common Stock during the Analysis Period and therefore the Class Period, which is contained entirely within the Analysis Period."  *Id.* at ¶64; *see also, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-208 (2d Cir. 2008) (observing that an event study "has been considered *prima facie* evidence of existence of such a causal relationship.").

In addition to the *Cammer* factors, other factors may support market efficiency. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).  For example, the *Krogman* factors inquire into (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ("the float").  *See Petrobras*, 862 F.3d at 276.  An analysis of the *Krogman* factors confirms the conclusion that Peabody stock traded in an efficient market.

**Market capitalization.**  During the Analysis Period, Peabody's market capitalization (the total value of a company's equity) averaged $3.83 billion.  *See* Coffman Rpt. ¶67.  Peabody's market capitalization during the Analysis Period was greater than at least 64% of NYSE-listed and NASDAQ-listed stocks, respectively.  *See* Coffman Rpt. ¶67.  Courts have found less substantial market capitalizations to be indicators of market efficiency.  *See Carpenters Pension*, 310 F.R.D. at 92 (finding that market capitalization of between $0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (finding market capitalization of $292 to

$585 million supported market efficiency).  Peabody's substantial market capitalization supports a finding of market efficiency.  *See* Coffman Rpt. ¶68.

 ***Bid-ask spread.***  Bid-ask spreads are a measure of transaction costs; low transactions costs indicate that arbitrage opportunities can be exploited.  *See* Coffman Rpt. ¶69.  The bid-ask spread for Peabody stock during the Analysis Period ranged between 0.025% and 0.059%%.  *See* Coffman Rpt. ¶70.  The bid-ask spreads on Peabody stock during the Class Period were comparable to those of randomly sampled stocks listed on the NYSE.  *See* Coffman Rpt. ¶70.  Such a low bid-ask spread indicates that arbitrage opportunities could be exploited, which is evidence of market efficiency.  *In re Teva*, 2021 WL 872156, at *15 (0.035% bid-ask spread indicated market efficiency); *Pearlstein*, 2021 WL 253453, at *16 (0.09% bid-ask spread indicated market efficiency); *In re JPMorgan Chase & Co.*, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) (0.02% bid-ask spread indicated market efficiency).

 ***The percentage of stock not held by insiders ("the float").***  Courts have held that a large float percentage can be an indicator of market efficiency.  *See Pearlstein*, 2021 WL 253453, at *16 (average float of 84.4% of shares outstanding supported finding of market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (public float of between 31% and 43% supported market efficiency).  Here, during the Analysis Period, insiders held, on average, 34.20% of all outstanding shares of Peabody Common Stock, meaning that approximately 65.80% of Peabody's shares were held by non-insiders.  Coffman Rpt. ¶71.  Peabody's float further indicates market efficiency.  Coffman Rpt. ¶71.

   **c.** **Damages Are Measurable by a Common Methodology**

 Plaintiff's ability to establish Class members' damages using a common methodology further demonstrates predominance.  *See Waggoner*, 875 F.3d at 105-106; *Roach*, 778 F.3d at 405-407.  Courts in this District regularly find that damages issues in securities fraud actions are

common to all class members, as damages can be calculated on a class-wide basis using an event study to measure the price impact of material, company-specific information disclosed to the public.  *See, e.g.*, *Barrick Gold*, 314 F.R.D. at 106.  Notably, however, Rule 23 does not require plaintiff to set forth a detailed model for calculating damages at the class certification stage.  *See Waggoner*, 875 F.3d at 105-106; *Roach*, 778 F.3d at 407; *see also Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").  "In general, courts have found *Comcast* to pose a low bar."  *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *18 (E.D.N.Y. Jan. 11, 2022).

Courts recognize that out-of-pocket damages under Section 10(b) of the Exchange Act are "measurable on a class-wide basis" and do not raise "individualized damages issues that defeat predominance."  *Barrick Gold*, 314 F.R.D. at 106.  Here, Plaintiff's class-wide damages methodology more than satisfies *Comcast*.  As Mr. Coffman explains, damages are calculable with the standard out-of-pocket methodology.  *See* Coffman Rpt. ¶77.  This methodology quantifies the amount of artificial inflation, caused or maintained by Defendants' alleged misconduct, that existed in Peabody's stock on each day of the Class Period.  *See* Coffman Rpt. ¶78.  Mr. Coffman's proposed methodology is consistent with Plaintiff's theory of liability that Defendants' misstatements and omissions artificially inflated Peabody's stock price during the Class Period.  *See Pearlstein*, 2021 WL 253453, at *22 (finding "Plaintiffs have provided a class-wide model for calculating damages arising from [their] theory of liability" and "have met their burden under *Comcast*.").

### 2.    Superiority Is Established

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation.  Together with predominance, the superiority requirement "ensures that the class will

be certified only when it would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Courts have universally recognized the superiority of class actions in cases alleging securities fraud, which "easily satisfy" this requirement, *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015), as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968).

To determine whether a class action is superior to other methods of adjudication, courts consider the following four factors: (i) the interests of members of the class in individually controlling the prosecution of separate actions; (ii) whether other litigation has already commenced; (iii) the desirability or undesirability of concentrating claims in one forum; and (iv) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).  Here, each of these factors supports a finding of superiority.  *See Chi. Bridge & Iron Co.*, 2020 WL 1329354 at *11.

Plaintiff seeks to represent a Class consisting of a large number of geographically dispersed Peabody common stock purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive.  *See In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 85 (S.D.N.Y. 2018) (finding securities suits easily satisfy the superiority requirement where "large numbers of geographically dispersed persons" make up Class).  Additionally, concentrating litigation against Defendants "in a single forum, particularly this one, has clear benefits," like eliminating the "risk of inconsistent adjudication" and promoting "the fair and efficient use of the judicial system."  *Williams v. KuCoin*, 2021 WL 5316013, at *16

(S.D.N.Y. Oct. 21, 2021).  Finally, securities class actions do not generally raise manageability issues and are routinely certified in the Southern District, which "is well known to have expertise in securities law." *Williams*, 2021 WL 5316013, at *16.  Thus, superiority is easily established.

### D.      Class Counsel Satisfies the Requirements of Rule 23(g)

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.  *See* Fed. R. Civ. P. 23(g)(1)(A).

Plaintiff has retained Labaton as lead counsel in this matter, and seeks its appointment as Class Counsel, pursuant to Rule 23(g).  Labaton is highly experienced in litigating federal securities class actions and other complex litigation.  Moreover, counsel has demonstrated its commitment to prosecuting this action, and will continue to devote the resources required to serve the Class's best interests.  *See Pearlstein*, 2021 WL 253453, at *11.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Lead Plaintiff Oregon Public Employees Retirement Fund to serve as Class Representative; (iii) appoint Labaton as Class Counsel; and (iv) grant such other and further relief as the Court deems just and proper.

Dated: July 15, 2022

Respectfully submitted,

**LABATON SUCHAROW, LLP**


By: */s/ Christine M. Fox*
　　Christine M. Fox
　　Carol C. Villegas
　　Mark Willis
　　James M. Fee
　　140 Broadway
　　New York, New York 10005
　　Telephone: (212) 907-0700
　　Facsimile: (212) 818-0477
　　cfox@labaton.com
　　cvillegas@labaton.com
　　mwillis@labaton.com
　　jfee@labaton.com

　　*Counsel for Lead Plaintiff Oregon Public*
　　*Employees Retirement Fund and the Proposed*
　　*Class*