**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  | x |  |
|---|---|---|
|  | : | Case No. 1:20-cv-08024-PKC |
| IN RE PEABODY ENERGY CORP. | : | |
| SECURITIES LITIGATION | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | x | |

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**<u>AND PLAN OF ALLOCATION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ............................................................................................................................3

I.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
ADEQUATE, AND WARRANTS FINAL APPROVAL...................................................3

     A.    The Law Favors and Encourages Settlement of Class Action Litigation....................3

     B.    The Standards for Final Approval .............................................................................3

     C.    Lead Plaintiff and Lead Counsel Have Adequately Represented the
Settlement Class ......................................................................................................5

     D.    The Settlement Was Reached After Robust Arm's-Length Negotiations...................7

     E.    The Relief Provided by the Settlement Is Adequate ...................................................7

          1.    The Complexity, Expense, and Likely Duration of the Litigation Support
Approval of the Settlement ...........................................................................8

          2.    The Risks of Establishing Liability and Damages Support Approval of
the Settlement..............................................................................................9

     F.    The Effective Process for Distributing Relief to the Settlement Class .....................15

     G.    The Requested Attorneys' Fees and Expenses Are Reasonable ...............................16

     H.    The Relief Provided in the Settlement Is Adequate Taking Into Account All
Agreements Related to the Settlement ....................................................................16

     I.     Application of the Remaining *Grinnell* Factors Support Approval ..........................17

          1.    The Ability of Defendants to Withstand a Greater Judgment............................17

          2.    The Reaction of the Settlement Class to Date .....................................................17

          3.    The Stage of the Proceedings and the Amount of Information Available
to Counsel Support Approval of the Settlement ..................................................18

          4.    The Range of Reasonableness of the Settlement Amount in Light of the
Best Possible Recovery and All the Attendant Risks of Litigation
Support Approval of the Settlement .....................................................................19

II.     THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE
        SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE
        APPROVED ................................................................................................................20

III.    NOTICE SATISFIED RULE 23 AND DUE PROCESS ...................................................22

CONCLUSION.................................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ...............................................................10

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................4, 8, 17, 20

*In re Citigroup Inc. Sec. Litig.*,
   No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) .................................3

*City of Providence v. Aeropostale Inc. et al.*,
   No. 11-cv-7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014),
   *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015) .............................6, 7

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................13

*Ebbert v. Nassau Cnty.*,
   No. 05-5445, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011)...................................11

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015),
   *aff'd*, 674 F. App'x. 37 (2d Cir. 2016)..................................................7

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)...............................20

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ........................................................22

*In re Gilat Satellite Networks, Ltd.*,
   No. 02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .................................8

*In re Hudson's Bay Co. Data Sec. Incident Consumer Litig.*,
   No. 18-8472, 2022 WL 2063864 (S.D.N.Y. June 8, 2022) ..................................5

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .......................................................14

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)..................................................8, 20

*In re Marsh & McLennan Cos. Sec. Litig.*,
   No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...............................23

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) ........................................19

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    No. 02 MD 1484, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .................................19

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)........................................19

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)..............................19, 20

*In re Patriot Nat'l, Inc. Sec. Litig.*,
    828 F. App'x. 760 (2d Cir. 2020)........................................19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ........................................5, 8

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ........................................5, 6

*In re PPDAI Grp. Inc. Sec. Litig.*,
    No. 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022)...................................5

*Puddu v. 6D Global Tech., Inc.*,
    No. 15-8061, 2021 WL 1910656 (S.D.N.Y. May 12, 2021) ........................................18

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ........................................10

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)........................................9, 10

*Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*,
    No. 01-cv-011814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ........................................19

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................9, 11, 12, 14

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05-cv-01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)........................................6, 17

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)........................................3, 7, 22

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06-cv-11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009)........................................18

**Statutes**

15 U.S.C. § 78u-4(a)(7) ..............................................................................................22

15 U.S.C. § 78u-4(e) ..................................................................................................21

**Rules**

Fed. R. Civ. P. 23(a) ..................................................................................................11

Fed. R. Civ. P. 23(b)(3) ..............................................................................................11

Fed. R. Civ. P. 23(c)(1)(C) ........................................................................................11

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................23

Fed. R. Civ. P. 23(e) ...........................................................................................3, 4, 22

Fed. R. Civ. P. 23(e)(2) ........................................................................................3, 4, 5

Fed. R. Civ. P. 23(e)(2)(A) ..........................................................................................5

