**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ——————————————— x | |
| | : Case No. 1:20-cv-08024-PKC |
| IN RE PEABODY ENERGY CORP. | : |
| SECURITIES LITIGATION | : |
| | : |
| | : |
| | : |
| | : |
| ——————————————— x | |

**DECLARATION OF CHRISTINE M. FOX IN SUPPORT OF**
**(I) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF**
**ALLOCATION AND (II) AN AWARD OF ATTORNEYS' FEES**
**AND PAYMENT OF EXPENSES**

I, CHRISTINE M. FOX, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am a partner in the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), which serves as Court-appointed Lead Counsel for Court-appointed Lead Plaintiff Oregon Public Employees Retirement Fund ("Lead Plaintiff" or "OPERF") and the proposed class in the above-captioned litigation (the "Action").[1] I have been actively involved throughout the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and participation in all material aspects of the Action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation.  I also submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses.  Both motions have the full support of Lead Plaintiff.  *See* Declaration of Brian de Haan, Senior Assistant Attorney General at the Oregon Department of Justice, submitted on behalf of OPERF, dated January 3, 2023, attached hereto as Exhibit 1.[2]

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated October 7, 2022 (ECF No. 74-1) (the "Stipulation").

[2] Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration.  For clarity, citations to exhibits that have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

## I.    PRELIMINARY STATEMENT

3.    The proposed Settlement now before the Court provides for the resolution of all claims in the Action, and related claims, in exchange for a cash payment of $4,625,000.  The Settlement Class is comprised of investors in Peabody common stock during the original class period of April 3, 2017 through October 28, 2019 (the "Settlement Class Period") in order to provide Defendants with a complete resolution of Lead Plaintiff's claims.  As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class in light of the significant risks of continuing to litigate the Action.

4.    This case has been vigorously litigated from its commencement in September 2020 through the execution of the Stipulation.  The Settlement was achieved only after Lead Counsel, *inter alia*, as detailed herein: (i) conducted a thorough and wide-ranging international investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, which included a review and analysis of publicly available information, interviews with confidential witnesses, (most of whom were former Peabody employees and certain of whom were former mine inspectors that were familiar with the Company's North Goonyella Mine (the "NGM")), and consultation with experts on longwall mining operations and safety protocols, as well as market efficiency, loss causation, and damages; (ii) prepared and filed a detailed Consolidated Amended Class Action Complaint (ECF No. 38) ("Complaint"); (iii) researched and drafted an opposition (ECF No. 45) to Defendants' comprehensive motion to dismiss the Complaint (ECF No. 42), which the Court granted in part and denied in part (ECF No. 50); (iv) moved for class certification (ECF Nos. 66-69), which included an expert report on market efficiency by Lead Plaintiff's economic expert; (v) engaged in fact discovery, including numerous

meet and confers with Defendants' Counsel regarding the respective Parties' multiple discovery requests and the review of approximately 1,100 documents produced by Defendants; (vi) defended a deposition of Lead Plaintiff's representative; and (vii) engaged in extensive mediation efforts overseen by David Murphy of Phillips ADR, which included the preparation of mediation briefs, a full-day mediation session, and subsequent negotiations of the final settlement documentation.

5.      Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their efforts, Lead Plaintiff and Lead Counsel are well-informed about the strengths and weaknesses of the remaining claims, and defenses, in the Action.  As discussed in detail below, the Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, continued to raise numerous challenging defenses. For example, Defendants would have continued to raise serious arguments concerning the elements of scienter and the falsity of the handful of allegedly misleading statements and omissions remaining in the case following the Court's Order on Defendants' motion to dismiss.  Additionally, Defendants likely would have continued to argue that damages for the class period sustained by the Court were not significant given that the Court dramatically reduced the scope of the case and the length of the class period in the order on Defendants' motion to dismiss.  Issues relating to damages would have come down to an inherently unpredictable and hotly disputed "battle of the experts," with Defendants' experts focusing on, among other things discussed herein, that news of the NGM fire on September 28, 2018 was already known to the market following Defendants' September 27, 2018 press release about a likely fire.  In the absence of a settlement, there was a very real possibility that the class could have recovered nothing or an amount significantly less than the negotiated Settlement.

6.     With respect to approval of the proposed Plan of Allocation for the Settlement proceeds governing the calculation of claims, as discussed below, the proposed plan was developed with the assistance of Lead Plaintiff's damages expert.  It provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged fraud.

7.     With respect to the Fee and Expense Application, as discussed in the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Brief"), the requested fee of 25% of the Settlement Fund would be fair both to the Settlement Class and to Lead Counsel, and warrants the Court's approval.  This fee request is well within the range of fee percentages frequently awarded in this type of contingent litigation and, under the facts of this case, is justified in light of the benefits that Lead Counsel has conferred on the Settlement Class, the risks it undertook, the quality of its representation, the nature and extent of the legal services, and the fact that Lead Counsel pursued the case on a contingency basis.  Lead Counsel also seeks $199,505.48 in Litigation Expenses, plus $9,197.60 to reimburse Lead Plaintiff for its reasonable costs and expenses, including lost wages, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(4).

## II.     FACTUAL BACKGROUND

### A.     Summary of Claims

8.     As set forth in the Complaint, Peabody is one of the largest coal mining companies in the world, with operations throughout the United States and Australia.  ¶ 29.[3]  During the class

---

[3] Citations of "¶ ___", unless otherwise noted, refer to the Complaint. ECF No. 38.

period, Peabody owned and operated 23 coal mines. *Id.* At that time, the Company organized its coal mines into six business segments, the largest of which was the Australian Metallurgical Mining Segment, which generated 23.1% of the Company's revenues in 2016 through its seven Australian mines, including its then-flagship mine at North Goonyella, which Peabody acquired in April 2004. ¶¶ 30-31, 69. When Peabody purchased the NGM, it was well-known that the mine was "gassy" and at risk for spontaneous combustion events, therefore requiring constant monitoring of mine gases. ¶ 69.

9.    Located in the Bowen Basin in Central Queensland, Australia, the NGM is reported to have coal reserves amounting to 175 million tons of coking coal, which is used to produce steel. ¶¶ 32, 34 & n.15, 35. In 2017, the NGM generated $100 million of Peabody's total operating profit of $498 million, or approximately 20%. ¶ 36. Because the NGM was so successful, in July 2018, Peabody announced that it had committed to a "life extension" of the mine to continue longwall mining there until 2026. ¶ 39.