Fed. R. Civ. P. 23(e)(2)(B) ..........................................................................................7

Fed. R. Civ. P. 23(e)(2)(C) ......................................................................................7, 15

Fed. R. Civ. P. 23(e)(2)(C)(iv) ...................................................................................16

Fed. R. Civ. P. 23(e)(3) ................................................................................................4

Court-appointed Lead Plaintiff Oregon Public Employees Retirement Fund ("OPERF" or "Lead Plaintiff"), on behalf of itself and the proposed Settlement Class, respectfully submits this memorandum of law in support of its motion for: (i) final approval of the proposed Settlement of the above-captioned action (the "Action"); (ii) approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund; and (iii) final certification of the Settlement Class.[1]

## PRELIMINARY STATEMENT

As set forth in the Stipulation, Lead Plaintiff has agreed to settle all claims asserted, or that could have been asserted, against the Released Defendant Parties in exchange for $4,625,000 (the "Settlement Amount"), for the benefit of the Settlement Class.  The terms of the Settlement are detailed in the Stipulation, which was executed on October 7, 2022. ECF No. 74-1.  The Settlement Class is comprised of investors in Peabody common stock during the original class period of April 3, 2017 through October 28, 2019 (the "Settlement Class Period") in order to provide Defendants with a complete resolution of Lead Plaintiff's claims.

As described below and in the accompanying Fox Declaration, the decision to settle was well-informed by nearly two years of hard-fought litigation that involved, *inter alia*: (i) a comprehensive international investigation that included a review and analysis of publicly available information, interviews with confidential witnesses (most of whom were former

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated October 7, 2022 (the "Stipulation").  ECF No. 74-1.  Citations to "¶" in this memorandum refer to paragraphs of the Declaration of Christine M. Fox in Support of (I) Final Approval of Class Action Settlement and Plan of Allocation and (II) An Award of Attorneys' Fees and Payment of Expenses (the "Fox Declaration" or "Fox Decl."), filed herewith, unless otherwise noted.

All exhibits are annexed to the Fox Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Fox Declaration and the second reference is to the exhibit designation within the exhibit itself.

Peabody employees and certain of whom were former mine inspectors) that were familiar with the Company's North Goonyella Mine (the "NGM"); (ii) consultation with experts on longwall mining operations and safety protocols, as well as market efficiency, loss causation, and damages; (iii) preparing an amended complaint; (iv) opposing Defendants' motion to dismiss the amended complaint, which the Court granted in substantial part and denied in part; (v) moving for class certification; (vi) engaging in fact discovery, including extensive meet and confers regarding the respective Parties' multiple discovery requests, reviewing approximately 1,100 documents produced by Defendants, and defending a deposition of Lead Plaintiff's representative; and (vii) engaging in extensive mediation efforts overseen by David Murphy of Phillips ADR, which included the preparation of mediation briefs, a full-day mediation session, and subsequent negotiations. *See generally* Fox Decl. at §§III-V.

Lead Counsel, which has extensive experience and expertise in prosecuting securities class actions, believes that the Settlement represents a favorable resolution of this complex litigation in light of the specific risks of continued litigation, particularly the risks of failing to survive Defendants' likely summary judgment motions in connection with proving materiality, falsity, scienter, and damages given the nature of the few remaining/non-dismissed omissions and statements and the truncated class period.

Lead Plaintiff, a sophisticated institutional investor that was actively involved in the Action, diligently represented the class and has approved the Settlement. *See* Declaration of Brian de Haan, Senior Assistant Attorney General at the Oregon Department of Justice, submitted on behalf of OPERF, Ex. 1. Accordingly, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement. In addition, the Plan of Allocation, which was developed by Lead Counsel with the assistance of Lead Plaintiff's damages expert, is a fair and

reasonable method for distributing the Net Settlement Fund and should also be approved by the Court.

## ARGUMENT

### I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

#### A.   The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'").[2]  This policy would be well-served by approval of the Settlement of this complex securities class action, which, absent resolution, could consume years of additional resources of this Court and, likely, the Court of Appeals for the Second Circuit.

#### B.   The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval.  The Settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms.  *See Wal-Mart Stores*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Pursuant to the amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

---

[2] All internal quotations and citations are omitted unless otherwise stated.