10.    Longwall mining is a complicated, time-consuming, and inherently dangerous process of removing coal, which uses heavy machines underground to cut large panels of coal, typically 2 to 2.5 miles long and 850 to 1,500 feet wide. ¶¶ 42-44. Once a section of a mine has been mined, the longwall mining system must be moved to the next section, also known as a "panel." ¶ 45. Because longwall mining often causes methane and other dangerous, flammable gases to be released underground, elevated concentrations of the gases occur when production rates are high, only to be exacerbated during longwall moves. ¶ 48.

11.    The Action arises out of events related to a longwall move at the NGM from the 9N panel to the 10N panel in August-September 2018. ¶ 49. Beginning in late August 2018,

Peabody evacuated the mine on several occasions due to elevated gas levels. ¶¶ 102-107. On September 1, 2018, Peabody personnel evacuated the NGM as carbon monoxide levels reached 700 ppm and the mine's spontaneous combustion triggers were reached. ¶¶ 108-109. Following the September 1, 2018 evacuation, miners did not re-enter the NGM until July 2019, though emergency maintenance crews and government inspectors did enter the mine occasionally during that time. ¶ 110.

12.     On September 28, 2018, Peabody disclosed that the NGM was on fire and that the Company did not expect any coal production from the mine in 4Q 2018. ¶ 178. Defendants continued to push back the timeline for the resumption of coal mining at the NGM until October 29, 2019, when they announced that it would be three years or longer before any meaningful resumption of coal production could begin at the NGM. ¶ 225.

13.     The Complaint set forth sixty (60) alleged misstatements concerning: (i) Defendants' statements about the NGM and the Company's overall commitment to safety (*see* ¶¶ 228-29, 232, 234, 244, 249, 251, 253, 256, 258-60, 263, 265-66); and (ii) Defendants' statements about the Company's plan to restart operations at the NGM after the fire (¶¶ 280-81, 295-96, 304-10, 317, 319-22, 327, 329, 334-36). The Complaint further alleged that Defendants made these statements with scienter, through its pleading of: (i) allegations supported by confidential witnesses; (ii) the NGM's status as core to Peabody's business; (iii) Defendants' frequent communications about the NGM; (iv) a timeline developed by Lead Plaintiff's longwall mining expert informed in part by his personal experience at the NGM; and (v) the known history of the NGM's spontaneous combustion and heating events. The Complaint also alleged that investors were injured when the market learned, through a series of disclosures, about the impact of the fire

on the NGM, including the complete cessation of operations at the mine. ¶¶ 383-90. The Complaint alleged that by the time the full truth was revealed on October 29, 2019, the value of Peabody's common stock had fallen precipitously from its class period highs. ¶¶ 17-18.

14.     The Complaint asserted claims against Peabody, former Peabody President and Chief Executive Officer ("CEO") Glenn L. Kellow ("Kellow"), and former Peabody Executive Vice President and Chief Financial Officer ("CFO") Amy B. Schwetz ("Schwetz") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## III.    PROCEDURAL HISTORY

### A.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

15.     On September 28, 2020, this Action commenced with the filing of a class action complaint by Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire") by Labaton Sucharow LLP ("Labaton Sucharow"). ECF No. 1. The case was entitled *Oklahoma Firefighters Pension and Retirement System v. Peabody Energy Corp. et al.*, Civil No. 1:20-cv-08024, and was assigned to Hon. Judge P. Kevin Castel, a Senior United States District Judge for the Southern District of New York.

16.     Pursuant to Section 21D(a)(3) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B), as amended by the PSLRA, on November 27, 2020, OPERF, Schultze Asset Management, LP ("Schultze"), and SCC/Dunhill Trust ("SCC"), filed three competing motions for appointment as lead plaintiff (*see* ECF Nos. 9, 13, and 15), with OPERF moving the Court to appoint Labaton Sucharow as lead counsel, Schultze moving to appoint Faruqi & Faruqi, LLP as lead counsel, and

SCC moving to appoint Federman & Sherwood as lead counsel. *Id.* No other movants filed for appointment as lead plaintiff.

17.    On December 4, 2020, SCC filed a Notice of Withdrawal of its motion for appointment as lead plaintiff. ECF No. 20. On December 11, 2020, Schultze filed a notice of non-opposition to OPERF's motion for appointment as lead plaintiff. ECF No. 21.

18.    On January 12, 2021, the Court entered an Opinion and Order appointing OPERF as Lead Plaintiff. ECF No. 26. By the same Opinion and Order, the Court approved OPERF's selection of Labaton Sucharow as Lead Counsel. *Id.*

### B.    The Amended Consolidated Class Action Complaint

19.    Lead Plaintiff filed the Consolidated Amended Class Action Complaint on March 19, 2021, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder during a class period of April 3, 2017 through October 28, 2019. ECF No. 38.

20.    The Complaint was the result of a significant effort by Lead Counsel that included, among other things, the review and analysis of: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases, news articles, and other public statements issued by or concerning the Company and the Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company and the Individual Defendants; (v) industry and regulatory standards regarding mine safety operations; and (vi) a comprehensive investigation by Lead Counsel's in-house investigators, who identified 168 potential witnesses, contacted 134 of those potential witnesses and interviewed 19 witnesses, all of whom were former Peabody

employees or government regulators in Australia that were familiar with the Company's operations at the NGM and others with potentially relevant knowledge. Additionally, in preparing the Complaint, Lead Counsel consulted with an expert and consultant in longwall mining in general, and at the NGM in particular, and longwall mining safety practices. The longwall mining expert was familiar with the NGM, having physically worked at the NGM earlier in his career (prior to the alleged class period).

21.     In general, the Complaint alleges that Defendants violated the federal securities laws by making materially false or misleading statements, or omitting material information, concerning Peabody's commitment to safety at the NGM and its ability to resume coal production at the NGM following the September 2018 fire.

22.     As alleged in the Complaint, after emerging from bankruptcy on April 3, 2017, Peabody needed to ramp up coal production at the highly profitable NGM.  ¶¶ 57-58.  In doing so, the Complaint alleges, Defendants focused on profitability at the expense of the Company's commitment to safety and allegedly misled investors about the efforts Peabody employed to protect against significant mining-related safety risks.  ¶¶ 7-8.  Throughout 2017 and 2018, Peabody detected elevated levels of methane gas at the NGM's 9N long face and/or tailgate roadway.  ¶ 93.  In late August 2018, the month before the September 2018 fire, higher methane and ethylene detections at the site led to evacuations of the mine.  ¶¶ 102-107.  After the final evacuation on September 1, 2018, Peabody attempted to contain the threat from elevated gas levels.  Yet, as detailed in confidential witness accounts, conditions at the mine worsened at the NGM throughout September 2018.