(A)       whether the class representatives and class counsel have adequately represented the class;

(B)       whether the proposal was negotiated at arm's length;

(C)       whether the relief provided for the class is adequate, taking into account:

        i.       the costs, risks, and delay of trial and appeal;

        ii.      the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        iii.     the terms of any proposed award of attorneys' fees, including timing of payment; and

        iv.     any agreement required to be identified under Rule 23(e)(3); and

(D)       whether the proposal treats class members equitably relative to each other.

In *City of Detroit v. Grinnell Corp.*, the Second Circuit has also held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the Rule 23(e) factors are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the

proposal."  Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.  Indeed,

"[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the [Second

Circuit] factors."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330

F.R.D. 11, 29 (E.D.N.Y. 2019); *see also In re PPDAI Grp. Inc. Sec. Litig.,* No. 18-CV-6716

(TAM), 2022 WL 198491, at *8 n.10 (E.D.N.Y. Jan. 21, 2022) (noting the significant overlap

between the relevant Second Circuit case law and the Rule 23(e)(2) factors); *In re Hudson's Bay

Co. Data Sec. Incident Consumer Litig.*, No. 18-8472, 2022 WL 2063864, at *6 (S.D.N.Y. June

8, 2022) (J. Castel) (noting that the Court will discuss the Grinnell factors separately, to the

extent they are not encompassed by Rule 23(e)(2)).

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the

Settlement principally in relation to the Rule 23(e)(2) factors and will also discuss the application

of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### C.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the court should consider

whether the "class representatives and class counsel have adequately represented the class."

Rule 23(e)(2)(A).   There can be little doubt that Lead Plaintiff and Lead Counsel have

adequately represented the Settlement Class.   Lead Plaintiff, like all other members of the

Settlement Class, acquired shares of Peabody common stock during the class period, when its

value was allegedly artificially inflated by false and misleading statements and omissions.  Thus,

the claims of the Settlement Class and Lead Plaintiff would prevail or fail in unison, and the

common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff

and all members of the Settlement Class.  *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65,

77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing

recovery, there is no conflict of interest between the class representatives and other class members.").

Lead Plaintiff was an active and informed participant in the litigation and, among other things: (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed pleadings and motions filed in the Action; (iii) searched for and produced documents in response to discovery requests; (iv) was deposed; and (iv) participated in settlement discussions and evaluated and approved the proposed Settlement.  *See* Ex. 1 at ¶3. Additionally, Lead Plaintiff is a sophisticated public pension fund that took an active role in supervising the litigation, as envisioned by the PSLRA, and endorses the Settlement.  *Id.* at ¶¶2, 4.  A settlement reached "with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater presumption of reasonableness."  *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-cv-01695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Additionally, throughout the Action, Lead Plaintiff had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases.  During the course of the litigation, Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims.  *See generally* Fox Declaration.  Moreover, Labaton Sucharow is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 3-C) and was able to successfully conduct the litigation against skilled opposing counsel.[3]  The judgment of Lead Counsel—a law firm that is highly experienced in securities class action litigation—that the Settlement is in the best interests of the Settlement Class is also entitled to "great weight."  *City of Providence v. Aeropostale Inc. et al.*, No. 11-cv-7132, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F.

App'x. 73 (2d Cir. 2015).

Accordingly, the Settlement Class has been, and remains, well represented.

### D.      The Settlement Was Reached After Robust Arm's-Length Negotiations

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced Mediator. ¶¶4, 46-48. As discussed in the Fox Declaration, the Parties and their counsel had a well-honed understanding of the strengths and weaknesses of the case before agreeing to settle. On July 29, 2022, the Parties participated in a full-day mediation session in New York City before the Mediator in an attempt to reach a settlement. In advance of the mediation, the Parties exchanged lengthy and comprehensive mediation statements, which addressed issues of both liability and damages and discussed the Parties' respective views of the claims and alleged damages. Following a full day of arms'-length negotiations including discussions regarding liability and damages, the Parties reached an agreement in principle to settle the Action on July 29, 2022. *Id*.

### E.      The Relief Provided by the Settlement Is Adequate

The Court must also consider whether "the relief provided for the class is adequate,

---

[3] Defendants were represented by a very well-regarded firm, Cravath Swaine & Moore LLP.

taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 36.