23.    As alleged in the Complaint, the truth about the Company's failure to implement adequate safety measures at the mine was revealed when, on September 28, 2018, the Company issued a press release reporting that a fire was occurring in the mine and that the Company did not expect any further production at the NGM for the remainder of 4Q 2018.  ¶¶ 279-83.  Then the Company made a series of subsequent alleged disclosures: (i) on February 6, 2019, revealing that remediation efforts and costs at the mine after the fire negatively affected Peabody's earnings and that production would not resume until early 2020 (¶¶ 303-306); (ii) on May 1, 2019, revealing there would be further delays in reopening the NGM and that, if these delays persisted, the Company would have to reassess its reventilation and re-entry plans, as well as its production targets for the mine (¶¶ 315-17); and (iii) on October 29, 2019, revealing that the Queensland Mine Inspectorate's strict restriction on restarting operations at the NGM would result in a further three year delay before any meaningful coal production could resume at the mine (¶¶ 342-48).

### C.    Defendants' Motion to Dismiss the Complaint

24.    On June 7, 2021, Defendants moved to dismiss the Complaint.  ECF Nos. 41 and 42, 47, 48.[4]  Defendants' memorandum cited dozens of cases and raised numerous legal issues aimed at undermining Lead Plaintiff's claims and allegations.  Defendants argued that the Complaint should be dismissed because Lead Plaintiff failed to state a claim under Section 10(b) and Rule 10b-5 by failing to plead scienter or any actionable misstatements.

---

[4] Prior to Defendants filing their motion to dismiss, the Parties submitted pre-motion letters to the Court regarding the motion to dismiss.  Defendants filed their pre-motion letter on April 30, 2021 (ECF No. 39), in response to which Lead Plaintiff filed an opposition pre-motion letter on May 6, 2021 (ECF No. 40).

25.     Concerning scienter, Defendants argued that, among other things, the Complaint failed to plead facts supporting a cogent and compelling inference of scienter and instead offered "boilerplate" allegations, statements from "low-level" confidential witness "untethered" to the Defendants, and no motive for defendants Kellow or Schwetz to lie.  Additionally, Defendants argued that the Complaint contained insufficient allegations that Defendants acted with severe "recklessness" where they "should have" or "likely" received, or "had access to" information "reflecting the true facts regarding Peabody."  Such allegations, Defendants argued, failed to plead specific facts showing that each Defendant "knew facts or had access to non-public information contracting their public statements" and "understood that their public statements were inaccurate, or were highly unreasonable in failing to appreciate that possibility."

26.     Regarding the inactionability of the alleged misstatements, Defendants argued that: (i) general statements about Peabody's commitment to safety prior to September 28, 2018 were inactionable as time-barred and immaterial puffery; (ii) statements about the state of the NGM in September 2018 following the evacuation were not false when made due to the fluctuating circumstances at the mine during that time; and (iii) statements about resumption of coal mining operations from late September 2018 to October 2019 were inactionable because they were true when made, protected forward-looking statements, or opinions.

27.     Defendants also argued that because Lead Plaintiff failed to plead a claim pursuant to Section 10(b), its control person claim pursuant to Section 20(a) also failed.

28.     On July 22, 2021, Lead Plaintiff filed its opposition to Defendants' motion to dismiss (ECF No. 45), along with a letter motion requesting oral argument (ECF No. 46).  With respect to Defendants' arguments regarding Lead Plaintiff's purported failure to plead actionable

misstatements, Lead Plaintiff responded that the Defendants' pre-fire statements were neither time-barred nor puffery. Lead Plaintiff contended that Defendants' statements prior to September 28, 2018 regarding the status of the NGM were actionable because the alleged misstatements included concrete misrepresentations of existing fact, including that Peabody's safety statements were determinate, verifiable statements, since Defendants claimed they "surpass[ed] industry averages."

29.    As to the Defendants' post-fire statements regarding the resumption of coal production at the NGM, Lead Plaintiff cited to its reliance upon internal Peabody documents and confidential witness statements as evidence the alleged misstatements and omissions were false and misleading when made. Finally, with respect to Defendants' argument that statements prior to September 28, 2018 were time-barred, Lead Plaintiff argued that Defendants misstated the applicable standard governing when the statute of limitations is triggered in a securities case, which is not until a plaintiff discovers – or a reasonably diligent plaintiff would have discovered – the facts.

30.    As to Defendants' scienter arguments, Lead Plaintiff argued that the Complaint contained plentiful allegations that, when considered collectively, gave rise to a strong inference of scienter. Specifically, Lead Plaintiff argued that it adequately pled Defendants' scienter through: (i) confidential witnesses, who placed Defendants in key meetings and in receipt of reports and other materials contradicting their public statements; (ii) that the NGM was core to Peabody's business success; (iii) the frequency of Defendants' statements about the NGM; (iv) the opinion of a highly qualified mining expert; and (v) the NGM's status as a known safety risk. Lead Plaintiff contended that these allegations supported a strong inference that Defendants were aware that the

NGM did not have adequate safety controls and that, given the condition of the mine following the fire, it would be several years until the NGM resumed coal production, if ever. For the same reasons, Lead Plaintiff argued, the Complaint adequately pled that Defendants were reckless in not knowing this information when they made their allegedly false statements.

31.    On August 23, 2021, Defendants filed a reply brief in further support of their motion, responding to Lead Plaintiff's arguments. ECF No. 49.

**D.    The Court's Order on Defendants' Motion to Dismiss the Complaint**

32.    On March 7, 2022, the Court issued a Memorandum and Order granting in part and denying in part Defendants' motion ("MTD Order"). ECF No. 50. The Court did not accept Defendants' argument that statements prior to the September 2018 fire were time-barred. However, the Court granted Defendants' motion to dismiss with respect to the alleged statements and omissions made prior to September 22, 2018, and after September 28, 2018, which accounted for the vast majority of the alleged false statements and omissions in the Complaint. MTD Order, at 45.