### 1.    The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature highly complex, and district courts have long recognized that "[a]s a general rule, securities class actions are notably difficult and notoriously uncertain to litigate." *In re Facebook,* 2015 WL 6971424, at *3; *Bear Stearns,* 909 F. Supp. 2d at 266; *In re Gilat Satellite Networks*, *Ltd*., No. 02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception. As detailed in the Fox Declaration, the case involved, among other things, unique issues related to falsity, scienter, materiality, loss causation, and damages in connection with the few remaining alleged misstatements and omissions during a class period that was only several days long.  Certifying a class, prevailing on summary judgment, and then achieving a litigated verdict (and sustaining any such verdict on appeal) would have been a very challenging and difficult undertaking.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense, and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Trial of the claims here would have required extensive expert testimony on issues related

to, among other things, longwall mining safety practices; the efficiency of the market for Peabody's common stock; and damages under the Exchange Act. Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited…").

### 2. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for a court to consider in its analysis of a proposed settlement. *See Id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."). While Lead Plaintiff and Lead Counsel believe the claims asserted against Defendants are strong, they recognize that the Action presented several substantial obstacles with respect to certifying the class as well as establishing the falsity and materiality of the alleged misstatements and omission remaining in the case following the Court's decision on Defendants' motion to dismiss (the "MTD Order"), and that Defendants acted with scienter regarding those statements and omissions.

Of course, even if Lead Plaintiff prevailed at summary judgment and then trial, it is virtually certain that appeals would be taken, which would have, at best, delayed any recovery. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . .

and would in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there was of course the possibility that the verdict could be reversed by the trial court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### (a)     The Risks of Achieving and Maintaining Class Certification

As discussed in the Fox Declaration (§VII.A.), Lead Plaintiff's motion for class certification was pending, and not fully briefed, when the Parties agreed to settle. Defendants had not yet submitted their opposition to Lead Plaintiff's motion. Following the Court's order on the motion to dismiss, the parameters of the remaining class period were hotly disputed between the Parties. Defendants argued strenuously that Lead Plaintiff was left with, at most, a three-day class period, while Lead Plaintiff would have continued to argue that the proposed class period was six days, from September 22, 2018, when smoke was alleged to have been seen billowing from the mine, until September 28, 2018, when Defendants announced there would be no further coal production at the NGM in 2018. Lead Plaintiff faced a substantial risk that the Court could have further reduced the class period, thereby further limiting the recoverable damages, or, at worst, denied the class certification motion in its entirety regardless of whether the Court adopted Lead Plaintiff's six-day proposal or Defendants' three-day proposal. ¶¶61-62.

In addition to disputing the length of the remaining class period after the MTD Order, Defendants would likely have continued to argue that Lead Plaintiff's purchase of additional Peabody common stock following the revelation of the fire on September 28, 2018 undermined its adequacy to serve as class representative, further threatening the chances of the motion for class certification's success. While this argument only arose because of the contours of the MTD

Order, which converted the September 28, 2018 partial disclosure to the only remaining disclosure at issue in the case, there was a small chance that Lead Plaintiff's additional post-class period Peabody stock purchases could have led to the denial of its motion for class certification on the basis of a lack of adequacy or typicality.  ¶63.

There was significant uncertainty with respect to how the Court would rule on these issues in connection with class certification or whether certification could be maintained through a potential appeal and a trial, militating in favor of settlement.  Additionally, class certification can be reviewed and modified at any time by a court before final judgment.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").  The Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification through trial and on appeal.  *See Ebbert v. Nassau Cnty.*, No. 05-5445, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of the certified class supported approval of Settlement).[4]

### (b)    Risks Related to Proving Liability: Falsity and Scienter

At summary judgment and trial, Defendants would strenuously maintain that Lead Plaintiff could not establish that Defendants' statements were false and misleading or that Defendants acted with scienter as required by the Exchange Act.  "Proving a defendant's state of mind is hard in any circumstances."  *Telik,* 576 F. Supp. 2d at 579.  Here, Lead Plaintiff must

---

[4] In the Preliminary Approval Order (ECF No. 77), the Court preliminarily certified the Settlement Class. There have been no developments in the case that would undermine that determination and, for all the reasons stated in the Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 73), Lead Plaintiff now requests that the Court reiterate its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes only, and the appointment of Lead Plaintiff as Class Representative and Labaton Sucharow as Class Counsel.

establish that Defendants knew (or believed) or were severely reckless in not knowing (or reckless in not believing) that their statements were false.