33.    The Court denied Defendants' motion to dismiss with respect to Defendants' alleged omissions between September 22, 2018 and September 28, 2018 regarding the existence of a fire at the NGM. MTD Order, at 24. The Court found that the Defendants had a duty to disclose the whole truth about the fire conditions at the mine after black smoke was alleged to have been seen rising from the NGM's main fan shaft on September 22, 2018, meaning there was likely a fire burning somewhere in the Company's most profitable mine. *Id.*

34.    With respect to scienter regarding the September 25, 2018 omissions, the Court noted that Lead Plaintiff's "allegations raise a cogent and compelling inference of scienter against

Peabody, Kellow and Schwetz" "based on conscious misbehavior or recklessness" because, by September 22, 2018, black smoke had been alleged to be seen coming out the main fan shaft at the mine and Peabody had assembled the North Goonyella Task Force to monitor the mine after the September 1, 2018 evacuation. MTD Order, at 43. Yet, the Court pointed out, Defendants permitted two Company statements to be released without any reference to smoke or fire on September 25, 2018. *Id.*

35.     On April 6, 2022, Defendants filed their Answer to the Complaint, denying the Complaint's substantive allegations and raising 22 affirmative defenses. ECF No. 54.

### E.     Lead Plaintiff's Motion for Class Certification

36.     On July 15, 2022, Lead Plaintiff filed a motion for class certification, and appointment of OPERF as Class Representative and Labaton Sucharow as Class Counsel.[5] ECF No. 66.

37.     In the motion, Lead Plaintiff set forth how the proposed class readily satisfied Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. Further, Lead Plaintiff argued that the class satisfied Rule 23(b)(3)'s additional requirement that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute. In support of its motion, Lead Plaintiff submitted a 37-page expert report from economic expert Chad Coffman, C.F.A ("Mr. Coffman") on market efficiency. ECF No. 68-

---

[5] Lead Plaintiff defined the proposed class as: "All persons and entities that purchased or otherwise acquired the publicly traded common stock of Peabody Energy Corporation during the period from September 22, 2018 through September 28, 2018, inclusive (the "Class Period"), and were damaged thereby." ECF Nos. 66, 69.

1. Mr. Coffman also offered the opinion that damages could be calculated using a common class-wide methodology. *Id.*

38.     Prior to Lead Plaintiff filing the motion for class certification, the Parties engaged in class certification discovery, which involved Defendants taking a 30(b)(6) deposition of OPERF through Assistant Attorney General Brian de Haan on July 7, 2022.  Lead Plaintiff had also proposed an additional OPERF representative to sit for a deposition to answer selected topics on Defendants' 30(b)(6) notice, but that deposition did not take place prior to the Parties agreeing to settle the Action.  Similarly, Defendants had noticed a deposition of Lead Plaintiff's investment manager, Dimensional Fund Advisors LP, but did not take the deposition before the Parties reached an agreement in principle to settle the Action.

39.     The Parties agreed to settle before Defendants' deadline to file their opposition to class certification.

## IV.    DISCOVERY

40.     Following the lifting of the PSLRA stay after the Court's decision on the motion to dismiss, discovery moved forward without delay.  On April 8, 2022, the Parties filed a proposed Case Management Plan. ECF No. 55.  That same day, Lead Plaintiff served its first set of requests for production on Defendants.  On May 6, 2022, Defendants served their first set of requests for production on Lead Plaintiff.  On May 9, 2022, Defendants served their responses and objections to Lead Plaintiff's document requests.

41.     On May 13, 2022, following the Initial Pretrial Conference, the Court entered the Scheduling Order for the case (ECF No. 60), which included a July 15, 2022, deadline for the completion of class certification discovery and for Lead Plaintiff to file its opening brief in support

of class certification.  Pursuant to the Scheduling Order, the Parties exchanged initial disclosures on May 27, 2022. On June 6, 2022, Lead Plaintiff served its responses and objection to Defendants' document requests.

42.    Thereafter, the Parties engaged in an extensive meet and confer process with respect to the Parties' respective discovery requests.

43.    On July 13, 2022, Lead Plaintiff substantially completed the production of documents to Defendants, producing approximately 1,179 pages of documents concerning, among other things, its transaction in Peabody securities in and outside of the proposed class period.

44.    Defendants began producing documents in response to Lead Plaintiff's document requests on July 7, 2022.  In all, Defendants' production, which had started just prior to the mediation, comprised 1,109 records (2,329 pages) and included emails to and from the Individual Defendants and other top Peabody executives in the weeks surrounding the proposed class period. The Parties were continuing to conduct discovery when they agreed to settle the Action.

45.    As noted above, Defendants took one deposition of OPERF related to Defendants' opposition to class certification, which Lead Plaintiff defended.  The Parties were in the process of scheduling further depositions related to Defendants' opposition to class certification when they reached an agreement to settle.

## V.    SETTLEMENT NEGOTIATIONS

46.    In June 2022, the Parties engaged David Murphy, a well-respected and highly experienced mediator (the "Mediator"), to assist them in exploring a potential negotiated resolution of the claims in the Action.  On June 13, 2022, the Parties informed the Court in a confidential

letter that they had engaged a private mediator and planned to hold a mediation session at the end of July 2022.

47.    On July 29, 2022, the Parties participated in a full-day mediation session in New York City before the Mediator in an attempt to reach a settlement.  In advance of the mediation, the Parties exchanged lengthy and comprehensive mediation statements, which addressed issues of both liability and damages and discussed the Parties' respective views of the claims, defenses, and alleged damages.  Following a full day of arm's-length negotiations, the Parties reached an agreement in principle to settle the Action on July 29, 2022.  The Parties informed the Court of the agreement in principle on August 4, 2022.

48.    Thereafter, the Parties negotiated the terms of the Stipulation, which was executed on October 7, 2022 and filed with the Court that same day.  ECF No. 74-1.

49.    As provided for in the Stipulation, in exchange for payment of the Settlement Amount, the Action will be dismissed with prejudice and Lead Plaintiff and the Settlement Class will forever release all Released Claims against the Released Defendant Parties.  Released Claims are all claims that were brought or that could have been brought in the Action or any forum arising out of the allegations and the purchase of Peabody publicly traded common stock during the Settlement Class Period (April 3, 2017 through October 28, 2019).  *See* Stipulation at ¶1(y), ¶4.

50.    Also upon the Effective Date of the Settlement, Defendants will forever release all Released Defendants' Claims against the Released Plaintiff Parties.  Released Defendants' Claims are all claims related to the institution, prosecution, or settlement of the claims.  *See* Stipulation at ¶1(y), ¶5.

51.    On October 7, 2022, Lead Plaintiff moved for preliminary approval of the

Settlement. ECF No. 72.