At summary judgment, and trial, Defendants would likely argue that Lead Plaintiff simply could not establish that Defendants' statements were false and misleading. For example, Defendants would likely continue to argue that they did not make any false statements or omissions, instead contending that there was absolutely no fire at NGM earlier than September 27, 2018. Defendants would likely have argued at summary judgment, and trial, that Peabody's internal documents compelled the conclusion that the alleged misstatements and omissions made on September 25, 2018 were not actionably false. In addition to their internal documents, Defendants would have argued that public Mine Record Entries also confirmed that Defendants statements were not false because there was no evidence of an actual fire before September 27, 2018. ¶¶64-66.

Defendants would also have continued to argue that they did not act with scienter, which is generally the most difficult element of a securities fraud claim for a plaintiff to prove. "Proving a defendant's state of mind is hard in any circumstances." *Telik*, 576 F. Supp. 2d at 579. Defendants had numerous scienter arguments that posed very significant hurdles to proving that they acted with an intent to commit securities fraud or with severe recklessness. As an initial matter, Defendants likely would have continued to argue that Lead Plaintiff's scienter allegations with respect to the misstatements and omissions that survived the motion to dismiss were based only on circumstantial evidence, and that Lead Plaintiff's version of events was not based on any "smoking gun" type of evidence. ¶67.

Defendants also likely would have continued to argue that the evidence would simply show, at summary judgment and trial, that a disclosed risk materialized, despite their best

around-the-clock remediation efforts. Peabody and its management were unable to prevent the fire and also were unable to reopen the NGM on the initial timeline they had projected—neither of which amounted to fraud.  ¶68.

Additionally, Defendants likely would have continued to argue that they honestly believed the opinions they formed based on the ever-changing on-the-ground gas, heat, and other readings at the NGM during September 2018, and that they had no motive to lie.  ¶69.

### (c)    Risks Related to Proving Loss Causation and Damages

Another principal challenge in continuing the litigation was the difficulty of proving loss causation and damages, particularly the "disaggregation" of confounding or non-fraud related information from the stock price declines.  These issues would have been hotly contested by Defendants, particularly in the context of class certification and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings and appeals.

To succeed at trial "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms.*, *Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  Following the Court's order on the motion to dismiss, only one of the allegedly corrective disclosures remained in case and Defendants would have likely argued that it repackaged already-available information or failed to provide any correction of the alleged misstatements, given the robust risk warnings and cautionary statements by Defendants throughout the remaining class period.  If such arguments were accepted by the Court or a jury, in whole or part, they would have eliminated or dramatically limited any potential recovery.

Using the post motion to dismiss class period of September 22, 2018 through September 28, 2018, and assuming Lead Plaintiff prevailed in proving liability for the few remaining misstatements and omissions, the most likely estimate of aggregate damages recoverable at trial ranged from $1 million to $13.3 million.  These estimates: (i) assume no non-fraud related

reasons for the price decrease on September 28, 2018; and (ii) are before netting any gains on pre-class period purchases.  Lead Plaintiff's expert also estimated that maximum damages attributable to a slightly shorter class period defined as September 25, 2018 to September 28, 2018 as between $663,000 and $10 million depending on the assumptions used. (The Settlement recovers between approximately 35% and 46% of estimated damages under these scenarios.). ¶75.

If Lead Plaintiff successfully appealed the Court's dismissal of at least certain of the allegedly false and misleading statements post-fire (September 29, 2018 – October 28, 2019) at the mine — something Lead Plaintiff was seriously contemplating at the time of the Settlement — Lead Plaintiff's expert has estimated that maximum damages attributable Defendants' alleged fraud for the period September 22, 2018 through October 28, 2019 were approximately $158 million before the disaggregation of non-fraud related stock price declines, and approximately $86 million after disaggregation.  (The Settlement represents approximately 5.4% of this estimate of recoverable disaggregated damages.).  ¶74.

While Lead Counsel would work extensively with Lead Plaintiff's damages expert with a view towards presenting compelling arguments to the jury and prevailing at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine that the class suffered little or no damages.  As courts have long recognized, the substantial uncertainty as to which side's experts might be credited by a jury presents a serious litigation risk.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 193 (S.D.N.Y. 2012) ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik,* 576 F. Supp. 2d at 579-80 (in this "battle of experts, it is virtually impossible to predict with any

certainty which testimony would be credited, and ultimately, which damages would be found…").