52.     On October 13, 2022, the Court entered the Preliminary Approval Order, authorizing that notice of the Settlement be sent to the Settlement Class and scheduling the Settlement Hearing for February 7, 2023 to consider whether to grant final approval to the Settlement. ECF No. 77.

## VI.    LEAD PLAINTIFF'S COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

53.     Pursuant to the Preliminary Approval Order, the Court appointed Strategic Claims Services ("SCS") as the Claims Administrator and instructed SCS to disseminate copies of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Notice Packet") by mail or email and to publish the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses.

54.     The Notice, attached as Exhibit A to the Declaration of Josephine Bravata Concerning (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Mailing Decl." or "Mailing Declaration") (Exhibit 2 hereto), provides potential Settlement Class Members with information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Settlement Class Members' right to participate in the Settlement; (iv) an explanation of Settlement Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the

Settlement.  The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for payment of expenses in an amount not to exceed $250,000.

55.    As detailed in the Mailing Declaration, SCS mailed or emailed Notice Packets to potential Settlement Class Members, as well as banks, brokerage firms, and other third-party nominees whose clients may be Class Members.  Ex. 2 at ¶¶ 2-9.  In total, to date, SCS has mailed or emailed 33,243 Notice Packets to potential nominees and Settlement Class Members.  *Id.* at ¶ 8.  To disseminate the Notice, SCS obtained the names, addresses, and/or emails of potential Class Members from a data file provided by Peabody's transfer agent, and from banks, brokers and other nominees.  *Id.* at ¶¶ 2-7.

56.    On November 10, 2022, SCS also caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the internet using *PR Newswire*.  *Id.* at ¶ 10 and Exhibit B thereto.

57.    SCS also maintains and posts information regarding the Settlement on a webpage established for the Settlement, www.strategicclaims.net/peabody, to provide Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Notice Packet and the Stipulation.  *Id*. at ¶ 12.  Lead Counsel also posted copies of the Notice and Claim Form on its website.

58.    Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is January 17, 2023.  To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense

Application have been received, and only one request for exclusion has been received. *Id*. at ¶ 13. Should any objections or additional requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due to be filed with the Court on January 31, 2023.

## VII.    RISKS FACED BY LEAD PLAINTIFF IN THE ACTION

59.     As detailed above, the core allegations in this case were that Defendants made materially false and misleading statements and omissions during the class period regarding the Company's commitment to safety at the NGM and the timeline for resumption of coal production at the NGM following the September 2018 fire.   While Lead Plaintiff believes that the claims asserted against Defendants are strong, it recognizes that the Action presented several significant challenges, such as certifying the class, surviving Defendants' anticipated summary judgment motion, and proving the falsity and materiality of the few alleged misstatements and omissions remaining in the case following the MTD Order, as well as proving that Defendants acted with scienter with respect to those misstatements.   Lead Plaintiff also faced considerable risks and obstacles to achieving a greater recovery were the case to continue.   In addition, even if Lead Plaintiff were able to overcome the risks to establishing liability and damages, it faced ongoing risks with respect to maintaining class certification and the potential for appeals.

60.     Lead Plaintiff and Lead Counsel carefully considered these challenges during the months leading up to the Settlement and during the settlement discussions with Defendants.

### A.    Risks Concerning Class Certification

#### 1.    Risks Concerning the Length of the Class Period

61.     When the Parties reached the Settlement, they were in the process of briefing and discovery related to Lead Plaintiff's motion for class certification.   Though Lead Plaintiff remains

confident that the class would have been certified had the case continued, whether the motion would have been granted or not was uncertain.  First, following the Court's order on the motion to dismiss, the parameters of the remaining class period was hotly disputed between the Parties.  But the class period was indisputably shorter than one week.  Defendants argued strenuously that Lead Plaintiff was left with, at most, a three-day class period, while Lead Plaintiff would have continued to argue that the proposed class period was six days, from September 22, 2018, when smoke was alleged to have been seen billowing from the mine, until September 28, 2018, when Defendants announced there would be no further coal production at the NGM in 2018.[6]

62.    Accordingly, Lead Plaintiff faced a substantial risk that the Court would have agreed with Defendants and further reduced the class period, thereby reducing the recoverable damages, or, at worst, would have denied the class certification motion in its entirety regardless of whether the Court adopted Lead Plaintiff's six-day proposal or Defendants' three-day proposal.

### 2.    Risks Concerning Lead Plaintiff's Adequacy

63.    In addition to disputing the length of the remaining class period after the MTD Order, Defendants would likely have continued to argue that Lead Plaintiff's purchase of additional Peabody common stock following the revelation of the fire on September 28, 2018 undermined its adequacy to serve as class representative, further threatening the chances of the motion for class certification's success.  While this argument was a consequence of the MTD Order, which converted the September 28, 2018 partial disclosure to the only remaining disclosure

---

[6] While the Complaint originally pled the September 28, 2018 announcement as a partial disclosure of the alleged fraud, the Court's MTD Order converted it to a full disclosure, as it was the only disclosure that remained in the case.

at issue in the case, there was a small chance that Lead Plaintiff's additional post-class period Peabody stock purchases following this alleged disclosure could have led to denial of its motion for class certification on the basis of a lack of adequacy or typicality.

**B.    Risks Concerning Proving Liability**

**1.    Risks Concerning Falsity**

64.    If the case were to continue, Defendants would likely continue to argue, at summary judgment and beyond, that they did not make any false statements or omissions, instead contending that there was absolutely no fire at NGM earlier than September 27, 2018.  Defendants would have likely argued that internal documents compelled the conclusion that the alleged misstatements and omissions made on September 25, 2018 were not actionably false.  In addition, Defendants would have likely argued that public Mine Record Entries also confirmed that Defendants' statements were not false because there was no evidence of an actual fire before September 27, 2018.

65.    Additionally, Defendants likely would have continued to argue that the Court's MTD Order hinged mainly upon, among other things, a photograph taken by a confidential witness discussed in the Complaint that purportedly showed smoke billowing out of the NGM's main fan shaft on September 22, 2018, a date in dispute by the Parties. At the time of the Settlement, the witness was located in Australia and was not subject to a deposition and document subpoena.

66.    For these reasons, Lead Plaintiff faced a substantial risk that the Court or a jury could have concluded that the remaining actionable misstatements and omissions were not materially false or misleading.