Given all of these risks with respect to liability, loss causation, and damages, Lead Plaintiff and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### F.    The Effective Process for Distributing Relief to the Settlement Class

Rule 23(e)(2)(C) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  The proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Strategic Claims Services ("SCS").  The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action.  Namely, class members can submit, either by mail or online using the Claims Administrator's website, the Court-approved Claim Form. Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund.  *See* Stipulation at ¶25. Lead Plaintiff's claims will be reviewed in the same manner.  Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims.  *Id*. at ¶31(d)-(e).  Any claim disputes that cannot be resolved will be presented to the Court.  *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶40) and the claims process is completed, Authorized Claimants will be issued payments.  If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution,

the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses).   Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions.   Thereafter, Lead Plaintiff recommends that any *de minimis* balance that still remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses, be contributed to a non-sectarian, not-for-profit charitable organization certified as tax exempt under Section 501(c)(3) of the Internal Revenue Code of 1986 and serving the public interest, designated by Lead Plaintiff and approved by the Court.  *Id*. at ¶28.

### G. The Requested Attorneys' Fees and Expenses Are Reasonable

As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 25% of the Settlement Fund, payable as ordered by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.   Most importantly with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.

### H. The Relief Provided in the Settlement Is Adequate Taking Into Account All Agreements Related to the Settlement

Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the Parties in connection with the proposed Settlement.   On August 2, 2022, the Parties entered into a settlement term sheet and on October 7, 2022, they entered into the Stipulation and a confidential Supplemental Agreement Regarding Requests for Exclusion (the "Supplemental Agreement").  *See* Stipulation at ¶42(a).   The Supplemental Agreement sets forth the conditions under which

Defendants have the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold.  As is standard in securities class actions, the Supplemental Agreement is being kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement, to the detriment of the Settlement Class.  The Supplemental Agreement, Stipulation, and Term Sheet are the only agreements concerning the Settlement entered into by the Parties.

## I.      Application of the Remaining *Grinnell* Factors Support Approval

### 1.      The Ability of Defendants to Withstand a Greater Judgment

While it is Lead Plaintiff's understanding that Defendants could withstand a judgment in excess of $4.625 million, courts generally do not find the ability of a defendant to withstand a greater judgment to be an impediment when the other factors favor the settlement.  *See, e.g., Veeco*, 2007 WL 4115809, at *11 ("this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied").

### 2.      The Reaction of the Settlement Class to Date

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy.  *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, SCS, mailed or emailed copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees.  *See* Declaration of Josephine Bravata Concerning (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Mailing Decl."), Ex. 2 at ¶¶2-9. As of December 30, 2022, SCS has mailed or emailed 33,243 copies of the Notice Packet to potential Settlement Class Members.  *Id*. at ¶8.  In addition, on November 10, 2022 the Summary

Notice was published in *The Wall Street Journal* and transmitted over the internet using *PR Newswire*. *Id*. at ¶10.

While the deadline set by the Court for Settlement Class Members to object (January 17, 2023) has not yet passed, to date, no objections to the Settlement or Plan of Allocation have been received and only one request for exclusion has been received. *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Lead Plaintiff will file reply papers no later than January 31, 2023, addressing any objections and any additional requests for exclusion.

### 3.    The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

"[A] sufficient factual investigation must have been conducted to afford the Court the opportunity to 'intelligently make… an appraisal of the settlement.'" *Puddu v. 6D Global Tech., Inc.*, No. 15-8061, 2021 WL 1910656, at *4 (S.D.N.Y. May 12, 2021). Here, as detailed in the Fox Declaration, prior to agreeing to settle, Lead Counsel conducted a robust international investigation; prepared a comprehensive amended complaint; opposed Defendants' motion to dismiss; moved for certification of the class; engaged in discovery, including numerous meet and confer sessions, review of 1,109 documents produced by Defendants, and participated in one deposition of Lead Plaintiff; retained professionals with expertise in (a) materiality, loss causation, and damages and (b) longwall mining; and prepared for and participated in a rigorous mediation process, involving a formal mediation session. *See* Fox Decl. at §§III-V.

Armed with this substantial base of knowledge, Lead Plaintiff was in a position to balance the proposed Settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation. Accordingly, Lead Plaintiff and Lead Counsel respectfully

submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01-cv-011814, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004).  The Court thus should find that this factor also supports approval.

> ### 4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement

Courts agree that the determination of a "reasonable" settlement "is not susceptible [to] a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a settlement…." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  Here, as discussed above and in the Fox Declaration (¶¶74-75), the Settlement recovers between approximately 5.4% to 46% of estimated likely recoverable damages, depending on the class period, trading model and assumptions used.