### 2.    Risks Concerning Scienter

67.    Defendants likely would also have continued to argue that they did not act with scienter, which is generally the most difficult element of a securities fraud claim for a plaintiff to prove.  In this case, Defendants had numerous scienter arguments that posed very significant hurdles to proving that they acted with the required intent to commit securities fraud or with severe recklessness.  As an initial matter, Defendants likely would have continued to argue that Lead Plaintiff's scienter allegations on the misstatements and omissions that survived the motion to dismiss were based only on circumstantial evidence, and that Lead Plaintiff's version of events was not based on any "smoking gun" type of evidence.

68.    Defendants also likely would have continued to argue that the evidence would show, at summary judgment and trial, simply that a disclosed risk materialized and that, despite their best around-the-clock remediation efforts, Peabody and its management were unable to prevent the fire that only started on September 28, 2018, and that they were also simply unable to reopen the NGM on the timeline they initially projected based on developments at the mine.

69.    Additionally, Defendants likely would have continued to argue that they honestly believed the opinions they formed based on the ever-changing on-the-ground gas, heat, and other readings at the NGM during September 2018, and that they had no motive to lie.

70.    Defendants also likely would have continued to insist that Lead Plaintiff's longwall mining expert had the benefit of hindsight in his assessment of what should have been done at the NGM, but that that did not change the fact that Defendants were doing the best they could with the information they had in and around the time of the fire at the NGM.

71.    For all these reasons, there was a very significant risk that the Court on summary

judgment, or a jury after trial, could have concluded that Defendants did not act with scienter.

### C.    Risks Related to Loss Causation and Damages

72.    Even assuming that Lead Plaintiff overcame the above risks and successfully had the class certified and established liability for Lead Plaintiff's proposed class period, Defendants had very substantial arguments that there were no recoverable damages or that damages were minimal, given that the Court significantly reduced the length of the class period in its MTD Order.

73.    As background, using the Settlement Class Period of April 3, 2017 through October 28, 2019—the original class period alleged in the Action and the period for which Defendants will be receiving a release in order to provide them with complete peace—Lead Plaintiff's consulting damages expert has estimated maximum aggregate damages of at least approximately $900 million.  However, this "best case" scenario would be impossible to achieve as it does not disaggregate the non-fraud related causes of downward stock movement on the four alleged corrective disclosures in the originally pled class period.

74.    If Lead Plaintiff successfully appealed the Court's dismissal of at least certain of the allegedly false and misleading statements post-fire (September 29, 2018 – October 28, 2019) at the mine — something Lead Plaintiff was seriously contemplating at the time of the Settlement — Lead Plaintiff's expert has estimated that maximum damages attributable Defendants' alleged fraud for the period September 22, 2018 through October 28, 2019, were approximately $158 million before the disaggregation of non-fraud related stock price declines, and approximately $86 million after disaggregation.  (The Settlement represents approximately 5.4% of this estimate of recoverable disaggregated damages.)

75.    Following the Court's MTD Order, damages were limited to a much smaller range as only one of the allegedly corrective disclosures remained in the case and the class period spanned for at most seven days (and less if Defendants' arguments were credited by the Court or a jury).  Using the post motion to dismiss class period of September 22, 2018 through September 28, 2018, and assuming Lead Plaintiff prevailed in proving liability for the few remaining misstatements and omissions, the most likely estimate of aggregate damages recoverable at trial ranged from only $1 million to $13.3 million, based on different trading assumptions.  However, this estimate (i) assumes no inactionable non-fraud related reasons for the price decrease on September 28, 2018; and (ii) is before netting class members' gains on pre-class period purchases.  Lead Plaintiff's expert also estimated damages attributable to Defendants' proffered slightly shorter class period of September 25, 2018 to September 28, 2018 as between approximately $663,000 and $10 million, depending on the trading model and assumptions used.  (The Settlement recovers between approximately 35% and 46% of damages under these more likely scenarios).

76.    Defendants would have likely argued Lead Plaintiff's damages were of course less than what Lead Plaintiff's damages expert estimated, arguing instead that damages are minimal or close to zero.  For example, Defendants would likely have argued that damages for the post motion to dismiss class period should be calculated: (i) only for the period September 25, 2018 through September 27, 2018 (two days); (ii) were much less than Lead Plaintiff's estimates; and (iii) in fact, were between zero and $0.27 per share.  In particular, Defendants would likely have argued that Lead Plaintiff could not prove that the alleged misstatements impacted the price in Peabody common stock on September 28 because Peabody issued a statement describing a "likely fire" on September 27, 2018 and would argue that the disclosure made the truth known to the market.

Defendants would likely point out that following the September 27, 2018 press release, Peabody's stock price declined. Defendants also would likely have argued that Lead Plaintiff's alleged disclosure on September 28, 2018 did not impact Peabody's stock price because, among other things, Peabody's stock price actually went up intra-day on September 28, 2018 before closing down $0.27 per share. In addition, Defendants likely would continue to argue, through their own expert testimony, that Lead Plaintiff's expert significantly underestimated the impact of non-fraud related information released on September 28, 2018.

77.    Even if only some of Defendants' damages arguments were accepted by the Court at summary judgment or by a jury after trial, recoverable damages could be greatly reduced well below Lead Plaintiff's estimates. Under any circumstances, the issues of loss causation and damages would likely come down to a battle of the experts. Accordingly, Lead Plaintiff and Lead Counsel recognized that the Court and the jury would be presented with very different opinions from highly qualified experts. If the Court or the jury found Defendants' expert's testimony to be more credible, Lead Plaintiff and the Settlement Class could recover nothing at all.

## VIII.    THE PLAN OF ALLOCATION

78.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, that is postmarked no later than February 2, 2023. As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Costs, and Taxes and Tax Expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

79.    The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 2–A at 9-14), was designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a damages analysis that would be submitted at trial.  Lead Counsel developed the Plan of Allocation in close consultation with Lead Plaintiff's damages expert and believes that the plan provides a fair and reasonable method for equitably distributing the Net Settlement Fund among Authorized Claimants.

80.    In developing the Plan of Allocation, Lead Plaintiff's consulting damages expert calculated the estimated amount of artificial inflation in the prices of Peabody common stock that allegedly was proximately caused by Defendants' false and misleading statements and omissions. In calculating the estimated artificial inflation, Lead Plaintiff's consulting damages expert considered price changes in Peabody common stock in reaction to public disclosures that allegedly corrected the respective alleged misrepresentations and omissions.

81.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of Peabody common stock during the Settlement Class Period using formulas consistent with the measure of damages under the Exchange Act.  The calculation of Recognized Loss Amounts will depend upon several factors, including when the Authorized Claimant purchased Peabody common stock during the Settlement Class Period and whether and when the stock was sold.