This recovery falls on the higher end of the range of reasonableness that courts within the Second Circuit regularly approve. *See, e.g.*, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, No. 02 MD 1484, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement representing approximately 6.25% of estimated damages and noting this was at the "higher end of the range of reasonableness of recovery in class actions securities litigations"); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x. 760, 762 (2d Cir. 2020) (affirming district court's approval of $6.5 million settlement representing 6.1% of the class's maximum potentially recoverable damages).

## II.   THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270.  A plan of allocation with a "rational basis" satisfies this requirement.  *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400, 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497.  A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192.  However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision."  *In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

Here, the proposed Plan, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid claims.  The Plan is set forth in full in the Notice.  *See* Ex. 2-A at ¶¶50-70.  The Plan provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Loss Amounts," calculated according to the Plan's formulas.  In developing the Plan, Lead Plaintiff's expert considered the amount of artificial inflation in the per share prices of Peabody common stock that allegedly was proximately caused by Defendants' allegedly false and misleading statements and omissions.  ¶80.  The sum of a Claimant's Recognized Loss Amounts will be the Claimant's "Recognized Claim."  If the aggregate amount of Recognized Claims is greater than the Net Settlement Fund, each Claimant will receive a settlement equal to their *pro rata* share of the Net Settlement Fund. ¶83.

A Claimant's total Recognized Claim will depend on, among other things, when their

shares were purchased and/or sold during the Settlement Class Period, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and the value of the shares when they were sold or held.  ¶81.

Recognized Loss Amounts for shares of Peabody publicly traded common stock purchased during the period from April 3, 2017 through September 21, 2018 will be multiplied by 0.1 (discounted by 90%).  This is to reflect the fact that these claims were dismissed by the Court in the MTD Order.  Thus, any recovery on these claims in the Action would have occurred only if the Court's Order dismissing these claims was appealed and the ruling was reversed on appeal.  ¶82.  Recognized Loss Amounts for shares of Peabody publicly traded common stock purchased during the period from September 28, 2018 (at or after 2:23 p.m. ET) through October 28, 2019 will be multiplied by 0.25 (discounted by 75%). This is to reflect the fact that these claims were also dismissed by the Court. Thus, any recovery on these claims in the Action also would have occurred only if the Court's Order dismissing these claims was appealed and reversed. Lead Counsel has determined that the litigation risks associated with the claims during this portion of the Settlement Class Period, while also significant, were somewhat lower, as reflected in the discount rate applied.  *Id*.  Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among the Settlement Class.

SCS, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated according to the Plan of Allocation.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"). Moreover, as noted above, to date, no objections to the proposed plan have been received.

## III.   NOTICE SATISFIED RULE 23 AND DUE PROCESS

Lead Plaintiff has provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Wal-Mart Stores*, 396 F.3d at 114—and be the best notice practicable under the circumstances. Both the substance of the notice program and the method of dissemination satisfied these standards.

The Notice provided all of the information necessary for Settlement Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the Plan of Allocation. The Notice informed Settlement Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Peabody common stock; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the right of Settlement Class Members to object to the Settlement or seek exclusion; and (vi) the binding effect of a judgment on Settlement Class Members. *See* 15 U.S.C. § 78u-4(a)(7). The Notice also contained the Plan of Allocation and provided information about how to submit a Claim Form.

In addition, SCS caused the Summary Notice to be published in *The Wall Street Journal* and to be released over the internet using *PR Newswire*. Ex. 2 at ¶10. SCS also has a webpage

for the Settlement, www.strategicclaims.net/Peabody/, to provide information about the Settlement, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order (*id*. at ¶12). Lead Counsel also posted copies of the Notice and Claim Form on its website, Fox Decl. at ¶57.

This combination of individual mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-8144, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## <u>CONCLUSION</u>

Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and finally certify the Settlement Class for purposes of the Settlement only. Proposed orders will be submitted with the reply papers, after the deadline for objecting or seeking exclusion have passed.


Dated: January 3, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

 */s/ Christine M. Fox*
Christine M. Fox
Mark Willis
James Fee
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cfox@labaton.com
mwillis@labaton.com
jfee@labaton.com

*Counsel for Lead Plaintiff Oregon Public Employees Retirement Fund*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

<u>/s/ <i>Christine M. Fox</i></u>
Christine M. Fox