82.    Recognized Loss Amounts for shares of Peabody publicly traded common stock purchased during the period from April 3, 2017 through September 21, 2018 will be multiplied by 0.1 (discounted by 90%). This is to reflect the fact that these claims were dismissed by the Court in connection with the MTD Order.  Thus, any recovery on these claims in the Action would have

occurred only if the Court's Order dismissing these claims was appealed and the ruling was reversed on appeal. Recognized Loss Amounts for shares of Peabody publicly traded common stock purchased during the period from September 28, 2018 (at or after 2:23 p.m. ET) through October 28, 2019 will be multiplied by 0.25 (discounted by 75%). This is to reflect the fact that these claims were also dismissed by the Court. Thus, any recovery on these claims in the Action would have occurred only if the Court's Order dismissing these claims was appealed and reversed. Lead Counsel has determined that the litigation risks associated with the claims during this portion of the Settlement Class Period, while also significant, were somewhat lower, as reflected in the discount rate applied.

83. The total of a Claimant's Recognized Loss Amounts will be their Recognized Claim. The Claims Administrator, SCS, under Lead Counsel's direction, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants.

84. The Claims Administrator, under Lead Counsel's supervision, will calculate Claimants' Recognized Claims using the transactional information provided in their Claim Form. Claims may be submitted to the Claims Administrator through the mail, online using the Claims Administrator's website, or for large investors with hundreds of transactions, through email to SCS's electronic filing team. (Neither the Parties not the Claims Administrator independently have Claimant's transactional information). Lead Plaintiff's losses will be calculated in the same manner.

85.     Once the Claims Administrator has processed all submitted claims, notified Claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will distribute the Net Settlement Fund.  After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund after six months from the date of initial distribution, Lead Counsel will, if cost effective, re-distribute the balance among eligible Claimants who have cashed their checks.  These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute.  Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not cost effective to reallocate, after payment of any outstanding Notice and Administration Expenses, Settlement Fund Taxes, and attorneys' fees and expenses, if any, shall be contributed to a non-sectarian, not-for-profit charitable organization certified as tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1986 and serving the public interest, designated by Lead Plaintiff and approved by the Court.

86.     To date, there have been no objections to the Plan of Allocation.

87.     In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiff's consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.    Consideration of Relevant Factors Justifies an Award of a 25% Fee

88.     Consistent with the Notice to the Settlement Class, Lead Counsel seeks a fee award of 25% of the Settlement Amount, plus accrued interest. Lead Counsel also requests payment of

expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $199,505.48, plus a request of $9,197.60 to Lead Plaintiff to reimburse it for the time it dedicated to the Action, consistent with the PSLRA. Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### 1.    Lead Plaintiff Supports the Fee and Expense Application

89.    Lead Plaintiff OPERF has evaluated and fully supports the fee and expense application. Ex. 1 at ¶ 5. In coming to this conclusion, Lead Plaintiff—a sophisticated investor that was involved throughout the prosecution of the Action and negotiation of the Settlement— considered the recovery obtained as well as Lead Counsel's substantial efforts to prosecute the claims on behalf of the class. Lead Plaintiff took its role as a representative plaintiff seriously in order to ensure an able and vigorous prosecution of the claims. *Id.*

### 2.    The Time and Labor of Lead Counsel

90.    The many tasks undertaken by Lead Counsel in this case are detailed above. The investigation, prosecution, and settlement of the claims asserted in the Action required extensive efforts on the part of Lead Counsel, given the complexity of the legal and factual issues raised by Lead Plaintiff's claims and the vigorous defense mounted by Defendants. The Action was prosecuted for approximately two years. Among other efforts, Lead Counsel conducted a comprehensive investigation into the class's claims; researched and prepared a detailed Complaint; briefed a thorough opposition to Defendants' motion to dismiss; moved for class certification; engaged in vigorous discovery efforts, including numerous meet and confer sessions with Defendants regarding the scope of discovery, the review of 1,109 documents produced by

Defendants, and consultation with experts in the fields of economics and longwall mining; defended Lead Plaintiff's deposition; and engaged in a hard-fought settlement process with experienced defense counsel.

91.    At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial.  Lead Counsel carefully and efficiently staffed the Action from the beginning, and litigated the case with just one main partner, Christine Fox.  Other partners were involved, but only at particular stages of the case, such as lead plaintiff appointment or settlement, consistent with their areas of expertise

92.    Attached hereto is Labaton Sucharow's time and expense declaration, which is submitted in support of the request for an award of attorneys' fees and payment of litigation expenses.  *See* Declaration of Christine M. Fox on Behalf of Labaton Sucharow LLP, Ex. 3. The declaration reports the amount of time spent by the attorneys and professional support staff of Labaton and the associated "lodestar" calculation, *i.e.*, hours multiplied by the firm's current hourly rates. The lodestar report was prepared from daily time records regularly prepared and maintained by the firm, which are available at the request of the Court.  Also included with this declaration is a breakdown of the firm's litigation expenses by category (the "Fee and Expense Schedules").

93.    The hourly rates of Lead Counsel here range from $875 to $1,300 for partners, $625 to $850 for of counsels, $450 to $575 for associates, and $400 for a staff attorney.  *See* Ex. 3-A. It is respectfully submitted that the hourly rates of the attorneys and paralegals included in the time schedule are reasonable and customary within the commercial litigation bar.  Exhibit 4, attached

hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2021. The analysis shows that across all types of attorneys, Lead Counsel's rates are consistent with, or lower than, the firms surveyed.

94.    Lead Counsel expended 2,931.9 hours prosecuting and settling the Action. *See* Ex. 3-A. The resulting lodestar is $1,991,873.00. *Id.* The requested fee of 25% of the Settlement Amount results in a negative "multiplier" of 0.58 on the lodestar, meaning that counsel is seeking 58% of the value of its time.

### 3.    The Complexity and Duration of the Litigation

95.    This Action presented substantial challenges from the outset of the case, which were skillfully navigated by Lead Counsel. The specific risks Lead Plaintiff faced in proving Defendants' liability and damages are detailed in Section VII above. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis.

### 4.    The Skill and Efficiency of Lead Counsel

96.    Lead Counsel is a highly experienced and skilled securities litigation law firm. The expertise and experience of its attorneys are described in Exhibit 3-C annexed hereto. Since the passage of the PSLRA, Labaton has been approved by courts to serve as lead counsel in numerous securities class actions throughout the United States. For example, Labaton Sucharow has served as lead counsel in a number of high profile matters: *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers

Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 3-C.

### 5.    Standing and Caliber of Defendants' Counsel

97.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented Cravath Swaine & Moore LLP, a prestigious and experienced defense firm, which vigorously represent its clients.  In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

### 6.    The Risk of Nonpayment

98.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average time of several years for these cases to conclude (and

this case has been no different), the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Lead Counsel received no compensation during the course of the Action but has incurred 2,931 hours of time for a total lodestar of $1,991,873.00 and has incurred $199,505.48 in expenses in prosecuting the Action for the benefit of the Settlement Class.

99.    Lead Counsel also bore the risk that no recovery would be achieved.  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

100.    Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

101.    Federal Circuit court cases include countless opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith*

*& Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

102.    Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), or substantially lost as to the main case, such as *In re Clarent Corp. Sec. Litig.*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

103.    Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).   And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the

Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

104.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.  Lead Plaintiff's success was by no means assured. Defendants disputed whether Lead Plaintiff could establish scienter and whether the alleged misstatements were actionable, and would no doubt contend, as the case proceeded to summary judgment and trial, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged.  Were this Settlement not achieved, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery.  Lead Counsel respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### 7.    The Favorable Settlement Achieved

105.    As discussed above, the $4,625,000 Settlement is a favorable result when considered in view of the substantial risks and obstacles to recovery and the damages issues in the case, if the Action were to continue through a decision on class certification and summary judgment to trial, and through likely post-trial motions and appeals.

106.    The recovery was the result of thorough and efficient prosecutorial and investigative efforts, complicated motion practice, and vigorous settlement negotiations.  As a result of the Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses, and it avoids the very substantial risk of no recovery in the absence of a settlement.

### B.       Request for Litigation Expenses

107.    Lead Counsel seeks payment from the Settlement Fund of $199,505.48 in Litigation Expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing and prosecuting the claims against Defendants.

108.    From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel was motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

109.    As set forth in the Fee and Expense Schedules, Lead Counsel's litigation expenses total $199,505.48  *See* Ex. 3-B.  Lead Counsel's declaration identifies the specific category of expense—*e.g*., expert and consultant fees, electronic discovery costs, mediation fees, travel costs, online/computer research, and duplicating.  *Id.*  As attested to, these expenses are reflected on the books and records maintained by Lead Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.  *Id.*

110.    Of the total amount of expenses, $142,587.50 or approximately 71% of the total, was expended on experts, primarily in the fields of market efficiency, damages, and loss causation, as well as longwall mining.  These experts were critical to developing Lead Plaintiff's claims.  For instance, Lead Counsel's economic expert prepared an expert report in connection with the class certification motion, assisted Lead Counsel during the mediation and settlement negotiations with Defendants, and assisted Lead Counsel with the development of the proposed Plan of Allocation.

111.    Another significant category of expenses was for document management litigation support, which totals $13,609.03, or approximately 7% of the total amount of expenses.

112.    The costs of electronic factual and legal research total $12,264.25 or approximately 6% of total expenses.  These are the costs of services such as LEXIS/Nexis, Westlaw, and Pacer. It is standard practice for attorneys to use LEXIS/Nexis and Westlaw to assist them in researching legal and factual issues.

113.    Lead Plaintiff's share of the costs of mediation totaled $20,000, or approximately 10% of the total expenses.

114.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and regularly charged to clients.  These expenses include, among others, work-related travel costs, filing fees, service fees, duplicating costs, long distance telephone costs, and express delivery expenses.

115.    All of the Litigation Expenses, which total $199,505.48, were necessary to the successful prosecution and resolution of the claims against Defendants.

## X.    REIMBURSEMENT OF LEAD PLAINTIFF'S EXPENSES IS FAIR AND REASONABLE

116.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Lead Plaintiff OPERF seeks reimbursement of its reasonable costs and expenses (including lost wages) incurred in connection with its work representing the Settlement Class in the amount of $9,197.60.  The amount of time and effort devoted to the Action by OPERF is detailed in the accompanying Declaration of Brian de Haan, Senior Assistant Attorney General at the Oregon Department of Justice, submitted on behalf of OPERF, attached hereto as Exhibit 1.  Lead Counsel respectfully submits that the amount requested by Lead Plaintiff is consistent with Congress's intent, as

expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

117.    As discussed in Lead Plaintiff's supporting declaration, Lead Plaintiff has been committed to pursuing the Settlement Class's claims since it became involved in the litigation. Lead Plaintiff has actively and effectively fulfilled its obligations as representative of the Settlement Class, complying with all of the demands placed upon it during the litigation and settlement of the Action, and providing valuable assistance to Lead Counsel. For instance, Lead Plaintiff reviewed significant filings with the Court, communicated with counsel regarding litigation developments, responded to discovery requests, searched for and produced documents to Defendants, prepared for and appeared at one of two scheduled depositions, liaised with its investment adviser Dimensional Fund Advisors regarding the receipt of a document subpoena from Defendants, discussed the potential for settlement with counsel, and received updates from counsel during the mediation session on July 29, 2022.

118.    The efforts expended by Lead Plaintiff, through the Oregon Department of Justice, during the course of the Action are precisely the types of activities courts have found to support reimbursement to representative plaintiffs, and they support Lead Plaintiff's request for reimbursement here.

## XI.    THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

119.    As mentioned above, consistent with the Preliminary Approval Order, to date a total of 33,243 Notices have been mailed or emailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 25% of the Settlement Fund and payment of expenses in an amount not greater than $250,000. *See* Ex. 2 -A

at ¶¶ 4 and 37.  Additionally, the Summary Notice was published in *The Wall Street Journal* and disseminated over *PRNewswire*.  *Id.* at ¶ 10.  The Notice and the Stipulation have also been available on the settlement website maintained by the Claims Administrator.  *Id.* at ¶ 12.[7]  While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received.  Lead Counsel will respond to any objections received in its reply papers, which are due on January 31, 2023.

## XII.    MISCELLANEOUS EXHIBITS

120.    Attached hereto as Exhibit 5 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

121.    Attached hereto as Exhibit 6 is a true and correct copy of Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA 2022).

## XIII.   CONCLUSION

122.    In view of the favorable recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the favorable recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel

---

[7] Lead Plaintiff's motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

respectfully submits that a fee in the amount of 25% of the Settlement Amount, plus accrued interest, be awarded and that litigation expenses, including an award to Lead Plaintiff, be paid in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 3rd day of January, 2023.

_____
CHRISTINE M. FOX